**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **In re NATIONAL CITY CORPORATION SECURITIES, DERIVATIVE & ERISA LITIGATION** _____ **This document relates to the Securities Case** | Master File No: 08 CV 7000 Judge Patricia A. Gaughan **CLASS ACTION** **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

NATURE OF THE ACTION AND OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.      THE CONSTRUCTION LOANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.     Summary and Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.     Background – What is a Construction Loan? . . . . . . . . . . . . . . . . . . . . . . 17

      C.     Defendants Misrepresented the Nature/Quality of the Construction Loans . . . . 17

            1.     Misrepresentations Through September 5, 2007 . . . . . . . . . . . . . . . . . . . 18
            2.     Falsity: The Construction Loans' "Bad Product Design"
                  is Partially Disclosed, but Still Misrepresented, on September 6, 2007 . 20
            3.     Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
            4.     Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      D.     Though Disclosing the "Bad Product Design" in September 2007,
            Defendants Misrepresented and Minimized its Scope, Severity and Financial
            Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

            1.     September 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
                  a.     Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
                  b.     Falsity/Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
            2.     October 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
                  a.     Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
                  b.     Falsity/Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
            3.     Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            4.     Defendants Only Later Admit that the Consequences of the
                 "Bad Product Design" of the Construction Loans Are Spread
                 Throughout the Entire Construction Loan Portfolio and Include
                 Extreme Loss Severity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      E.     Defendants Materially Misrepresented the Performance of the Construction
            Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

            1.     Background – Nonperforming Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
            2.     Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
            3.     Falsity / Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
            4.     Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
            5.     Further Material Misrepresentations Resulting From
                 Defendants' Misrepresentation of Nonperforming Loans . . . . . . . . . . . 39

                  a.     Reserve-to-Nonperforming Loan Ratios . . . . . . . . . . . . . . . . . 40
                  b.     Loan Charge-Offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
                  c.     Loan Loss Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
                  d.     Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

i

F.     Defendants Materially Understated and Misrepresented the Loan Loss Reserves for the Construction Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

      1.    Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      2.    Falsity / Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

G.     Defendants Omitted to Disclose Construction Loan Portfolio Line-Item Disclosures at all Times Until February 2008 . . . . . . . . . . . . . . . . . . . . . . . . . 47

II.     THE FIRST FRANKLIN LOANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.     Summary and Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

B.     Defendants Materially Misrepresented the Performance of the First Franklin Loans by Falsely Classifying Hundreds of Millions of Dollars of First Franklin Loans as "Performing" When, Under Stated Company Policy and Objective Fact, Such Loans Were in Fact "Nonperforming" . . . . . . . . . . . . . . . . . . . . . . 59

      1.    Defendants' Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
      2.    Falsity and Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      3.    The Result: Loan Portfolio Performance Appeared Materially Better Than It In Fact Was, and Loan Portfolio Liabilities Appeared Materially Less Dire Than They In Fact Were . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

C.     Defendants Materially Understated and Misrepresented the Loan Loss Reserves for the First Franklin Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

      1.    Defendants' Material Overstatement of Reserve-to-Nonperforming Loan Ratios Made Reserves Appear More Adequate Than They In Fact Were . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

            a.    Misrepresentations Concerning Reserve-to-Nonperforming Loan Ratios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
            b.    Falsity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

      2.    Defendants Misrepresented that They Maintained Loss Reserves (1) in Amounts Adequate to Absorb Current Loan Portfolio Risks Under Current Economic Conditions, and (2) *Prospectively*, To Take Into Account Expected Future Loan Performance . . . . . . . . . . . . . 65

            a.    Misrepresentations: Current Risks and Current Economic Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
            b.    Misrepresentations: Reserves Established on A Prospective Basis to Take Into Account Expectations of Loan Performance "Going Forward" . . . . . . . . . . . . . . . . . . . . . . . . . . 73
            c.    Falsity: By Basing 2007 Loss Reserves on Loan Charge-Off Levels, Defendants Turned a Blind Eye (1) to the Current Risks and Current Economic Conditions They Represented They Were Reserving For, and (2) to Prospective Loan Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

           i.     Defendants Admit in January 2008 That, During 2007, They Failed to Reserve For Current, Known Risks and Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

           ii.    Falsity is Further Evidenced by Defendants' Massive Loan Loss Reserve Increases After the Class Period, Which Did Not Arise From Any "New" Risks or Conditions, But Rather Were Necessitated By Defendants' Prior Failure to Reserve For Current, Known Risks and Conditions . . . . . . . . . . . . . . . . . . . . 79

    3.      Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

  D.     Defendants Further Misled as to First Franklin Loan Performance and Reserve Adequacy by Characterizing Insurance Disputes as the Primary Driver of Loss Reserve Increases for the First Franklin Loans . . . . . . . 93

    1.      Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
    2.      Falsity and Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

  E.     Defendants Further Misled as to First Franklin Loan Quality and Risks by Failing to Disclose That $1.6 Billion of the First Franklin Loan Portfolio was Effectively Sub-Subprime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    1.      Misrepresentations Prior to and During the Class Period . . . . . . . . . . 102
    2.      Falsity and Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

III.   THE NATIONAL HOME EQUITY LOANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

  A.     Summary/Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

  B.     Background – National City's Various Home Equity Lending Operations and Portfolios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

  C.     False and Misleading Statements Overview . . . . . . . . . . . . . . . . . . . . . . . . . . 110

  D.     Defendants Misrepresented the Nature, Quality, Characteristics and Risks of the NHE New Production Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

    1.      Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
    2.      Falsity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
    3.      Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
    4.      Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

  E.     Defendants Falsely Represented the NHE New Production Loans as Loans "Held for Sale" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

    1.      Background: Portfolio Loans versus Loans "Held for Sale" . . . . . . . . 121
    2.      Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
    3.      Falsity and Scienter: Defendants Knew The Company Did Not Have the Ability to Sell the Subprime Quality NHE New Production Loans After March 14, 2007, and Had No Choice But to Retain Them on the Company's Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
    4.      Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

iii

F.    Defendants Materially Misrepresented the Financial Impact to National City of the NHE New Production Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

    1.    Misrepresentations:  March 2007 - August 2007 . . . . . . . . . . . . . . . . . . 131
        a.    Defendants Misrepresent the Value/Risks of the NHE New Production Loans by Failing to Take *Any* Fair Value Writedowns on NHE New Production Loans "Held for Sale" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
        b.    Defendants Misrepresent the Value/Risks of the NHE New Production Loans by Failing to Establish *Any* Loan Loss Reserves for the Unsellable NHE New Production Loans "Held for Sale" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
        c.    Falsity/Scienter   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
        d.    Impact  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
    2.    Misrepresentations:  September 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . 136
        a.    Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136
        b.    Falsity/Scienter   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
        c.    Impact  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
    3.    Misrepresentations:  October 2007  . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
        a.    Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
            i.    Loss Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
            ii.    Fair Value and Fair Value Writedowns . . . . . . . . . . . . 146
            iii.   Capital and Dividend . . . . . . . . . . . . . . . . . . . . . . . . . . 147
        b.    Falsity/Scienter   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
        c.    Impact  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

G.    Denouement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

    1.    Precursors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151
    2.    December 17, 2007: The Tip of the NHE New Production Iceberg Revealed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
    3.    January 2, 2008: The Capital Crisis Begins, and the Dividend is Cut . . 153

IV.   THE IMPACT OF THE ABOVE-MENTIONED LOANS ON THE COMPANY'S CAPITALIZATION, LIQUIDITY AND FUNDAMENTAL FINANCIAL CONDITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

A.    Summary and Overview  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

B.    Background: Prior to the Class Period, the Company Rids Itself of "Excess Capital"
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
C.    Class Period Misrepresentations Concerning the Company's Fundamental Financial Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

    1.    April 2007 - November 2007: Defendants Maintain that Loan Losses Will Have No Impact on the Company's Fundamental Financial Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
    2.    December 2007 - January 2008: Defendants Admit that Loan Losses Have a Minor Impact on the Company's Fundamental Financial Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

iv

3.   March 2008: As Defendants Remain Silent, the Market Suspects
     that Loan Losses Are Overwhelming the Company's Fundamental
     Financial Condition and the Threatening the Company's Ability to
     Continue as an Ongoing Concern . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
4.   April 21, 2008: Endgame – the Truth Is Revealed  . . . . . . . . . . . . . . . 185

LOSS CAUSATION / ECONOMIC LOSS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

ADDITIONAL SCIENTER ALLEGATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

A.   A Strong Inference of Scienter is Raised by the Fact that Defendants
     Themselves Originated All the Residential Real Estate Loans at Issue,
     And Were Thus Aware *Ab Initio* of The Loans' Objective Quality  . . . . . . . . . 196

B.   A Strong Inference of Scienter is Raised by the Fact that Defendants
     Were Required to, and in Fact Did, Monitor the Performance of All
     the Residential Real Estate Loans at Issue, And Were Thus Aware
     At All Times of The Loans' Objective Performance . . . . . . . . . . . . . . . . . . . . . 199

C.   A Strong Inference of *Scienter* is Further Supported by National City's
     Pending Acquisition of MAF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

D.   A Strong Inference of *Scienter* is Further Supported by Defendants'
     Admissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

E.   A Strong Inference of *Scienter* is Further Supported by Accounts Provided
     by Former Employees of National City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

FALSE FINANCIAL STATEMENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

CLASS ACTION ALLEGATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

FIRST CLAIM
Violation of Section 10(b) of The Exchange Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

SECOND CLAIM
Violation of Section 20(a) of The Exchange Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

THIRD CLAIM
For Violation of Section 11 of the Securities Act of 1933  . . . . . . . . . . . . . . . . . . . . . 227

FOURTH CLAIM
For Violation of Section 15 of the Securities Act of 1933  . . . . . . . . . . . . . . . . . . . . . 241

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

v

Court-appointed Lead Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund ("Lead Plaintiff") makes the following allegations, except as to allegations specifically pertaining to plaintiffs and plaintiffs' counsel, based upon the investigation undertaken by Lead Counsel, which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about National City Corporation ("National City" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a securities class action lawsuit brought on behalf of (1) a class consisting of all persons who purchased or otherwise acquired the common stock of National City Corporation ("National City" or the "Company") during the period April 30, 2007 through April 21, 2008, inclusive (the "Class Period"), and (2) a subclass of all persons who acquired National City common stock issued pursuant to a National City registration statement filed with the SEC in connection with National City's acquisition of MAF Bancorp, Inc. on or about September 1, 2007 (the "MAF Subclass"), to recover damages caused by defendants' violations of the federal securities laws.  Excluded from the class and the MAF Subclass are the defendants, members of their immediate families, National City and any officer or director of National City.

2.      National City Corporation, headquartered in Cleveland, Ohio, is one of the nation's largest financial holding companies, operating through an banking network primarily in Ohio, Florida, Illinois, Indiana, Kentucky, Michigan, Missouri and Pennsylvania, and also serving customers in selected markets nationally. Its core businesses include commercial and retail banking, mortgage financing and servicing, consumer finance and asset management.

3.      Throughout the class period, National City held as income-generating assets

1

approximately $100-$120 billion of loans, including approximately: (1) $35 billion of commercial loans (i.e., loans to businesses), (2) $24 billion of commercial real estate loans, (3) $8.5 billion of consumer loans, and (4) $48 billion of residential real estate loans (including $18 billion of home equity lines of credit).

4.     Plaintiffs' complaint focuses on the last of these four categories, National City's residential real estate loans, and, more specifically, on three distinct groups of residential real estate loans referred to herein as the Construction Loans, the NHE New Production Loans, and the First Franklin loans.  The Construction Loans were originated by the Company's National City Mortgage unit to finance residential construction (including land acquisition costs):  during the class period, National City held approximately $3 billion of such loans.  The NHE New Production Loans were home equity loans and lines of credit originated by the Company's National Home Equity unit: during the class period, National City held approximately $6 billion of such loans.  The  First Franklin loans were subprime first- and second-lien mortgages originated by the Company's former subprime lending subsidiary, First Franklin:  during the class period, National City held approximately $8 billion of such loans.

5.     Plaintiffs allege that defendants made material misrepresentations concerning the Construction Loans (as detailed in Section I, *infra*),  the First Franklin loans (Section II, *infra*), the NHE New Production Loans (Section III, *infra*), and Company's fundamental financial condition given its holdings of these loans (Section IV, *infra*).  Essentially, with respect to each of the above-mentioned groups of loans, plaintiffs allege that defendants misrepresented (1) the basic nature and quality of the loans, (2) the performance of the loans, and (3) the credit risk to the Company of those loans, including the loan loss reserves maintained by defendants in amounts purportedly adequate to absorb those credit risks.

6.     **Loan Nature/Quality.**  Put bluntly, the Company had approximately $10 billion more of subprime loans than defendants represented.  That the First Franklin loans were subprime was publicly known: that the Construction Loans and NHE New Productions Loans were

2

*also* effectively subprime was not.  Defendants publicly represented the Construction Loans and the NHE New Production Loans, respectively, as prime and "prime quality" loans. In truth, both had been originated by defendants with the worst hallmarks of subprime,  under subprime standards that even the Company's former subprime subsidiary First Franklin refused to countenance (such as borrower income merely "stated" by the borrower rather than objectively documented by the lender). As a result of their (undisclosed) subprime origination standards, they bore (undisclosed) subprime-level risks of default and, upon default, extreme loss.[1]

7.      Defendants so admitted: with respect to loan standards, nature and quality, between September 2007 and April 2008; with respect to consequent loan losses, between December 2007 and April 2008.  Indeed, as defendants only revealed in April 2008, *losses from the Construction Loans and the NHE New Production Loans were far worse than the Company's First Franklin loan losses – i.e., the only loans acknowledged by defendants as subprime – on both an aggregate and a dollar-for-dollar basis.*  Whereas First Franklin subprime losses are expected to be $750 million, Construction Loan and NHE New Production Loan losses are three times greater and on the order of $2.5 billion.

8.      The subprime quality and credit characteristics of the Construction Loans and the NHE New Production Loans were not in any way "late breaking"news to defendants. Defendants were aware at the point of loan inception of the loans' objective bases and characteristics.

9.      **The Construction Loans**.  With respect to the Construction Loans, as detailed in Section I, *infra*, defendants later admitted that they had realized no later than "late 2006" that the subprime origination standards of the Construction Loans constituted a serious "product deficiency" that had exposed those loans to high likelihood of default and extreme loss severity upon default.  Defendants omitted to disclose this self-acknowledged "bad product design" until

---

[1]      Lenders typically dis-aggregate loan loss risks into two distinct factors: (1) the risk of a loan defaulting; and (2) upon default, the amount of money actually lost ("loss severity").

3

September 2007, but even then misrepresented the true problem by claiming that default risks were limited to a small sub-subset of the Construction Loan portfolio and by omitting to disclose how sharp loss severity upon default would be. In January 2008, defendants admitted that the entire Construction Loan portfolio was at elevated risk of default, and that loss severity could be approximately 50%. In April 2008, defendants admitted that loss severity was in fact between 50% and 95%, that they expected the remaining Construction Loan portfolio of $2.7 billion to result in loan losses of $600 million, and that such losses were expected to be *imminent*.

10. **The NHE New Production Loans**. As detailed in Section III, defendants misrepresented: (1) that in excess of $6 billion of the Company's NHE New Production Loans were "prime quality" when in fact, as defendants only later admitted, they were subprime quality; (2) that those $6 billion of subprime quality NHE New Production loans were ostensibly being "held for sale" when, in fact, they were unsellable (as defendants later admitted but had long known); and (3) the true credit risk to the Company of those loans given defendants' knowledge that (a) the loans were of subprime quality and (b) the Company had no choice but to retain them (i.e., they were unsellable).

11. Prior to and during the class period, National City originated billions of dollars of NHE New Production Loans with the intent to sell them to the secondary mortgage market rather than retain them in National City's own loan portfolio. Defendants therefore reported these loans as "held for sale" rather than as portfolio loans. Designating the loans as "held for sale" meant that defendants did not have to establish loan loss reserves for those loans, because the loans would be sold to others who would then bear the loans' credit risks. National City claimed in its SEC filings that loans were only classified as "held for sale" when the Company had "the intent *and ability* to sell" the loans (emphasis added).

12. In truth, however, defendants did *not* have the ability to sell the NHE New Production Loans. Unbeknownst to the class and only later admitted by defendants (as detailed in Section III.D), the NHE New Production Loans were not "prime quality" but subprime quality,

4

underwritten pursuant to standards even worse than the Company's acknowledged subprime loans (as National City's CEO admitted on January 22, 2008).  The secondary mortgage market for subprime loans had effectively collapsed in early 2007: defendants themselves acknowledged in mid-March 2007 that it had become *impossible* to sell subprime loans.

13.    In short, defendants: (1) continued at all times until September 2007 falsely to classify as "held for sale" as much as $6 billion of unsellable, subprime quality NHE New Production Loans, notwithstanding the fact that the defendants knew that those loans could no longer be sold, and (2) failed to establish adequate – indeed, *any* – loss reserves for such subprime quality, unsellable loans.    In September 2007, defendants acknowledged the loans were unsellable, repatriated $4.4 billion of them onto the Company's loan portfolio, but still continued to mislead by (1) continuing to retain further billions classified as "held for sale", (2) continuing to misrepresent the quality of the loans, and (3) representing that the financial impact and credit risks of holding the loans would be de *minimis*.  In January 2008, defendants repatriated further billions of NHE New Production Loans onto the Company's loan portfolio, admitted that the loans' objective characteristics were fundamentally and "visibly" worse than the Company's other loans, and sharply increased loss reserves.  None of these January 2008 disclosures, however, made clear the size of the catastrophe that defendants revealed only in April 2008: the repatriated $6.2 billion of NHE New Production Loans would impose losses on the order of $2 billion.[2]

14.    **Loan Performance**.  Compounding defendants' misrepresentation of loan nature and quality were defendants' misrepresentations of the loans' performance (as detailed in Sections I.E and II.B).  Defendants represented throughout the class period that they declared a loan to be nonperforming after 90 days without payment.  In fact, undisclosed to plaintiffs and the class, defendants were waiting for a loan to go unpaid for *half a year* (180 days) before declaring it to be

---

[2]    Indeed, the degree of losses suffered by the NHE New Production Loans was roughly equivalent to that of the single riskiest subsection of the Company's subprime loans – the First Franklin second-lien  loans – which the NHE New Production Loans closely resembled.  The impact of those losses was much greater, however, because: (1) Company had five times as many NHE New Production Loans ($6.2 billion) as it did First Franklin second-lien loans ($1.3 billion), and (2) the First Franklin loans were openly known to be subprime.

5

nonperforming.  In May 2008, defendants admitted that their "prior period... practice" was not in accord with stated class period policy, returned to stated policy, and revealed at the stroke of a pen an additional two thirds of a billion dollars of nonperforming loans ($688 million).

15.     Defendants' misrepresentations made the Company's residential real estate loans appear to be performing significantly better than they in fact were.  After defendants' May 2008 reversion to policy, an additional $260 million of Construction Loans – 10% of the entire Construction Loan portfolio – was revealed to be nonperforming (raising the nonperforming percentage of the Construction Loan portfolio to an alarming 18.6%).  Reported First Franklin nonperforming loans *quadrupled*.

16.     Conversely stated, defendants' misleading failure to report hundreds of millions of dollars of loans to be nonperforming made the Company's loan liabilities appear less dire than they in fact were. Those nonperforming loans previously rendered invisible by defendants were near-guaranteed to default, and upon default to experience extreme loss severity (First Franklin second-lien loss severity was 100% on any defaulting loan; Construction Loan loss severity was 50%-95%).  In short, the amount of nonperforming loans had a very high dollar-for-dollar translation into imminent loan losses.

17.     **Loss Reserve and Loss Reserve Adequacy**.  Finally, and further compounding the effects of misrepresented loan quality and performance, defendants falsely represented that (1) they maintained the Company's loan loss reserves at levels adequate to absorb probable loan losses given current loan portfolio risks and current economic events/conditions, and (2) they established reserves on a prospective basis to take future loan performance into account. These representations were false.  Unbeknownst to plaintiffs and the class, defendants had been systematically under-reserving for the current, known portfolio risks and the current, known economic conditions that they purported to be reserving for.

18.     On January 22, 2008, defendants admitted that they had been basing their loss reserve provisioning on levels of current loan charge-offs, but had been *failing* to reserve for loans

6

that had yet to reach charge-off thresholds.  Current charge-offs are a *lagging*, rather than a leading, indicator of loan losses.  It takes a long time for a loan to progress to 90 days delinquent, followed some time later by "nonperforming", followed some time later by charge-off.  Here, it took much, much longer given defendants' practice (undisclosed until May 12, 2008) of waiting for half a year without payment to go by before declaring a loan to be nonperforming, only after which time would the loan be charged off.

19.     The effect of (secretly) tying reserves to charge-offs and (secretly) waiting half a year without payment before declaring a loan to be nonperforming and only later charging it off was to produce a (secret) large "time lag" between currently operative conditions and the loss reserves supposedly established to account for them.  To illustrate:  loss reserves established in July 2007 were responding to charge-offs of loans that began to be in trouble in approximately January 2007, rather than to loans showing early signs of trouble in July 2007.  Thus, by basing reserve provisioning levels on (already artificially depressed) charge-off levels, defendants were not in fact reserving for current portfolio risks and current economic conditions, but rather for the risks and conditions operative approximately half a year in the past that had caused the currently-charged-off loan to become delinquent in the first place.

20.     This rendered the Company's reserves materially misleading in amount and nature: there was, unbeknownst to the class, a gulf between what defendants *said* they were reserving for and what defendants actually were reserving for.  A similar gulf opened up between the reserves established and probable portfolio losses so that the former (loss reserves) no longer meaningfully indicated the latter (probable loan losses).

21.     The specifics vividly illustrate the principle. Until late October 2007, the loss reserves maintained by defendants for the Company's *entire* residential real estate loan portfolio ($25-$30 billion, without counting home equity lines of credit ["HELOCs"]) were no more than $286 million (in late October, they were increased to $342 million).  In April 2008, defendants revealed loss expectations on the order of $3.5 billion – ten times defendants' 2007 loan loss

7

reserves.  To put matters in perspective:  the expected First Franklin Loan losses that defendants revealed only in April 2008 – approximately $750 million of losses from a remaining portfolio of $5.34 billion of First Franklin Loans – dwarfed by themselves the entire loss reserves maintained by defendants throughout 2007 for all $25-$30 billion of the Company's residential real estate loans. Even were the *entirety* of the Company's 2007 residential real estate reserves reserved for the First Franklin loans (i.e., approximately 20% of the residential real estate portfolio), leaving no reserves at all for the remaining 80% of residential real estate loans (i.e. $20-$25 billion of other residential real estate loans, including the Construction Loans and half of the NHE New Production Loans, each with their own enormous losses), those reserves were *still* insufficient even for the limited task of absorbing half of the losses generated by the $5.35 billion of First Franklin loans.[3]

22.  The severe disparity between loan loss reserves and loan losses did not arise because of any new developments in 2008 that made loan losses ten times more severe than was apparent in 2007.  On the contrary, as detailed herein, defendants were aware  early in the class period of the very loan risks and economic conditions they later identified as the reasons underlying their massive 2008 loan loss reserve increases for the NHE New Production Loans, Construction Loans and First Franklin loans.  The only new development in 2008 was the mere fact of reserving for the risks which defendants had previously ignored.

23.  **Fundamental Financial Condition**.  Despite the subprime quality of nearly $20 billion of the Company's residential real estate loans, and despite the Company's under-reserving for the known risks of those loans, defendants falsely represented that the Company's fundamental financial condition was sound and that continued payment of the dividend was assured. In truth, the Company's enormous loan losses, and the need to reserve for them, were driving a capitalization and liquidity crisis.  The Company was forced first to halve its dividend and ultimately

---

[3]  Further perspective: As defendants only revealed in April 2008, the losses from a mere subset of the First Franklin Loans – the $1.3 billion of remaining First Franklin loans that were second liens – would generate $450 million in losses. Defendants' 2007 loan loss reserves of $280-$342 million, purportedly established on a prospective basis to take into account expected loan performance, purportedly adequate for the Company's entire $25-$30 billion of residential real estate loans, were in fact inadequate to cover the losses generated by a mere 5% subset of those loans (i.e., the $1.3 billion of First Franklin second liens).

eliminate it, the Company's credit ratings were cut, counterparties began to flee.  In mid-March 2008, effectively admitting the Company's loan losses were beyond the Company's ability to handle, defendants put the Company up for sale and began looking for a deep-pocketed suitor that could provide the necessary capital and liquidity to allow the Company to continue to exist.

24.     The above-referenced misrepresentations had the effect of inflating the trading price of National City shares throughout the class period.  At the start of the class period, the Company's shares traded at nearly $37 per share.  In the wake of a series of piecemeal admissions between September 6, 2007 and January 2008, the stock price declined to below $15 per share, and, after the mid-March 2008 disclosures, to below $10 per share.

25.     The full truth was not disclosed until April 2008, when, *inter alia*, defendants revealed that to salvage the Company's ability to continue as a going concern, they had secured a $7 billion  equity investment to cushion the Company against those its loan losses.  However, that rescue was secured only at a very high price – namely, massive dilution of existing shareholders' equity by issuing to the new equity providers approximately 1.4 billion new Company shares at an effective price of $5 per share.  Existing shareholders, who owned 100% of the Company on April 20, 2008, owned only 33% on April 21, 2008.  That was why, on the news that the Company had secured a life-saving rescue from its crushing loan losses, National City's share price sharply declined, immediately losing 27.6% of its remaining value and falling from $8.33 per share on April 18, 2008 to $6.03 per share on April 21, 2008.

26.     As defendants admitted on April 21, 2008, both the breathtaking size and punishing price of the Company's costly rescue had been driven by the size of the expected loan losses sitting on its books, and specifically the losses from the NHE New Production Loans, Construction Loans and First Franklin loans.  Defendants disclosed publicly and for the first time on April 21, 2008 what they had previously revealed in the form of "nonpublic" disclosures to prospective suitors: expected further losses from the NHE New Production Loans, Construction Loans and First Franklin loans to exceed $3 billion.

## PARTIES

27.      Court-appointed Lead Plaintiff Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as Trustee of the New York State Common Retirement Fund ("Lead Plaintiff") purchased shares of National City common stock during the class period as described in the certification previously filed by it with the Court, including shares of National City common stock that were acquired during the class period pursuant to a registration statement filed with the SEC by National City in connection with National City's acquisition of MAF Bancorp Inc. ("MAF"), and suffered damages from such purchases and acquisitions of National City common stock.

28.      National City is a Delaware corporation with principal executive offices at 1900 East Ninth Street, Cleveland, Ohio 44114-3484. .

29.      Defendant Peter E. Raskind ("Raskind") is  National City's Chief Executive Officer and has been since July 2007, National City's Chairman of the Board and has been since December 2007, National City's President and has been since December 2006, and a National City director since December 2006. Defendant Raskind signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

30.      Defendant David A. Daberko ("Daberko") was National City's Chief Executive Officer from 1995 to July 2007, Chairman of the Board from 1995 to December 2007, and a National City director from 1988 to December 2007.    Defendant Daberko signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

31.      Defendant Jeffrey D. Kelly ("Kelly") is National City's Chief Financial Officer and has been since 2000, National City's Vice Chairman and has been since December 2004, and a National City director since December 2007. Defendant Kelly signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

32.      Defendant Thomas A. Richlovsky ("Richlovsky") is National City's Senior

10

Vice President and Treasurer and has been since 1989.    Defendant Richlovsky signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

33.    Defendant Robert C. Rowe ("Rowe") is, and throughout the class period was, National City's Chief Credit Officer and a National City Senior Vice President.

34.    Defendant James R. Bell, III ("Bell") was National City's Chief Risk Officer from April 2004 to November 2007.

35.    Defendant Jon E. Barfield ("Barfield ") is a National City director and has been since 1998.  Barfield is also a member of National City's Risk and Public Policy Committee and has been since 2006, and a member of the Audit Committee and has been since 2005. Defendant Barfield signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

36.    Defendant James S. Broadhurst ("Broadhurst ") is a National City director and has been since 1996. Broadhurst is also Chairman of National City's Audit Committee and a member of the Risk and Public Policy Committee and has been since 2005.   Defendant Broadhurst signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

37.    Defendant Christopher M. Connor ("Connor") is a National City director and has been since 2002. Connor is also a member of National City's Compensation and Organization Committee and has been since 2005.   Defendant Connor signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

38.    Defendant Bernadine P. Healy ("Healy") is a National City director and has been since 2003. Healy was also a National City director from 1995 to 2001 and from 1989 to 1990. Healy is a member of National City's Compensation and Organization Committee and has been since 2006.   Defendant Healy signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

11

39.     Defendant Michael B. McCallister ("McCallister") is a National City director and has been since December 2006.   Defendant McCallister signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

40.     Defendant Paul A. Ormond ("Ormond") is a National City director and has been since 1999. Ormond is also Chairman of National City's Compensation and Organization Committee and has been since 2005.   Defendant Ormond signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

41.     Defendant Gerald L. Shaheen ("Shaheen") is a National City director and has been since 2001. Shaheen is also a member of National City's Compensation and Organization Committee and has been since 2005.   Defendant Shaheen signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

42.     Defendant Jerry Sue Thornton ("Thornton") is a National City director and has been since 2001. Thornton is also a member of National City's Risk and Public Policy Committee and has been since 2006, and a member of the Audit Committee and has been since 2005.   Defendant Thornton signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

43.     Defendant Morry Weiss ("Weiss") is a National City director and has been since 1993. Weiss is also Chairman of National City's Risk and Public Policy Committee and has been since 2007, and a member of the Risk and Public Policy Committee and Audit Committee and has been since 2005.   Defendant Weiss signed the registration statement for the National City shares issued in connection with National City's acquisition of MAF.

44.     Defendants Barfield, Broadhurst, Connor, Healy, McCallister, Ormond, Shaheen, Thornton and Weiss are referred to herein as the "Director Defendants".

45.     By reason of their positions as officers and/or directors of National City, defendants Raskind, Daberko, Kelly, Richlovsky, Bell and Rowe (collectively, the "Officer Defendants") were at all relevant times controlling persons of National City within the meaning of

12

Section 20(a) of the Exchange Act and/or Section 15 of the Securities Act of 1933.  Because of their executive, managerial, and/or directorial positions with National City, the Officer Defendants had access to adverse, non-public information about the financial condition, operations, and future business prospects of National City as particularized herein and acted to conceal the same.  Any acts attributed to National City were caused and/or influenced by the Officer Defendants by virtue of their domination and control thereof.

## I.      THE CONSTRUCTION LOANS

### A.      Summary and Overview

46.      Prior to and during the class period, the Company, through its National City Mortgage (NCM) division, made over $3 billion in construction loans to finance the construction of residential real estate, which loans resided in the Company's loan portfolio during the class period (the "Construction Loans").   National City's self-described "unique approach" to construction lending had helped National City become, prior to and during the class period, the second-largest provider of residential construction loans in the country.  That same unique approach, defendants admitted at the end of the class period on April 21, 2008, had saddled National City with well over half a billion dollars of imminent Construction Loan losses.  In fact, on a dollar for dollar basis, as defendants revealed at the end of the class period, the Company's Construction Loans would generate *greater losses than the Company's subprime loans.*

47.      As alleged in detail below, with respect to the Construction Loans:

48.      First, defendants misrepresented the true nature and quality of the Construction Loans.  Prior to and during the class period, defendants claimed that the mortgages produced by NCM were prime, conforming mortgages.[4]  In fact, NCM originated (and the Company

---

[4]      *Nonconforming* mortgages fail, in one or multiple ways, to conform to the quality standards required by government-sponsored enterprises (e.g., Fannie Mae, Ginnie Mae, Freddie Mac) for mortgages that they agree to purchase and securitize.  Mortgages that conform to those standards (outlined below) are known as "conforming loans" or "agency-eligible" loans.  Conforming loans are extremely safe, for two basic reasons.  First, because most are purchased by the government-sponsored entities, the securitized bonds backed by such loans enjoy an implicit federal guarantee.  Second, because conforming loans adhere to what amount to "best practice" standards, developed over

was holding in its loan portfolio)  more than $3 billion of Construction Loans, all of which were nonconforming and most of which featured the worst qualities of subprime (namely: origination on the basis of income stated by the borrower rather than verified by the lender, at extremely high LTV[5] ratios effectively exceeding 100%, with no down payment).

49.     In fact, defendants later admitted that they had realized no later than "late 2006" that the subprime origination standards of the Construction Loans constituted  a serious "product deficiency", and that the Construction Loans' "bad product design" had exposed those loans to high likelihood of default and extreme loss severity upon default.

(a)     The problem was straightforward.  The Company offered its Construction Loans on a "no money down" basis, in which: (1) National City first advanced the full amount of the funds necessary to acquire the land (i.e, 100% LTV), and then (2) advanced as necessary the full amount of funds needed to pay for construction of the residence (i.e., again, 100% LTV), (3) all without any equity provided by the borrower.  Sharp real property price declines during 2006 in the Company's key Construction Loan markets (Florida, California, etc.) removed all economic incentive for Construction Loan borrowers to continue with construction, because they would be left owing more on their mortgages than their property would be worth when finished.

(b)     **The First Consequence of the Construction Loans' "Bad Product Design"**

---

decades of mortgage lending,  to minimize the credit risks to lenders.  Such standards include, *inter alia*:  borrower creditworthiness minimums (prime borrowers only); maximum loan-to-value ratios (significant down payment required so that borrower has equity in the property and so that, in case of default, funds from sale after foreclosure will be sufficient to pay back the mortgage in full); maximum debt-to-income ratios (to ensure that the borrower can be reasonably expected to make his or her payments); and, very importantly, documentation standards (rigorous, objective verification of the borrower's income).  Given the standardization and long history of conforming mortgage origination, the performance of such highly-standardized conforming mortgages is well-understood and extremely safe.  So, even as the market for subprime mortgages collapsed in 2007 as buyers fled the market, the market for conforming mortgages continued its normal functioning.

[5]     LTV, or "loan to value", is the acronym for the ratio of the loan amount to the value of the loan's collateral.  Conforming mortgages standards have traditionally required that LTV ratios not exceed 80%, by requiring borrowers to provide a down payment of 20% of the property's value.  Nonconforming and subprime loans, were extended, as discussed herein, at levels approaching or equaling 100% LTV (e.g., "no money down").  Such high LTV loans pose higher credit risk.  First, high LTV increases the risk of default: the less equity a borrower has invested in the property, the more free and likely the borrower is to default.  Second and more importantly, high LTV deepens loss severity: the larger the amount loaned for a given property, the less likely full recovery of that amount will be were the loan to default and the property to be sold at foreclosure.

14

**– Extreme Risk of Default**.  Precisely because of the Construction Loan's 100% LTV, "no money down" structure, Construction Loan borrowers were completely free (and highly likely) to avoid the impending loss that would likely befall them upon construction completion by defaulting on the loan, handing over the land and construction detritus, and walking away with no loss at all.  In short, the Construction Loans were at extreme risks of default.

        (c)      **The Second Consequence of the Construction Loans' "Bad Product Design" – Extreme Loss Severity Upon Default**.  Precisely because of the Construction Loan's 100% LTV, "no money down" structure, the Company would experience severe loss upon default.  To begin with, the land, whose acquisition the Company had financed in full through a 100% LTV loan at or near market-peak prices, would return upon default to National City worth significantly less (given the sharp, intervening property price deflation) than the amount National City had advanced for its purchase.  Making matters far worse was that the amounts National City had advanced for whatever construction had been completed were effectively unrecoverable.  The resulting collateral (e.g., architect and engineering plans, studies, permits; physical materials; partial residence construction, etc.) would be of little value to bidders for the property at foreclosure.  In short, having advanced money to acquire the land and construct the property, the Company was facing significant losses on the land funds and near-total losses on the construction funds.

        50.      Second, defendants admitted to the Construction Loans' "bad product design" in September 2007, but simultaneously (a) misrepresented and minimized the scope of their default risks and (b) omitted to disclose their loss severity risks, thus (c) misrepresenting the financial impact to the Company of Construction Loan losses.

        (a)      As to scope, defendants represented in and after September 2007 that only one $250-$400 million sub-subset of the Construction Loan portfolio (Florida properties being constructed for investment rather than as primary/secondary residences) was affected by the bad product design.  Defendants admitted on January 22, 2008 that loans *throughout* the $3 billion Construction Loan portfolio (i.e., including primary/secondary residence properties) were affected.

15

(b)     As to loss severity:  even prior to the class period defendants had known that extreme loss severity would ensue upon Construction Loan defaults.  Though defendants disclosed in September 2007 that a small subset of the Construction Loans was prone to risk of default, defendants omitted to disclose that loss severity upon default would be extreme.  On January 22, 2008, defendants admitted they were seeing Construction Loan loss severities of 50%.  On April 21, 2008, defendants admitted they would experience loss severities of 50%-95% based on how much construction had been completed prior to default.

51.     Third, defendants materially misrepresented the performance and the prospects of the Construction Loans by failing to report hundreds of millions of dollars of Construction Loans as nonperforming loans, when in fact and under defendants' stated policy, such loans were nonperforming.  Defendants represented throughout the class period that they declared loans to be nonperforming after 90 days without payment.  In fact, undisclosed to plaintiffs and the class, defendants were waiting for loans to go unpaid for *half a year* (180 days) before declaring them nonperforming.  This undisclosed practice made portfolio performance appear to be materially better than it in fact was, losses appear less likely than they in fact were, and reserves appear more adequate than they in fact were.  In May 2008, defendants admitted that their class period practice had been other than represented by stated class period policy, and reverted to previously-stated policy.  The result:  $688 million of residential real estate loans were added to the nonperforming ranks at the stroke of pen, including $260 million of Construction Loans.  As the Construction Loan portfolio then totaled $2.6 billion, this amounted to suddenly designating an additional 10% of the entire portfolio as non-performing.

52.     Fourth, defendants established inadequate reserves for Construction Loan losses  that were materially false and misleading, and misrepresented the Company's method for computing that reserve.  The Company's stated policy concerning loan loss reserves represented that reserves were maintained at levels adequate to absorb current loan portfolio risks under current economic conditions.  Defendants further represented that "the current level of reserves today is

16

driven by our expectations of the performance of the portfolio going forward.  It is not driven by net charge-offs at the time, but it is really a look into the future."  However, as defendants revealed on January 22, 2008, prior class period reserves in fact had been driven by current charge-offs (directly contrary to defendants' representations) and for that reason, as explained more fully herein, turned a blind eye to current risks and conditions (directly contrary to defendants' representations).

53.    To put matters in perspective and clothe these allegations with their quantitative details:  the expected Construction Loan losses that defendants revealed only in April 2008 – approximately $590 million of losses from a remaining portfolio of $2.7 billion of Construction Loans – *dwarfed by themselves the entire loss reserves maintained by defendants throughout 2007 for all $25-$30 billion of the Company's residential real estate loans*.  The loan loss reserve for the Company's $25-$30 billion of residential real estate loans stood at all times through late October 2007 at less than $290 million (less than half of the losses expected from the Construction Loans alone).

**B.    Background – What is a Construction Loan?**

54.    Construction loans are short-term loans (of approximately 12-18 months duration) used to finance home construction (often including land acquisition costs). When construction is completed, the construction loan is typically paid off by the borrower by taking a subsequent traditional mortgage loan on the finished property.  Certain lenders combined these two steps (initial land acquisition and construction loan, subsequent mortgage loan) into one loan package, variously termed "combination" loans, "construction-to-permanent" loans, or "construction-permanent" loans.

55.    The construction loans originated by NCM were  just such "construction-permanent" loans that integrated into a single loan package a land acquisition loan, a construction loan, and a permanent mortgage.  National City would first advance 100% of the amount needed to acquire the land (say, $200,000).  Then, during the construction period (say, 18 months), it would advance further funds as needed to finance construction (say, $300,000).  Finally, after construction

17

was completed, National City would convert the loan into a more traditional long-term mortgage.

### C.    Defendants Misrepresented the Nature/Quality of the Construction Loans

56.    Until September 2007, defendants' SEC filings represented that the mortgages originated by NCM were prime, conforming mortgages extended on conservative, low LTV levels. This was materially false and misleading: NCM was in fact originating more than $3 billion of highly nonconforming, no-money-down, extremely high LTV Construction Loans.

57.    In September 2007, defendants admitted to the Construction Loans' "bad product design", but simultaneously (a) misrepresented and minimized the scope of their default risks and (b) omitted to disclose their loss severity risks, and thus (c) misrepresented the financial impact to the Company of Construction Loan losses.

58.    In fact, as defendants later admitted, defendants had been aware of the Construction Loans' "bad product design" and the costly consequences of such design – high risk of default, extreme loss severity upon default – since "late 2006".

### 1.    Misrepresentations Through September 5, 2007

59.    Prior to and during the class period, defendants (1) consistently described NCM's output not only as prime, but as prime *conforming* mortgages originated under the strictest and safest underwriting guidelines and thus eligible for purchase by the government-sponsored entities (GSEs)[6], (2) consistently distinguished NCM's output from the Company's nonconforming/subprime mortgage operations, and (3) emphasized that NCM's mortgages were originated on conservative, low-LTV terms.

(a)    For example, the first description of NCM in the Company's Form 10-K filed with the SEC on February 6, 2006, in an introductory letter from then chief executive officer and chairman David Daberko, stated "National City Mortgage, our prime mortgage unit...".  The

---

[6]    Conforming mortgages are ones originated in accord with the strict underwriting standards of the GSEs, making such mortgages not only extremely creditworthy but also eligible for purchase by the GSEs.  Producing GSE-eligible mortgages thus effectively guarantees an originating lender the ability to sell such mortgages profitably.

February 6, 2006 Form 10-K later provided a more detailed description of NCM's output –

mortgages "primarily originated in accordance with underwriting standards set forth by the

government-sponsored entities", with low "loan-to-collateral value ratios of 80% or less":

> **National City Mortgage's residential real estate production is
> primarily originated in accordance with underwriting standards
> set forth by the government-sponsored entities (GSEs) of the
> Federal National Mortgage Association (FNMA), the Federal
> Home Loan Mortgage Corporation (Freddie Mac), and the
> Government National Mortgage Association (GNMA). National
> City Mortgage production is sold in the secondary mortgage
> market primarily to the GSEs**, the Federal Home Loan Banks
> (FHLB), and jumbo loan investors. These loans are generally
> collateralized by one-to-four family residential real estate, **have
> loan-to-collateral value ratios of 80% or less, and are made to
> borrowers in good credit standing**...

> \*\*\*\*\*

> National City Mortgage (NCM) **primarily originates conventional
> residential mortgage and home equity loans** ... **These loans are
> typically sold to primary mortgage market aggregators (Fannie
> Mae, Freddie Mac, Ginnie Mae, or the Federal Home Loan
> Banks)** and jumbo loan investors...

> (b)      The February 6, 2006 Form 10-K contrasted NCM and its ostensibly prime,

conforming loans to the Company's First Franklin unit, which ostensibly was responsible for

producing the Company's nonconforming mortgages:

> **Nonconforming mortgage loans are originated by First Franklin
> Financial Corporation (First Franklin), a business unit within
> NCF**, principally through wholesale channels, including a national
> network of brokers and mortgage bankers... **Nonconforming
> mortgages are generally not readily saleable to primary mortgage
> market aggregators due to the credit characteristics of the
> borrower, the underlying documentation, the loan-to-value ratio,
> or the size of the loan, among other factors**...

> (c)      Similarly, the Company's Form 10-Q filed with the SEC on August 8, 2006

represented NCM's output to be prime, conforming loans:

> **Mortgage loans originated by NCM generally represent loans
> collateralized by one-to-four-family residential real estate and
> are made to borrowers in good credit standing. These loans are
> typically sold to primary mortgage market aggregators (Fannie**

19

Mae, Freddie Mac, Ginnie Mae, or the Federal Home Loan Banks)
and jumbo loan investors...

(d)       Likewise, in a September 5, 2006 press release announcing that the Company

had decided to sell off its First Franklin unit – the unit responsible for generating the Company's

nonconforming loans – defendants directly contrasted First Franklin to NCM, stating "National City

Mortgage, our prime mortgage subsidiary...".

(e)       The Company's Form 10-K for 2006, filed with the SEC on February 8, 2007

continued to represent NCM's output as prime, conforming mortgages (i.e., the only mortgages

purchased by GSEs), made on conservative standards including "loan-to-collateral-value ratios of

80% or less":

> **National City Mortgage's residential real estate production is
> primarily originated in accordance with underwriting standards
> set forth by the government-sponsored entities** (GSEs) of the
> Federal National Mortgage Association (FNMA), the Federal Home
> Loan Mortgage Corporation (Freddie Mac), and the Government
> National Mortgage Association (GNMA). National City Mortgage
> production is sold in the secondary mortgage market primarily to the
> GSEs, the Federal Home Loan Banks (FHLB), and jumbo loan
> investors. **These loans are generally collateralized by
> one-to-four-family residential real estate, have loan-to-collateral
> value ratios of 80% or less, and are made to borrowers in good
> credit standing**.

(f)       The Company's Form 10-Q for the first quarter of 2007, filed with the SEC

on May 9, 2007, and the Company's Form 10-Q for the second quarter of 2007, filed with the SEC

on August 8, 2007, continued to represent NCM's output as prime, conforming mortgages (i.e., the

only mortgages purchased by the GSEs such as Fannie Mae):

> **National City Mortgage (NCM) primarily originates conventional
> residential mortgage** and home equity loans both within National
> City's banking footprint and nationally... **These loans are typically
> sold to primary mortgage market aggregators (Fannie Mae,
> Freddie Mac, Ginnie Mae, or the Federal Home Loan Banks)** and
> jumbo loan investors.

**2.       Falsity: The Construction Loans' "Bad Product Design" is Partially
         Disclosed, but Still Misrepresented, on September 6, 2007**

20

60.     The above-detailed misrepresentations were materially false and misleading. In fact, NCM originated more than $3 billion of Construction Loans, *all of which were nonconforming and many of which featured the worst qualities of subprime*. National City's Construction Loans were (1) often originated on the basis of borrower income merely "stated" by the borrower rather than documented and verified by the lender; with (2) no down payment required from the borrower, at (3) extremely high loan-to-collateral to value ratios of as much as and even higher than 95%.

61.     Defendants admitted the "no money down" and high LTV nature of the Construction Loans on September 6, 2007, during the Company's Analyst Day conference call with analysts and investors.  These loan origination standards created what defendants termed a "product deficiency" in the Construction Loans. Defendant's September 6, 2007 statements relating to the Construction Loans were as follows:

> **ROWE: ...we will talk just broadly about stable, modestly increasing, increasing. And then, I do want to discuss in that increasing book I'm going to stress right here the National City Mortgage investment construction book**.
>
> **\*\*\*\*\***
> **Approximately $550 million of that book of business were for investors, folks that wanted to build a home to flip to make some money. Of that $550 million, $400 million is in the State of Florida. And of that $400 million, I would say approximately $250 million is on the West Coast of Florida, where individuals who had decided to execute on this type of transaction decided they were going to stop midstream**. Okay, that is their call.
>
> **Where we have a little bit of a challenge is that we had a product I would say deficiency in that we were not getting their equity upfront in the deal like we do on the commercial real estate book of business**. Commercial real estate book of business as we showed 65% in the land. This book of business, **we were putting the money into the deal day one. And the individual's equity was to come in when they decided -- when they started the vertical construction**.
>
> **Okay, so we have $250 million of loans that it is clear there's not going to be a vertical construction, because it's now a period of time where there is a technical default. And we have now talked to many of these folks and it is not their desire to build because**

it is just going to accrete to more of a loss.

I will tell you that **many of them are still paying interest. However in our discussions with them, it is apparent that that is really not what they would intend and like to do. So given that, we think it is prudent on that to recognize what we think the ultimate default will be on that book, apply a loss severity and come up with a reserve**...

**We were going to be very conservative in our approach. So that -- the reserve will be around 60 to $65 million for that particular book of business. And as I said, it will be somewhere in the back half of '07 because we still don't have actual dollars of delinquency that would reflect that all these folks have defaulted because they have not. It is just our conversations and working through the process with them**.
*****

... However, I do want to communicate, **these individuals in many cases have not defaulted. They are paying interest. But we're trying to get out in front because we have been having conversations with them, because it is clear they are not going to build the home. And it is clear they are not going to be an investor. So what are they going to do?  The question becomes, what is their capacity to handle that interest on their own? And a 730 FICO score given the size of their loans, we believe they would have the ability to handle the interest payments. But we also in our discussions believe that they are not going to do that**.

...**Clearly in my mind, it was a product deficiency, underwriting deficiency on the investor construction book at NCM, at National City Mortgage Company. It is part of our legacy that when we're doing deals on the corporate side or on the consumer side, there is money going in. That was supposed to be the case here. It did not come in at the point in time when the first money went out to buy the land. It was supposed to come in at vertical. Quite frankly, it just was not -- we just did not think about that. We did not think you are going to have significant property price depreciation that would cause people to just walk**.

 UNIDENTIFIED COMPANY REPRESENTATIVE: I would just make a quick add... **As Rob said, bad product design. Because the product was originated for sale, it was always structured so to go to a permanent, there was a buyer for the permanent loan. But unlike the products that go through our normal credit process, there wasn't an injection of equity upfront. The injection of equity occurred when the construction went vertical on the property. That was not a good structure. We are incorporating the costs of working through that right now**.

62.    As described by defendants on September 6, 2007, the problem with the

22

Construction Loans was straightforward, and resulted from the interplay between (1) the undisclosed, nonconforming, subprime-like nature of the Construction Loans – no down payment, high LTV, and (2) the sharp decline in real estate prices that began in 2006, especially in the country's most overheated markets (Florida, West Coast states) where National City did most of its construction lending.  Because National City had structured the Construction Loans as no-money-down loans without any equity contributions from construction borrowers[7], the borrowers were absolutely free – and, indeed, economically incentivized – to default, turn over the land and whatever construction had been done, and call it a day.  Given the Construction Loans' structure, default became the only way for many borrowers *not* to lose money when real estate prices began their sharp declines in 2006.  In a nutshell, the Construction Loans were at elevated risk of default.

63.    Defendants' September 6, 2007 disclosures, though admitting to the Construction Loan's "bad product design", represented that the risk presented by the Construction Loans' bad product design was (1) default risk, rather than loss severity risk, and (2) limited in scope to a small sub-subset of $250 million of loans made for investment-intended Florida properties. They were therefore, still materially false and misleading.  In fact, (1) the Construction Loans, upon default, would suffer extremely high losses as a direct result of their bad product design, and (2) the bad product design/dynamic was not limited to Florida investment properties but widely applicable

---

[7]    The precise details:

National City's Construction Loans were "justified" on paper by structuring the entire loan through the appraised value of the home "as if it were already built".  This "as if" appraisal was substantially in excess of land acquisition and construction costs: for example, an appraisal of $700,000 where land acquisition cost $200,000 and construction a further $300,000.  National City would commit to lend $500,000 (i.e., 100% of the land and construction costs), purportedly justified and made safe by the theoretical appraisal.  Because this theoretical appraisal value ($700,000) was substantially in excess of the $500,000 that would be advanced, matters were (1) *as if* the borrower had provided a down payment in excess of 20% (i.e., the $200,000 difference between appraised value and amount lent) for the purchase of a $700,000 home, and (2) *as if* the loan to collateral value ratio was a relatively low 70% (a $500,000 loan for a $700,000 property).

The hard reality, however, was different.  In fact, Construction Loan borrowers provided no down payment, and the Company extended loans to borrowers at LTV levels up to and even exceeding 95%.  The first step in construction lending was for National City to advance 100% of the funds needed to acquire the land, without any down payment from the borrower (i.e., 100% LTV).  The next step was for National City to advance construction costs as needed, again requiring essentially no equity from the borrower.  Additionally, National City structured its construction lending so that the loan would include not only the full amount of the construction costs, but also an "interest reserve" from which interest payments on the construction loan would be collected (i.e., not only no borrower down payment, but no interest payments).  This resulted in a loan structure in which the borrower didn't have to make any payments at all during the time the home was being built.

to and affecting loans throughout the $3 billion Construction Loan portfolio.

### 3.     Scienter

64.     Although defendants first publicly admitted such "bad product design" only in September 2007, defendants themselves date their awareness of the loans' "bad product design" to "late 2006", *prior to the class period*.  Deflating property prices during 2006 exposed the "bad product design" of the Company's Construction Loans to defendants and made clear to them the costly consequences of the Construction Loans' design – high rates of default, high loss severity upon default.   That realization in late 2006 was exactly what led defendants to "tighten[] underwriting standards" for such loans in late 2006 and cut origination in 2007, as defendants later and repeatedly reassured in January and February 2008:

> **Please note that we tightened underwriting standards for residential construction lending in late 2006** and into 2007. New lending volumes are negligible... (January 22, 2008 Conference Call, Defendant Rowe)
>
> *****
>
> National City Mortgage - Residential Construction
>
> Summary Description
> $2.97 billion portfolio
> ...
> -     **tightened underwriting [at the] end of 2006**
> -     **limited new production.**[8]
>
> *****
>
> **Management tightened underwriting standards for residential construction loans beginning in late 2006** which is expected to significantly reduce production volume in 2008. (Form 10-K for 2007, filed with the SEC on February 13, 2008, p. 37)

### 4.     Impact

65.     Defendants had been aware since late 2006 that declining property prices had exposed a deep flaw in the Company's Construction Loans, arising from their subprime origination

---

[8]     January 22, 2008 Supplemental Data Presentation, p. 19, attached as exhibit to January 22, 2008 Form 8-K.

24

standards (high LTV, no down payment, stated income origination), exposing those loans to high risks of default and loss.  As a result of defendants' failure to disclose the "bad product design" and subprime origination standards of the Construction Loans, and of defendants' representation of NCM's loan output as prime, conforming and conservatively-originated at low LTV levels, plaintiffs and the class remained unaware until September 2007 of the fundamental problem in the Company's Construction Loans – and, indeed, that there was any problem at all.[9]

D.     **Though Disclosing the "Bad Product Design" in September 2007, Defendants Misrepresented and Minimized its Scope, Severity and Financial Consequences**

1.     **September 2007**

a.     **Misrepresentations**

66.     Defendants' September 6, 2007 statements (quoted in ¶ 61, *supra*) were materially false and misleading.

b.     **Falsity/Scienter**

67.     Although finally acknowledging the long-known basic design flaw of the Company's Construction Loans and explaining how declining real estate prices were exposing that flaw:

(a)     Defendants still represented that the problem, and any consequent losses, were limited to one small sub-subset of the larger Construction Loan portfolio, namely a $250-$400 million segment of Construction Loans made in Florida for investment properties.  But in fact, as defendants knew but only revealed on January 22, 2008, neither the problem nor the losses were limited to Florida properties or to investor properties.  Instead, the same "bad product design"

---

[9]     During the Company's conference calls of April 30, 2007 and July 26, 2007, defendants did mention the Construction Loans specifically to note minor loss reserve increases.  However, in each of those calls, defendants described Construction Loan risks  to be merely a function of the fact that many of those loans related to non-primary-residence properties (e.g., April 30, 2007 – "this is just a recognition that these properties are generally not owner occupied primary residences"; July 26, 2007 – "As I mentioned during last quarter's call, we added reserves for this portfolio during the first quarter to reflect that many of these properties were not destined to be the owner's primary residence").  It is an axiomatic credit-risk principle that loans for non-primary residences (especially investment properties, and to a lesser extent second homes) are at higher risk of default than loans for primary, owner-occupied residences. Therefore, the Company should have been reserving for this anyway, and the market understood these comments as mere confirmation of that fact.

25

problem was affecting loans throughout the $3 billion Construction Loan portfolio.  In truth, nothing in the "product design" flaws of the Company's Construction Loans made its impact limited, as defendants represented, to properties being built for investment.  Rather, the design flaws were applicable as well to properties being built for primary/secondary residences.  Defendants had been aware of such design flaws since late 2006, when they began to tighten underwriting standards so as no longer to generate loans with such high default and loss-severity risks.

(b)     Defendants portrayed the problem with the Construction Loans to be primarily a "default risk" problem, and omitted to disclose how awfully sharp the loss severity upon default would be.  Defendants had long known since spotting the loans' bad product design in late 2006 that, given the structure of the Construction Loans, loss severity would be extreme.  Loss severity was not, as defendants represented on September 6, 2007, merely a question of defendants' sitting on land worth less than the amount the Company advanced to acquire it, but of additional and near-total losses on all amounts the Company had advanced for partial construction.

(c)     Defendants further misrepresented the financial impact of the Construction Loans by disclosing a reserve increase that they described to be an especially forward-looking and conservative one.  But in fact, the reserve increase was neither conservative nor particularly forward-looking, and vastly understated the losses that defendants knew the Construction Loans would generate.  Defendants had long known, and stated clearly on September 6, 2007, the operative principle at work – given real estate price declines, equity-free borrowers were likely not to proceed with construction.  This was the very reason that defendants had begun tightening their underwriting standards in late 2006.  Defendants stated they were "trying to get out in front" of matters by reserving for losses prior to loans officially entering default, precisely because the principle was clear and the outcome known ("it is clear they are not going to build the home"). But in fact, as detailed in Section I.G, the loss reserve was backward- rather than forward-looking and turned a blind eye to the known outcome ("it is clear they are not going to build the home"), namely the sizeable wave of defaults then building.  Directly contrary to defendants' representations that they

26

were "trying to get out in front" of the issue and that they were "incorporating the costs of working through that right now", defendants were in fact deferring the issue and *not* "incorporating the costs of working through that right now".

68.    Moreover, the Construction Loans were *short-term* loans, typically of 12-18 months duration.  Therefore, unlike 30-year mortgages, losses from the loans were guaranteed to hit the Company quickly.

69.    In sum, having spotted the bad product design in late 2006, defendants were aware that the Construction Loans were a ticking time bomb, declining property prices the burning fuse, and the coming explosion of defaults to be costly and imminent.

### 2.    October 2007

#### a.    Misrepresentations

70.     During their October 24, 2007 conference call, defendants further discussed the Construction Loans. Defendants reiterated their September 6, 2007 presentation of the basic problems with those loans ("With the downdraft in real estate prices, the economic incentive to do the deal has gone away and many of the borrowers have decided not to build and have stopped making payments or are expected to. In essence, National City has a portfolio of lot development loans to individuals at high loan to values because the equity in the deal was not required until construction of the home began") and they emphasized the adequacy of the reserves they had taken on a forward-looking basis to account for those problems ("We have decided to set aside approximately 50 million of reserves for this specific portfolio, given our current estimate of defaults and loss severity... the current level of reserves today is driven by our expectations of the performance of the portfolio going forward. It's not driven by net charge-offs at the time, but it's really a look to the future. So, we believe we are appropriately reserved"):

> ROWE: ...**the residential construction book... I spoke last month about a particular subset of this portfolio, approximately 400 million, representing financing extended to individuals to build speculative properties, primarily in Florida. With the downdraft**

27

**in real estate prices, the economic incentive to do the deal has gone away and many of the borrowers have decided not to build and have stopped making payments or are expected to. In essence, National City has a portfolio of lot development loans to individuals at high loan to values because the equity in the deal was not required until construction of the home began. We have decided to set aside approximately 50 million of reserves for this specific portfolio, given our current estimate of defaults and loss severity**.

\*\*\*\*\*

...**we conducted a thorough review of all the loan portfolios. Rigorously evaluated the trends and current environment and increased our reserves to a level that we believe is appropriate. While we cannot predict what will happen in the market in the coming months or quarters, reserve actions taken in the third quarter represent our view of the expected loss inherent in the loan portfolio**...

\*\*\*\*\*

JILL HENNESSY [National City Head of Investor Relations][10]: In general, should we expect additional reserve build going forward?

ROB ROWE: Well, **I would state right up front that the current level of reserves today is driven by our expectations of the performance of the portfolio going forward. It's not driven by net charge-offs at the time, but it's really a look to the future. So, we believe we are appropriately reserved**. As we said right up front, this is a difficult environment to simulate and we just have to keep it at that. We believe we are appropriately reserved today.

### b.      Falsity/Scienter

71.      Defendants' October 24, 2007 disclosures (essentially: a loss reserve increase of $51 million conjoined with repeated and emphatic representations concerning the quality and adequacy of that reserve[11]) were materially false and misleading because:

(a)      Defendants still represented that the problem, and any consequent losses, were limited to one small sub-subset of the larger Construction Loan portfolio, namely a $400 million segment of Construction Loans made in Florida for investment properties.  On January 22, 2008,

---

[10]      During National City's conference calls, National City's head of Investor Relations, Jill Hennessy, would collect questions directed to her by analysts and investors, and relay those questions to the Company's officers participating in the conference call.

[11]      For example: "we conducted a thorough review of all the loan portfolios. Rigorously evaluated the trends and current environment and increased our reserves to a level that we believe is appropriate... the current level of reserves today is driven by our expectations of the performance of the portfolio going forward. It's not driven by net charge-offs at the time, but it's really a look to the future. So, we believe we are appropriately reserved".

defendants admitted that the problem was affecting loans throughout the entire $3 billion Construction Loan portfolio, and therefore generating much greater losses.  Defendants had always known, however, that the "product deficiency" was not limited in application to investment properties, but applicable as well to primary/secondary residence properties.

(b)     Defendants continued to describe the problem only in terms of default risk, while omitting to disclose the loss severity aspect.  On April 21, 2008, defendants publicly admitted what they had long known – that Construction Loan loss severity was, as a result of Construction Loan structure, extreme, and producing losses of 50%-95% on the loans that defaulted.   As defendants had known since late 2006, upon default, National City would be left with: not only (1) land worth substantially less than the market-peak, 100%-LTV amounts which National City had advanced for its purchase, but (2) partial construction detritus  (including, in addition to physical material, other products such as architects' plans, engineering studies, etc. that required significant cost outlays) that, upon foreclosure, would have almost no value for purchasers of the property at foreclosure.  Therefore, while land losses would be substantial, construction losses would be near-total.

(c)     Defendants still misrepresented the financial impact of the Construction Loans by disclosing a $51 million reserve increase that they described to be an especially forward-looking and conservative one.  But in fact, the reserve increase was neither conservative nor particularly forward-looking (as detailed in Section I.G, *infra*, defendants admitted on January 22, 2008 that their prior class period reserves had been established on a backward-looking basis), and vastly understated the losses that defendants knew the Construction Loans would generate.  On April 21, 2008, defendants revealed that *imminent* expected losses from the Construction Loans were approximately $600 million (i.e, more than ten times the October 2007 reserve increase, and approximately ten times the total reserve for the Construction Loans as of October 2007).  Indeed, those imminent Construction Loan losses alone were approximately twice as large as the Company's entire reserves maintained throughout 2007 for all $25-$30 billion of residential real estate loans.

29

### 3. Impact

72.     Although defendants disclosed the basic design flaw and dynamic afflicting the Construction Loans in September 2007, defendants' September and October 2007 statements were still materially false and misleading because they falsely circumscribed the extent and severity of the problem. Given defendants' representations, plaintiffs and the class understood:

(a)     The problem was a limited one. It applied only to $250-$400 million of loans, rather than to the entire $3 billion portfolio.

(b)     Loss severity would be moderate. The Company could experience losses on the land returned to it, given evident property price deflations, but that was the extent of the loss severity factor.

(d)     The overall financial impact would be moderate and had already been incurred. The Company had made a large effort to "get ahead" of its Construction Loan problems and had established reserves far in advance to cover those problems.

### 4. Defendants Only Later Admit that the Consequences of the "Bad Product Design" of the Construction Loans Are Spread Throughout the Entire Construction Loan Portfolio and Include Extreme Loss Severity

73.     On January 22, 2008, defendants disclosed financial and operational results for the fourth quarter and year of 2008, including a massive loss reserve increase of $691 million.

74.     During their January 22, 2008 conference call with analysts and investors, defendants made several new and corrective disclosures with respect to the Construction Loans. First, defendants disclosed that Construction Loan portfolio problems were not limited to the small subset of homes being built for investment in Florida, but were afflicting the entire portfolio (i.e., homes being built as primary and secondary residences as well). Second, defendants made clear for the first time that Construction Loan loss severities were quite high (e.g., "50% loss severity in Florida on this portfolio, with some developments in that state even higher"). Third, defendants stated that, as a result, National City had "increased our reserves to this portfolio significantly, to

30

reflect both higher frequency of default and higher loss severities"[12]:

> ROWE: ... The next part of the residential real estate portfolio to review is the National City mortgage residential construction book. Please turn to page 19, showing this **3 billion residential construction portfolio, 2.6 billion of which is to individuals to finance their primary or secondary residence, and 400 million to individuals to finance the construction of real estate for investment purchases. We talked a lot about this book last quarter, in particularly the investment portfolio**.
>
> Since the end of the third quarter, the 90 plus **delinquency dollars and delinquency rates has risen for both the investor properties and the primary/second home segment. A fair amount of the delinquent loans have emanated from a cohort of individuals who have decided not to build due to declining home prices. In those instances, the individuals have little equity in the deal and some have decided to default on their obligation. In those instances, our loss severities have and will continue to be quite high**.
>
> **During the third and fourth quarter, we increased our reserves to this portfolio significantly, to reflect both higher frequency of default and higher loss severities. On average we are assuming a 50% loss severity in Florida on this portfolio**, with some developments in that state even higher. **Please note that we tightened underwriting standards for residential construction lending in late 2006 and into 2007. New lending volumes are negligible**.

      75.     In fact, both of the Construction Loan-specific facts necessitating the massive January 2008 reserve increase had long been known to defendants.

      (a)     Defendants knew from the very beginning that the combination of "bad product design" and declining home prices created a dynamic and incentives that applied not merely to construction-for-investment loans, but also construction-for-primary/secondary residence loans.

      (b)     Similarly, defendants realized from the very beginning that loss severities would be extremely high, given the absence of down payments, the costs of foreclosure, the sharp deflation of real estate prices, and the likely near-100% losses that the Company would suffer on all its construction-related disbursements for projects where construction was not completed.

---

[12]     Defendants did not disclose the specific size of the "significant" reserve increase for the Construction Loans, but just the total reserve increase for all loans.

76.    On April 21, 2008, the Company announced:

(a)    its $7 billion rescue from the capitalization and liquidity crises into which the Company had been plunged by losses from the Construction Loans, First Franklin Loans, and NHE New Production Loans;

(b)    financial and operational results for the first quarter of 2008, including (1) a staggering $1.39 billion increase to loan loss reserves, (2) more than half a billion dollars of loan charge-offs during the first quarter, and (3) a doubling of expected charge-offs for the year to $2.0-$2.4 billion; and

(c)    for the first time, estimates of imminent expected losses for the Construction Loans – "$550 million to $625 million of remaining losses principally over the next 15 to 18 months" – as well as for the First Franklin Loans and NHE New Production Loans.

77.    The Company's April 21, 2008 press release attributed sharp rises in loan loss reserves, loan charge-offs, and non-performing asset levels to, *inter alia*, the Construction Loans:

> Credit Quality
> **The provision for loan losses was $1.4 billion in the first quarter of 2008**, $691 million in the fourth quarter of 2007, and $122 million in the first quarter of 2007. **The higher provision in 2008 principally reflects further deterioration in the credit quality of residential real estate loans, specifically** within the liquidating nonprime and broker-sourced mortgage and home equity portfolios, as well as **the residential construction portfolio**.
>
> Net charge-offs were $538 million in the first quarter of 2008, $275 million in the preceding quarter, and $147 million in the first quarter of last year. The **higher charge-offs are concentrated in the previously identified residential real estate portfolios**. **Nonperforming assets were approximately $2.3 billion, up from $1.5 billion at December 31, 2007, with the increase primarily driven by higher levels of nonprime mortgage, residential construction and formerly held-for-sale mortgage loans**.

78.    During their April 21, 2008 conference call, defendants provided new details about Construction Loan loss severity (between 50% and 95%, depending on the amount of construction completed), and about the speed and size of Construction Loan losses  (essentially, $100 million per quarter for the next six quarters – thus forming a large part of the Company's

increased forecast for in-year charge-offs):

> ROWE:... In total, net charge-offs for the quarter were $538 million, compared to a $1.4 billion provision charge, increasing the allowance for loan losses to $2.6 billion or 2.23% of loans at quarter end. **During our last call we indicated a range for 2008 losses of $1 billion to $1.3 billion. We are updating that guidance to a range of $2 billion to $2.4 billion. In response, our reserve builds for the quarter was $855 million. Deterioration in broker-sourced national home equity, the non-prime mortgage book and the residential real estate construction firm portfolios exceeded expectations, resulting in higher first quarter charge-offs and provision charges**...

> Please turn to slide 13 and the construction firm loan portfolio originated through the mortgage company... **Delinquency has extended to borrowers building their primary residence, not just those building second homes or investment properties. We now expect losses to continue at about $100 million a quarter for the next year based on severity assumptions of 75% for undeveloped plans, 95% for in-process homes and 50% to 55% for near completion projects**.

> On slide 15, **we are summarizing remaining expected losses on these three higher risk and liquidating portfolios**... We expect remaining losses in national home equity of $2 billion to $2.4 billion... The non-prime portfolio losses shown here at $750 million... **For the construction term portfolio the combination of normal construction schedules and the severity rate assumptions reviewed earlier lead to an expectation of $550 million to $625 million of remaining losses principally over the next 15 to 18 months**.

79.    The new disclosures made by defendants on April 21, 2008 had all, in fact, long been known to defendants. Defendants had long known that the bad product design of the Construction Loans made all such loans, not just the small sub-subset of investment properties, susceptible to high rates of default and loss. Defendants had long known but omitted to disclose that loss severity on the Construction Loans would be awfully high, not simply because of foreclosure costs, high-LTV ratios, and declining land prices, but because of the near-total unrecoverability of amounts disbursed for partial construction. The Construction Loans were short-term loans of 12-18 months, as opposed to mortgages of 30 years, so defendants had long known that Construction Loan losses would hit quickly and require high levels of near-term charge-offs.

**E.      Defendants Materially Misrepresented the Performance of the Construction Loans**

80.      Defendants materially misrepresented the performance of the Construction Loans by falsely and inaccurately classifying hundreds of millions of dollars of those loans as "performing" when, under stated company policy and objective fact, such loans were in fact "nonperforming".  Defendants so admitted after the class period, on May 13, 2008, revealing at the stroke of a pen an additional two-thirds of a billion dollars of residential real estate loans to be nonperforming (including an additional $260 million of Construction Loans).   These misrepresentations made it appear as if the Company's loan portfolio were performing materially better than it in fact was, and made the Company's residential real estate credit risks seem lesser and more remote than they in fact were.

81.      As a direct result of defendants' misrepresentation and understatement of the Company's nonperforming loans, a number of other material line-items reported in the Company's quarterly financial statements were also materially false and misleading.  These included, as summarized in Section I.E.5, the reserve-to-nonperforming-loan ratio (an important indicator of reserve adequacy), loan charge-offs (because charge-offs are taken only after a loan is declared nonperforming, defendants' failure to declare loans to be nonperforming led to like failures to take timely charge-offs of loans), loss reserves (which defendants tied to current charge-off levels, which levels were depressed because of defendants' failure to declare loans to be nonperforming), and earnings (which are reduced on a dollar-for-dollar basis by loan charge offs and loan loss reserve provisions).

**1.      Background – Nonperforming Loans**

82.      The loans held by the Company in its loan portfolio (and its "held for sale" warehouse) generated interest income for the Company but also posed credit risks to the Company. Put simply, the loans could go bad, leading to loss not only of interest income (as borrowers stopped making payments) but loss of principal (i.e., the money that had been lent by the Company).

34

Consequently, lenders such as National City are required to disclose material information concerning, *inter alia*, the nature and quality of the loans being held, the performance of those loans (how many loans are delinquent?  How many are nonperforming?  How many in foreclosure?), and expected losses from those loans.

83.     Loans are generally classified as performing, delinquent and nonperforming. After a loan has been delinquent for a certain time it is classified as nonperforming, and after it has been nonperforming for a certain time, a loss is recognized by applying  a "charge-off" in the amount of the loss against the current loan loss reserve.  The amount of "nonperforming" loans is thus a primary indicator of a lender's credit risks, and of the financial impact of those risks.  It is a leading and likely indicator of the amount of loans that will default, and of the lender's losses from loan defaults.

### 2.     Misrepresentations

84.     During the class period, defendants' stated policy with respect to designating real estate loans as "nonperforming" assets was, as each of the Company's SEC filings during the class period stated[13], to designate loans as nonperforming after (1) 90 days had passed without payment and (2) the loan's collateral would not be sufficient to provide for full payment of principal and interest owed (or, alternatively, even sooner where "individual analysis of a borrower's creditworthiness indicates a credit should be placed on nonperforming status"):

> Notes to Consolidated Financial Statements
>
> ... Commercial loans and leases and **loans secured by real estate are designated as nonperforming when either principal or interest payments are 90 days or more past due** (unless the loan or lease is sufficiently collateralized such that full repayment of both principal and interest is expected and is in the process of collection), terms are renegotiated below market levels, **or when an individual analysis of a borrower's creditworthiness indicates a credit should be placed on nonperforming status**...

---

[13]     Namely, the Company's Forms 10-Q filed with the SEC on May 9, August 8 and November 13 ,2007, and the  Company's Form 10-K filed on February 13, 2008 (as well as the Company's Form 10-K filed prior to the class period on February 8, 2007).

85.    In its quarterly financial statements issued during the class period, National City reported *inter alia* the amount of "nonperforming" residential real estate loans that it was holding: $536 million of nonperforming residential real estate loans as of the first quarter of 2007; $562 million as of the second quarter of 2007, $861 million as of the third quarter of 2007, and $1.09 billion as of the fourth quarter of 2007.[14]

### 3.    Falsity / Scienter

86.    In May 2008, however, defendants revealed that, contrary to stated policy during the class period, their *practice* during the class period had been to wait until loans had gone without payment for half a year (180 days) before reporting them as nonperforming.  As the Company's May 13, 2008 Form 10-Q disclosed:

> CREDIT RISK
> ...
> Delinquent Loans:
> Residential real estate delinquencies decreased compared to year end due to the designation of certain of these loans as nonperforming at March 31, 2008. **After consideration of regulatory guidance in light of the continued deterioration in the market value of the underlying collateral in 2008, a total of $688 million of 90+ days past due residential real estate loans were reclassified as nonperforming. These loans included $294 million of nonprime mortgage, $260 million of residential construction**, and $134 million of other mortgage loans. See the corresponding increases in nonperforming loans. **In prior periods, in consideration of market conditions, the practice had been to designate such loans as nonperforming when they reached 180 days past due.**  Home equity line of credit delinquencies have also decreased compared to year end due to the reclassification of $74 million of such balances as nonperforming as of March 31, 2008.
>
> *****

---

[14]    Throughout the class period, defendants did not provide any line item disclosures for Construction Loan performance (as detailed in Section I.G), but subsumed Construction Loan figures within larger totals for residential real estate.  Nonperforming loans as of the first quarter of 2007 were reported in the Company's press release and Form 8-K dated April 30, 2007, and in the Company's Form 10-Q filed with the SEC on May 9, 2007.  Nonperforming loans as of the second quarter of 2007 were reported in the Company's press release and Form 8-K dated July 26, 2007, and in the Company's  Form 10-Q filed with the SEC on August 8, 2007.  Nonperforming loans as of the third quarter of 2007 were reported in the Company's press release and Form 8-K dated October 24, 2007, and in the Company's Form 10-Q filed with the SEC on November 13, 2007.  Nonperforming loans as of the fourth quarter of 2007 were reported in the Company's press release and Form 8-K dated January 22, 2008, and in the Company's  Form 10-K filed with the SEC on February 13, 2008.

...Nonperforming Assets: Note 1 to the Consolidated Financial Statements describes the Corporation's policies for classifying a loan as nonperforming and recognizing charge-offs. These policies are consistent with regulatory standards. A summary of nonperforming assets follows:

| Nonperforming Loans (In millions) | Q1 2008 | 2007 |
|---|---|---|
| Commercial | $218 | $149 |
| Commercial Leases | $13 | $6 |
| Commercial Construction | $387 | $301 |
| Commercial Real Estate | $239 | $189 |
| Residential Real Estate: | | |
|    Non-prime Mortgage | $435 | $119 |
|    **Construction** | **$496** | **$145** |
|    Other | $383 | $162 |
| Home Equity Lines of Credit | $88 | $19 |
| Total Non-Performing Loans | $2,259 | $1,090 |
| Total Non-Performing Assets | $2,752 | $1,523 |
| Nonperforming assets as a percentage of period-end portfolio loans and other nonperforming assets | 2.37% | 1.31% |

...Nonperforming residential real estate loans increased in the first quarter of 2008 due to further deterioration in the credit quality of the aforementioned higher risk loans. In addition, as discussed earlier, **a total of $688 million of 90+ days past due loans were reclassified as nonperforming as of March 31, 2008, due to declines in the values of the underlying collateral. These loans were comprised of $294 million of nonprime mortgage, $260 million of residential construction, and $134 million of other mortgage loans**. See the corresponding decreases in delinquent loans.

87.     This "prior period... practice" (i.e., the 180 day wait) was (1) undisclosed during the class period, and (2) directly contradicted defendants' stated policy during the class period for "nonperforming" designations, which (falsely) represented that defendants were conferring nonperforming designations twice as quickly as they in fact were (i.e., after 90 days without payment, rather than 180).

37

88.     This undisclosed practice, moreover, led to defendants' failure to report as "nonperforming" hundreds of millions of dollars of loans that defendants were in fact aware were nonperforming.  When in May 2008 defendants simultaneously disclosed and renounced the 180-day rule, and returned in practice to their stated policy, a further two thirds of a billion dollars ($688 million) of loans previously reported as performing – including $294 million of First Franklin loans and $260 million of Construction Loans –  were revealed not to be so.

89.     Defendants' class period practice with respect to non-performing loan classification was particularly false and misleading with respect to the Construction Loans.

(a)     Given the short life of these loans (generally 18 months or less – as opposed to typical 30 year mortgages), schedules were compressed for Construction Loans: it was apparent to defendants long before 180 days of delinquency that a Construction Loan was effectively non-performing.

(b)     Moreover, as defendants themselves described during the class period, National City expended serious efforts to "get out in front" (¶ 61, *supra*) of the matters they knew to be looming in the Construction Loan portfolio.  For example, during class period conference calls, defendants described how – having realized the nature of the problem they had on their hands – they contacted Construction Loan borrowers well in advance of technical default in order to determine what their intentions were (given that everyone understood that it no longer made any sense for the borrower to continue with construction).  Given the efforts that defendants themselves described – efforts obviously taken because defendants realized the problem at hand – defendants were well aware before 180 days had passed that the Construction Loans in particular were non-performing.

(c)     Finally, defendants' failure to follow their stated policy was all the more inexcusable with respect to Construction Loans, because it was precisely those loans where it was most evident that collateral would not suffice to pay back all principal and interest.  To reiterate: defendants' stated policy called for nonperforming designation at 90 days without payment *where it could be determined that such 90-day late loans were insufficiently collateralized to promise full*

38

*payback*.  Given defendants' longstanding awareness of the  "bad product design" of the Construction Loans – advancing full payment to acquire land, then advancing full construction costs, all without any down payment from the borrower – and given defendants' longstanding awareness of sharp property price deflation, defendants knew since late 2006 that they would face severe losses (substantial on the land, near-total on the construction) upon default.  That realization was exactly why defendants "tightened" their underwriting of such loans in late 2006 and cut origination in 2007.  In short, the Construction Loans were long known by defendants to be insufficiently collateralized, and therefore constituted the clearest case for designation as nonperforming even prior to 90 days of delinquency.

### 4.    Impact

90.    Defendants' misrepresentations with respect to nonperforming loans were material.  Simply put, they made the Company's residential real estate loans appear to be performing significantly better than they in fact were.  Conversely stated, they made the Company's loan liabilities appear less dire than they in fact were.  Hundreds of millions of nonperforming residential real estate loans were rendered invisible to the public.  When defendants ceased application of the undisclosed 180-day rule, more than two-thirds of a billion dollars worth of residential loans suddenly "popped up" as nonperforming ones, including $260 million of Construction Loans. Following the May 2008 reclassification, nonperforming loans were revealed to be more than twice the amount previously stated, climbing to an alarming 18.6% of the entire Construction Loan portfolio. At the time of the reclassification, the Construction Loan portfolio totaled $2.67 billion, meaning that an *additional* 10% of the entire portfolio ($260 million) had in fact been nonperforming but not reported as such.  And given the sharp loss severities on the Construction Loans (ranging from 50%-95%, depending on how much funds for construction, over and above land acquisition, were disbursed), apparent to defendants before the class period even began, such nonperforming loans had high rates of dollar-for-dollar translation into actual losses.

39

### 5.    Further Material Misrepresentations Resulting From Defendants' Misrepresentation of Nonperforming Loans

91.    As a direct result of defendants' misrepresentation of the Company's nonperforming loans, a number of other material line-items reported in the Company's quarterly financial statements were also materially false and misleading.  These are more completely detailed in ¶¶ 446-454 (False Financial Statements), but, as summarized here, included:

#### a.    Reserve-to-Nonperforming Loan Ratios

92.    A primary indicator of the adequacy of reserves is the ratio of reserves to nonperforming loans.  If a company's loan loss reserves are a multiple of the amount of its nonperforming loans, the company appears relatively well-reserved for impending loan losses.  If on the other hand a company's loan loss reserves are not much larger than, or even smaller than, its amount of nonperforming loans, the company appears less well-reserved for impending loan losses, and may need to devote future earnings to building up its reserves.

93.    By under-reporting nonperforming loans by two thirds of a billion dollars, defendants materially and falsely inflated the reserve-to-nonperforming loan ratio.  Thus, defendants' stated loss reserves during the class period were made to appear more adequate than they in fact were.

#### b.    Loan Charge-Offs

94.    Loan "charge-offs" refer to those losses recognized/incurred by the lender on its bad loans.  A loan is charged off only after it has been declared nonperforming (or, at best, simultaneously with such declaration).  By (secretly) waiting 180 days to declare loans to be nonperforming, defendants introduced like delays with respect to charge-offs.  This had the effect of under-reporting current loan losses (i.e., charge offs) and improperly shifting loss acknowledgment into the future.

#### c.    Loan Loss Reserves

95.    The daisy chain that began with under-reporting nonperforming loans reached all the way to loan loss reserves.  Defendants – contrary to their own express representations and

40

undisclosed to the class until January 22, 2008 – had tied the Company's pre-2008 loan loss reserve levels to current charge-off levels. Those charge-off levels were artificially and materially depressed because of defendants' failures to declare loans to be nonperforming.

### d. Earnings

96. Each dollar that defendants failed to charge-off and/or failed to dedicate to its loan loss reserves – as a result of the aforementioned failure to declare nonperforming loans to be such – was a dollar that falsely inflated earnings.

### F. Defendants Materially Understated and Misrepresented the Loan Loss Reserves for the Construction Loans

97. Throughout the class period, defendants established *de minimis* and materially misleading loan loss reserves for the Construction Loans, and misrepresented and otherwise omitted to disclose that the financial impact to the Company of the losses from the Construction Loans would be much greater than indicated by the loss reserves established by the Company to protect against that impact.

98. As already alleged, defendants were aware, even prior to the class period, that the Construction Loans' "bad product design" would result in high rates of default (disclosed publicly in September 2007), extreme loss severity (disclosed publicly in January/April 2008), and, in conjunction with the short-term nature of those loans, quickly-hitting resulting losses (disclosed in April 2008). In short, defendants knew that Construction Loan losses would be large and imminent.

### 1. Misrepresentations

99. Throughout the class period, defendants made numerous representations as to the adequacy, quality and forward-looking nature of their loss reserves, both generally in describing their loan loss reserve policies, and specifically and emphatically in conference call statements.

100. In each of their class period SEC filings (the Forms 10-Q filed with the SEC

41

on May 9, 2007, August 8, 2007, and November 13, 2007, and the Form 10-K filed with the SEC on February 13, 2008), Defendants represented the Company's loss reserves were "maintained at a level believed adequate by management to absorb probable incurred losses within the loan portfolio [] based on the size and current risk characteristics of the loan portfolio… current economic events in specific industries and geographical areas [] and general economic conditions":

> **The allowance for loan losses is maintained at a level believed adequate by management to absorb probable losses inherent in the loan portfolio and is based on the size and current risk characteristics of the loan portfolio, an assessment of individual problem loans and actual loss experience, probable recoveries under lender paid mortgage insurance, current economic events in specific industries and geographical areas, including unemployment levels, and other pertinent factors, including regulatory guidance and general economic conditions.**

101.    Furthermore, in each of their class period conference calls, defendants further emphasized the adequacy and prospective quality of the loss reserves they had established:

(a)    For example, defendants described during their July 26, 2007 conference call how they had "launched a loan-by-loan review of the [Construction Loan] portfolio for potential problems";

(b)    More explicitly, defendants described during their September 6, 2007 conference call, when they disclosed the basic "product deficiency" in the Construction Loans that left (only a purported subset of) those loans at high risk of default, how defendants were making an effort "to get out in front" of anticipated defaults "because we have been having conversations with them, because it is clear they are not going to build the home", how defendants were "going to be very conservative in our approach" and establish reserves for such yet-to-default loans, and, ultimately, that defendants were "incorporating the costs of working through that [bad product design] right now":

> ROWE: … **Okay, so we have $250 million of loans that it is clear there's not going to be a vertical construction, because it's now a period of time where there is a technical default. And we have now talked to many of these folks and it is not their desire to**

42

**build because it is just going to accrete to more of a loss**.

I will tell you that **many of them are still paying interest. However in our discussions with them, it is apparent that that is really not what they would intend and like to do. So given that, we think it is prudent on that to recognize what we think the ultimate default will be on that book, apply a loss severity and come up with a reserve**...

**We were going to be very conservative in our approach. So that -- the reserve will be around 60 to $65 million for that particular book of business. And as I said, it will be somewhere in the back half of '07 because we still don't have actual dollars of delinquency that would reflect that all these folks have defaulted because they have not. It is just our conversations and working through the process with them**.

*****

So in summary, we have talked about all the various reserves that we are taking. **National City Mortgage Company, we are early in assessing this because there has not been actual true defaults on a lot of the deals that the consumers were involved with**.... **the final theme is that in the real estate book overall at National City, we have the segments that you have known about that have challenges. We are changing some of our reserve forecast for those challenges, nothing major and nothing dramatically new**...

*****

However, I do want to communicate, **these individuals in many cases have not defaulted. They are paying interest. But we're trying to get out in front because we have been having conversations with them, because it is clear they are not going to build the home. And it is clear they are not going to be an investor. So what are they going to do?  The question becomes, what is their capacity to handle that interest on their own? And a 730 FICO score given the size of their loans, we believe they would have the ability to handle the interest payments. But we also in our discussions believe that they are not going to do that**.

*****

 UNIDENTIFIED COMPANY REPRESENTATIVE: ...  **As Rob said, bad product design... That was not a good structure. We are incorporating the costs of working through that right now**.

(c)      And even more explicitly, defendants represented during their October 24,

2007 conference call, when reiterating their September 6, 2007 disclosures about the bad product

design of the Construction Loans and announcing a $50 million reserve increase, how defendants

– after having "conducted a thorough review of all the loan portfolios" and  "rigorously evaluated

the trends and current environment and increased our reserves to a level that we believe is appropriate" – had reserved on the basis of forward-looking expectations for portfolio performance rather than on the basis of current charge-offs ("I would state right up front that the current level of reserves today is driven by our expectations of the performance of the portfolio going forward. It's not driven by net charge-offs at the time, but it's really a look to the future. So, we believe we are appropriately reserved"):

> ROWE: ... **we conducted a thorough review of all the loan portfolios. Rigorously evaluated the trends and current environment and increased our reserves to a level that we believe is appropriate. While we cannot predict what will happen in the market in the coming months or quarters, reserve actions taken in the third quarter represent our view of the expected loss inherent in the loan portfolio**. That said, the mortgage and housing markets have not yet stabilized, so continued vigilance is required.
> *\*\*\*\*\**
> JILL HENNESSY: In general, should we expect additional reserve build going forward?
>
> ROB ROWE: Well, **I would state right up front that the current level of reserves today is driven by our expectations of the performance of the portfolio going forward. It's not driven by net charge-offs at the time, but it's really a look to the future. So, we believe we are appropriately reserved**.

### 2.     Falsity / Scienter

102.    The above statements concerning loss reserves, the losses purportedly covered by those reserves, and the adequacy of those loss reserves were materially false and misleading.

103.    Defendants so admitted on January 22, 2008, when,  in conjunction with disclosing their first truly massive loss reserve increase ($691 million), defendants admitted that the increase had been driven by  "estimated probable credit losses within the loan portfolio that have not yet reached charge-off thresholds".  Defendants' January 22, 2008 press release stated, in relevant part:

> Credit Quality
>
> **The provision for loan losses was $691 million in the fourth quarter of 2007**, compared with $368 million in the preceding quarter and $325 million in the fourth quarter of 2006. For the year,

44

the provision was $1.3 billion in 2007 compared with $489 million in 2006. The larger provision in 2007 primarily reflects higher credit losses on liquidating portfolios of nonconforming mortgage and out-of-footprint home equity loans, as well as other mortgage loans.

As of December 31, 2007, the allowance for loan losses was $1.8 billion, or 1.52% of portfolio loans, compared to $1.1 billion, or 1.18% of portfolio loans, a year ago. **The allowance has increased to reflect estimated probable credit losses within the loan portfolio that have not yet reached charge-off thresholds**.

104.     Defendants' January 22, 2008 admission that their first truly massive loss reserve increase had resulted from the inclusion of "estimated probable credit losses within the loan portfolio that have not yet reached charge-off thresholds" revealed defendants' prior representations and loss reserves to have been materially false and misleading.  Unbeknownst to the class, and in direct contravention of defendants' prior descriptions of the Company's loss reserves, the Company's prior class period loss reserves had *failed* to provide for loans that had not yet reached charge-off thresholds, and instead had been based on loans already at charge-off levels.

105.     In fact, at all times prior to the January 22, 2008 reserve increase, defendants had been linking loss reserve provisioning to current charge-off levels and had thus been basing loss reserves on *backward-* rather than *forward-looking* basis.

106.     Current charge-offs are *lagging*, rather than a leading, indicator of loan losses. It takes a long time for a loan to progress to 90 days delinquent, followed some time later by "nonperforming", followed some time later by charge-off.  Here, it took much, much longer than usual given defendants' practice (undisclosed until May 12, 2008) of waiting for half a year without payment to go by before declaring a loan to be nonperforming, only after which time would the loan be charged off.

107.     The effect of (secretly) tying reserves to charge-offs and (secretly) waiting half a year without payment before declaring a loan to be nonperforming and only later charging it off was to produce a large "time lag" between currently operative conditions and the loss reserves supposedly established to account for them.  To illustrate:  loss reserves established in July 2007

45

were responding to charge-offs of loans that began to be in trouble in approximately January 2007, rather than to loans showing early signs of trouble in July 2007.   Thus, by basing reserve provisioning levels on (already artificially depressed) charge-off levels, defendants were not in fact reserving for "current economic events... and... conditions", but rather for the conditions operative approximately half a year in the past that had caused the currently-charged-off loan to become delinquent in the first place.   This rendered their reserves materially misleading in amount and nature: there was, unbeknownst to the class, a gulf between what defendants *said* they were reserving for and what defendants actually were reserving for.

108.   Defendants' misrepresentation of loss reserves was particularly egregious with respect to the Construction Loans, precisely because defendants were aware of the fundamental problems with the Company's Construction Loans even prior to the class period, were aware that such loans would default at high rates and with sharp loss severity, and were aware that losses would come quickly.

109.   As a result of defendants' undisclosed reserving practices, a gulf opened up between the reserves established and portfolio troubles so that the former (loss reserves) no longer meaningfully indicated the latter (loan portfolio troubles).   This gulf, created by defendants' undisclosed reserving practices and defendants' misrepresentations concerning those practices, necessitated the large reserve increase of $691 million revealed on January 22, 2008, as well as the even larger reserve increase of $1.39 billion revealed on April 21, 2008.  In effect, defendants were playing "catch up".

110.   The inadequacy of defendants' class period reserve provisioning  was only revealed in April 21, 2008, when defendants disclosed for the first time their estimates of losses for the Construction Loans, First Franklin Loans, and NHE Loans –  $3.3-$3.8 billion – in a presentation slide reproduced below:

46

| Liquidating Portfolio - Loss Expectations | | |
|---|---|---|
| As of March 31, 2008<br>($ in millions) | 3/31 Current Pool Balance | Net Remaining Expected Loss |
| National Home Equity | | |
|    Originated for Portfolio | $4,546 | $300-$400 |
|    Originated for Sale | $6,239 | $1,700-$2,000 |
| | | |
| **Total National Home Equity** | **$10,785** | **$2,000-$2,400** |
| | | |
| Non-Prime Mortgage [1] | | |
|    First Liens | $3,978 | $300 |
|    Second Liens | $1,283 | $450 |
| | | |
| **Total Non-Prime Mortgage** | **$5,345** | **$750** |
| | | |
| **Construction - Permanent Portfolio** | **$2,673** | **$550-$625** |
| | | |
| [1] Includes expected mortgage insurance recoveries | | |

111.    As subprime has now become the yardstick for poor performance, direct comparison with subprime provides a strong sense of just how toxic the Construction Loans were. On an absolute basis, Construction Loan losses (approximately $587.5 million) approach those expected from subprime ($750 million).  *On a dollar-for-dollar basis, Construction Loan losses are even worse than subprime*: whereas $5.34 billion of subprime loans generate $750 million in losses (a loss of 14% of the portfolio balance), $2.67 billion of Construction Loans generate approximately $587.5 million in losses (a loss of 22.0% of the portfolio balance).

### G.    Defendants Omitted to Disclose Construction Loan Portfolio Line-Item Disclosures at all Times Until February 2008

112.    Despite knowing the since late 2006 that the Construction Loan portfolio

47

represented an area of elevated credit risk, defendants obscured to the point of invisibility the performance and risks of the Construction Loans by failing to report residential Construction Loans as a separate line item in the Company's reported financial statements (as well as in all other financial/operational figures provided in the Company's various SEC filings) throughout 2007.[15]

113.    Instead, defendants subsumed residential Construction Loan performance and prospects (e.g., as measured by rates/amounts of delinquency, charge-off and non-performance, as well as loss reserves established) within their reporting of much larger (and better-performing) loan portfolios – mostly, "residential real estate" and, on some occasions, "National City Mortgage".[16] During the class period, the Construction Loan portfolio totaled between $2.7 and $3.5 billion, while the reporting categories these loans were subsumed into generally totaled between $10-$30 billion. As a result, it was impossible to determine, from the results reported by the Company, the performance and prospects of the Construction Loans.

114.    In fact, the Construction Loans were performing far worse, and their prospects were far poorer, than was visible in the Company's reported financial statements.  Brief and instructive flashes of visibility were provided only in haphazard fashion and only under direct questioning by analysts during conference calls.

(a)    For example, during the April 30, 2007 conference call, in response to an analyst inquiring about a rise in delinquencies reported for National City Mortgage (a portfolio exceeding $10 billion), defendants indicated that that rise was largely due to the Construction Loans:

> JILL HENNESSEY: Thank you, Jeff. Jim, a question for you. **Can you provide some details on the ... 35% increase [in loans 90 days or more past due] from fourth quarter at National City Mortgage? Any specific markets or industry concentration?**

---

[15]    By contrast, the Company reported *commercial* construction loans as a separate line item, as well as the subprime First Franklin loans and the NHE run-off loans.

[16]    The reported "residential real estate" category gathered together generally $25 -$50 billion in loans, depending on other sub-categories provided.  When reporting non-performing asset rates and delinquency rates, the company subdivided "residential real estate" into two subcategories – the subprime First Franklin loans and the "National City Mortgage and Other".  As subprime First Franklin rates of delinquency and non-performance were quite high, extracting them left the remaining residential real estate portfolio (i.e., "National City Mortgage and Other", including the Construction Loans) seeming better.

48

JIM BELL: ...In the mortgage company, as I mentioned, **we have a construction loan portfolio**. These are loans where we are doing construction for individual owners and they also then have a take out to a first mortgage for us. And **we have assessed a number of those transactions as being less likely to be completed by the original owner in today's marketplace, [inaudible] have both an increase in NPAs and increase in reserves associated with that**.

(b)      Similarly, it was only by being forced to respond to an analysts' question during the Company's July 26, 2007 conference call about the delinquent loans reported under the "National City Mortgage and Other" category, that defendants revealed that the *entirety* of the loans reported delinquent (for a portfolio exceeding $10 billion) were Construction Loans (a $3 billion subset of that larger portfolio):

> **JILL HENNESSEY: Thank you, Jim. What amount of the $263 million in the 90 day past due category in National City Mortgage are construction loans?**
>
> **JIM BELL: Virtually all of them.** That's a portfolio statistic. There may have been some standing loans that were reclassified in there on the Florida acquisitions, but virtually all of that is construction loans.

115.      Such piecemeal data, discrete factoids and occasional revelations were the exceptions proving the rule: discovered only through explicit questions asked, in the absence of which there would have been only silence.  As the above-mentioned disclosures indicate, the severely poor performance of the Construction Loans – although themselves a small fraction of the portfolios for which the Company reported data – was largely responsible for what seemed to be only minor performance deteriorations in the larger portfolios.  But in fact, these were significant performance deteriorations in the Construction Loan portfolio.

116.      In February 2008, defendants changed their financial and operational reporting to disclose as a separate line item within "residential real estate" the performance of the residential Construction Loans.  Defendants did so precisely because of the extreme credit risks posed by the residential Construction Loans, prefacing the new line-item disclosures with the explanation that:

**Management considers certain segments of the loan portfolio to pose a higher risk of credit loss**. These portfolios consist of **construction loans to [] consumers**, nonprime mortgage loans, and broker-sourced home equity loans and lines of credit.

117.    On February 13, 2008, the Company filed with the SEC its Form 10-K for 2007.  For the first time, defendants provided specific line-item disclosures for Construction Loans – i.e., defendants extracted Construction Loans from the catch-all "residential real estate" category into which their performance had previously been submerged.  With respect to the Construction Loans, defendants reported total portfolio size, the amount of loans 90 days past due or more, and the amount of loans classified as non-performing assets.  Defendants included such disclosures in the "Credit Risk" section of the Form 10-K, together with the above-mentioned preface:

CREDIT RISK

**...Management considers certain segments of the loan portfolio to pose a higher risk of credit loss. These portfolios consist of construction loans to residential real estate developers and consumers**, nonprime mortgage loans, and broker-sourced home equity loans and lines of credit.

| (In millions) | 2007 | 2006 |
|---|---|---|
| Commercial Construction: | | |
|    Residential Real Estate Developers | $4,491 | $3,915 |
| Residential Real Estate: | | |
|    Non-prime Mortgage | $6,012 | $7,480 |
|    Broker-sourced home equity loans | $3,732 | $1,412 |
|    **Residential construction** | **$3,062** | **$2,564** |
| Home Equity Lines of Credit: | | |
|    Broker-sourced home equity lines | $7,475 | $5,928 |
| Total Higher Risk Loan Portfolios | $24,772 | $21,299 |

**...Residential construction loans exhibited higher risk in 2007 with some borrowers abandoning their construction plans and defaulting on their loans due to a range of factors including declining real estate values**. Approximately 45% of the residential construction loans relate to properties located in either Florida or California. Management tightened underwriting standards for

50

residential construction loans beginning in late 2006 which is expected to significantly reduce production volume in 2008.

*****

Delinquent Loans: Detail of loans 90 days past due accruing interest, excluding insured loans, follows:

| (In millions) | 2007 | 2006 |
|---|---|---|
| Commercial | $38 | $31 |
| Commercial Leases | - | - |
| Commercial Construction | $87 | $13 |
| Commercial Real Estate | $51 | $18 |
| Residential Real Estate: | | |
| Non-prime Mortgage | $808 | $567 |
| **Construction** | **$302** | **$4** |
| Other | $446 | $133 |
| Home Equity Lines of Credit | $102 | $37 |
| Credit Card and other unsecured lines | $46 | $35 |
| Other Consumer | $17 | $11 |
| Mortgage Loans Held for Sale and Other | $16 | $89 |
| Total Loans 90 Days Past Due | $1,913 | $938 |

... Residential real estate delinquencies have increased significantly as many borrowers have been unable to make their payments due to a range of factors including interest-rate resets or declining home values. **Residential construction loans, nonprime mortgage loans, and broker-sourced home equity loans have experienced the largest growth in delinquencies**.
*****

Nonperforming Assets.  Note 1 to the Consolidated Financial Statements describes the Corporation's policies for classifying a loan as nonperforming and recognizing charge-offs. The Corporation's policies are consistent with regulatory standards. A summary of nonperforming assets as of December 31 follows:

| (In millions) | 2007 | 2006 |
|---|---|---|
| Commercial | $149 | $92 |
| Commercial Leases | $6 | $32 |

51

| | | |
|---|---|---|
| Commercial Construction | $301 | $109 |
| Commercial Real Estate | $189 | $111 |
| Residential Real Estate: | | |
|    Non-prime Mortgage | $119 | $65 |
|    **Construction** | **$145** | **$6** |
|    Other | $162 | $85 |
| Home Equity Lines of Credit | $19 | $0 |
| Total Non-Performing Loans | $1,090 | $500 |
| Total Non-Performing Assets | $1,523 | $732 |
| Nonperforming assets as a percentage of period-end portfolio loans and other nonperforming assets | 1.31% | 0.76% |

... Nonperforming residential real estate loans have increased due to a larger portfolio balance and more delinquent loans being placed on nonaccrual status. **Residential construction loans in particular have been adversely affected by weakness in the housing markets.** Borrowers with nonprime mortgages have also been adversely affected by a range of factors including interest-rate resets.

\*\*\*\*\*

Allowance for Loan Losses:

...Pools of homogeneous loans with similar risk and loss characteristics are also assessed for probable losses... For consumer loans, average historical losses are utilized to estimate losses currently inherent in the portfolio. Consumer loans are pooled by probability of default within product segments. The probability of default is based on the historical performance of customer attributes, such as credit score, loan-to-value, origination date, collateral type, worst delinquency, and other relevant factors.  The allowance for pools of homogeneous loans was $1.3 billion and $757 million at December 31, 2007 and 2006, respectively. **This element of the allowance increased in 2007 primarily due to a higher expected probability of default rate assigned to the liquidating residential real estate loan portfolio and residential construction loans arising from adverse trends observed in delinquencies, charge-offs and foreclosures**.

118.    As the February 13, 2008 Form 10-K made clear, defendants provided the specific Construction Loan disclosures because they were material, and they were material precisely because  "Management considers certain segments of the loan portfolio [i.e., naming the

52

Construction Loans] to pose a higher risk of credit loss".

119.    However, as earlier alleged and as defendants themselves admitted, defendants (i.e., "management") had known since late 2006 – prior to the class period – that the Construction Loans were at just such "higher risk of credit loss".  In short, what was new in the February 2008 Form 10-K was neither the risk nor the materiality of the Construction Loans, but merely the fact of disclosure itself.  Defendants' prior omissions of such disclosures, as the Company began to provide only towards the end of the class period, were material.

## II.    THE FIRST FRANKLIN LOANS

### A.    Summary and Overview

120.    Prior to the class period, the Company through its First Franklin unit was one of the country's largest originators of subprime mortgages.  At the end of 2006, the Company sold its First Franklin unit, but was still left holding a "run-off" portfolio of First Franklin loans that the Company had originated previously but had been unable to sell off.  As no new loans were being added, the First Franklin loans retained by National City would "run off" over time as the mortgages were paid down or paid off.  At the start of the class period in April 2007, National City's run-off portfolio of First Franklin Loans contained $8.2 billion of First Franklin subprime mortgages ($6 billion of first lien mortgages; $2.2 billion in second lien loans).

121.    During the class period, defendants misrepresented the performance and the credit deterioration of the First Franklin Loans and their financial impact on the Company. Specifically:

(a)    First, throughout the class period, defendants represented that they considered a loan to be nonperforming if it went unpaid for more than 90 days.  In May 2008, defendants revealed that in fact they had classified residential real estate loans as nonperforming only after loans had not received any payment for *half a year*.  This undisclosed practice led to the Company's

53

failure to report as "nonperforming" hundreds of millions of dollars of First Franklin loans that defendants were in fact aware were nonperforming. In May 2008, defendants disclosed and renounced the 180-day rule, and returned in practice to their stated policy. The result: the revelation that a further two thirds of a billion dollars of loans ($688 million) – including $294 million of First Franklin loans –  previously reported as performing were in fact nonperforming.  First Franklin nonperforming loans nearly quadrupled, rising from $119 million to $435 million.

(b)     Second, defendants established materially false and misleading loan loss reserves for the First Franklin Loans, materially misrepresented the adequacy of those reserves, and materially misrepresented the methods by which (and the losses for which) the reserves had been established.  Specifically:

(i)     A primary and disclosed measure of reserve adequacy is the ratio of reserves to nonperforming loans.  By under-reporting nonperforming loans, the ratio of reserves-to-nonperforming loans was correspondingly overstated;

(ii)     The Company's stated policy concerning loan loss reserves represented that reserves were maintained at levels adequate to absorb *current* loan portfolio risks under *current* economic conditions.   Moreover, defendants emphasized during class period conference calls, the Company's reserves not only took current risks into account but were *prospective* (e.g.,"the current level of reserves today is driven by our expectations of the performance of the portfolio going forward.  It is not driven by net charge-offs at the time, but it is really a look into the future.").  These representations were materially false and misleading.  In fact, throughout 2007, class period reserves had been based on current charge-offs (directly contrary to defendants' representations) and had *failed* to include amounts for loans that had yet to reach charge-off levels, as defendants only revealed on January 22, 2008.  By basing reserves on charge-offs, as explained more fully herein, defendants turned a blind eye to current, known risks and conditions (directly contrary to defendants' representations), and *failed* to reserve for such current risks and conditions.

54

(c)     Additionally, defendants further misled as to reserve adequacy and portfolio performance by blaming their pre-2008 reserve increases for the First Franklin Loans on the purportedly improper recalcitrance of one insurer to pay claims, rather than as a function of reserve inadequacy in light of the actual loss content of the First Franklin Loans.  In fact, defendants knew they were sitting on enormous subprime losses that, even were the Company's insurers behaving to defendants' satisfaction, would nevertheless impose massive losses that Company would have to bear.  In April 2008, and only after having secured its life-saving $7 billion capital infusion – whose necessity and size was a direct function of the as-yet undisclosed loan losses sitting on the Company's books – defendants revealed that they expected losses from $5.34 billion of First Franklin loans, *even after insurance recoveries*, to be three quarters of a billion dollars ($750 million).  This amount alone, as detailed below, was more than twice the entire loss reserve maintained by defendants throughout 2007 *for all of the Company's $25-$30 billion of residential real estate loans*.

122.     The net effect of defendants' misrepresentations was to materially misrepresent the financial impact to the Company from First Franklin loan losses.

(a)     To put matters in perspective and provide the actual quantitative details:  the expected First Franklin Loan losses that defendants revealed only in April 2008 – approximately $750 million of losses from a remaining portfolio of $5.34 billion of First Franklin Loans – *dwarfed by themselves the entire loss reserves maintained by defendants throughout 2007 for all $25-$30 billion of the Company's residential real estate loans*.  The loan loss reserve for the Company's entire $25-$30 billion of residential real estate loans stood at all times until October 2007 at less than $290 million; and after October 24, 2007 at $342 million.  Even were the *entirety* of the Company's 2007 residential real estate reserves reserved for the First Franklin Loans (i.e., approximately 20% of the residential real estate portfolio), leaving no reserves at all for the remaining 80% of residential real estate loans (i.e. $20-$25 billion of other residential real estate loans), those reserves were *still* insufficient even for the limited task of absorbing half of the losses generated by the $5.35 billion

of First Franklin loans.

(b)    Further perspective: As defendants only revealed in April 2008, the losses from a mere subset of the First Franklin Loans – the $1.3 billion of remaining First Franklin loans that were second liens – would generate $450 million in losses. Defendants' 2007 loan loss reserves of $280-$342 million, purportedly established on a prospective basis to take into account expected loan performance, *purportedly adequate for the Company's entire $25-$30 billion of residential real estate loans, were in fact inadequate to cover the losses generated by a mere 5% subset of those loans* (i.e., the $1.3 billion of First Franklin second liens).

123.    The above-alleged misrepresentations were made with *scienter*. Specifically:

(a)    The First Franklin loans had been originated by the Company itself. Defendants were intimately aware of First Franklin's loan origination standards, and had full access to all details concerning First Franklin loan performance, loan credit quality and risks (e.g., LTV and CLTV ratios[17]; borrower income levels; property locations; rate reset size and timing on adjustable rate mortgages, including the first-lien mortgages associated with the Company's second-lien piggybacks, etc.);

(b)    Defendants knew, and after the class period admitted, that during the class period they had not been following their stated policy for declaring loans to be nonperforming. Instead, they had delayed conferring nonperforming designations until loans had gone a full 180 days without payment, and thus failed to report as nonperforming more than two-thirds of a billion dollars of residential real estate loans (including  $294 million of First Franklin loans) that, under stated policy and objective fact, were nonperforming.

(c)    Defendants knew, and late in the class period admitted (on January 22, 2008),

_____

[17]    CLTV is an acronym for "**combined** loan to value", and applies in situations where a property serves as the collateral for two loans: a first-lien mortgage, and second-lien home equity loan or home equity line of credit.  As discussed herein, CLTV levels were effectively 100% in situations where borrowers took out, together with a first mortgage, a "simultaneous" second-lien loan (also known as a "piggyback") that served as a qualifying down payment for the first-lien mortgage.  This piggyback loan structure presented unique and severe risks, as defendants were well aware (as detailed at ¶¶ 174-180).  National City held billions of dollars of such piggyback loans in its First Franklin and NHE New Production Loan portfolios.

that they had been basing prior class period loss reserves on current charge-off levels and had failed to reserve for loans that had yet to reach charge-off levels. At all times, defendants were precisely aware of the status of such latter loans (e.g., delinquent, how many days delinquent, etc.) and were aware that such delinquent-but-not-yet-at-charge-off-level loans constituted a sizeable and building wave of future defaults. Defendants represented that they had been reserving for such loans, but in fact prior to January 22, 2008 were not.

(d)     The massive loss reserve increases instituted by defendants towards and at the end of the class period – $691 million in January 2008, $1.39 billion in April 2008 – were not necessitated by any new developments, but merely as a result of the need to play "catch-up" given the prior inadequacy of the reserves. When explaining their reserve increases in January 2008 and April 2008, defendants did not mention a single new development with respect to the First Franklin loans requiring the increased reserves. All relevant facts, dynamics and risks had long been known:

(i)     First, the First Franklin portfolio was a *run-off* portfolio : the loans were a known and fixed quantity at the start of the class period. No new loans were being added – on the contrary, the First Franklin portfolio shrank by approximately $3 billion  during the class period as loans were paid down or paid off. Despite such significant diminishment in portfolio size (and thus, theoretically, in the size of total portfolio risks), reserves needed to be – and at the end of the class period were – dramatically increased.

(ii)     Second, defendants themselves acknowledged in mid-March 2007 that the subprime market had collapsed as buyers – now aware of subprime's risks – had all fled. That collapse closed the door to the possibility of subprime borrowers refinancing out of their current, largely adjustable rate mortgages whose rates were on the cusp of resetting from initial low "teaser" rates to substantially higher "fully indexed rates". These resets would produce "payment shock" that many subprime borrowers had a demonstrated *inability* to handle, given that they had qualified for the mortgages based on the payment burden imposed only by the low initial rates. Whereas in prior years the effect of such payment shock had been muted by rising real estate prices and falling loan

57

origination standards, both of which allowed escape through refinancing, such escape was no longer possible: real estate prices had been declining since mid-2006, and loan origination standards had tightened as a result of the subprime collapse in early 2007.  The result was that subprime borrowers were trapped in mortgages now guaranteed to default at extremely high rates when rates reset. Defendants were aware of this dynamic at the very start of the class period and, as they explained during every single class period conference call, were closely tracking the timing and effects of those rate resets.

(iii)     Third, defendants, even prior to the class period, had long been aware of subprime's severe risks, and especially of the risks posed by the second-lien subprime loans.  At the start of the class period, defendants had approximately $2.2 billion of such loans (the First Franklin second-liens).     Defendants knew, as they described in each of their class period conference calls in April, July, September and October 2007 and January 2008, that second-lien defaults would be driven by the upcoming rate resets on the associated, larger first-lien adjustable rate mortgages.  Defendants knew, as they described in conference calls, when those rate resets would hit, how much in additional payment burden those rate resets would produce, and whether the borrower's income was sufficient to carry such new and higher payments.  Defendants knew even *prior* to the class period that, upon default, second-lien loss severity would be total: in January 2007, defendants stated that their loss reserve modeling assumed that any subprime second-lien loan that would experience default would experience 100% loss severity upon default.  Defendants described their massive, belated January/April 2008 reserve increases, with respect to First Franklin, to have been primarily driven by: (1) second-lien defaults caused by rate-resetting on associated first-lien mortgages;(2) 100% loss severity upon default; and (3) the inability of borrowers to escape their adjustable rate payment shocks and consequent default by refinancing.  But these facts and dynamics had long been known to defendants, even prior to the class period.

(iv)     Fourth, defendants were aware that approximately $1.6-$1.7 billion of their First Franklin Loans were effectively sub-subprime, and would generate outsize losses even

for subprime loans.  In fact, those $1.7 billion of subprime mortgages had been explicitly rejected during late 2006 by buyers who *actually wanted to buy subprime loans*.  They were rejected because the buyers had seen that those mortgages fell even below the already notoriously debased standards of run of the mill subprime loans, and therefore refused to purchase them.  Effectively, the $1.7 billion at issue were sub-subprime, the worst of the worst, unsellable even at a time when the subprime mortgage markets were booming.

(e)     Finally, defendants were reluctant to establish reserves "adequate [] to absorb probable incurred losses within the loan portfolio [] based on the size and current risk characteristics of the loan portfolio" because actually doing so would exhaust the Company's available capital and liquidity and reveal the true depth of the Company's crisis.  That crisis and its depth became increasingly evident between January 2008 and April 2008, as the Company: (1) slashed its dividend twice and effectively eliminated it; (2)  raised $2.5 billion in funds, yet (3) still had its credit ratings downgraded and its counterparties cut off their exposure to the Company; until (4) defendants put the Company up for purchase by a deep-pocketed suitor who could provide the funds necessary to absorb the loan losses sitting on the Company's books.  Indeed, it was only *after* the Company secured a life-saving $7 billion infusion that the Company disclosed the true extent of the losses it expected from the loans it had – $3.3-$3.8 billion, including $750 million from First Franklin loans alone.  And, as defendants admitted, that $7 billion infusion was only given after defendants had allowed the entities providing those funds to view heretofore "nonpublic" information – namely, the size of the loan losses sitting on the Company's books.  In fact, the size of such loan losses was nowhere indicated by the Company's publicly-stated loss reserves.

**B.     Defendants Materially Misrepresented the Performance of the First Franklin Loans by Falsely Classifying Hundreds of Millions of Dollars of First Franklin Loans as "Performing" When, Under Stated Company Policy and Objective Fact, Such Loans Were in Fact "Nonperforming"**

124.    The amount of "nonperforming" loans is a primary indicator of a lender's credit risks, and of the financial impact of those risks.  It is a leading and likely indicator of the

59

amount of loans that will default, and of the lender's losses from loan defaults.

### 1.      Defendants' Misrepresentations

125.      During the class period, defendants' stated policy with respect to designating real estate loans as "nonperforming" assets was, as each of the Company's SEC filings during the class period[18] stated:

> ... Commercial loans and leases and **loans secured by real estate are designated as nonperforming when either principal or interest payments are 90 days or more past due** (unless the loan or lease is sufficiently collateralized such that full repayment of both principal and interest is expected and is in the process of collection), terms are renegotiated below market levels, **or when an individual analysis of a borrower's creditworthiness indicates a credit should be placed on nonperforming status**...

126.      Prior to and during the class period, defendants, when disclosing the Company's results for the fourth quarter of 2006 and each of the first three quarters of 2007, reported the following amounts of nonperforming loans and the following rates of overall nonperformance:

|                                                                                          | 2007             | Q1 2007          | Q2 2007          | Q3 2007           |
| ---------------------------------------------------------------------------------------- | ---------------- | ---------------- | ---------------- | ----------------- |
| Nonperforming Portfolio Loans                                                            | $500 million     | $536 million     | $562 million     | $ 861 million     |
| Total Portfolio Loans                                                                    | $95.49 billion   | $99.57 billion   | $99.68 billion   | $111.99 billion   |
| Nonperforming Assets as Percentage of Portfolio Loans and other nonperforming assets     | 0.76%            | 0.80%            | 0.85%            | 1.08%             |

### 2.      Falsity and Scienter

---

[18]      Namely, the Company's Forms 10-Q filed with the SEC on May 9, August 8, and November 13, 2007, and  the Company's Form 10-K filed on February 13, 2008 (as well as the Company's Form 10-K filed prior to the class period on February 8, 2007).

127. The above-detailed representations were materially false and misleading.

128. Defendants admitted after the class period in a Form 10-Q filed with the SEC on May 13, 2008 that (1) they had previously not been following stated policy, but rather waiting for 180 days without payment before declaring a loan to be nonperforming, and (2) as a result, defendants had failed to disclose the existence of more than two-thirds of a billion dollars ($688 million) of nonperforming loans, including $294 million of First Franklin loans:

> After consideration of regulatory guidance in light of the continued deterioration in the market value of the underlying collateral in 2008, **a total of $688 million of 90+ days past due residential real estate loans were reclassified as nonperforming**. These loans included $294 million of nonprime mortgage, $260 million of residential construction, and $134 million of other mortgage loans. See the corresponding increases in nonperforming loans. **In prior periods, in consideration of market conditions, the practice had been to designate such loans as nonperforming when they reached 180 days past due**.

129. Defendants' representation of their stated policy with respect to designating residential real estate loans as nonperforming (¶ 125 *supra*) was false and misleading: as defendants admitted in May 2008, they had not been following that policy. The amount of nonperforming loans reported by defendants was also false and misleading: under stated policy and objective fact, additional hundreds of millions of dollars of residential real estate loans were *de jure* and *de facto* nonperforming but not reported as such.

### 3. The Result: Loan Portfolio Performance Appeared Materially Better Than It In Fact Was, and Loan Portfolio Liabilities Appeared Materially Less Dire Than They In Fact Were

130. The above misrepresentations were material. Simply put, they made the Company's residential real estate loans appear to be performing significantly better than they in fact were. Conversely stated, they made the Company's loan risks and liabilities appear less dire than they in fact were. Hundreds of millions of nonperforming residential real estate loans were rendered invisible to the public. When defendants ceased application of the undisclosed 180-day rule, more than two-thirds of a billion dollars worth of Company loans suddenly "popped up" as nonperforming

ones, including $294 million of First Franklin loans.  As First Franklin second-lien loans have a loss severity of 100%, the addition of approximately $300 million of First Franklin nonperforming loans to the nonperforming loans had a high rate of dollar-for-dollar translation into expected loan losses (with the same being true for the $260 million of reclassified Construction Loans).

131.    Specifically: after defendants' May 2008 return to stated policy, the amount of First Franklin loans reported to be nonperforming nearly *quadrupled* – rising from $119 million reported as of December 31, 2007 to $435 million as of March 31, 2007 (as revealed in the Company's May 13, 2008 Form 10-Q).  Nearly the entire $316 million increase was due to the reclassification of $294 million of First Franklin loans that were previously nonperforming but not reported as such.  In short, that $435 million of First Franklin loans were nonperforming was a dramatic surprise to the public but nothing new to defendants.

132.    Further indication of the degree to which matters were misrepresented (i.e, materiality) is provided in the table below.  This table reproduces the nonperforming loan amounts reported by defendants[19] as summarized in the table in ¶ 126 above, but adding in at all times the extra $688 million of nonperforming loans that defendants only revealed in May 2008 (the methodology is necessarily imprecise but directionally accurate).  As comparison demonstrates, when the nonperforming loans that defendants failed to report as such are added in, the amount of nonperforming loans more than doubles:

|  | 2007 | Q1 2007 | Q2 2007 | Q3 2007 |
|---|---|---|---|---|
| Reported Nonperforming Portfolio Loans | $500 million | $536 million | $562 million | $ 861 million |
|  |  |  |  |  |

[19]    Throughout 2007, defendants reported nonperforming loan figures only for broad categories of loans (e.g., residential real estate), but omitted to disclose specific nonperformance figures for specific loan portfolios (such as the First Franklin loans).  Only towards the end of the class period, starting in February 2008, did defendants begin to make such specific disclosures for portfolios considered to be at "higher risk of credit loss", including the First Franklin loans and the Construction Loans (conceding the materiality of such figures).  However, defendants had known even prior to the class period that the First Franklin loans were just such a portfolio at "higher risk of credit loss".  Thus, their omission was a material one.

| Actually Nonperforming Portfolio Loans | $1.188 billion | $1.224 billion | $1.250 billion | $1.549 billion |
|---|---|---|---|---|

133.    Furthermore, as detailed below, defendants' misstatement of and under-reporting of nonperforming loans had the direct effects of (1) making loan loss reserves appear to be far more adequate than they actually were, and (2) causing loan loss reserves to be materially understated.

## C.    Defendants Materially Understated and Misrepresented the Loan Loss Reserves for the First Franklin Loans

134.    Throughout the class period, defendants represented that they were applying a "forward looking" approach to ensure that First Franklin loss reserves were set in a "conservative" manner more than adequate to absorb probable loan losses given current portfolio risks and current economic conditions.  In fact, as the investing public would only learn fully at the end of  the class period, the Company's reserves had been materially understated, and were inadequate to absorb probable losses from *known, current* portfolio risks and economic conditions, as a result of defendants' use of a *backward-looking* methodology to set reserve levels.  In essence, defendants were reserving for the *past*, rather than the future, and turning a blind eye to current portfolio risks and economic conditions.   In fact, the First Franklin loan risks and the economic conditions exacerbating First Franklin loan losses that defendants cited as the justification for their large reserve increases in January 2008 and April 2008, had been known in full to defendants at class period inception (as alleged in detail at ¶¶ 174-180 below).

## 1.    Defendants' Material Overstatement of Reserve-to-Nonperforming Loan Ratios Made Reserves Appear More Adequate Than They In Fact Were

135.    The ratio of loan loss reserves to nonperforming loans is a primary indicator of the adequacy of those reserves.  If a company's reserves are a multiple of the company's non-performing loans, the company appears to be relatively well-reserved for loan losses.  Conversely, if a company's reserves are a fraction of the company's nonperforming loans, the company appears

63

less well-reserved for impending loan losses, and may have to increase such reserves.

136.    As demonstrated below, defendants falsely reported throughout 2007 that reserves were generally more than twice the amount of nonperforming loans (though dipping to 160% in and after October 2007), when, in fact, reserves were at all times *less* than the amount of nonperforming loans.

### a.    Misrepresentations Concerning Reserve-to-Nonperforming Loan Ratios

137.    During the class period, defendants, when disclosing the Company's results for the fourth quarter of 2006 and each of the first three quarters of 2007, reported the following amounts of nonperforming loans and the following loss-reserve-to-nonperforming-asset ratios:

|  | 2007 | Q1 2007 | Q2 2007 | Q3 2007 |
|---|---|---|---|---|
| Nonperforming Portfolio Loans | $500 million | $536 million | $562 million | $ 861 million |
| Nonperforming Assets (Portfolio Loans plus OREO) | $732 million | $801 million | $848 million | $1.211 billion |
| Total Portfolio Loans | $95.49 billion | $99.57 billion | $99.68 billion | $111.99 billion |
| Loan Loss Reserves | $1.131 billion | $1.104 billion | $1.136 billion | $1.373 billion |
| **Loss Reserves as Percentage of Nonperforming Portfolio Loans** | **226.1** | **206.1** | **202.2** | **159.4** |

### b.    Falsity

138.    As already alleged, in May 2008 defendants admitted that they had been under-reporting nonperforming loans throughout the class period by as much as $688 million, including $294 of First Franklin loans that in fact had been nonperforming but had not been reported as such.

139.    As a direct consequence of such under-reporting of nonperforming loans, the reserve-to-nonperforming loan ratios had been overstated throughout the class period.

### c.    Impact

140.    An indication of the degree to which matters were misrepresented (i.e, materiality) is provided in the table below.  This table reproduces the nonperforming loan amounts and ratios reported by defendants as summarized in the table in ¶ 137 above, but adding in at all times the extra $688 million of nonperforming loans that defendants only revealed in May 2008. When the nonperforming loans that defendants failed to report as such are added in, the amount of nonperforming loans more than doubles and the ratio of reserves-to-nonperforming-portfolio loans is more than halved.   Moreover, loss reserves are revealed to be *less* than the amount of nonperforming portfolio loans, rather than generally more than twice the amount of nonperforming portfolio loans:

|  | 2007 | Q1 2007 | Q2 2007 | Q3 2007 |
|---|---|---|---|---|
| Nonperforming Portfolio Loans | $1.188 billion | $1.224 billion | $1.250 billion | $1.549 billion |
| Nonperforming Assets (Portfolio Loans plus OREO) | $1.420 billion | $1.489 billion | $1.536 billion | $1.899 billion |
| Total Portfolio Loans | $95.49 billion | $99.57 billion | $99.68 billion | $111.99 billion |
| Loan Loss Reserves | $1.131 billion | $1.104 billion | $1.136 billion | $1.373 billion |
| **Loss Reserves as Percentage of Nonperforming Portfolio Loans** | **95.2** | **90.2** | **90.88** | **88.64** |

### 2.    Defendants Misrepresented that They Maintained Loss Reserves (1) in Amounts Adequate to Absorb Current Loan Portfolio Risks Under Current Economic Conditions, and (2) *Prospectively*, To Take Into Account Expected Future Loan Performance

141.     The loss reserves established by the Company were materially false and misleading because, contrary to defendants' representations, they failed to account for current, known portfolio risks and economic conditions, and failed to take into account expected future loan performance.  Defendants so admitted after towards the end of the class period on January 22, 2008, and only then began to take post-facto, massive reserve increases to "catch up" to probable losses.

65

### a. Misrepresentations: Current Risks and Current Economic Conditions

142.    In each of their class period SEC filings[20], Defendants represented the Company's loss reserves were "maintained at a level believed adequate by management to absorb probable incurred losses within the loan portfolio [] **based on the size and current risk characteristics of the loan portfolio**, an assessment of individual problem loans and actual loss experience, probable recoveries under lender paid mortgage insurance, **current economic events** in specific industries and geographical areas [] and **general economic conditions**" (emphasis added):

Notes to Consolidated Financial Statements

1. Basis of Presentation and Significant Accounting Policies

**Allowance for Loan Losses and Allowance for Losses on Lending-Related Commitments**:

**The allowance for loan losses is maintained at a level believed adequate by management to absorb probable losses inherent in the loan portfolio and is based on the size and current risk characteristics of the loan portfolio, an assessment of individual problem loans and actual loss experience, probable recoveries under lender paid mortgage insurance, current economic events in specific industries and geographical areas, including unemployment levels, and other pertinent factors, including regulatory guidance and general economic conditions**...

143.    As defendants would later admit, this was false and misleading: defendants' method for computing loan loss reserves had been based, throughout 2007, on backward-looking indicators of loan losses that ignored known, current loan risks and economic conditions.

144.    During the class period, defendants adjusted the Company's loss reserves each quarter, as summarized in the table below, purportedly based on the most current information concerning loan performance and economic trends.  The surface mechanics were as follows.  First, defendants started with the loss reserve that had been established at the end of the prior reporting

---

[20]    Namely, the Company's Forms 10-Q filed with the SEC on May 9, August 8, and November 13, 2007, and the Company's Form 10-K filed on February 13, 2008 (as well as the Company's Form 10-K filed prior to the class period on February 8, 2007).

period.  Second, defendants applied the current quarter's loan "charge offs" (i.e., actual, experienced losses) against that reserve, thereby diminishing it.   Third,   based on the most current information concerning loan performance and economic trends, defendants replenished the reserve to a greater or lesser degree to restore it to a purportedly adequate level.

(a)       As the table below demonstrates, defendants' disclosures concerning loss reserves and charge-offs were accomplished only at a certain level of generality.   Defendants omitted to disclose specific loss reserve and charge-off figures for the specific portfolios that were hardest hit by losses and that are at issue here – the First Franklin loans, the NHE New Production loans, and the Construction Loans – even though defendants in fact considered these as separate and distinct loan portfolios, and even though defendants in fact reported many other specific figures and statistics for those loan portfolios.   Rather, defendants only disclosed: (1) company-wide figures for charge-offs and loss reserves; (2) breakdowns by broadest loan classification (e.g., commercial, commercial real estate, residential real estate, consumer), and (3) breakdowns by line of business (e.g., mortgage banking, retail banking, etc.).   None of these breakdowns allowed plaintiffs or the class to determine the loss reserves allocated to the First Franklin, NHE New Production and Construction Loans.   For example, the "residential real estate" line-item included all these loans (which at April 2008 totaled approximately $19 billion) with the partial exception of that portion of the NHE loans that were HELOCs, together with further tens of billions of dollars of other residential real estate loans.

(b)       Defendants did not affirmatively disclose their quarterly loss reserve increases.   However, it is possible to derive those increases from other figures that defendants did disclose.   Specifically, each quarter, defendants disclosed the former loss reserve, the charge-offs taken against that loss reserve, and the new loss reserve.   Therefore, the implied loss reserve increase could be determined by comparing (1) the former loss reserve, as diminished by current charge offs, with (2) the new loss reserve – with the difference being the amount by which defendants had decided to increase the reserve.

67

**Class Period Loss Reserves and Reserve Increases**

| (Millions of Dollars) | 2006 | Q1 2007 | | | Q2 2007 | | |
|---|---|---|---|---|---|---|---|
| | Reserve | Charge Offs | Reserve Increase | Loss Reserve | Charge Offs | Reserve Increase | Loss Reserve |
| Commercial | 459 | (23) | (22) | 414 | (19) | 20 | 415 |
| Commercial Constr. and Real Estate | 140 | (3) | 21 | 158 | (1) | 20 | 177 |
| **Residential Real Estate** | **280** | **(67)** | **70** | **283** | **(36)** | **39** | **286** |
| HELOC and other Consumer | 102 | (17) | 26 | 111 | (12) | 15 | 114 |
| Credit Card and other unsecured | 150 | (37) | 25 | 138 | (30) | 36 | 144 |
| Other | | | 2 | | | 15 | |
| Total | 1,131 | (147) | 122 | 1,104 | (98) | 145 | 1,136 |

| (Millions of Dollars) | Q2 2007 | Q3 2007 | | | Q4 2007 | | |
|---|---|---|---|---|---|---|---|
| | Reserve | Charge Offs | Reserve Increase | Loss Reserve | Charge Offs | Reserve Increase | Loss Reserve |
| Commercial | 415 | (11) | 53 | 457 | | | |
| Commercial Constr. and Real Estate | 177 | (18) | 80 | 239 | | | |
| **Residential Real Estate** | **286** | **(51)** | **107** | **342** | Expected $700 Million Reserve Increase Disclosed on December 17, 2007 | | |
| HELOC and other Consumer | 114 | (27) | 88 | 175 | | | |
| Credit Card and other unsecured | 144 | (34) | 50 | 160 | | | |
| Other | | | (10) | | | | |
| Total | 1,136 | (141) | 368 | 1,373 | | | |

68

| (Millions of Dollars) | Q3 2007 | Q4 2007 | | | Q1 2008 | | |
|---|---|---|---|---|---|---|---|
| | Reserve | Charge Offs | Reserve Increase | Loss Reserve | Charge Offs | Reserve Increase | Loss Reserve |
| Commercial | 457 | (10) | 14 | 461 | (19) | 66 | 508 |
| Commercial Constr. and Real Estate | 239 | (77) | 101 | 263 | (31) | 94 | 326 |
| **Residential Real Estate** | **342** | **(101)** | **356** | **597** | **(326)** | **860** | **1,131** |
| HELOC and other Consumer | 175 | (37) | 140 | 278 | (97) | 256 | 437 |
| Credit Card and other unsecured | 160 | (50) | 53 | 163 | (65) | 82 | 180 |
| Other | | | 27 | | | 35 | |
| Total | 1,373 | (275) | 691 | 1,762 | (538) | 1,393 | 2,582 |

145.     During their quarterly conference calls, and occasionally in the "Supplemental Data" presentations provided in conjunction with those calls beginning in late 2007, defendants disclosed further detail about the performance and expected performance of specific loan portfolios (including the First Franklin loans) and about loss reserve increases and/or charge-offs relating to those specific loan portfolios (although generally failing to disclose the actual amounts of the loss reserves specifically established for those portfolios).

146.     During defendants' January 23, 2007 conference call, defendants disclosed a substantial loss reserve increase specifically for the First Franklin loans.  Defendants represented that that reserve increase took into account, *inter alia*, recently-observed rising delinquencies, the understanding that any subprime second-lien loan that defaulted would result in a 100% loss, the anticipation that losses from subprime second-lien loans would hit quickly, and the anticipation of a "significant deterioration in the credit quality in 2007", and concluded that "we feel we are well reserved for the risk based on everything we know at this point".

> ...**Given that we assume a 100% loss on non-prime second mortgages that go bad**, both forms of coverage amount to a 50% loss mitigation.

69

\*\*\*\*\*

JILL HENNESSEY: Thank you, Jeff. Final question for Jim. Do you believe you are done with credit charges on your remaining First Franklin runoff portfolio?

JIM BELL: Well, we took a large charge. We obviously didn't try and take all the charges that would exist forever and a day. **We tried to accommodate what we thought would be a significant deterioration in the credit quality in 2007**.

147.    However, even after defendants' First Franklin reserve increases during the fourth quarter of 2007, the Company's loss reserve for all residential real estate loans stood at $280 million (total reserves for all Company loans were $1.131 billion).

148.    After the first quarter of 2007, during which time both the primary (i.e., origination) and the secondary (i.e., sale for securitization) subprime markets effectively collapsed, defendants revisited the loss reserve issue for First Franklin during their April 30, 2007 conference call. Defendants insisted that analysis be "divided into two parts; the performance of the underlying loans and the claims playing behavior of our insurers". Defendants represented that underlying First Franklin loan performance was good (i.e., better than the negative assumptions that defendants had put in place after the fourth quarter of 2006) but insurer behavior was not, and that insurer behavior lay behind the Company's (modestly) increased loss reserves and charge-offs. In light of the above, Defendant Daberko concluded that "We have reason to feel a bit more optimistic about the First Franklin portfolio, both fundamentally and with respect to the insurance coverage, based on the developments as Jim described. ...The National City that is taking shape in 2007 is somewhat smaller, but lower risk, more focused and possesses better growth potential":

> BELL:... In summary, credit performance in retail and wholesale businesses are very solid, residential mortgage-related credit shows weakness, but is somewhat stronger than we expected, and **we have taken what I think is an appropriate but conservative approach to accounting for our LPMI issue, although I hope developing facts will allow our recapture of much of those reserves**. With that I'll turn the floor over to our Chairman, Dave Daberko...
>
> DABERKO:  As Jim mentioned, other than a small number of

70

specific names and situations, we're very pleased with credit quality on the commercial side, and at this point it appears that loan-loss provisions for the year will be less than planned. So, our outlook for the year is that we expect each successive quarter to show improvement. **We have reason to feel a bit more optimistic about the First Franklin portfolio, both fundamentally and with respect to the insurance coverage, based on the developments as Jim described. ...The National City that is taking shape in 2007 is somewhat smaller, but lower risk, more focused and possesses better growth potential**.

149.  However, even after defendants' purportedly "conservative" First Franklin reserve increases (purportedly for insurance-related issues), as of April 30, 2007 the Company's loss reserve for all residential real estate loans stood at $283 million (total reserves for all Company loans were $1.104 billion).  Given the Company's previous loss reserve of $280 million, and after residential real estate net charge-offs during the first quarter of $67 million, this implied a loss reserve increase for all residential real estate loans of $70 million.  The April 30, 2007 residential real estate reserve of $283 million was in fact highly inadequate: as defendants would later reveal, First Franklin second-lien loan losses alone were expected to be $450 million, total First Franklin losses to be $750 million, and further residential real estate loans losses (including the Construction Loans and the NHE loans) to be $2.5-$3 billion.

150.  Defendants' statements during their July 26, 2007 conference call mirrored almost the statements they made during the April 30, 2007 conference call.  First Franklin portfolio performance was purportedly within loss expectations apart from insurer-related issues, the Company was being "conservative" in not *reducing* its First Franklin loss reserves, leading defendant Raskind to conclude that "To sum up, while the first half of this year has been more difficult than we expected, we firmly believe that this Company is strategically in a much better place than it was one year ago. We've got a more attractive footprint, a lower risk profile, and a better business mix. We are acutely aware of where we have fallen short of expectations, and of the risks and the challenges we face. National City harbors much more performance potential than we have been displaying in the recent past and we are working hard to convert that potential to clear

71

results. And along the way, we pledge to be very candid and forthright as we keep you apprised of our progress".

151.    However, even after defendants' purportedly "conservative" refusal not to reduce First Franklin reserves (still purportedly driven by insurance-related issues), the Company's loss reserve for all residential real estate loans stood at $286 million (total reserves for all Company loans were $1.136 billion).  Given the Company's previous loss reserve of $283 million, and after residential real estate net charge-offs during the first quarter of $36 million, this implied a loss reserve increase for all residential real estate loans of $39 million.  The July 26, 2007 residential real estate reserve of $286 million was in fact highly inadequate: as defendants would later reveal, First Franklin second-lien loan losses alone were expected to be $450 million, total First Franklin losses to be $750 million, and further residential real estate loans losses (including the Construction Loans and the NHE loans) to be $2.5-$3 billion.

152.    On September 6, 2007, as alleged above, defendants disclosed that they expected to increase loss reserves for First Franklin by $50 million, but once again characterized the increase's "real driver" to be the improper behavior of one of the Company's insurers (in conjunction with a slight raise to loss estimated for the underlying loans, based on observed higher rates of payment delinquency):

> ROWE:... **So once again, the final theme is that in the real estate book overall at National City, we have the segments that you have known about that have challenges. We are changing some of our reserve forecast for those challenges, nothing major and nothing dramatically new**.
>
> *****
>
>  ...Well on the consumer side if you're increasing your reserves, you're increasing your expected life forecast. So they do translate one another. **And we're saying that we believe because of the rate reset activity and the delinquency that has generated out of that, there will be higher loss content than we had said when I think we described 12% loss. This is not a significant change. And once again, if insurer b was paying at the same claims rate that insurer a was, there would not be much here at all. That is really why it**

72

**is going up... Yes, the gross losses are going up. If insurer b was paying at that same rate that insurer a, the net losses would not be going up by much at all. But I have given you the number. I think that is the number**.

TOM RICHLOVSKY [National City's Treasurer]: I think **I gave you that 12% number and that was two quarters ago. That was pre-insurance losses on the second mortgage loan portfolio. Obviously we're anticipating greater degree of gross loss on those seconds. But the real driver as Rob has just alluded to is the behavior of insurer b on the payment rate on those losses driving net losses. But it is not 12% on the entire $7.5 billion of First Franklin.**

153.    On September 17, 2007, the Company filed a Form 8-K with the SEC attaching National City's Mid-Quarter Update for the third quarter of 2007.  The third quarter Mid-Quarter Update reiterated defendants' September 6, 2007 statements, and concluded that First Franklin risk levels "continue to be modestly elevated".

Credit Quality
The credit trends and outlook as described in the company's September 6 disclosures are fundamentally unchanged as of the date of this report. Credit quality in the commercial portfolio is stable, and the core consumer portfolios, including direct home equity lending, are also performing well. **With respect to the balance of real estate lending activities, as previously described, risk levels continue to be modestly elevated in the non-prime (First Franklin) first lien portfolio**...

154.    The $50 million reserve increase  for the First Franklin loans that defendants warned of on September 6, 2007 turned out, as defendants later revealed in a Supplemental Data presentation provided in connection with defendants' October 24, 2007 conference call, to be a $37 million increase.

        **b.    Misrepresentations: Reserves Established on A Prospective Basis to Take Into Account Expectations of Loan Performance "Going Forward"**

155.    Defendants announced financial and operational results for the third quarter of 2007 on October 24, 2007, including increases to loss reserves.  With respect to the First Franklin loans, defendants raised loss reserves by $37 million.  The basis for that reserve increase, as defendants explained, was the same dynamic they had identified throughout their prior statements

during 2007 – rate resets on first-lien mortgages associated with the First Franklin second-lien loans were "leading to increased delinquency... Therefore, we increased loan reserves".  Defendant Rowe emphasized that defendants had carefully evaluated the Company's loans and the current economic trends and conditions in establishing their loss reserves ("Rigorously evaluated the trends and current environment and increased our reserves to a level that we believe is appropriate.. reserve actions taken in the third quarter represent our view of the **expected loss** inherent in the loan portfolio").

156.    Furthermore, defendants explicitly emphasized that those reserves had been established to take into account a future substantially worse than the present ("I would state right up front that the current level of reserves today is driven by our **expectations of the performance of the portfolio going forward**. It's not driven by net charge-offs at the time, but it's really a look to the future. So, we believe we are appropriately reserved"):

> JILL HENNESSY: **In general, should we expect additional reserve build going forward?**
>
> **ROB ROWE: Well, I would state right up front that the current level of reserves today is driven by our expectations of the performance of the portfolio going forward. It's not driven by net charge-offs at the time, but it's really a look to the future. So, we believe we are appropriately reserved. As we said right up front, this is a difficult environment to simulate and we just have to keep it at that. We believe we are appropriately reserved today.**

157.    As of October 24, 2007, the Company's loss reserve for all residential real estate loans stood at $342 million (total reserves for all Company loans were $1.373 billion).  Given the Company's previous loss reserve of $286 million, and after residential real estate net charge-offs during the third quarter of $51 million, this implied a loss reserve increase for all residential real estate loans of $107 million ($37 million of which was for the First Franklin loans).The October 24, 2007 residential real estate reserve of $342 million was in fact highly inadequate: as defendants would later reveal, First Franklin second-lien loan losses alone were expected to be $450 million,

total First Franklin losses to be $750 million, and further residential real estate loans losses (including the Construction Loans and the NHE loans) to be $2.5-$3 billion.

158.    Defendants filed their Form 10-Q for the third quarter of 2007 with the SEC on November 13, 2007.  The November 13, 2007 Form 10-Q explicitly referred to the dynamic (of which defendants, as their prior statements throughout 2007 indicated, had long been aware) where rate resets on adjustable rate mortgages were causing a spike in delinquencies and defaults. However, the November 13, 2007 Form 10-Q elevated this dynamic into disclosure of a new "Risk Factor" and elevated its stated consequences to a degree of impact upon the Company that had not been previously disclosed ("future rate resets on adjustable rate loans could drive increases in delinquencies and ultimately losses on these loans beyond that which has been provided for in the allowance for possible loan losses. In the event the allowance for loan losses is insufficient to cover such losses, National City's earnings and capital could be adversely affected").

        c.    **Falsity: By Basing 2007 Loss Reserves on Loan Charge-Off Levels, Defendants Turned a Blind Eye (1) to the Current Risks and Current Economic Conditions They Represented They Were Reserving For, and (2) to Prospective Loan Performance**

159.    Unbeknownst to the class, defendants' representation of the Company's stated policy concerning loan loss reserves, as well as the loss reserves themselves and defendants' conference call commentary concerning those reserves, were materially false and misleading, because, in practice, defendants had been failing throughout 2007 to reserve for *current* loan portfolio risks and *current* economic conditions, let alone for future loan performance.

        i.    **Defendants Admit in January 2008 That, During 2007, They Failed to Reserve For Current, Known Risks and Conditions**

160.    Defendants so admitted on January 22, 2008, when,  in conjunction with disclosing their first truly massive loss reserve increase ($691 million)[21], defendants admitted that

---

[21]    Defendants' January 22, 2008 loss reserve increase was preceded by a warning issued on December 17, 2007 that the Company expected to increase reserves by approximately $700 million.  On December 17, 2007, the Company filed a Form 8-K with the SEC attaching National City's Mid-Quarter Update for the fourth quarter of 2007. The Mid-Quarter Update, finally beginning to acknowledge the financial impact of the dynamics that defendants had

the increase had been driven by "estimated probable credit losses within the loan portfolio that have not yet reached charge-off thresholds".  Defendants' January 22, 2008 press release stated, in relevant part:

> Credit Quality
>
> **The provision for loan losses was $691 million in the fourth quarter of 2007**, compared with $368 million in the preceding quarter and $325 million in the fourth quarter of 2006. For the year, the provision was $1.3 billion in 2007 compared with $489 million in 2006. The larger provision in 2007 primarily reflects higher credit losses on liquidating portfolios of nonconforming mortgage and out-of-footprint home equity loans, as well as other mortgage loans.
>
> As of December 31, 2007, the allowance for loan losses was $1.8 billion, or 1.52% of portfolio loans, compared to $1.1 billion, or 1.18% of portfolio loans, a year ago. **The allowance has increased to reflect estimated probable credit losses within the loan portfolio that have not yet reached charge-off thresholds**.

161.    In plain English, that meant that, at all times prior to the January 22, 2008 reserve increase, defendants, by linking loss reserves to current charge-off levels,  had been basing loss reserves on *backward-* rather than *forward-looking* basis.  Unbeknownst to the class, and in direct contravention of defendants' prior class period descriptions of the Company's loss reserves, the Company's prior class period loss reserves had failed to provide for loans that had not yet reached charge-off thresholds, and instead had been based on loans already at charge-off levels.

162.    Indeed, defendants' loan loss reserve provisioning throughout 2007 merely

---

long known, stated:

> Credit Quality
> Credit quality in the commercial and core consumer portfolios, including direct home equity lending, remains satisfactory. **The areas of elevated risk continue to be in the run-off portfolios of First Franklin non-prime mortgages, especially seconds**; broker-originated home equity loans and lines of credit associated with the former National Home Equity business; and certain sectors of investment real estate and residential construction. In particular, indirect home equity loans and lines that were transferred to portfolio in the third quarter have shown further deterioration beyond that which was anticipated at the time the September 30 loan loss allowance was established. As a result, **additional loan loss provision will be required in the fourth quarter to increase the allowance to a level commensurate with management's best estimate of the probable loss content of these portfolios. While the exact amounts will not be determinable until after the close of the year, it is expected that the total provision for loan losses for the fourth quarter will be in the area of $700 million**.

76

tracked current charge-offs in rough terms, as is evident in the table at ¶ 144, *supra* (reproducing defendants' reported reserves, charge-offs, and implied reserve increases throughout 2007 and early 2008).

        (a)      For example, on April 30, 2007, defendants reported $67 million in residential real estate net charge-offs for the first quarter of 2007 and added $70 million in reserve provisioning. Similarly, on July 26, 2007, defendants reported $36 million in net charge-offs for the second quarter of 2007 and added $39 million in reserve provisioning.

        (b)      Defendants' October 24, 2007 reserve provisioning did not break from this pattern.  Defendants reported $51 million in residential real estate net charge-offs for the third quarter of 2007, and added $107 in reserve provisioning.  Although the reserve provisioning was $56 million above charge-off levels, the entirety of that increase was due to the fact that the Company had added $4.4 billion of subprime quality, second-lien NHE New Production Loans to its portfolio for which it had yet to reserve a penny (as detailed in Section III).  That is, reserves did not outstrip current charge-offs because defendants started to add reserves for loans that had yet to reach charge-off levels, but rather because defendants had to establish reserves *de novo* for $4.4 billion of NHE New Production loans.

        (c)      The pattern only changed, on January 22, 2008, when defendants disclosed fourth quarter 2007 residential real estate net charge-offs of $101 million, *but added $356 million in reserve provisioning*.  This was a qualitative and quantitative break: reserve provisions more than tripled current charge-off levels, outstripping current charge-offs by more than a quarter of a billion dollars.  Defendants' April 21, 2008 disclosures continued this new pattern: the $860 million in residential real estate reserve provisioning *outstripped by more than half a billion dollars* the $326 million in residential real estate net charge-offs.

        163.      Current charge-offs are *lagging*, rather than a leading, indicator of loan losses. It takes a long time for a loan to progress to 90 days delinquent, followed some time later by "nonperforming", followed some time later by charge-off.  Here, it took much, much longer than

usual given defendants' practice (undisclosed until May 12, 2008) of waiting for half a year without payment to go by before declaring a loan to be nonperforming, only after which time would the loan be charged off.

164.    The effect of (secretly) tying reserves to charge-offs and (secretly) waiting half a year without payment before declaring a loan to be nonperforming and only later charging it off was to produce a (secret) large "time lag" between currently operative conditions and the loss reserves supposedly established to account for them.  To illustrate:  loss reserves established in July 2007 were responding to charge-offs of loans that began to be in trouble in approximately January 2007, rather than to loans showing early signs of trouble in July 2007.  Thus, by basing reserve provisioning levels on (already artificially depressed) charge-off levels, defendants were not in fact reserving for "current economic events... and... conditions", but rather for the conditions operative approximately half a year in the past that had caused the currently-charged-off loan to become delinquent in the first place.   This rendered their reserves materially misleading in amount and nature: there was, unbeknownst to the class, a gulf between what defendants *said* they were reserving for and what defendants actually were reserving for.

165.    That gulf only widened throughout 2007 as current economic conditions deteriorated, current risks grew, and expectations for future loan performance diminished, while defendants' loss reserve methodology turned a resolutely blind eye to such deterioration and fixed its gaze backwards at charge-offs.

166.    The undisclosed backward-looking nature of defendants' purportedly forward-looking reserves goes a far way towards explaining how it came to be that through October 23, 2007 – long after subprime risks and loss dynamics were known, long after the subprime markets shut down and refinancing became impossible for subprime borrowers facing imminent rate resets and consequent payment shock, long after sharp property price deflations had set in, long after even defendants themselves acknowledged that loss severity on subprime second-liens would be 100% – defendants' loss reserve for the Company's entire $25-$30 billion of residential real estate loans

78

was only $286 million.  On October 24, 2007, it was raised, but only to $342 million.

    ii. **Falsity is Further Evidenced by Defendants' Massive Loan Loss Reserve Increases After the Class Period, Which Did Not Arise From Any "New" Risks or Conditions, But Rather Were Necessitated By Defendants' Prior Failure to Reserve For Current, Known Risks and Conditions**

    167. Defendants' massive loss reserve increases in 2008 – $691 million in January 2008, $1.39 billion in April 2008 – were largely prompted by the need to play "catch-up" to the current risks and economic conditions that defendants had ignored during 2007 by tying reserves to charge-offs rather than to other available indicators of more current risks and conditions.  In January 2008, when defendants added the forward-looking element that they had previously represented to be present, residential real estate reserves were nearly doubled from $342 million to $597 million.  In April 2008, residential real estate reserves were doubled again to $1.13 billion, and defendants further disclosed that remaining expected losses for the First Franklin loans, the Construction Loans, and the NHE loans totaled $3.3-$3.8 billion.  Such losses were of an order of magnitude completely unmoored from the loss reserves previously established and maintained by defendants.

    168. As defendants' April 21, 2008 disclosures made clear, the loan loss reserves established and maintained by defendants during the class period were materially false and misleading and completely unmoored from the Company's internal expectations for loan losses.  For example, the Company's loss expectations for the remaining $1.3 billion of First Franklin second-lien loans alone – $450 million – by themselves more than exhausted the amount of reserves maintained by defendants throughout 2007 for all of the Company's $25-$30 billion of residential real estate loans ($280-$342 million).  Even were 2007 reserves wholly dedicated to First Franklin second lien loans (and they were not), they would still have been insufficient for even the limited task of adequately reserving for this mere 4%-8% subset of the residential real estate portfolio (while of course leaving nothing at all in reserve for the remaining $23-$28 billion of residential real estate loans).

### 3.    Scienter

169.    Defendants were aware throughout the class period that their stated loss reserves were materially understated and deeply misleading.

170.    Undisclosed to the class until January 22, 2008, defendants had based the Company's loss reserves on loans that had reached charge-off levels and had failed to reserve for loans that had yet to reach charge-off levels.  This made loss reserves backwards-looking – all the more so given defendants' undisclosed 180-day delay in declaring loans to be nonperforming and then charging them off.  The result was that reserves were established on the basis of a slowly-moving shockwave conveying information reflective of *past* conditions – e.g., the economic conditions that had caused borrowers to fail to pay the loans six months in the past – rather than on the basis of more current and available information (e.g., loans in early stages of delinquency that had yet to reach charge-off thresholds).  Defendants thus knew that their loss reserves, contrary to defendants' representations, were not maintained at a level adequate to absorb portfolio loan losses given current loan risks and current economic events and conditions.

171.    Indeed, the current risks and current economic conditions relevant for determining adequate First Franklin loan loss reserves were known to defendants even at the start of the class period.

172.    First, as a preliminary matter, the Company's losses did not stem – unlike other well-publicized instances of subprime losses –  from the purchase of complex debt securities collateralized by packages of subprime mortgages originated by others and hidden by untrustworthy credit ratings.  Rather, the First Franklin loans had been generated by the Company itself.  The Company was fully aware of the underwriting standards for such loans, and of all the loans' relevant details pertaining to credit risk (e.g., LTV and CLTV ratios, borrower income levels and the debt-to-income levels imposed by the loans, property location, etc. – and, in the case of second liens as detailed below, the risks posed by the associated first liens, including the size and timing of payment rate resets).

173.    Second, the First Franklin was a *run-off* portfolio.  No new loans were being added.  At the start of the class period, defendants knew with respect to First Franklin exactly what they had to deal with.  As the First Franklin portfolio shrank nearly 40% (from $8.2 billion in April 2007 to $5.3 billion in March 2008) as loans were paid down or paid off, theoretically loss reserves could likewise decline.  But loss reserves skyrocketed.  This paradoxical circumstance was in large part the result of defendants' failure to reserve during the class period for risks and conditions that they were aware of prior to and throughout the class period.

174.    Third, defendants had long been well aware, even at the start of the class period, of all the primary dynamics that would and did drive losses in the First Franklin portfolio, and particularly in the First Franklin second-lien loans.  These primary dynamics, described below, constituted the current risks and current economic events and conditions that defendants were in fact aware of and purported to be reserving for.

(a)    **Declining Property Prices**.  Property prices had begun to decline in 2006, and *had already declined severely before the start of the class period in the geographic locales in which First Franklin made the majority of its loans* (California, Florida, and other western states such as Nevada, Arizona).  Property price declines increased loan loss risks in two ways.  First, they directly increased the loss severity of loans that entered default – as the collateral, if sold after foreclosure, now had lower market value.  This was particularly consequential for the First Franklin second liens, where loss severity upon default would be total.   Second, property price declines also increased the risk of default.  Falling house prices, combined with 100% CLTV mortgages, meant that many borrowers were effectively "underwater" – they had borrowed more through their mortgage than the property was worth, and thus not only had no equity in the property but in fact had "negative" equity.  Such borrowers were significantly more likely to default.

(b)    **Subprime Market Collapse in Early 2007**.  Both the subprime primary (i.e., origination) and secondary (i.e., securitization) markets collapsed in early 2007.  Defendants themselves so acknowledged no later than March 2007 when they admitted they would not be able

to sell their $1.6-$1.7 billion of "held for sale" First Franklin loans.  Acknowledgments aside, the collapse was front page news.  Subprime loans were no longer desirable commodities, and subprime loan originators largely either went bankrupt (dozens in late 2006 and early 2007) or tightened their loan origination standards so as to no longer originate many or any subprime loans.  The subprime markets collapsed because the real credit risks of subprime mortgages – and the extent to which origination standards had been debased – began to be widely understood.  Defendants, subprime lenders themselves, had long been intimately aware of subprime origination standards.  In any event, no later than the market collapse they themselves acknowledged in March 2007, defendants were so aware.

(c) **Subprime Adjustable Rate Mortgage Origination Standards Create a Wave of Mortgages Guaranteed to Default Absent Refinancing Before Rate Resets**.  First Franklin mortgages, and subprime mortgages generally, were overwhelmingly adjustable-rate mortgages in which, after an initial "teaser" period of below-market fixed rates (generally 1 or 2 years), rates would reset to a premium over market rates (e.g., "LIBOR plus 2", or 2% above the LIBOR rate).  Subprime practice was to qualify borrowers for such mortgages on their ability to pay the low initial rates, rather than the higher subsequent rates ("fully-indexed rates") to which the mortgage would reset.  Indeed, subprime borrowers often only qualified for mortgages based on the initial rates: i.e., they had a demonstrated *inability* to carry the payment burden at the higher rates to which the mortgages would reset (referred to as "payment shock").  In order to avoid payment shock and default, such borrowers would have to refinance their mortgages prior to or shortly after the rate resets.  Defendants, themselves having operated one of the country's largest subprime mortgage originators, were well aware that subprime originations had been based on the low initial rates, and that with refinancing now unavailable (as detailed next) such mortgages would default at unprecedented levels.

(d) **As a Result of Declining Property Prices and the Early 2007 Subprime Market Collapse, the Door to Refinancing Closed, Trapping Subprime Borrowers in**

**Adjustable-Rate Mortgages With Impending Large Payment Rate Resets.**  By March 2007, with subprime risks now understood, and with subprime loans no longer able to be sold, lenders were no longer willing to make subprime loans on the same standards as before.  That meant, for instance, that borrowers who had taken out high LTV or CLTV loans (e.g., $295,000 for the purchase of a property valued at $300,000), could no longer obtain through refinancing an equally-high LTV or CLTV loan that would allow them to pay off the initial mortgage.  For example, post February-2007, such borrowers would only be able to borrow at an 80% LTV/CLTV rate (e.g. $240,000 for a $300,000 property.  And since property prices had already sharply declined in the interim, the amounts they would qualify for would be lower still.  Furthermore, as "stated income" loans became largely extinct, all new loans would be based on documented/verified income, thus further shrinking the amounts that subprime borrowers would be qualified to borrow.  In short: given tightened lending standards and declining property prices, subprime borrowers would no longer be able to borrow amounts sufficient to enable refinancing, and were thus trapped in their adjustable rate mortgages with rate resets looming.  Given such circumstances, it was widely understood that the upcoming rounds of adjustable rate mortgage rate resets would produce a much higher spike in defaults than in the past, because – unlike circumstances in prior years – subprime borrowers would no longer be able to refinance their way out of those mortgages and their payment shocks.

Defendants were well aware of this at all times during the class period.  During each of the class period conference calls, defendants discussed First Franklin risks and reserves primarily in light of the timing and size of the rate resets on the mortgages.

(e)    **The Especially Severe Risks of "Piggyback" Loans**.  The two chief excesses of subprime lending were: (1) stated income loans, in which borrower income was merely "stated" by the borrower rather than documented or verified by the lender (now widely known as "liar loans"; and (2) extremely high LTV loans, in which borrowers borrowed nearly all or even all of the property purchase price with little or no down payment.  The former (stated income lending) increased the risk of default, because "stated" incomes were frequently overstated, thus overstating

83

the borrower's ability to successfully make monthly loan payments.  The latter (high LTV lending) also increased default risk slightly (borrowers with little equity invested in the property were more likely to defaults), but in main effect increased the loss severity upon default.   The higher the amount loaned for a given property, the less likely a lender was to be able to recoup that amount in case of default, after the costs of foreclosure.[22]

(i)      **Piggyback Loans**.  High LTV lending reached its apotheosis, or nadir, in the form of the "simultaneous second-lien" or "piggyback" loan.   The Company's $2.2 billion of First Franklin second-lien loans (at the start of the class period) were piggyback loans. In piggyback lending, borrowers borrowed the *entire* value of the property by taking out a first-lien mortgage *together with* a "simultaneous second" second-lien loan (used as a down payment to make the borrower eligible for the first mortgage).  The "combined loan-to-value" ratios of piggyback loans generally approached 100%, meaning, as discussed above, that default risks were greater, and loss severity were greater.  However, as discussed next, the peculiarity of the piggyback structure offloaded losses specifically to the piggyback, making piggyback loss severity not merely extreme, but total.

(ii)     **Piggyback Loan Loss Severity Was 100%, or Total**.  The loss severity arose from the combination of (1) the high combined loan to value ratio of the piggyback loan (generally, approaching 100%), (2) the high costs of foreclosure, and (3) crucially, the *subordinate* position of the second lien.  Because the entire value of the property (e.g., $300,000) had been borrowed through the combined first and second liens (e.g., respectively, $260,000 and $40,000), proceeds from a foreclosure sale ($300,000, optimistically) – after foreclosure costs ($50,000)– were often insufficient to repay even the first lien ($250,000 recovered, but $260,000

---

[22]      To illustrate: A borrower obtains a $295,000 loan package to buy a $300,000 property, but subsequently defaults. The costs and fees associated with the foreclosure process could be approximately $50,000. Thus, even if the lender sold the property at foreclosure for full $300,000 value, it would only recover $250,000 after foreclosure costs – and would thus be out $45,000 on the $295,000 lent.  Conversely, if a substantial down payment of 20% had been required for the $300,000 property, then the amount loaned would be $240,000 (80% LTV) and, even after foreclosure costs of $50,000, the lender would still recoup enough through foreclosure sale ($300,000) to emerge without a loss ($240,000 lent; $250,000 recovered).

lent), *leaving nothing left to repay the second lien*.  In short, when piggyback loans defaulted, the second-lien lender was generally left with a total or near-total loss.  Declining real estate prices beginning in 2006 worsened this dynamic, as they further reduced the proceeds resulting from foreclosure sales and thus effectively guaranteed that upon default, piggyback loan losses would be total.

(iii)    **Defendants Knew Prior to the Class Period that Piggyback Loan Loss Severity Was 100%, or Total, and Represented Explicitly That They Took Such 100% Loss Severity Into Account in Their Reserves**.    During their January 23, 2007 conference call, defendants stated that their loss expectation models (and thus, their loss reserves) included assumptions that First Franklin second-lien loss severity would be 100%  – "we assume a 100% loss on non-prime second mortgages that go bad".

(iv)    **Given That Piggyback Loss Severity Was Recognized to be Total Even Prior to the Class Period, The Operative Driver of First Franklin Loan Losses – and Loan Loss Reserves – Was Thus the Likelihood of Loan Default**.  Fifth, given that loss severity upon default was total, the operative driver of losses from second lien loans was therefor the risk or rate of default.  Put in plain English, given that any piggyback loan that went bad would lose all its money, the chief worry was therefore how many of the loans would go bad.  Defendants' statements show that defendants had reached this conclusion no later than January 2007, when they began to model for 100% loss severity for the Company's First Franklin piggyback loans.

(v)    **The Primary Driver of Piggyback Default Risks Was the Larger, Associated First-Lien Mortgage, and Especially the Resetting Rates on the First-Lien Mortgages.**  The primary driver of second lien defaults are the larger first lien mortgages with which the second liens are associated, and specifically the rate resets on those mortgages.  Those larger first lien mortgages account for the majority of the borrower's payment burden.  The vast majority of subprime first-lien  mortgages were adjustable rate mortgages featuring low initial rates that, after 1 or 2 years, reset to much higher, above-market rates.  Such rate resets produce "payment shock"

85

and cause defaults to spike as borrowers prove incapable of satisfying the higher monthly payments. Recent subprime origination standards were such that borrowers were qualified for such mortgages based on their ability to carry the low, initial rates despite their simultaneously demonstrated *inability* to pay at fully-indexed rates.  Given that the door to refinancing was effectively closed to subprime borrowers in March 2007, current subprime borrowers – unlike in years past – would not be able to refinance out of such rate-resetting mortgages.  The result of all this was that the coming default spike as a result of rate resets would be much higher than in prior years.

(vi)    **Prior to and Throughout the Class Period, Defendants Explicitly Represented That Their Loss Reserves For Second-Lien Loans Were Based on Analysis of the Associated First Liens and, Especially, the Timing and Size of Their Rate Resets**.  Again, defendants' statements show that defendants were aware of this dynamic no later than January 2007, and defendants represented during throughout the class period, in each of their class period conference calls (April 30, 2007; July 26, 2007; September 6, 2007; October 24, 2007; January 22, 2008) that this dynamic was driving their loss reserve provisioning for First Franklin loans.

For example, during their January 23, 2007 conference call, defendants explained that the First Franklin piggybacks had been "originated between July of 2005 and April of 2006",were associated with first-lien adjustable rate mortgages whose rates would reset after 1 or 2 years, and that as a result of this reset schedule, defendants were "accelerat[ing] our estimate of the timing of these losses" to conlude that "roughly two-thirds of these [First Franklin second-lien] losses [are] expected to occur prior to the two-year anniversary of the origination on the loan".

Similarly, during defendants' July 26, 2007 conference call, defendant Bell explained that "those of you who have followed National City in the performance of the First Franklin loans that we have elected to retain over the years, recall that losses and payoffs both peak around the second anniversary, when the bulk of the rates reset...".

Likewise, defendants' September 6, 2007 conference call analysis of the First Franklin loans was dedicated in detail to an analysis of the effects of rate resets:

86

>ROWE: ... what happens with rate reset activity?  What does that mean?  What does it mean for the first liens?  What does it mean for second liens?... So you look at our book of business and you say, okay, how much rate reset activity do you now have over the next nine months in first liens?  You have $1.5 billion...  The second liens, you have to extrapolate the same type of analysis.  So the second liens where we have $800 million of second liens that will have rate resets over the next year in front of them... If you do that math, you come up with [expected losses of] $50 million, $60 million...  So once again, the final them is that in the real estate book overall at National City, we have the segments that you have known about that have challenges.  We are changing some of our reserve forecast for those challenges, nothing major and nothing dramatically new... [W]e're saying that we believe because of the rate reset activity and the delinquency that has generated out of that, there will be higher loss content than we had said when I think we described a 12% loss.  This is not a significant change...

The same analysis was repeated during defendants' October 24, 2007 conference call.

Defendants represented explicitly that they had been tracking rate reset activity and its effects since

October of 2006 for First Franklin first and second liens ("what I would highlight for you is that we

have been tracking since of October of last year, what exactly does rate reset activity mean?") and

that defendants had reserved for higher-than-actually-witnessed levels of delinquency and loss

severity resulting from rate resets ("we have assumed delinquencies that are generated from rate

resets and we have also assumed loss severities that are higher than we have seen traditionally"):

>ROWE: ... we will start with the nonprime portfolio... Losses for the nonprime first liens and second liens have been broken out... **As we have described in the past, the action is in the performance of a second lien portfolio which totals $1.7 billion... It appears that the rate resetting of the first liens in front of those second liens is leading to increased delinquency.  With little liquidity left in the nonprime market, we believe this trend will continue**.  Therefore, we increased loan reserves... In summary, we conducted a thorough review of all the loan portfolios.  Rigorously evaluated the trends and current environment and increased our reserves to a level that we believe is appropriate [given] our view of the expected loss inherent in the loan portfolio.
>*****
>Well, when you look at the nonprime book at National City, it's made up of both first liens and second liens.  The ultimate outcome, as we've described in the past, would be different between first and second liens.  Let me walk you through that a little bit.  **The rate reset activity over the next 18 months on the first lien portfolio**

> **will be approximately $1.6 billion.  Of that $1.6 billion, somewhat close to $1 billion are first liens that are insured.  So really we have only a $600 million book of business that will be subjected to rate resets where we could be on the hook for loss content... But what I would highlight for you is that we have been tracking since of October of last year, what exactly does rate reset activity mean?... On the second lien portfolio, we have approximately $600 million of content that will have rate reset activity in front of it over the next 18 months... What I would assure you in our calculations when you are simulating the current environment, we have assumed delinquencies that are generated from rate resets and we have also assumed loss severities that are higher than we have seen traditionally... we believe that we are appropriately reserved for the potential outcomes**.
> *****
> Well, I would state right up front that the current level of reserves today is driven by our expectations of the performance of the portfolio going forward.  It's not driven by net charge-offs at the time, but it's really a look to the future.  So, we believe we are appropriately reserved.

Indeed, during defendants' October 24, 2007 conference call, defendants described how, in anticipation of every single First Franklin loan that would experience rate resets, defendants contacted borrowers 90 days prior to the reset "to go over the math and determine what is their ability to handle that type of increase or not":

> ROWE: ... as it relates to the legacy First Franklin book, **we have instituted a calling tree – calling 90 days ahead of time to any customer that is going to have a rate reset**.  We think that's an important thing to do **so we can actually work with that person in front of the rate reset to kind of go over the math and determine what is their ability to handle that type of increase or not**.

> (vii)  **Because Defendants Tracked The Rate Reset Schedules for The First-Lien Mortgages Associated with the First Franklin Piggybacks, Defendants Were Aware and in Fact Acknowledged Even Prior to the Class Period That Resets, Defaults and Losses Would Balloon During the Class Period, When The Majority of Those Rate Resets Would Occur.**  As the above-quoted conference call statements evidence, defendants kept themselves intimately apprised of rate reset timing and size with respect to the First Franklin loans.  Prior to the class period, defendants were aware given the rate reset schedules of the first lien mortgages

associated with the First Franklin second lien piggybacks, the Company was facing a wave of rate resets, and consequent spikes in defaults and losses that would crest in 2007 and 2008. Defendants' class period conference call statements displayed that defendants were tracking looming rate resets and their effects in detail. Indeed, defendants' practice, as stated during their October 24, 2007 conference call, was to contact all First Franklin borrowers three months prior to the rate reset "so we can actually work with that person in front of the rate reset to kind of go over the math and determine what is their ability to handle that type of increase or not".

175. **Every Single Factor Cited by Defendants for Their Massive 2008 Reserve Increases Had In Fact Been Known At the Start of the Class Period.** The essential negative dynamics affecting the First Franklin loans – and especially the second liens responsible for generating the majority of the First Franklin losses – were known to defendants even at the beginning of the class period. All the "risk characteristics of the loan portfolio", and all the relevant economic and geographic conditions (to reiterate: sharp property price declines in First Franklin's major areas of operation, the collapse of the subprime market and the absence of any escape hatch through refinancing) were known at the beginning of the class period. Defendants represented generally and explicitly, throughout the class period, that the loss reserves they established took such risk characteristics and conditions into account. But in fact they did not.

176. In the first months of 2008, defendants enacted two unprecedented, massive reserve increases ($691 million in January 2008; $1.39 billion in April 2008) driven in large part by the First Franklin second lien loans. But as defendants' explanations for those reserve increases demonstrates, *there were no new developments that drove those increases*. Rather, the factors cited by defendants as having necessitated those enormous and late-breaking reserve increases were exactly the same factors that defendants had been aware of throughout the class period, exactly the same factors that defendants explicitly represented that they had been reserving for – 100% loss severity, defaults driven by rates resetting on first lien mortgages, all exacerbated by the absence of refinancing options and by home price deflation.

89

177.    For example, during their January 22, 2008 conference call and in conjunction with by far their largest reserve increase to date ($691 million), defendants explained:

> ROWE: ...The second mortgage portion of the nonprime portfolio exhibited increased delinquency and charge-offs in the fourth quarter. Refinancing options are now limited to only the upper end of this portfolio. The lack of liquidity in the marketplace to refinance for many of our borrowers has created pressure as the rate reset activity increases. For National City, the impact of rate resets will play out earlier than the non-prime industry overall, as much of the first resets our customers face already happened in 2007 or will happen within the first four months of 2008...
>
> ... The second liens have and will continue to drive the bulk of the losses... the trends in the 90-plus-day dollar delinquency number have deteriorated since mid-summer, when liquidity for this asset class dried up. We believe that many of these second liens are behind first liens, which have or will rate reset by April 2008. So we anticipate the pressure applied to this portfolio from mortgage rate resets will abate later in 2008. Please note that we increased loss reserves for this portfolio in the fourth quarter meaningfully... For the remaining non-prime book, the effects of repricing a first that stand in front of our seconds, as well as the refinancing constraints facing these borrowers, will be the most important factors driving the ultimate level of losses.

178.    Defendants' January 22, 2008 representations are extraordinarily striking insofar as *every single factor cited for the necessity to "increase[] loss reserves for this portfolio in the fourth quarter meaningfully" had long, long been known to defendants*. That refinancing would be impossible for subprime borrowers in adjustable rate mortgages was known in March 2007, when defendants themselves acknowledged the collapse of the subprime market. That rate resets would drive First Franklin piggyback defaults and losses was known since January 2007: defendants had been tracking resets since October 2006 and in fact called every borrower facing a reset 90 days before the reset to "go over the math" and determine whether the borrower (and loan) could survive the payment shock. That any First Franklin piggyback loan that defaulted would experience a total loss upon default was also known since January 2007. Indeed, defendants merely confirmed on January 22, 2008 what they had known and represented one year earlier on January 23, 2007 – that the rate reset timing for First Franklin loans would hit the Company prior to the 2 year anniversary of the loans, namely, between mid-2007 and mid-2008.

90

179.    In short, defendants' massive January 22, 2008 reserve increase, including the "meaningfully" increased loss reserves for First Franklin second liens, was not necessitated by any new developments, but rather and only by defendants' prior failures/delays to reserve for long-known risks and conditions.

180.    Defendants' April 21, 2008 reserve increase ($1.39 billion) was an exact redux of the January 22, 2008 reserve increase.  As defendants explained during their April 21, 2008 conference call:

> ROWE... From a risk perspective, there are two portfolios here: $4 billion of first mortgages and $1.3 billion of second.  The second liens have and will continue to drive the bulk of the losses... We believe that  a significant factor behind growing second lien delinquencies and losses are rate resets on the underlying first lien. Through the end of the first quarter, many of the seconds have had a first in front of them reset.  We did significantly increase our loss reserves for this portfolio in the fourth quarter and further added to loss reserves in the first quarter.  We also adopted new charge-off policies that accelerated loss recognition in the portfolio, including recognizing 100% loss severity on second liens at 180 days past due and reflecting recoveries from mortgage insurance proceeds on a cash basis.  Incremental first lien charge offs include the effect of higher loss severity assumptions.
>
> ... we are summarizing remaining expected losses on these three higher risk and liquidating portfolios... The nonprime portfolio losses shown here at $750 million are net of expected mortgage insurance recoveries.  Gross losses before mortgage insurance would be approximately $1.2 billion. For the second lien portfolio cumulative lifetime gross losses are expected to be approximately 50% of the beginning static pool.

181.    **Defendants Were Reluctant To Establish Reserves Adequate To Absorb Known Conditions and Risks Because So Doing Would Reveal and Precipitate A Capital and Liquidity Crisis**.  In truth, defendants – aware at the beginning of the class period of the risks and conditions that they only began to reserve for at the end of the class period – were reluctant to establish reserves "adequate [] to absorb probable incurred losses within the loan portfolio [] based on the size and current risk characteristics of the loan portfolio... current economic events in specific industries and geographical areas [] and general economic conditions" because actually doing so

would exhaust the Company's available capital and liquidity and reveal the true depth of the Company's crisis.

182.    In truth, the Company's losses residing in the Company's portfolio of residential real estate loans were threatening to overwhelm the Company.  That crisis and its depth became increasingly evident between January 2008 and April 2008, as the Company: (1) slashed its dividend twice and effectively eliminated it; (2)  raised $2.5 billion in funds, yet (3) still had its credit ratings slashed and its counterparties cut off their exposure to the Company; until (4) defendants put the Company up for purchase by a deep-pocketed suitor who could provide the funds necessary to absorb the loan losses sitting on the Company's books.  Indeed, it was only *after* the Company secured a life-saving $7 billion infusion that defendants disclosed the true extent of the losses expected from the Company's most troubled residential real estate loan portfolios – $3.3-$3.8 billion, including $750 million from First Franklin loans alone.  And, as defendants admitted, that $7 billion infusion was only given after defendants had allowed the entities providing those funds to view heretofore "nonpublic" information – namely, the size of the loan losses sitting on the Company's books.

183.    At all times prior to April 2008, defendants publicly "low-balled" their loss reserves and loss reserve provisions, putting them at amounts far below those actually needed to absorb probable losses from the Company's loan portfolio.  Defendants were motivated to do so in order to obscure the severity of the Company's capital and liquidity predicament – which, had it been revealed, would have likely resulted in compounding that predicament into a "death spiral" like the one experienced by Bear Stearns.  Establishing truly adequate loss reserves would have swallowed up the Company's available funds and capital and would have plunged the Company's Tier 1 ratio below regulatory thresholds for "well-capitalized" institutions.  The consequences for the Company of falling below such thresholds would be severe.  Namely, in light of its massive liabilities its potential inability to satisfy them (as signaled by a Tier 1 shortfall), the Company would need to raise funds to demonstrate its continued viability.  Yet at exactly the same time, and

92

precisely because of its massive liabilities and potential inability to satisfy them, raising funds would become far more expensive and/or impossible (because of concerns about the Company's creditworthiness). More importantly, the Company's counterparties – fearing for their own exposure – would refuse to do further business with the Company and demand payment from the Company for debts it owed (in short, a "run on the bank") at the very time the Company was itself already short of funds. The result – insolvency. Indeed, defendants later admitted in April 2008 (as was anyway evident from a glimpse at the Company's share price) that they had in fact entered just such a death spiral. The Company's credit ratings were cut with the possibility of more to come, the Company's counterparties began to limit their exposure, and the Company put itself up for sale in the hope that a deeper-pocketed suitor could provide the funds necessary to survive the loan losses sitting on the Company's books. And all this *despite* defendants' low-balling of loss reserves, as market participants began to suspect that the Company's loan losses were materially larger than defendants' stated loss reserves (and, indeed, defendants' ability to adequately reserve for them).

> **D.  Defendants Further Misled as to First Franklin Loan Performance and Reserve Adequacy by Characterizing Insurance Disputes as the Primary Driver of Loss Reserve Increases for the First Franklin Loans**

184.    Through most of 2007, defendants represented that they had adequately reserved for the First Franklin loans, that the First Franklin loans were performing within defendants' loss reserve expectations, and that the primary driver of the need to increase First Franklin loss reserves was, purportedly, the recalcitrance of one of the Company's two insurers to pay claims for insured First Franklin loans.

### 1.    Misrepresentations

185.    Defendants' March 14, 2007 Mid-Quarter Update for the first quarter of 2007 provided an update on the credit quality of the Company's loans. In the Mid-Quarter Update, defendants represented that they would have to raise loss reserves for the First Franklin portfolio by approximately $50 million solely as a result of the behavior of one of the Company's insurers:

Credit Quality

In the nonconforming mortgage (First Franklin) portfolio, delinquency trends and losses have thus far been consistent with the expectations embodied in the year-end loan loss reserve. As previously disclosed, a sub-portfolio of second mortgages, totaling $2.2 billion at December 31, is covered under lender paid mortgage insurance written by two different carriers, and these policies are in turn subject to 50% reinsurance by a National City subsidiary. **While one of the insurers has been paying submitted claims promptly, the other has been rejecting a meaningful number of claims filed for reasons that National City believes are inappropriate under the insurance contract**. Should this situation not be resolved through negotiation by the end of March, National City plans to pursue all available contractual and legal remedies to achieve payment of valid claims. In this circumstance, all such loans in dispute will be fully charged off or equivalently reserved. **Further, the allowance for loan losses is subject to adjustment based on changing expectations of insurance recoveries from the carrier. The exact amount of the required adjustment to the allowance for loan losses arising from these circumstances has not been determined; however, it is currently estimated to be on the order of $50 million**, which could be partially offset by a reduction in reinsurance expense at the insurance subsidiary.

186.     Defendants announced first quarter operational and financial results on April 30, 2007.  Defendants' April 30, 2007 press release disclosing those results identified insurer behavior as the primary cause of increased loss reserves and charge-offs.  Specifically, defendants stated that $20 million of the Company's first quarter 2007 reserve increase ($122 million in total, of which $70 million related to residential real estate) had been necessitated by the insurer's behavior, which had also caused the Company to charge off a further $24 million of First Franklin loans (out of total First Franklin charge-offs of $53 million for the quarter).

The provision for credit losses for the first quarter of 2007 was $107 million, compared to $323 million in the fourth quarter of 2006, and $27 million in the first quarter a year ago. **As previously disclosed in the Corporation's midquarter report, one of the third party mortgage insurance providers for the run-off nonconforming mortgage loan portfolio has been rejecting a meaningful number of claims for reasons that management feels are unjustified. In light of this situation, adjustments were made to the Corporation's charge-off practices and loss forecast to reflect an assumed loss of insurance coverage for loans in dispute. Approximately $20 million of the provision for credit losses in the**

94

**first quarter of 2007 arose from these revised assumptions regarding insurance coverage**. Notwithstanding these adjustments, management believes it is entitled to insurance recovery and continues to pursue its contractual rights under the contract. Within the nonconforming mortgage portfolio itself, delinquencies and credit losses have been in line with loss forecasts established at the end of 2006.

First quarter 2007 net charge-offs were $147 million, compared to $128 million in the preceding quarter, and $121 million in the first quarter a year ago. **Charge-offs for the first quarter of 2007 included $53 million of nonconforming mortgage loans of which approximately $24 million were associated with the previously described insurance matter**.

187.    In a conference call that defendants held with analysts and investors on April 30, 2007 to discuss the Company's results, plans and prospects, defendants focused on the insurance issue at length.  Defendants represented that proper understanding of the Company's First Franklin portfolio performance required that analysis be "divided into two parts; the performance of the underlying loans and the claims playing behavior of our insurers".  Defendants represented that underlying First Franklin loan performance was good but insurer behavior was not, and that insurer behavior lay behind the Company's (modestly) increased loss reserves and charge-offs:

> JIM BELL, CHIEF RISK OFFICER, NATIONAL CITY CORP.:...
> Within the nonconforming runoff portfolio, the underlying loans are performing somewhat better than we had expected at the start of the year, but because of the continued tightening of lending standards in the market, we are not yet improving or adjusting our loss development forecast. **The disagreement with one of our lender-paid mortgage insurance providers, described in our mid-quarter update last month, did not reach resolution by the end of the quarter. So at that point, we did charge-off all loans that were over 180 days past due and where the insurance status was in question. This reflects a regulatory requirement. We also adjusted our reserve upwards to reflect the actual history of claims paid versus claims made through the first quarter of the year from inception**. I'll walk you through the impacts of the accounting.
>
> *****
> **Now, the portfolio performance during the quarter for the portfolio needs to be divided into two parts; the performance of the underlying loans and the claims playing behavior of our insurers**...

95

**Turning to the insurers, we described our disagreement with one of our insurers in our mid-quarter update last month. We did not reach resolution by the end of the quarter and we took the accounting actions we had outlined. Specifically, we charged off all loans over 180 days past due, where there was an element of claims dispute, or $24 million of loans, and we adjusted our reserve upwards by $40 million to reflect the rate of claims paid versus claims made through March 31st**. Partially offsetting these effects was the positive adjustment to our own insurance reserve on our reinsurance of those of $20 million, harmonizing the claims payment assumptions. **In recent days we have been that the insurer is undertaking executive level review of these denial decisions and that this has resulted in a substantial number of these decisions being reversed**. We have meetings scheduled over the next couple of weeks between National City executives and executives from the insurer to establish a mutual understanding of coverage recision practices, both past and going forward. As I stated at the beginning of my remarks, I am cautiously optimistic we'll be able to resolve this matter satisfactorily, but that will be a second quarter event.

In summary, credit performance in retail and wholesale businesses are very solid, residential mortgage-related credit shows weakness, but is somewhat stronger than we expected, and **we have taken what I think is an appropriate but conservative approach to accounting for our LPMI issue, although I hope developing facts will allow our recapture of much of those reserves**.

188.     Defendants similarly represented in the Form 10-Q for the first quarter of 2007, filed with the SEC on May 9, 2007:

**A third-party mortgage insurance provider has been denying a meaningful number of claims on second lien nonconforming mortgages for reasons that management believes are inappropriate. In the first quarter of 2007, management changed its charge-off practices and recovery forecast on this portfolio to reflect an assumed loss of insurance coverage for all such loans in dispute. A provision for credit losses of $20 million arose from these revised assumptions regarding assumed loss of insurance coverage**. Management intends to continue to pursue its contractual right to payment under this contract. To the extent the Corporation ultimately prevails on disputed claims, recoveries will be recognized when received.

189.     On June 14, 2007, defendants filed a Form 8-K with the SEC attaching National City's Mid-Quarter Update for the second quarter of 2007.  The second quarter Mid-Quarter Update again stated that underlying First Franklin loan performance was good and was

96

within the Company's expectations and loss reserves, and made further mention of insurer behavior:

> Credit Quality
>
> Credit trends in the core commercial and consumer portfolios continue to be stable.  In the run-off portfolio of First Franklin nonconforming mortgages, delinquency trends and losses have been relatively stable and remain consistent with the expectations underlying the year-end loan loss reserve. **As previously disclosed, a sub-portfolio of First Franklin second mortgages, totaling $1.9 billion at May 31, is covered under lender paid mortgage insurance written by two different carriers, and these policies are in turn subject to 50% reinsurance by a National City subsidiary. While one of the insurers has been and continues to pay submitted claims promptly, the other had been rejecting a meaningful number of claims filed for reasons that National City believed were inappropriate under the insurance contract.** Following the payment in May of a number of previously disputed claims, as well as recent discussions with this carrier, there is reason to expect a more favorable and predictable claims review and payment process going forward.

190.    Defendants announced financial results for the second quarter of 2007 on July 26, 2007.  During a conference call with analysts and investors to discuss the Company's results, plans and prospects, defendants presented a sunny picture of First Franklin portfolio performance.  Defendants stated that underlying loan performance was within loss reserve expectations, that insurer behavior had improved, and that, although the Company was being "conservative" in not reducing its loss reserves, if insurer behavior continued to improve, the Company would in fact reduce its loss reserves:

> JIM BELL, CHIEF RISK OFFICER, NATIONAL CITY: Thanks, Jeff, and good morning, all. I describe the first quarter results from a credit standpoint as complex and interesting. I think the second quarter results are better described as straightforward, routine and solid. You may consider them to be stronger than that.
>
> In our footprint commercial and retail banking businesses, losses declined from the first quarter to the second and the outlook remains stable. **In the runoff portfolios from national home equity and non-prime, gross loss development moderated during the quarter and we also came nearer to agreement relative to claims payment with one of our mortgage insurers. The combined effect of those positive developments was a reduction in residential real estate loss during the quarter**. I will speak more on the outlook for those portfolios in a moment.

The non-prime mortgage portfolio reduced by $800 million during the quarter. Dollar **delinquencies improved modestly during the quarter and net charge-offs moderated principally because of an improvement in claims payment performance by one of our LPMI providers. While that performance is improved, it is not yet at the level of our expectations nor does it match the level of our other provider. We have, accordingly, not adjusted the claim paying assumptions embedded in our reserve analysis, although obviously we reflect the claims paid on a dollar-for-dollar basis in the current results. If we continue to observe sustained performance, we will look revisit the reserve assumption in the next quarter**.

**Leaving aside the noise of the insurance, the performance of the underlying loans for the first two quarters has been somewhat better than our expectation**. You should recall that at the end of last year, trouble by the development of greater than expected early delinquency on the 2005 vintage loans, we projected what the performance would be if delinquency, the transition of delinquency severity and ultimately loss rates continued to accelerate and grow, and we set our loss reserve accordingly. Thus far, the rate of loss development for 2007 has been below our original expectation. We have not, however, changed our loss development rate assumptions for the reserve. We have adjusted the start point each quarter to reflect our actual experience.

**Right now, our best estimate is that net losses in the second half of the year will be approximately the same as those for the first half. However, if the next two quarters outperform, as have the last two, or if our LPMI provider continues to provide -- to improve their claims paying performance, that estimate could prove to be too conservative**.

On the other hand, those of you who have followed National City in the performance of the First Franklin loans that we have elected to retain over the years, recall that losses and payoffs both peak around the second anniversary, when the bulk of the rates reset and the prepayment fee falls away on the underlying loan. The sub-portfolio that contains the most risk is the remaining $1.88 billion of second mortgages, which were originated during the second half of 2005. If the borrowers underneath this portfolio perform as did our borrowers from the first half of 2005, then we will be pleased. This is, however, the greatest risk to our forecast and I look forward to knowing, rather than projecting, this outcome.

*****

RASKIND: ... To sum up, while the first half of this year has been more difficult than we expected, we firmly believe that this Company is strategically in a much better place than it was one year ago. We've

got a more attractive footprint, a lower risk profile, and a better business mix. We are acutely aware of where we have fallen short of expectations, and of the risks and the challenges we face. National City harbors much more performance potential than we have been displaying in the recent past and we are working hard to convert that potential to clear results. And along the way, we pledge to be very candid and forthright as we keep you apprised of our progress.

191.     On September 6, 2007, defendants held their annual Analyst Day. Defendants' September 6, 2007 disclosures, including a press release and a lengthy conference call, marked (as elsewhere alleged in greater detail) the first in a series of admissions concerning the financial impact of the Company's residential real estate loans.  A press release issued by the Company on September 6, 2007 warned of an expected $160 million in residential real-estate related charges (including loss reserve increases, severance charges for discontinued operations, etc.) that would cause the Company's mortgage-banking line of business to lose an estimated $130-$160 million in the third quarter.  The September 6, 2007 press release stated specifically that while the company's commercial loans and consumer loans were fine, "certain subsectors" of the company's real estate loans, and "in particular, portions of the First Franklin sub-prime run-off portfolio" had come under "greater stress" and would require loss reserve increases:

> Also during today's conference, National City Chief Credit Officer Robert C. Rowe reviewed credit trends, noting that the commercial loan portfolio is stable, and that the consumer portfolio continues to be very strong.  The primary area of credit focus is in real estate. **While the majority of the company's real estate risk levels are stable to modestly increasing, there are certain sub-sectors of the portfolio that have come under greater stress as difficult market conditions continue. In particular, portions of the First Franklin sub-prime run-off portfolio**, investment real estate, and loans to individuals to finance real estate investment **are subject to increased loan loss reserve requirements in the second half of this year**.

192.     In defendants' September 6, 2007 Analyst Day presentations and conference call[23], defendants explained that they would increase loss reserves for First Franklin by $50 million, $40 million of which increase was specifically related to the First Franklin second-lien mortgages.

---

[23]     Defendant Bell – who as Chief Risk Officer had previously run presentations concerning portfolio performance and credit quality – was not in evidence on September 6, 2007.  Defendant Rowe took over that function. Defendant Bell's resignation was later announced on November 16, 2007.

Again, defendants explicitly represented, with respect to the First Franklin reserve increase, that "the real driver [] is the behavior of insurer b" and that " if insurer b was paying at the same claims rate that insurer a was, there would not be much [reserve increase]  here at all. That is really why it is going up":

> So once again, the final theme is that in the real estate book overall at National City, we have the segments that you have known about that have challenges. We are changing some of our reserve forecast for those challenges, nothing major and nothing dramatically new.
>
> *****
>
> ROB ROWE: I will take a stab. Well on the consumer side if you're increasing your reserves, you're increasing your expected life forecast. So they do translate one another. **And we're saying that we believe because of the rate reset activity and the delinquency that has generated out of that, there will be higher loss content than we had said when I think we described 12% loss. This is not a significant change. And once again, if insurer b was paying at the same claims rate that insurer a was, there would not be much here at all. That is really why it is going up.** ... **Yes, the gross losses are going up. If insurer b was paying at that same rate that insurer a, the net losses would not be going up by much at all. But I have given you the number. I think that is the number.**
>
> TOM RICHLOVSKY: I think **I gave you that 12% number and that was two quarters ago. That was pre-insurance losses on the second mortgage loan portfolio. Obviously we're anticipating greater degree of gross loss on those seconds. But the real driver as Rob has just alluded to is the behavior of insurer b on the payment rate on those losses driving net losses. But it is not 12% on the entire $7.5 billion of First Franklin.**

## 2.      Falsity and Scienter

193.     Defendants' above-detailed statements were materially misleading, and created the impression of a state of affairs that differed materially from the one that actually existed. Between March 2007 and September 2007, defendants' representations made matters seem as if the risks to the Company of the First Franklin loan losses were driven primarily by the "improper" behavior of one of the Company's insurers, and that absent such "improper" behavior the Company's loss reserves for First Franklin were adequate and would not have needed to be

100

increased.

194.     In truth, as already alleged, defendants had been failing throughout to reserve for current, known portfolio risks and current, known economic events and conditions.

195.     After September 2007, defendants announced round after round of increasingly immense loss reserves, necessitated primarily by the First Franklin loans, the Construction Loans, and the NHE loans.  Defendants simultaneously ceased to speak of insurer behavior.  In fact, in conjunction with their most massive reserve increase (the $1.39 billion for the first quarter of 2008), defendants, when asked about insurer behavior in an April 21, 2008 conference call (after not saying a word on the topic during the previous half year), admitted that the Company's insurers were on full and proper claims-paying behavior:

> TERRY MCEVOY - OPPENHEIMER:  Out of the $5.3 billion of the non-prime liquidating portfolio what percent has insurance, specifically the $1.6 billion of second liens? Also, **could you maybe update us on the relationship with those two insurance companies?**
>
> ROWE: The second liens all have a form of mortgage insurance. The way it works at the current time is it's essentially a 50-50 deal with the MI carrier so to the extent not all of the claims are paid, then we would have less than 50% of our losses in the form of recovery. Those carriers are paying, I think insurer A as we have described before is paying more readily and is paying stable as well. The first liens also have mortgage insurance, I think it's around $1.3 billion or so have mortgage insurance on them and that's down to 60% loan-to-value.
>
> RASKIND: Rob, did you mention insurer B as well?
>
> ROWE: Insurer B has always paid readily.
>
> RASKIND: It's the other way around...
>
> ROWE: It's the other way around, I apologize for everybody. **So both insurers are paying readily at the current time**.

**E.     Defendants Further Misled as to First Franklin Loan Quality and Risks by Failing to Disclose That $1.6 Billion of the First Franklin Loan Portfolio was Effectively Sub-Subprime**

196.     Prior to the class period, at the end of 2006, defendants sold the First Franklin

101

unit to Merrill Lynch, and further agreed to sell approximately $6.4 billion of the Company's First Franklin loans. However, $1.6-$1.7 billion of those First Franklin loans that the Company agreed to sell were rejected by the purchasers and were returned to the Company. Defendants represented that there was nothing fundamentally wrong or alarming with respect to those returned loans, that the loans were merely "unsuitable" in light of the particular needs of the purchaser, and that defendants would sell these loans to other purchasers. However, defendants were unable to do so during the end of 2006 and the first two months of 2007, even when the subprime markets were booming. In March 2007, defendants acknowledged that the subprime market had effectively collapsed in late February 2007, that it was no longer possible to sell subprime loans, and that the Company would thus keep the $1.6-$1.7 billion of loans.

197.    Thus, at the start of the class period on April 2007, defendants confirmed the Company's run-off First Franklin portfolio had swelled by $1.6-$1.7 billion of First Franklin loans. Defendants further represented that, upon transferring those loans to the Company's portfolio, they wrote down the value of those loans by $28 million, and consequently did not need to increase extant loss reserves to account for losses expected from the additional $1.6-$1.7 billion of loans.

198.    These representations were materially misleading. In fact, the $1.6-$1.7 billion of First Franklin loans were of markedly poorer credit quality than even the already-debased standards of run-of-the-mill subprime (which defendants misrepresented and omitted to disclose). Consequently, those loans would generate outsize losses far larger than $28 million (representing *a mere 1.7% of the loans' outstanding balance*) and thus require outsize reserves (which defendants misrepresented and omitted to disclose).

### 1.    Misrepresentations Prior to and During the Class Period

199.    On September 5, 2006, the Company announced that it had agreed to sell off First Franklin entirely, together with $5.6 billion of the Company's remaining First Franklin mortgages, to Merrill Lynch. Defendants later announced (during an October 17, 2006 conference call) an additional agreement to sell a further $800 million of First Franklin loans, further reducing

their First Franklin portfolio.

200.    On December 14, 2006, the Company filed a Form 8-K with the SEC attaching National City's Mid-Quarter Update for the fourth quarter of 2006.  The Mid-Quarter updated revealed that the Company had only managed to sell $3.6 billion of First Franklin mortgages to Merrill (rather than $5.6 billion) because Merrill "exclud[ed]" some of the mortgages from its purchase.  Additionally, the Mid-Quarter Update downsized the earlier-reported deal to sell a further $800 million of First Franklin mortgages, stating that it now expected to sell $650 million:

> ...$3.6 billion of First Franklin loans that had been in portfolio but moved to held for sale at September 30 were sold in November for a small gain. **The total amount sold was less than originally planned due to payoffs and exclusions permitted by the sale contract.** Another sale of approximately $650 million is expected to close in December.

201.    On January 23, 2007, defendants held a conference call with analysts and investors to discuss the Company's results, plans and prospects.   During the conference call, defendants spoke at length about the First Franklin loans they had failed to sell.  Defendants described those loans are merely having "documentary deficiencies" that made them not fit in the buyer's planned securitization, and that the Company would repair those deficiencies and sell the loans:

> DABERKO:... At the time we agreed to sell the First Franklin franchise, we also made the decision to sell parts of the retained portfolio, essentially the loans not covered by some form of insurance or the credit default swap... **For the loans we did sell, the buyers were more selective in rejecting loans from the pool, mainly due to documentation issues and also more aggressive in asserting their recourse rights.** The higher recourse reserve requirements reduced loan sale revenue and contributed to a loss on one of the sales.
>
> BELL: ... **Before leaving the topic of First Franklin, I want to make a brief observation about the first mortgage loans remaining in held for sale that fell out of the previously announced sale.** These are first mortgages that were written during the first half of the year 2004 and before. They are seasoned loans. They are performing well. Of the $1.7 billion of these loans at 12/31, 82% were current and 13% were within the 30-day category. **As Jeff said, they're principally documentary errors that need to be**

**resolved before they could be sold in a securitization.**... **An effort is underway as we speak to repair these documentary deficiencies and then to sell the loans back into the more liquid securitization market toward the end of this quarter**.

*****

**JIM BELL: ...At the final close in November, Merrill and another buyer purchased $3.3 billion of those loans and $1.6 billion of those loans fell out of the sale, and as Jeff mentioned and as I alluded to in my comments, those were principally good current loans, but which had documentary deficiencies, which rendered them not usable in the securitization that the buyer was planning. We are working at this point to correct those documentary deficiencies for those loans where they can be corrected and to redeliver them into the marketplace at the securitization prices**.

202.    On March 14, 2007, the Company filed a Form 8-K with the SEC attaching National City's Mid-Quarter Update for the first quarter of 2007.  The Mid-Quarter Update revealed that the Company had been unable to sell the $1.6 billion of First Franklin loans that had fallen out of prior planned sales, and that, given the subprime market collapse, did not expect to be able to sell those loans.  Therefore, the Company would retain that extra $1.6 billion of First Franklin loans in its run-off portfolio:

> With respect to nonconforming (First Franklin) loans, the remaining $1.6 billion of loans held for sale are currently not saleable at what management considers an acceptable price due to adverse market conditions. Accordingly, the decision has been made to retain these loans, and they will be transferred back into portfolio in March. Fair value writedowns of $11 million have been recorded through February, and a further writedown is likely prior to the transfer of these loans back into portfolio.

203.    Thus, when the class period began, on April 30, 2007 when the Company announced financial and operational results for the first quarter of 2007, defendants confirmed that the Company's First Franklin run-off portfolio was in fact approximately $1.6 billion larger than previously stated, because defendants had not been able to sell the $1.6 billion of First Franklin loans (that they had classified as "held for sale" since September 2006).

> ... **Of the $6 billion of nonconforming mortgage loans transferred to held for sale, approximately $4 billion were sold in 2006. No further sales occurred in the first quarter of 2007. In light of**

104

**unfavorable market conditions, the remaining loans totaling $1.6 billion were returned to portfolio in March 2007.** Prior to that transfer, fair value writedowns and other charges of $28 million were recorded as a reduction to loan sale revenue.

204.     Although defendants' April 30, 2007 press release and certain prior disclosures referred to $1.6 billion in unsellable loans, the Company's financial statements show that the Company's First Franklin portfolio increased from $6.495 billion in February 2007 (when the loans were still classified as held for sale) to $8.217 billion at the end of March 2007 (after the loans had been transferred).   The First Franklin run-off portfolio therefore increased in size by approximately $1.72 billion.

205.     Additionally, on April 30, 2007, defendants held a conference call with analysts and investors to discuss the Company's results, plans and prospects.  Again, defendants made further representations with respect to the $1.6-$1.7 billion of unsellable First Franklin loans that had swelled the Company's portfolio:

> BELL: ...**The $1.6 billion that was originally held for sale at the start of the quarter were loans where we had -- which we had contracted to sell and which fell out of the sale because of documentation deficiencies that made them unready for packaging within a securitization**. As we told you in last quarter's call, we took a mark of $56 million at year end against that portfolio, and our intent was to repair as many of the documentation files as we could and then take that portfolio back to market.
>
> **As you're all aware, the market appetite for nonprime-backed securities softened dramatically during the first quarter**... **actually we didn't ultimately get or take a bid**. We took an additional mark-to-market at the end of this quarter based on the current trading levels and subordination structures of similar securitizations of $28 million and returned the loans to portfolio. **The sum of the marks taken is greater than the level of the loss reserves that we would hold against this portfolio. There is accordingly no reserve allocated to these loans and we will revisit the carrying value analysis quarterly**.

206.     On May 9, 2007, the Company filed its Form 10-Q with the SEC for the first quarter of 2007, reiterating that because of the subprime market shutdown, previously "held for sale" First Franklin loans had been returned to the Company's portfolio:

Loan sale losses associated with First Franklin were $23 million in the first quarter of 2007 and $34 million in the fourth quarter of 2006, versus $60 million of revenue in the first quarter a year ago. The losses were due to fair value write-downs and other charges of $28 million in the first quarter of 2007 and $73 million in the preceding quarter. **In light of unfavorable market conditions, the unsold loans were returned from held for sale to portfolio in March 2007.**

### 2.    Falsity and Scienter

207.    Defendants' above-detailed statements were materially false and misleading.

208.    The $1.6-$1.7 billion of First Franklin loans been rejected by buyers even during the subprime boom, by buyers actually *desirous* of purchasing billions of dollars of subprime mortgages.   In short, *buyers who actually wanted to buy subprime loans did not want these $1.6-$1.7 billion of them*.   Buyers did not want these loans because these loans were, effectively, *sub*-subprime.   The buyers' due diligence had discovered what defendants themselves knew: these loans were of markedly lower creditworthiness than the already-debased levels of run-of-the-mill subprime.

209.    When originators sell mortgage loans to securitizers, securitizers conduct due diligence on the loans and are allowed to reject "exception loans" (mortgages that fall short of the originator's stated underwriting standards –e.g., a higher debt-to-income level than the originator's standards allow), loans whose creditworthiness is thrown into question by incomplete or troubling underlying documentation (i.e., the loan files), and loans so poorly underwritten that within months of origination they were already going unpaid.  Such "exception" and "documentation" issues are in fact a primary indicator that loans present a materially greater credit risk.  In fact, the $1.6-$1.7 billion of First Franklin loans rejected by buyers in 2006 were rejected precisely because the purchasers' due diligence had revealed those loans to be of materially greater credit risk, both because of exceptions (i.e., they failed to meet already-debased subprime origination standards) and because underlying objective documentation failed to justify the loans' origination.

210.    Defendants did not so disclose.  Rather, between January 2007 and April

106

2007, defendants represented that the primary problem with those loans were technical, paperwork issues that could be corrected, rather than fundamental, credit quality issues that could not.  These representations were materially false and misleading.  Defendants' representations, and defendants' misleading and completely inadequate $28 million writedown (a mere 1.7% of the loans' balance) literally "papered over" the fact that these $1.6-$1.7 of First Franklin loans were sub-subprime – loans that weren't justified even by subprime standards, loans that would produce losses even greater than the already-elevated loss levels of general subprime loans.

211.    The Company itself originated the First Franklin loans at issue and was fully informed about the precise details of those loans' credit quality and origination/underwriting standards.  Defendants were therefore aware that such loans would not be accepted by subprime purchasers, precisely because of the loans' elevated credit risks, and thus that the Company would need to reserve higher-than-usual amounts for those loans.

III.    **THE NATIONAL HOME EQUITY LOANS**

A.    **Summary/Overview**

212.    National City originated, prior to and during the class period, billions of dollars of home equity loans and home equity lines of credit (referred to herein as home equity loans).  As described in Section III.B, the Company's home equity loans were originated "directly" through the Company's retail bank branches, and "indirectly" through the Company's National Home Equity ("NHE") division.  The Company's direct home equity loans were originated to retain in the Company's loan portfolio; the NHE loans, during 2006 and 2007, were originated to sell into the secondary mortgage markets.

213.    The loans generated by NHE during 2006 and 2007 (the "NHE New Production Loans") were largely subprime quality but publicly misrepresented by defendants as "prime quality" (Section III.D).  In fact, known to defendants but unknown to the class, nearly half

107

the NHE New Production loans had been originated on a "stated income" basis.[24]  Defendants only publicly so admitted in October 2007.  In fact, known to defendants but unknown to the class, the NHE New Production Loans' objective credit quality and characteristics were fundamentally worse than the Company's other home equity loans: the NHE  New Production Loans were originated at higher LTV/CLTV levels, to less credit-worthy borrowers, for properties concentrated in the areas of the country undergoing the sharpest real estate price declines.  Defendants only publicly so admitted in January 2008.  Nearly half of the NHE New Production Loans were in fact piggyback loans (whose severe risks – and defendants' complete awareness of those risks – were just detailed in the First Franklin allegations [¶¶ 174-180, *supra*]). In short, as remained undisclosed until late in or throughout the class period, the NHE New Production Loans featured the worst and riskiest hallmarks of subprime.

       214.    By early 2007, NHE's subprime quality output was effectively unsellable but publicly misrepresented by defendants as "held for sale" (Section III.E).  Loans reported as "held for sale", purportedly loans that the Company had not only the intent but also the *ability* to sell, were distinguished from and not included in the Company's acknowledged loan portfolio.  However, given the NHE New Production Loans' subprime quality, and given that defendants themselves acknowledged that subprime loans could no longer be sold after the subprime market meltdown of late February 2007, defendants knew no later than mid-March 2007 that the NHE New Production Loans were effectively unsellable.  The Company had no choice but to retain them in the Company's loan portfolio.  Defendants, however, continued to represent billions of dollars of NHE New Production Loans as "held for sale" through September/October 2007 (when they repatriated approximately $4.4 billion of NHE New Production Loans onto the Company's portfolio), and a

---

[24]      "Stated income" lending, known more colorfully as "liar loans" and NINJA loans (an acronym for No Income, No Job or Assets), was a hallmark of subprime lending, and lies for obvious reasons at the generative heart of what is now known as the subprime crisis.  "Stated income" lending was born as a "niche" product originally extended only to a relative handful of prime borrowers that had relatively high but difficult to document income (e.g., artists).  However, when stated income loans were extended to wage earners whose income was regular and documentable, it became, very clearly, a way for people to qualify for a mortgage  when their actual incomes would not qualify them.  Loans originated on the basis of stated income were more likely to default than those originated on the basis of objectively documented income.

further $2 billion through December 2007 (until the "held for sale" warehouse was completely emptied of NHE New Production Loans).

215.    The result was that, unbeknownst to plaintiffs and the class, the Company was sailing straight into an iceberg made up of $6.4 billion worth of subprime quality NHE New Production Loans.  There is no dispute that the collision nearly sank the Company.   Where as already alleged, the Construction Loans will generate losses of $600 million and the First Franklin loans $750 million, *NHE New Production Loan losses are on the order of $2 billion*.  The gravamen of plaintiffs' allegations below is that (1) prior to collision, defendants knew but omitted to disclose that this iceberg lay in the Company's path, and (2) post-collision, defendants misreported the damage, first denying there was any, then describing some nicks and scratches, and finally admitting the hull had been breached and the ship was sinking.

### B.    Background – National City's Various Home Equity Lending Operations and Portfolios

216.    In National City's direct operations (i.e., its bank branches, where it interacted directly with customers), National City offered, and throughout the class period, continued to offer a full range of prime mortgage products (mortgages, home equity loans, and home equity lines of credit).  Over and above these directly-originated prime mortgage products, the Company also operated indirectly on a nationwide basis by funding mortgage products originated by mortgage brokers.  National City's indirect operations consisted primarily of First Franklin,  which funded subprime mortgages originated by mortgage brokers, and National Home Equity ("NHE"), which funded purportedly prime home equity loans and lines of credit originated by mortgage brokers.

217.    In 2005, National City made a strategic shift to focus on its direct businesses, and as part of this shift changed its indirect mortgage business operations (First Franklin and NHE) to an "originate and sell" model under which the First Franklin and NHE loans generated would not be held on National City's portfolio but rather sold into the secondary mortgage markets.  (By contrast, the mortgages and home equity loans that National City originated in its direct operations

continued to be "originated for portfolio" and held on National City's books).  After the 2006 sale of First Franklin, NHE continued as the Company's primary indirect business.

218.    In short and as a result, at the beginning of the class period, National City's home equity loans consisted of three analytically-distinguishable segments.

(a)    First, continuing direct home equity lending, through National City retail branches, producing prime home equity loans that the Company held on its residential real estate loan portfolio (the "Direct HE Loans").  At the end of the class period, the Company was holding approximately $15.8 billion of Direct HE Loans.

(b)    Second, a collection of home equity loans that NHE had originated *prior* to the Company's transformation of NHE into an "originate and sell" operation, which  National City held on its books as a separate "run off" portfolio (the "NHE Run-Off Loans") without replenishing with new loans.  At the start of the class period, the Company was holding approximately $6.9 billion of NHE Run-Off Loans; at the end, $4.5 billion.

(c)    Third, continuing indirect home equity lending through NHE, producing during 2006 and 2007 purportedly prime home equity loans intended for sale rather than to be held by the Company (the "NHE New Production Loans").  In September/October 2007, defendants repatriated $4.4 billion of the NHE New Production Loans onto the Company's loan portfolio, and in December 2007/January 2008 a further $2 billion, resulting in a portfolio at the end of the class period of $6.2 billion.

219.    In April 2008, defendants made explicit the stunning disparities in the losses expected for these three portfolios of home equity loans: the $15.80 billion Direct HE Portfolio, with no stated income lending, is expected to generate *de minimis* losses; the $4.55 billion NHE Run-Off Portfolio $300 million in losses (i.e, a 6.6% loss rate); and the $6.24 billion of NHE New Production Loans $1.7-$2.0 billion in losses (i.e., a 29.6% loss rate).

## C.    False and Misleading Statements Overview

220.    In a nutshell, plaintiffs essentially  allege that defendants misrepresented the

110

"what", the "when", and the "how much" with respect to NHE New Production Loans.

(a)     First, the "what": plaintiffs allege that defendants fundamentally and materially misrepresented the nature and quality of the loans that NHE was generating during the class period (i.e., the NHE New Production Loans).  Defendants uniformly described the NHE New Production Loans as "prime quality" when, in fact, they were subprime quality.  The result? National City's exposure to subprime loans was more than $6 billion greater than advertised. Defendants now estimate that those $6 billion of NHE New Production Loans will cause on the order of $2 billion in losses.

(b)     Second, the "when":  because the NHE New Production Loans were originated for sale, they were placed in "held for sale" status rather than in National City's loan portfolio.  Accounting regulations and National City's own policies state that loans classified as "held for sale" are loans for which there is both the intent *and the ability* to sell.  Defendants operated in violation of the latter proviso: they continued to hold the NHE New Production Loans in "held for sale" status even after it became evident that such loans could no longer be sold.  As further explained below, this had direct consequences for the "how much" issue.

(c)     Third, the "how much": plaintiffs allege that defendants failed to establish adequate and timely loss reserves and/or take fair-value writedowns for the NHE New Production Loans, and as a result misrepresented the impact these loans would have on the Company's capitalization, fundamental financial condition and liquidity (all of which were thrown into crisis in late 2007 and early 2008, with the NHE New Production Loans as the largest single precipitating event).  To telescope matters, in August 2007 the stated financial impact from these loans was $0 while in April 2008 it was on the order of $2 billion.

221.     Although plaintiffs analytically distinguish these three matters here – the what, the when, and the how much – and present them sequentially, in reality they were significantly interconnected and unfolded simultaneously.  For example, the "how much" has direct implications for the "what".  Had defendants taken timely or adequate loss reserves, charge-offs, or fair-value

writedowns for the NHE New Production Loans, such actions would have served to inform plaintiffs and the class of the true nature and quality of those loans.  Defendants failed to take timely or adequate loss reserves, charge-offs, or fair-value writedowns, and thus plaintiffs and the Class remained uninformed as to exactly how toxic those loans actually were.  Put simply, defendants' failure to timely and accurately disclose the financial impact of these loans functioned further to mislead plaintiffs and the class as to what exactly those loans were.  Other interconnections abound.[25]

###        D.        Defendants Misrepresented the Nature, Quality, Characteristics and Risks of the NHE New Production Loans

222.    Defendants misrepresented  the nature and quality of the NHE New Production Loans, and omitted material information about the nature and quality of those loans. Defendants, at all times prior to October 2007, (1) consistently characterized those loans as "prime" or  "prime quality", (2) consistently distinguished those NHE-generated loans from the Company's "nonconforming" and "nonprime" loans (which, according to the Company, were generated principally by the Company's subprime subsidiary First Franklin), (3) consistently adverted to National City's purported refusal to engage in underwriting riskier forms of home equity loans (such as interest-only and option ARM loans), and  (4) consistently omitted to disclose that nearly 50% of the NHE New Production Loans had been underwritten in the single riskiest manner possible – namely, on a "stated income" basis.  That omission alone rendered the prior two categories of statements misleading:  "stated income" loans are by definition nonconforming loans, and are on

---

[25]        For example, the "what" also had direct implications for the "how much".  Had defendants accurately represented the  true nature and quality of the NHE New Production Loans, plaintiffs and the Class would have had information that could helped them ascertain whether or not the Company's loss reserves, charge-offs, writedowns and capitalization levels were adequate.
        Similarly, the "when" is implicated in the "how much".  Accounting conventions reasonably provide that no loss reserves need be established against loans "held for sale".  Precisely because defendants kept the entirety of the NHE New Production Loans in "held for sale" status into September 2007 (and kept further billions of such loans there through December 2007), defendants did not establish any loss reserves for those loans until September 2007 (and did not reserve for the rump portion kept as "held for sale" through December 2007).   Had defendants timely acknowledged the impossibility of sale, the Company would have established loss reserves against those loans much earlier.

their face an extremely risky way to lend money, let alone billions of dollars.  Additionally, defendants failed to disclose until January 22, 2008 that: (5) the objective credit quality and characteristics of the NHE New Production Loans were objectively worse than those of all the Company's other home equity loans.  Just how much worse, however, was not clear until April 21, 2008, when defendants first revealed the stunning disparities in the losses being generated by the NHE New Production Loans, the NHE Run-Off Loans and Direct HE loans (¶ 219, *supra*).

223.    Defendants began to abandon these consistent representations in September 2007, after which time they (1) never again described the NHE New Production Loans as "prime" or "prime quality", (2) ceased to distinguish those loans from the Company's nonconforming loans, and instead referred to the NHE New Production Loans as "non-agency" and "non agency-eligible" loans (exact synonyms for nonconforming loans), (3) admitted that their loan underwriting standards had deteriorated, and (4) began to disclose the existence of "stated income" lending and later its degree.  At the same time defendants started changing the way they talked about the NHE New Production Loans, defendants also began disclosing an ever- and fast-increasing financial fallout from those loans.  Nevertheless, defendants (5) continued to maintain that the NHE New Production Loans, apart from their "stated income" component,  were largely of the same nature and quality as the prime home equity loans that National City originated directly for its own portfolio (i.e., the Direct HE Loans) and indirectly for its own portfolio (i.e., the NHE Run-Off Loans), until admitting on January 22, 2008, that "the quality and other characteristics" of the NHE New Production Loans were "visibly worse" than the NHE Run-Off Loans and HE Direct Loans.

### 1.    Misrepresentations

224.    National City's Form 10-K for 2006, filed with the SEC on February 8, 2007, and National City's 2006 Annual Report to Shareholders, issued on or about May 21, 2007, stated:

> **The National Home Equity business unit within NCF originates, primarily through brokers, prime quality home equity loans outside National City's banking footprint**. During 2006, NCF implemented a strategy to originate-and-sell all nonfootprint, broker

sourced originations of nonconforming mortgage loans and home equity lines and loans... **Nonconforming mortgage loans were originated by First Franklin, principally through wholesale channels, including a national network of brokers and mortgage bankers**...

*****

**The residential real estate portfolio also includes prime-quality home equity installment loans. These loans are originated** through the retail branch network of the Consumer and Small Business Financial Services line of business and **nationally through National Consumer Finance's National Home Equity business unit. Neither business line originates interest-only or pay-option ARM installment loans**.

225.    Similarly, National City's Form 10-Q for the third quarter of 2006, filed with the SEC on November 14, 2006, stated:

> **The National Home Equity business unit within NCF originates, primarily through brokers, prime quality home equity loans ... Nonconforming mortgage loans are originated by First Franklin Financial Corporation (First Franklin), principally through wholesale channels, including a national network of brokers and mortgage bankers**.

226.    Likewise, National City's Form 10-Q for the first quarter of 2007, filed with the SEC on May 9, 2007, and National City' Form 10-Q for the second quarter of 2007, filed with the SEC on August 8, 2007, stated:

> **NHE originates prime quality home equity loans and lines of credit outside National City's banking footprint through a broker network**.

227.    Defendants further reinforced their depiction of NHE-generated loans as "prime" and/or "prime quality" in various presentations and conference calls that they held with analysts and investors.  For example, in a September 13, 2006 investor conference hosted by Lehman Brothers, defendant Daberko described NHE's output as "prime" and represented that NHE's "fairly unique operating model" generated "large amounts of very high-quality assets".

228.    Even after National City admitted  in September 2007 that the NHE New Production Loans could not be sold and would have to remain on the Company's books, defendants

114

continued to misrepresent the true nature, quality, characteristics and risks of the NHE New Production Loans.[26]  For example, during defendants' September 6, 2007 conference call with analysts and investors, defendant Rob Rowe stated that the NHE New Production Loans "com[ing] back on balance sheet" were essentially similar to and consistent with the well-performing HE Direct Portfolio and the NHE Run-Off Portfolio (although disclosing, for the first time, a "higher stated income content" in the NHE New Production loans that would cause higher losses than experienced by the other portfolios).  Likewise, during defendants' October 24, 2007 conference call with analysts and investors, defendant Rowe stated that the NHE New Production Loans "placed in the loan portfolio [after being] declared to be no longer saleable" were essentially similar to and consistent with the well-performing HE Direct Portfolio and the NHE Run-Off Portfolio (although disclosing an expectation for higher losses in the NHE New Production loans given that 40% of NHE New Production loans but only 10% of the NHE Run-Off Portfolio loans had been originated on a "stated income" basis):

> … during the third quarter, **National City placed in the loan portfolio just over 4 billion of National Home Equity loans and lines that were declared to be no longer saleable**. Thus, the total national home equity runoff portfolio now totals $10.7 billion. **Note that both the original held for investment book and held for sale book share similar characteristics in terms of loan to value and FICO and purpose, except that the held-for-sale book held higher percentage of stated income, roughly 40% versus the original 10%**…

### 2.     Falsity

229.     Effectively, the materially misleading impression created by defendants was that the NHE New Production Loans were prime, well-underwritten loans entirely distinct from the "nonconforming", subprime First Franklin second-lien loans..

(a)     Although defendants stated that NHE New Production Loans shied away from

---

[26]     As discussed later, defendants did so in part through stating that the return of more than $6 billion of the NHE New Production Loans to the Company's books would entail *de minimis* financial impact through fair value writedowns and loss reserves, that National City had "the capital and the liquidity" to absorb those loans, and that National City was entirely "comfortable moving the assets that are in the warehouse currently onto our balance sheet and in the loan portfolio".

underwriting certain risky products (interest-only loans, option ARM loans), and praised NHE's "operating model [] enabling us to continue to generate large amounts of very high-quality assets", defendants omitted to disclose (at all times until October 24, 2007) that *nearly half of the NHE New Production loans were underwritten in riskiest way possible and in a manner guaranteed to generate large amounts of very low-quality assets – namely, through "stated income" lending*. "Stated income" loans are by definition "nonconforming", and as defendants belatedly disclosed in October 2007, 40% of the NHE New Production Loans were "stated income" ones.  After September 2007, Defendants changed their terminology and in all further public documents and statements only referred to the NHE New Production Loans as "non-agency" and "non-agency-eligible" loans (i.e., exact synonyms for nonconforming).

(b)　　Given the high proportion of "stated income" loans in the NHE New Production Loans (which defendants disclosed only on October 24, 2007), and given their other objective credit risk characteristics (which defendants disclosed only on January 22, 2008), it was false and misleading to characterize the NHE New Production Loans as "prime quality" (defendants' phrase of choice).  The NHE New Production Loans were, more accurately, "subprime quality", as defendants were aware because defendants themselves had originated those very loans.

(c)　　Although defendants distinguished the NHE New Production Loans from National City's "nonconforming", subprime First Franklin loans, the vast majority of the NHE New Production Loans – originated under subprime standards, in near-entirety second liens and nearly half simultaneous second liens (i.e., piggybacks) – were just like the *riskiest* subset of the First Franklin loans (i.e., the First Franklin second-liens).  And indeed, the loss expectations defendants revealed on April 21, 2008 for these two portfolios (the NHE New Production Loans and the First Franklin second-lien loans) were substantially the same:  approximately 30% of the loans' cost basis.[27]

---

[27]　　The $6.2 billion NHE New Production Loan portfolio with losses of $1.7-$2.0 billion; the $1.3 billion portfolio First Franklin second lien portfolio with losses of $450 million.

230.    During defendants' September 6, 2007 conference call, defendant Rowe revealed for the first time that the NHE New Production Loans had a "higher stated income content" than was present in the Company's other home equity loan portfolios.  Additionally, defendant Kelly stated generally that the Company was "investigating our underwriting practices to firm those up as soon as possible" and admitted as well that "we have allowed ourselves to get a little less disciplined in that area than we probably should have."

231.    On October 24, 2007, defendants announced financial and operational results for third quarter, including inter alia a $113 million loss reserve increase for the NHE New Production Loans (i.e., larger than the $20 million indicated in defendants' September 6, 2007 comments).  During defendants' October 24, 2007 conference call, defendant Rowe revealed (as quoted in ¶ 228, *supra*) that the "higher stated income" content of the NHE New Production Loans as compared with the Company's other home equity portfolios was in fact much, much higher.  Defendants disclosed for the first time that *"roughly 40%" of the NHE New Production Loans were stated income, as compared with only 10% of NHE Run-Off Loans and 0% of the Direct HE Loans*. Nevertheless, defendant Rowe maintained that apart from stated income, all the loans' credit quality and characteristics were essentially similar (*see* quote in ¶ 228 *supra*).

232.    On December 17, 2007, defendants disclosed a forthcoming increase in loan loss reserves by "in the area of $700 million" because of "in particular, indirect home equity loans and lines that were transferred to portfolio in the third quarter" (i.e., the NHE New Production Loans).

233.    During their January 22, 2008 conference call, defendants admitted, contrary to their September and October 2007 representations, that over and above the "stated income" issue, the credit characteristics and quality of the NHE New Production Loans were *not* similar to those of National City's other home equity portfolios.  In fact, the NHE New Production Loans were made (1) to less creditworthy borrowers, (2) on riskier, higher-CLTV terms, and (3) for properties more concentrated in areas of greatest home price depreciation.  Defendants concluded that these three

117

facts, together with the previously-disclosed high percentage of stated income loans, "distinguish it [the NHE New Production Loans] from our direct branch-based customer portfolio and heavily influence our outlook on losses".  In fact, as defendants admitted , the NHE New Production Loans' objective credit characteristics were "visibly worse" than the Company's other home equity loans:

> …  the more recent National Home Equity vintages. Again, this segment represents loans originated for sale and underwritten to capital market standards, but which could not be sold or were kicked out of trades and were transferred from the held-for-sale warehouse to portfolio. **The quality and other characteristics of these loans are visibly worse than those underwritten for our portfolio**. Again, compared to the older vintage, **this portion of the portfolio has fewer balances above 730 FICO and more balances above 90% loan to value**. As you can see by the trending provided, this segment has exhibited meaningful deteriorating conditions. **We have increased the reserves significantly during the fourth quarter for this portfolio to reflect our view of much higher loss content in the future**.
>
> *****
>
> For the National Home Equity portfolio, primarily the most recent vintage, **the higher component of stated income product, reliance on broker originations, and the geographic concentrations and markets subject to home price depreciation, distinguish it from our direct branch-based customer portfolio and heavily influence our outlook on losses**.

234.    Perhaps defendants' most striking admission of the poor credit quality of the NHE New Production Loans came when, during defendants' January 22, 2008 conference call, defendant Raskind was confronted with the accusation that "prudent lending standards were thrown to the wind" at National City.  In reply, defendant Raskind defended the credit standards of the Company's acknowledged subprime loans (i.e., the First Franklin loans), but conceded the accusation with respect to the NHE New Production Loans.  As defendant Raskind stated on January 22, 2008:

> JILL HENNESSY: Peter, another question for you. With respect to credit problems, prudent lending standards were thrown to the wind in order to generate loan volume. What actions have been taken and what assurances can you give us that this will not occur again at National City?
>
> PETER RASKIND: Well, first off, I'm not sure I completely agree with the premise of the question. **I don't know that prudent lending**

**standards were, as the question said, completely thrown to the wind. For example, in the old First Franklin business which we've sold, we never, for example, engaged in stated income lending in the subprime segment as some competitors did. That said, and as was described earlier, we did have some loans that were originated for sale, originated to capital market standards, for which we found there was no buyer and had to take into portfolio. And that's a decision we wish we could take back**.  So I think **going forward, one of our watch words will be that as we originate loans, whether they be for portfolio or for sale, we will be quite careful that in -- if a series of circumstances arises that requires us to take the loans into portfolio, that we will be comfortable doing so**.

235.    Defendant Raskind's reply – disputing that prudent lending standards were "completely thrown to the wind" by pointing out that *First Franklin* did not engage in stated income lending – highlights just how poor the NHE New Production Loans really were (nearly half of which were originated on stated income basis).  The purportedly "prime quality" loans that NHE was producing  *used origination standards that even the Company's subprime unit refused to countenance*.

### 3.    Scienter

236.    Defendants were aware at all times that the NHE New Production Loans were other than as publicly represented.  Defendants funded each and every one of those more than $6 billion in loans.  In making their decisions whether or not to fund the NHE New Production Loans, it was standard practice to demand and receive relevant information that allowed the lenders to assess the loans' credit risks and on the basis of which lenders decided whether or not to actually fund the loan.  Even at the point of loan inception, therefore, defendants knew *inter alia* the exact LTV/CLTV of each NHE New Production Loan, the creditworthiness and income of each NHE borrower, the level of borrower income documentation on the basis of which the loan was being originated (i.e., merely "stated" or objectively documented and verified), whether the loan was a piggyback, etc.  Defendants did not "discover" late in the game that the NHE New Production Loans had characteristics other than defendants thought, nor did those characteristics somehow change.  Rather, those characteristics were objective and present even at the point of loan inception..

119

4.    **Impact**

237.    Defendants' misrepresentations concerning the NHE New Production Loans created an impression of a state affairs materially different than the one that actually existed.   In essence, defendants described NHE New Production Loans, when those loans were going out ostensibly never to return (i.e., being originated for sale at all times prior to August 2007), very differently from the way they described those very same loans when they boomeranged back to National City after August 2007.  In short, the loans issued *purportedly* as "prime" and returned *de facto* as "subprime".

E.    **Defendants Falsely Represented the NHE New Production Loans as Loans "Held for Sale"**

238.    At all times after March 14, 2007,  defendants' reporting and representation of the NHE New Production Loans as "held for sale" was materially false and misleading, because large swathes of the NHE New Production Loans *could not be sold*.   The NHE New Production Loans were subprime quality rather than, as defendants represented, prime quality.  Defendants acknowledged on March 14, 2007 that it had become impossible to sell subprime loans, because the market for such loans had collapsed as the buyers for such loans had all fled.   Therefore, as defendants themselves recognized no later than March 14, 2007, National City could *not* sell its subprime quality NHE New Production Loans and in fact had no choice but to retain them on the Company's loan portfolio.  Nevertheless, at all times until September 2007, defendants reported the entirety of the Company's NHE New Production Loans as "held for sale".

239.    On September 6, 2007, defendants acknowledged that the loans were unsellable,  and in September/October 2007 defendants transferred $4.4 billion of those loans out of the "held for sale" warehouse and repatriated them onto the Company's loan portfolio. Nevertheless, defendants still continued to hold in the "held for sale" warehouse approximately $2 billion more of NHE New Production Loans.  Defendants only transferred those loans to the Company's loan portfolio in late December 2007.  On January 22, 2008, defendants verified that the

120

"held for sale" warehouse had finally been emptied of all NHE New Production Loans.

### 1.    Background: Portfolio Loans versus Loans "Held for Sale"

240.    Beginning in 2006, the home equity loans and lines of credit that defendants originated through NHE were originated with the intent to sell them to the secondary mortgage markets, rather than retain them in National City's own loan portfolio.  Therefore, when reporting the Company's financial and operational results, defendants did not classify the NHE loans held by the Company as "portfolio" loans, but rather kept and reported them in a separate 'holding bin' or "warehouse" of loans "held for sale".

241.    Because the loans were (ostensibly) being "held for sale" rather than being retained on the Company's loan portfolio, those loans (ostensibly) posed no credit risk to the Company (i.e., because the continuing risk of loan losses would, after the loans were sold, be borne by the buyer of the loans), so defendants (ostensibly) did not need to establish loss reserves for those loans.

### 2.    Misrepresentations

242.    National City's Form 10-K for 2006, filed with the SEC on February 8, 2007, stated that loans classified as "held for sale" are loans that "the Corporation has the intent *and ability* to sell" (emphasis added):

> **Loans that the Corporation has the intent *and ability* to sell or securitize are classified as held for sale or securitization**.  Loans held for sale or securitization are carried at the lower of the carrying amount or fair value applied on an aggregate basis. Fair value is measured based on purchase commitments, bids received from potential purchasers, quoted prices for the same or similar loans, or prices of recent sales or securitizations. (Emphasis added)

243.    National City's class period SEC filings – specifically, the Company's Forms 10-Q filed with the SEC on May 9, 2007, August 8, 2007 and November 13, 2007 stated exactly the same:  that loans classified as "held for sale" are loans that "the Corporation has the intent *and ability* to sell" (emphasis added).

121

244.    At all times until September 2007, National City classified as "held for sale" billions of dollars of NHE New Production Loans.  Through August 2007, every single new loan generated by NHE was classified as "held for sale". Specifically, defendants represented:

(a)    $3.4 billion of NHE New Production Loans "held for sale" as of the end of the first quarter of 2007, $ ($2.29 billion of home equity lines of credit and $1.15 billion of home equity loans)[28];

(b)    $4.8 billion of NHE New Production Loans "held for sale" as of the end of the May 2007, $ ($2.99 billion of home equity lines of credit and $1.84 billion of home equity loans)[29];

(c)    $5.1 billion of NHE New Production Loans "held for sale" as of the end of the first quarter of 2007, $ ($3.31 billion of home equity lines of credit and $1.81 billion of home equity loans).[30]

245.    The above-mentioned representations were materially false and misleading, because at all times after March 14, 2007 (at the latest), defendants knew that the Company did not have the ability to sell the subprime quality NHE New Production Loans.

246.    On September 6, 2007, defendants announced that they were moving approximately $4 billion of NHE New Production Loans out of "held for sale" status:

> KELLY: **Our intention is to move everything that we don't believe is saleable in the foreseeable future into the loan portfolio**... And what is readily saleable in my mind, what is readily saleable is essentially – for the forseeable future is essentially agency-eligible product.  That is roughly half of the mortgage warehouse at National City Mortgage and really is essentially all of the product we're currently originating.
>
> So we are originating product today so that it can be sold.  We are not

---

[28]    Via April 30, 2007 press release and financial supplement attached to Form 8-K, and via Form 10-Q filed on May 9, 2007.

[29]    Via June 17, 2007 Mid-Quarter Update attached as an exhibit to Form 8-K.

[30]    Via July 26, 2007 press release and financial supplement attached to Form 8-K, and via Form 10-Q filed on August 8, 2007.

originating much product in the National City Mortgage business that cannot be sold into the secondary markets readily.

247.     However, it is clear that even after defendants stated their intention to move all unsellable loans onto the Company's portfolio, defendants still continued to retain in excess of $2 billion of NHE New Production Loans as "held for sale" until December 2007/January 2008 [31]:

(a)     On September 17, 2007, National City filed a Form 8-K with the SEC, attaching its Mid-Quarter Update for the first two months of the third quarter of 2007. The Mid-Quarter Update showed that National City still retained as of August 30, 2007 $2.71 billion of home equity loans and home equity lines of credit in its "held for sale" warehouse (an unspecified portion of which were NHE New Production Loans).

(b)     On October 24, 2007, National City filed a Form 8-K with the SEC, attaching its Financial Supplement and further "Supplemental Data" relating to the Company's financial results for the third quarter of 2007. These documents revealed that National City still retained as much as $2.56 billion of home equity loans and home equity lines of credit in its "held for sale" warehouse (an unspecified portion of which were NHE New Production Loans).

(c)     On December 17, 2007, National City filed a form 8-K with the SEC, attaching a Mid-Quarter Update for the first two months of the fourth quarter of 2007. The Mid-Quarter update revealed that, as of November 30, 2007, that National City still retained as much $1.21 billion of home equity loans and home equity lines of credit in its "held for sale" warehouse (i.e., a $1.5 billion reduction from August 2007 levels). The Mid-Quarter Update stated that "substantially all" unsellable loans had been removed from the "held for sale" warehouse, either by sale of by transfer to National City's portfolio, that the remaining loans held for sale consisted "mainly of agency-eligible and other loans deemed readily saleable" and that "no additional losses

---

[31]     National City's financial statements after August 2007 were adjusted to account for the fact that the NHE unit no longer had a distinct existence and that its remaining operations had been merged into the National City Mortgage unit. Therefore, after August 2007, it became impossible to ascertain the exact location and quantity of the NHE New Production Loans (because the formerly distinct figures for NHE were now swallowed up within larger figures for National City Mortgage).

of significance are expected" from those remaining held for sale loans. [32]

248.    Defendants' September 2007-December 2007 disclosures detailed above were false and misleading – over and above misstatements of the financial impact of the NHE New Production Loans, as detailed in the next section – because they still classified billions of dollars worth of unsellable NHE New Productions Loans as "held for sale".

### 3.    Falsity and Scienter: Defendants Knew The Company Did Not Have the Ability to Sell the Subprime Quality NHE New Production Loans After March 14, 2007, and Had No Choice But to Retain Them on the Company's Portfolio

249.    Defendants' classification and reporting of the NHE New Production Loans as loans "held for sale" was false and misleading, violating National City's stated policies (¶ 242, *supra*) and the accounting rules and policies that National City's policies parroted.  Also false and misleading was National City's stated policy concerning "held for sale" loans, because defendants did not actually follow their stated policy in practice.  Defendants' reporting and representations were false and misleading because, as detailed below, defendants did not in fact have *ability* to sell those loans.

250.    As already alleged, large swathes of the NHE New Production Loans were of subprime quality.

251.    Defendants knew the company did not have the ability to sell the subprime quality NHE New Production Loans after March 14, 2007, and had no choice but to retain them on the Company's portfolio.

252.    On March 14, 2007, defendants filed a Form 8-K with the SEC attaching the Company's Mid-Quarter Update for the first quarter of 2007.  There, the Company concluded that its nonconforming First Franklin loans, i.e., subprime loans, were "currently not saleable... due to

---

[32]    Importantly, the Mid-Quarter Update disclosed that this warehouse cleansing resulted in $200 million worth of charges for losses on sales and writedowns for those loans still retained.  Finally, as detailed next in Section III.F, the Mid-Quarter Update disclosed that the defendants intended to increase loan loss reserves by "in the area of $700 million" because of "in particular, indirect home equity loans and lines that were transferred to portfolio in the third quarter" (i.e., the NHE New Production Loans).

adverse market conditions", and that, as a result, the Company had transferred all remaining "held for sale" First Franklin loans – $1.6 billion worth – to the Company's own books.

253.     As defendants reported on April 30, 2007 in a press release announcing National City's financial and operational results for the first quarter of 2007, although the Company had been able to sell approximately $4 billion of subprime First Franklin loans in late 2006, *it had not been able to sell a single further dollar's worth of subprime First Franklin loans during the first quarter of 2007*:

> Of the $6 billion of nonconforming mortgage loans transferred to held for sale, approximately $4 billion were sold in 2006. **No further sales occurred in the first quarter of 2007. In light of unfavorable market conditions, the remaining loans totaling $1.6 billion were returned to portfolio in March 2007**. Prior to that transfer, fair value writedowns and other charges of $28 million were recorded as a reduction to loan sale revenue.

254.     Therefore, having conceded no later than March 14, 2007 that the First Franklin subprime loans could no longer be sold because the market for them had collapsed, defendants were aware, prior to the start of the class period, that the Company's subprime quality NHE New Production Loans also could no longer be sold.   The market for them was one and the same, because the loans were effectively identical.   Indeed, as defendant Raskind asserted on January 22, 2008 (*see* quote in ¶ 234, *supra*), the NHE New Production Loans were originated on standards more "subprime" than the Company's actually-acknowledged subprime loans (the First Franklin loans).   Moreover, as already alleged and as defendants admitted, the worst and costliest segment of the First Franklin loans were the First Franklin second-lien loans, which were responsible for the lion's share of First Franklin loan losses.  The NHE New Production Loans were, in near $6.4 billion entirety, second-liens, featuring extremely high CLTV levels.  Nearly half were simultaneous second-liens (piggybacks).  As defendants revealed on April 21, 2008, NHE New Production Loan losses and First Franklin second-lien losses are of equivalent severity.

255.     Defendants were aware precisely and at all times of the subprime nature, quality, characteristics and risks of large swathes of the NHE New Production Loans, but

125

misrepresented the nature and quality of those NHE New Production Loans to plaintiffs and the Class.

256.    Defendants belatedly admitted that the NHE New Production Loans were unsellable through a series of partial disclosures stretching from September 6, 2007 through January 22, 2008, as detailed immediately below.

257.    Defendants' partial disclosures began in August 2007 with various references to difficult market conditions for the loans being produced by NHE.

258.    On September 6, 2007, defendants held National City's annual "Analyst Day" to present and discuss the Company's financial and operational results, plans and prospects.  In conjunction with the Analyst Day, defendants also issued a press release and held a conference call with analysts and investors, in which defendants disclosed a wide array of bad news relating to the Company's mortgage banking, including the inability to sell the NHE New Production Loans and the consequent (belated) reclassification of approximately $4 billion of such loans from the "held for sale" warehouse to the Company's portfolio.

(a)    The September 6, 2007 press release stated, in relevant part:

**The meeting commenced with an update on the Mortgage Banking business, with Vice Chairman and CFO Jeffrey D. Kelly detailing aggressive steps the company has taken at its National City Mortgage and National Home Equity business units in response to changing conditions in the mortgage markets**. An overview of those actions -- along with their financial effects -- includes:
   -- Suspension of broker-sourced originations of home equity loans and merging the National Home Equity (NHE) unit into National City Mortgage in August, resulting in the elimination of approximately 500 positions. Severance and other charges totaling up to $10 million will be recorded in the third quarter.
*****
-- **Evaluation as to whether held-for-sale mortgage and home equity loans should be reclassified to held for investment based on continued lack of liquidity in the mortgage capital markets. In connection with that review, certain held-for-sale home equity loans and lines were transferred into portfolio at fair value, which approximated their cost basis**.   The status of other held-for-sale loans, principally so-called Alt-A and closed end second mortgages, will continue to be monitored in September, with the

126

potential for fair value writedowns currently estimated at around $30 million.[33]

(b)    During the September 6, 2007 conference call, defendants further specified that (1) they had removed approximately $4 billion of NHE New Production Loans from "held for sale" status and transferred them to the Company's portfolio, where they would be later joined by further such loans to which the Company had committed but had not yet been completed; (2) that they were still keeping $1.8 billion of such loans in held for sale status; and (3) that (as further focused on in Section III.F), the financial impact on the Company would be minimal (a grand total of $5 million of "fair value" writedowns for all $7.8 billion of the loans, plus establishing a loss reserve of approximately $20 million for the $4 billion of loans transferred):

> ... we have also **moved $4 billion of prime home equity loans in our held-for-sale inventory into the loan portfolio**... Additionally, **we will retain in portfolio approximately $2 billion of loans in lines that were in the pipeline at the time that we suspended production**...
>
> **The movement of these loans from held for sale to portfolio will have no immediate financial statement impact because our assessment of their value approximates our cost basis.**
>
> Finally, we are evaluating the likelihood of the settlement of about $1.8 billion in prime home equity loans currently held in the warehouse.  While these are committed sales with executed agreements, given the lack of liquidity, there is some possibility that these trades may not fully settle... in the event that one or more of the trades fail to settle, we may see a further fair value writedown of up to $5 million.
>
> *****
>
> UNIDENTIFIED AUDIENCE MEMBER: Can you just clarify **on the reserve increase, does that include the expectation for the home equity loans coming on your balance sheet?**
>
> ROB ROWE: **No, that does not. That is a good question. Assuming it was around $4 billion that would come back on the balance sheet.** Once again, it is next 12 months. And first year, first 18 months of losses in an NHE product are not high. So **it is not going to be a big number. I did not include it because this was really to specific portfolios that we already had. It is around $20**

---

[33]    These "other held for sale loans", as defendants' subsequent conference call comments made clear, were loans originated by the Company's National City Mortgage division.

**million**.

259.    On January 22, 2008, defendants announced financial and operational results for the fourth quarter and year of 2007, and demonstrated – finally – that the Company's "held for sale" warehouse was truly clean and emptied of unsellable home equity loans.  A January 22, 2008 Form 8-K filed by defendants, attaching defendants' Financial Supplement and "Supplemental Data" presentation, showed that whereas the "held for sale" warehouse had contained approximately $2.56 billion of home equity loans and lines of credit as of September 30, 2007, as of December 30, 2007 total warehouse holdings of such loans and lines had been reduced to only $4 million.  As defendants stated at the start of their January 22, 2008 conference call:

> First, **by way of completing the shutdown of the National Home Equity business, the curtailment of non agency eligible mortgage production, and an aggressive effort to clean up the mortgage warehouse, we incurred charges in the held-for-sale portfolio from trade fallout, scratch and dent losses, and mark-to-market adjustments totaling around $150 million pretax**, or $0.16 per share.

> As you may recall, and as the slide on page five of the presentation deck shows, **we had $11.5 billion of loans in the warehouse at September 30, including $2.5 billion of second mortgages and home equity lines of credit in unsettled trades**. **Of that amount, $1 billion was actually sold and the fallout from the trades was either sold at distressed prices or moved to the portfolio at market**. As a result of the settlement of trades, continued product constraints, and movement of loans into the portfolio, **the warehouse balance at December 31 of 3.7 billion is dramatically smaller and effectively now contains only high quality, first mortgages**.

260.    Defendants also disclosed on January 22, 2008, as detailed in the next subsection, a wide array of large charges and losses, in large part stemming from the impact of the NHE New Production Loans.

### 4.    Impact

261.    Defendants' false and misleading statements classifying the NHE New Production Loans as "held for sale" were material.    Defendants understated the Company's exposure to subprime quality loans.  By September 2007, defendants had piled up more than $6

billion of subprime quality NHE New Production Loans in National City's "held for sale" warehouse (with a further $2 billion in the pipeline) – *with a stated financial impact to National City from those loans, classified in that way, of $0.*[34]

262.    In essence, through September 2007 the Company (1) had $6 billion more of subprime quality loans than it was letting on and, (2), as next detailed, neither reserved one penny against losses from this *de facto* part of its portfolio nor wrote down the value of the loans.

263.    In fact, the losses expected from the NHE New Production Loans were so large that they served as the single largest precipitating factor of the capitalization and liquidity crisis that engulfed National City in late 2007 and 2008, that caused National City to cut in half and later effectively eliminate its dividend, that caused National City to search for a deep-pocketed suitor to save it from its loan loss problems, and that decimated National City's share price between December 2007 and April 2008.  As Defendants revealed in April 2008, expected losses from those unsellable NHE New Production Loans are alone on the order of $2 billion.

### F.    Defendants Materially Misrepresented the Financial Impact to National City of the NHE New Production Loans

264.    Defendants knew that they were generating billions of dollars of subprime quality loans through NHE, knew no later than March 2007 that the market for such loans had collapsed, and knew therefore that National City had no choice but to retain the loans in its loan portfolio and suffer the consequences.  Those consequences, specifically, were the risks of default and loss presented by more than $6 billion of subprime quality second-lien mortgage loans that the

---

[34]    Each time defendants reported financial and operational results between April 30, 2007 and August 2007 (i.e., first quarter results on April 30, 2007 *via* press release and financial supplement attached to a Form 8-K; mid-quarter update for the second quarter of 2007, attached to a Form 8-K filed on June 14, 2007; and second quarter 2007 results via July 24, 2007 press release and financial supplement attached to a July 26, 2007 Form 8-K), defendants reported that the Company had been able to sell some NHE New Production Loans.  Defendants' report of NHE New Production Loan sales in the April 2007 - June 2007 quarter (relatively small though they were) was itself  misleading.  Those loans that the Company had managed to sell were the loans that better approximated the "prime quality" loans that defendants represented to be NHE's output.  The subprime quality loans that NHE was generating (unbeknownst to plaintiffs and the class), the majority of NHE's total production, were not sold during that time, and instead were piling up in the Company's "held for sale" warehouse.  That pile ultimately amounted to more than $6.4 billion of highly toxic NHE New Production Loans that are now expected to impose on the order of $2 billion in losses.

Company had no choice but to retain.  The risks of such loans, and defendants' awareness prior to and during the class period of those risks, have already been alleged in detail.[35]  Defendants, at all times during the class period, misrepresented those risks and their financial impact on the Company (and thereby misrepresented the Company's financial results).[36]  As is detailed below:

(a)     First, between March 2007 and September 2007, defendants hid even the possibility of risk from sight, by misrepresenting NHE's output as prime quality rather than subprime quality (Section III.D *supra*) and by misclassifying the entirety of that largely unsellable output as "held for sale" rather than acknowledging the loans were impossible to sell (Section III.E *supra*).  During this time, defendants failed to take *any* fair value writedowns on the NHE New Productions held for sale, and failed to establish *any* loss reserves for these unsellable assets that the Company had no choice but to retain.  Thus, between March 2007 and September 2007, defendants represented the risk to the Company of the NHE New Production Loans as $0.

(b)     Second, in September 2007, after defendants first revealed that they would have to retain approximately $6-$8 billion of NHE New Production Loans, defendants misrepresented the financial impact as minimal ($5 million in fair value writedowns, $20 million in loan loss reserves, and no impact on the Company's capitalization and liquidity).

(c)     Third, between October 2007 and January 2008, defendants began to disclose – but did not fully reveal – the true financial impact of the NHE New Production Loans.  During this time period, defendants disclosed hundreds of millions of dollars of fair value writedowns and related markdowns with respect to the NHE New Production Loans (a little on October 24, 2007; much more on December 17, 2007), raised loss reserves for those loans by further hundreds of millions of dollars ($113 million on October 24, 2007; further hundreds of millions on December

---

[35]     The NHE New Production Loans were nearly all second-liens, and largely of subprime quality.  Their risks, therefore, were essentially similar to those presented by the First Franklin second lien loans.

[36]      For example, by failing to take timely and adequate fair value writedowns, asset charge-offs and loan loss reserves, the company reported inflated earnings (e.g., funds were reported as net income rather than being diverted into loan loss reserves).  A more detailed pleading of exactly how and why the Company's reported financial results and financial condition were false and misleading is presented separately in ¶¶ 456-454.

17, 2007), and, finally, admitted what the market had long suspected – that the burden of such toxic assets was damaging the Company's fundamental financial condition and throwing the Company's capitalization, liquidity and solvency into doubt (on January 2, 2008).

(d) The full truth was not disclosed until April 2008, when, *inter alia*, defendants revealed that they expected further losses from the NHE New Production Loans to be on the order of $2 billion, and that, to salvage the Company's ability to continue as a going concern, they had secured a $7 billion equity investment to cushion the Company against those and other losses already detailed. However, that rescue was secured only at a very high price – namely, massive dilution of existing shareholders by issuing to the new equity providers approximately 1.4 billion new Company shares at an effective price of $5 per share. Existing shareholders, who owned 100% of the Company on April 20, 2008, owned only 33% on April 21, 2008. That was why, on the news that the Company had secured a life-saving rescue from its crushing loan losses, National City's share price sharply declined, immediately losing 27.6% of its remaining value and falling from $8.33 per share on April 18, 2008 to $6.03 per share on April 21, 2008.

### 1. Misrepresentations:  March 2007 - August 2007

265. **Fair Value**. At all times through August 2007, defendants failed to write down to "fair value" (i.e., current market value) the reported value of the NHE New Production Loans held for sale. Indeed, defendants failed to take *any* writedowns at all. This was false and misleading because (1) it was the Company's purported policy to write down such loans when their fair value was lower than the loan's cost basis; and (2) it was evident to defendants, after the market for subprime loans collapsed no later than March 2007, that the fair value of the subprime quality NHE New Production Loans was significantly less than their cost basis. Essentially, defendants falsely represented that the NHE New Production Loans were untroubled assets with unimpaired value, when in fact they were deeply troubled assets whose value was fundamentally impaired.

266. **Loss Reserves.** The NHE New Production Loans were improperly and falsely classified as "held for sale" to begin with, as they were unsellable and as the Company

therefore had no choice but to retain them.  Although they were *de facto* portfolio loans, and although Company policy and GAAP require that loss reserves be established against the credit risks posed by portfolio loans, defendants failed to reserve a single penny through August 2007 for billions of dollars of unsellable, subprime quality NHE New Production Loans.  This was materially false and misleading because it represented that the risk to the Company of the NHE New Production Loans totaled $0.  In truth, as defendants had long known, given the loans' subprime quality and the collapse of the market for loans of such quality, the Company would have to bear the risks of the NHE New Production Loans and those risks were massive.

> **a.      Defendants Misrepresent the Value/Risks of the NHE New Production Loans by Failing to Take *Any* Fair Value Writedowns on NHE New Production Loans "Held for Sale"**

267.      At all times through August 2007, National City reported the entirety of the loans being generated by NHE as loans "held for sale", eventually amassing by September 2007 approximately $6 billion of such loans in the Company's "held for sale" warehouse (with a further $2 billion still in the pipeline but not yet completed).

268.      National City's publicly-stated policy with respect to loans "held for sale" was, as National City's class period SEC filings stated[37], to carry such loans at the lower of (1) the loans' amount or (2) the loans' "fair value":

> Loans that the Corporation has the intent and ability to sell or securitize are classified as held for sale or securitization. **Loans held for sale or securitization are carried at the lower of the carrying amount or fair value applied on an aggregate basis.**

269.      The "fair value" of loans held for sale, as National City's class period SEC filings stated, was purportedly the current market valuation of such loans (e.g., bids received, prices quoted for similar loans, etc.):

> **Fair value is measured based on purchase commitments, bids**

---

[37]      Namely, National City's Forms 10-Q filed with the SEC on May 9, August 8 and November 13, 2007. The same policy was also stated in the Company's pre-class period SEC filings (e.g., the Company's Form 10-K for 2006, filed with the SEC on February 8, 2007).

> **received from potential purchasers, quoted prices for the same or similar loans, or prices of recent sales** or securitizations.

270.     Defendants reported financial results for National City's first quarter of 2007 via (1) April 30, 2007 press release, (2) April 30, 2007 conference call, (3) April 30, 2007 Form 8-K, attaching a detailed "Financial Supplement", and (4) Form 10-Q filed with the SEC on May 9, 2007.

271.     Defendants reported financial results for National City's second quarter of 2007 via (1) July 26, 2007 press release, (2) July 26, 2007 conference call, (3) July 26, 2007 Form 8-K, attaching a detailed "Financial Supplement", and (4) Form 10-Q filed with the SEC on August 8, 2007.  Defendants also reported financial results for the first two months of the second quarter of 2007 in a Mid-Quarter Update, attached as an exhibit to a Form 8-K filed with the SEC on June 14, 2007.

272.      In all the above-mentioned documents, statements and financial statements, defendants valued the NHE New Production Loans being "held for sale" at full loan amount, failed to take a single penny in fair value writedowns, and failed to write down those loans to "fair value".

> **b.     Defendants Misrepresent the Value/Risks of the NHE New Production Loans by Failing to Establish *Any* Loan Loss Reserves for the Unsellable NHE New Production Loans "Held for Sale"**

273.     Defendants' classification of billions of dollars of unsellable subprime quality NHE New Productions Loans as "held for sale" was improper, and materially false and misleading, because the Company did not have the requisite *ability* to sell the loans.

274.     In a nutshell, the subprime quality unsellable NHE New Production Loans were *de facto* portfolio loans.  It is Company policy, and required by GAAP, to establish loan loss reserves against expected losses from loans held on the Company's books.  As the Company's 2006 Form 10-K and class period SEC filings stated:

> Allowance for Loan Losses and Allowance for Losses on Lending-Related Commitments:
>
> **To provide for the risk of loss inherent in extending credit, National City maintains an allowance for loan losses** and an

133

allowance for losses on lending-related commitments. The **determination of the allowance for loan losses is based upon the size and risk characteristics of the loan portfolio** and includes an assessment of individual impaired loans, historical loss experience on pools of homogeneous loans, specific environmental factors and factors to account for estimated imprecision in forecasting losses...
*****
**The allowance for loan losses is maintained at a level believed adequate by management to absorb probable losses inherent in the loan portfolio and is based on the size and current risk characteristics of the loan portfolio, an assessment of individual problem loans and actual loss experience, probable recoveries under lender paid mortgage insurance, current economic events in specific industries and geographical areas, including unemployment levels, and other pertinent factors, including regulatory guidance and general economic conditions**.

275.    At all times through August 2007, defendants failed to establish any loss reserve whatsoever with respect to the NHE New Production Loans.

### c.    Falsity/Scienter

276.    **Fair Value**. Defendants knew from the get go that large swathes of the NHE New Production Loans were subprime quality.  Defendants acknowledged that, no later than March 14, 2007, the subprime market had collapsed and that it was effectively impossible to sell subprime loans except at deep discounts.  Therefor, the fair value of the loans had fallen substantially below their cost basis, and pursuant to stated Company policy defendants should have written down the value of those loans.  By failing to take any fair value writedowns and carrying the NHE New Production Loans at their cost basis, defendants misrepresented the value of those loans and falsely represented that the NHE New Production Loans could be sold at full price or at a profit, when in fact the subprime quality NHE New Production Loans could only be sold at a deep discount or not at all. Defendants later admitted in July and September 2007 that fair value indicators (e.g., bids they were receiving for loans held for sale [when they received bids at all], quoted prices and sales in the relevant market) were far below loan cost basis.  And in December 2007 and January 2008, as defendants disclosed that they had finally cleaned out the "held for sale" warehouse of last NHE New Production Loans residing therein, defendants admitted that they had incurred losses of

134

approximately $200 million by selling a small portion of the loans at deep discounts.

277.    **Loss Reserves**.  Pursuant to stated Company policy and GAAP, defendants were required to establish loss reserves to provide for the risk of loss that the NHE New Production Loans posed.  Defendants failed to establish any such loss reserves until September 2007, under the misleading fiction that the unsellable loans were being held for sale.  But defendants knew those loans could not be sold, and were well aware of the severe credit risks posed by subprime quality second lien loans (¶¶ 171-180, *supra*).

278.    In September 2007, defendants belatedly admitted that the NHE New Production Loans were indeed unsellable, transferred $4.4 billion of them to the Company's portfolio (but retained more than $2 billion as "held for sale") and asserted that loss reserves would need be only $20 million for those $4.4 billion of loans.  On October 24, 2007, defendants established a $113 million loss reserve for the NHE loans, "meaningfully" higher (as defendant Rowe observed) than the $20 million indicated in September.  On December 17, 2007, defendants warned that they would need to raise reserves by $700 million, "in particular" (as defendants stated in a December 17, 2007 Form 8-K) for the NHE New Production Loans, and on January 22, 2008 defendants disclosed a $691 million reserve increase driven by the NHE New Production Loans.  On April 21, 2008, defendants disclosed a loss reserve increase of $1.39 billion, again driven most prominently by the NHE New Production Loans, and further disclosed that the Company's $6.4 billion of NHE New Production Loans would generate losses on the order of $2 billion.

### d.    Impact

279.    Defendants' failures to take any fair value writedowns and/or to establish any loan loss reserves with respect to the NHE New Production Loans had the effect of rendering invisible to plaintiffs and the class the looming disaster represented by those loans – a disaster so severe that it would eventually overwhelm the Company's capitalization, liquidity and solvency, forcing the Company to accede to a life-saving but deeply punishing $7 billion "rescue".

280.    Additionally, defendants' failure to take any writedowns or establish any loss

reserves resulted directly in inflating the Company's reported earnings and assets.  As loss reserves are established by taking charges against what otherwise would be earnings, defendants' failure to take loss reserves caused the Company to reported inflated earnings.  Similarly, as fair value writedowns likewise result in charges against earnings and in asset-value decreases, defendants' failure to take fair value writedowns caused the Company to report inflated earnings and inflated asset values.

### 2.  Misrepresentations:  September 2007

#### a.  Misrepresentations

281.  On September 6, 2007, defendants belatedly admitted that $4 billion of the NHE New Production Loans were indeed unsellable (although they continued to hold in excess of $2 billion of such loans as "held for sale" until December 2007).

282.  During their September 6, 2007 conference call, defendants (falsely) portrayed the financial impact of the NHE New Production Loans headed for the Company's portfolio to be *de minimis* in every respect, including (a) fair value writedowns, (b) loss reserves, (c) impact on capital, liquidity, and ability to continue to pay its dividend. Specifically, defendants represented:

(a)      that (1) there was no need to write down the value of the $4-$6 billion of NHE New Production Loans headed for the Company's portfolio because "our assessment of their value approximates our cost basis", and thus that "the movement of these loans from held for sale to portfolio will have no immediate financial statement impact"; that (2) fair value writedowns on the NHE New Production Loans still remaining in the "held for sale" warehouse would amount to no more than $5 million; and (3) that the Company's fair value valuation assumptions were "conservative" (in the absence of any market prices or quotes that would establish fair market value);

(b)      that loss reserve establishment for the repatriated-to-portfolio loans would only require "around $20 million";

136

(c)     that repatriating those loans onto the Company's portfolio would have no impact at all on the Company's capitalization and liquidity ("I think we easily have the capacity to move it back both from a capital and a funding standpoint. ... Obviously, we feel comfortable moving the assets that are in the warehouse currently onto our balance sheet and in the loan portfolio.... I think we have a capital position and a liquidity position to put it in portfolio from this point forward if we need "); and

(d)     that the Company could comfortably withstand maintaining its current dividend notwithstanding the repatriation of the NHE New Production Loans, and that defendants saw no need to, and would not, reduce the Company's dividend:

> **The movement of these loans from held for sale to portfolio will have no immediate financial statement impact because our assessment of their value approximates our cost basis.**
>
> *****
> JEFF KELLY: ...Obviously when we made the decision to move those loans out of held for sale and into our loan portfolio, it was because we did not think the loans could be sold in a reasonable period of time. And as such -- and that frankly, we think the market prices that would exist if we were to attempt to push them off the balance sheet would not represent an economic execution.
>
> **Obviously, there are accounting rules around the decision to move things out of held for sale and into your loan portfolio, and they are essentially that you have to mark them to fair value. We have used a model to do that in the absence of readily observable market prices for our prime home equity loans, and that model is similar to that which we use to value the First Franklin loans that we moved back into portfolio at the end of the first quarter that were also not saleable in that earlier period of disruption**.
>
> There are a number of key variables you use to value those loans. There are cumulative loss curve, prepayment speeds, discount rate, capital structure and funding. **We think all of the assumptions that we have employed in that are on the conservative side of what we have used in the past when we have marked something to model**.
> *****
> UNIDENTIFIED AUDIENCE MEMBER: Can you just clarify **on the reserve increase, does that include the expectation for the home equity loans coming on your balance sheet?**
>
> ROB ROWE: **No, that does not. That is a good question.**

137

**Assuming it was around $4 billion that would come back on the balance sheet.** Once again, it is next 12 months. And first year, first 18 months of losses in an NHE product are not high. So **it is not going to be a big number. I did not include it because this was really to specific portfolios that we already had. It is around $20 million**.

\*\*\*\*\*

JEFF KELLY: ... Our intention is essentially to move everything that we don't believe is saleable in the foreseeable future into the loan portfolio. And we think that our capital ratio is getting to the top of the range by the middle of next year is consistent with that movement of virtually all of those assets. ... I don't see any reason to raise the capital targets per se... I think we easily have the capacity to move it back both from a capital and a funding standpoint. ... Obviously, we feel comfortable moving the assets that are in the warehouse currently onto our balance sheet and in the loan portfolio.... I think we have a capital position and a liquidity position to put it in portfolio from this point forward if we need to...

\*\*\*\*\*

JILL HENNESSEY: The dividend payout ratio.

JEFF KELLY: The dividend payout ratio. Well, we have always targeted about a 45% dividend payout ratio. That is still our target. We are comfortable with it. **There have been periods of time in the past when it has been above that for short periods of time, even as many as a couple of years... So, yes, we're still comfortable with that as our target. It is still our target and we don't intend to change it at this point.**

\*\*\*\*\*

RASKIND... The related topic that has already come up would be our dividend policy and dividend payout ratio. As was pointed out this morning, our payout ratio today is well above our previously stated target of 40% to 45%. **We see the dividend as a very important component of shareholder return and we have no intention of altering it. Put another way, a payout ratio above our target for a period of time is okay with us.**

> **b.**    **Falsity/Scienter**

283.    Defendants' September 6, 2007 statements detailed above were materially false and misleading.

284.    First, defendants massively misrepresented and understated the financial impact of the Company's repatriation of the NHE New Production Loans in claiming that fair value writedowns for all transferred and transferrable NHE New Production Loans would total no more

than $5 million.  Defendants stated: (1) that the initial transfer of $4 billion of NHE New Production loans, as well as the eventual transfer of a further $2 billion of NHE New Production Loans still in the funding pipeline, would have "no immediate financial statement impact" because their "fair value" purportedly equaled the loans' carrying amount (i.e., no fair value writedown required at all); and (2) that of a remaining $1.8 billion of NHE New Production Loans still held for sale, fair value writedowns, if those loans were transferred, would be no more than $5 million.

285.    In fact, the fair value of those loans was significantly lower than their carrying value, and the assumptions defendants used to estimate "fair value" to be no more than $5 million less than the loans' carrying value were not "on the conservative side":

(a)    To start with, "fair value" per Company policy was supposed to be market value.  In fact, there *was* a market value for those loans, and that market value, as defendants themselves acknowledged during their September 6, 2007 conference call, was *far* below the loans' cost basis.  Defendant Kelley so admitted when he explained that the Company had given up on selling the loans after realizing that they could only be sold at materially discounted prices ("we think the market prices that would exist if we were to attempt to push them off the balance sheet would not represent an economic execution").  Thus, market indicators for valuation of the NHE New Production Loans in September 2007 indicated that their fair value was far below their carrying value.  In fact, defendants turned a blind eye to such market valuations, and improperly refused to use them as the basis for their "fair value" determination.

(b)    Instead, rather than "marking to market", defendants "marked to model" and modeled the "fair value" of the NHE New Production Loans.  Defendants claimed to use "conservative" assumptions in modeling the purported fair value of the loans.  That was false.  The assumptions used by defendants yielded:  (1) a fair value of $6 billion for the $6 billion in of NHE loans already transferred and in pipeline, and (2) a fair value of at least $1.795 billion for the $1.8 billion of NHE loans still held for sale.  These were not and could not have been conservative modeling assumptions, given the loans risks' and defendants' awareness of those risks.

139

(c)     As the entirety of the NHE New Production Loans were second-liens (and nearly half simultaneous second liens), they bore risks of steep loss severity in case of default.  As nearly all the loans had been originated for purchases of property at market-peak prices (given that they were originated in 2006 and 2007) – the loss severity was reasonably expected to be steeper still.  Indeed, only one month later, defendants would admit that loss severity experience on such loans was running above 90% (i.e., for any loan that defaulted, only 10% of the loan value was recovered), and that current industry-wide practice was to model for 100% losses.  That was *not* new news for defendants, however: defendants recognized even prior to the class period, in January 2007, that subprime second lien loans were producing 100% loss severity.  The NHE New Production Loans were subprime quality loans.  Defendants had thus long known that any NHE New Production Loan that defaulted would result in a near-total or total loss.  And, given that nearly half the NHE New Production Loans were originated on a "stated income" basis, such loans were at elevated risks of default.

(d)     Thus, defendants' $5 million fair value "haircut" to $7.8 billion of NHE New Production Loans amounts (a mere 0.3% discount to the loans' cost basis of $7.8 billion) was tantamount to asserting (leaving interest income aside) that no more than 0.3% of the loans would default.  Although the details of the analysis may be incorrect (because interest income must be considered), the substance is indisputable – defendants' "conservative" assumptions vastly underestimated the risk of default of the NHE New Production Loans.

(e)     As defendants would later acknowledge, the "fair value" of the NHE New Production Loans was far lower than they claimed.  In December 2007, defendants disclosed that they would require additional loan loss reserves of approximately $700 million to reserve for, "in particular, indirect home equity loans and liens that were transferred to portfolio in the third quarter".  In January 2008 defendants slashed the Company's dividend in half and admitted the Company was facing a capital and liquidity crisis, catalyzed largely by the losses being generated by the toxic NHE New Production Loans.  In April 2008, defendants raised reserves by $1.39

140

billion, driven in largest part by the NHE New Production Loans, and disclosed that $6.4 billion of those loans would generate losses on the order of $2 billion.

286. Second, defendants misrepresented and understated the financial impact of the Company's repatriation of the NHE New Production Loans in stating that establishment of loss reserves for the $4 billion of transferred NHE New Production Loans would require only "around $20 million".

287. The $20 million loss reserve for $4 billion in NHE New Production Loans was materially false and misleading and did not represent, as per the Company's stated policies, a sum adequate to absorb probable losses from those loans given their risk characteristics and current economic events.

(a) As defendants only later revealed on April 21, 2008, the Company suffered from a "significant deficiency" in its internal controls relating specifically to the loan loss reserves for loans transferred into the Company's portfolio (i.e., primarily the NHE New Production Loans).

(b) The risk characteristics of the NHE New Production Loans and current economic events required a much larger loan loss reserve because probable losses from the $4 billion of loans were far greater than $20 million. A $20 million reserve for $4 billion of loans amounts to a statement that probable losses are 0.5% of the loan portfolio. As just stated, defendants were aware that loss severity on the subprime quality NHE New Production Loans was 100%. So, the $20 million loan loss provision was effectively stating that only 0.5% of the $4 billion of NHE loans would default. However, given that nearly half the NHE New Production Loans were originated on a "stated income" basis, such loans were at elevated risks of default. Such risks were even further elevated by the fact that all the loans had been extended for purchases at market-peak prices during 2006 and 2007, and that a majority of the loans had been extended on extremely-high CLTV terms – meaning that borrowers had essentially borrowed the entire cost of properties which had since deflated in value. Such "underwater" purchasers also presented higher default risks.

(c) As defendants later acknowledged, requisite loss reserves for the NHE New

141

Production Loans needed to be far higher.  In December 2007, defendants disclosed that they would establish additional loan loss reserves of approximately $700 million to reserve for, "in particular, indirect home equity loans and liens that were transferred to portfolio in the third quarter".  In January 2008 defendants revealed approximately $430 million of loan charge-offs and writedowns, raised reserves by $691 million, admitted the Company was facing a capital and liquidity crisis and slashed the Company's dividend in half – all catalyzed largely by the losses being generated by the toxic NHE New Production Loans.  In April 2008, defendants  raised reserves by $1.39 billion, driven in large part by the NHE New Production Loans, and disclosed that the Company's  $6.4 billion of those loans would generate losses on the order of $2 billion.

288.    Third, defendants massively misrepresented and understated the financial impact of the Company's repatriation of the NHE New Production Loans by repeatedly asserting the Company's ability to absorb the NHE New Production Loans comfortably and without impact to the Company's capitalization, liquidity and dividend.  In truth, as defendants later acknowledged, the repatriation of  the NHE New Production Loans, and of the huge losses those loans were generating, overwhelmed the Company's capital and liquidity, requiring not only eradication of the Company's dividend but ultimately a recapitalization of the Company.

289.    In fact, as defendants subsequently acknowledged between December 2007 and April 2008:  (1) the Company was profoundly uncomfortable with absorbing those loans, precisely because it did not have sufficient capital and the liquidity to do so; (2) absorbing the loans would deeply erode the Company's capital ratios and push them below regulatory minimums unless significant further capital was raised; (3) the Company needed to increase its capital levels in order to absorb the loans and to maintain the Company's capital ratios above regulatory minimums; (4) the Company's capital strategy and analysis were not "conservative" so as to properly position the Company in the current macroeconomic environment, but rather reckless in the extreme and positioned the Company for a capital crisis; and (5) the Company's current dividend payout was unsustainable and would require deep reduction and/or elimination.  As further detailed below:

142

(a)     On October 24, 2007, defendants admitted that they would have to raise capital levels (but asserted that such levels would rise naturally through retained earnings in the future);

(b)     In November 2007, both Fitch and Moody's, citing the NHE New Production Loans, downgraded the Company's credit ratings and warned further downgrades were possible;

(c)     On December 17, 2007, defendants warned that they would be raising loan loss reserves by approximately $700 million for the fourth quarter of 2007, which sharp increase was driven by "[i]n particular, indirect home equity loans and lines that were transferred to portfolio in the third quarter".  Defendants also disclosed that they had incurred a further $200 million in writedowns and losses associated with cleaning out the "held for sale" warehouse of the last remaining NHE New Production Loans;

(d)     On January 2, 2008, in light of that nearly $1 billion in reserves, writedowns and losses – which eliminated the possibility of retaining any earnings with which to replenish capital – defendants cut the Company's dividend in half, deepened cost-cutting measures, announced plans to raise capital actively through securities offerings, retained Goldman Sachs as a "capital adviser", and signaled the inception of the Company's capitalization crisis;

(e)     On January 22, 2008, defendants admitted that the credit quality and characteristics of the NHE New Production Loans werr fundamentally and objectively poorer than that of all the Company's other home equity loans;

(f)     On March 13, 2008, Moody's cut the Company's credit ratings again, even after the Company had raised over $1.4 billion in funds and $600 million in capital through securities offerings, because of the NHE New Production Loans ("The Company's very sizable second-lien home equity portfolio will result in significant losses that will further weaken the Company's capital position");

(g)     Nearly simultaneously, in mid-March 2008, rumors surfaced that the Company had put itself up for sale, leading to the market conclusion (later confirmed) that the

143

Company's loan losses were even worse than previously indicated and ultimately too large for the Company to handle (thus the Company's search for a deep-pocketed suitor); and

(h)    On April 21, 2008, the Company was rescued from the burden of its loan losses by a $7 billion, massively-dilutive outside equity investment whose breathtaking size and punishing price (recapitalization of the Company so that current shareholders were diluted by 66%) were driven by the Company's loan losses, and especially the NHE New Production Loans.  As defendants also disclosed on April 21, 2008, they expected the $6.4 billion of NHE New Production Loans to generate losses on the order of $2 billion.

c.    **Impact**

290.    As ¶ 289 (a)-(h) summarize, the NHE New Production Loans were the iceberg that nearly sunk the Company ship.  Defendants' pre-September 2007 representations functioned to render the iceberg wholly invisible to plaintiffs and the class.  Defendants' September 6, 2007 representations functioned, essentially, to portray the NHE New Production Loan iceberg as merely an ice cube.  According to defendants, no fair value writedowns were needed because the loans were fairly valued at cost basis, minimal loss reserves were needed because the loans were a minimal credit risk, and there would be no impact at all on the fundamental financial condition of the company (capitalization, liquidity, dividend).

3.    **Misrepresentations:  October 2007**

a.    **Misrepresentations**

291.    On October 24, 2007, the Company announced financial and operational results for the third quarter of 2007 via press release and Financial Supplement and Supplemental Data presentations attached as exhibits to Form 8-K filed with the SEC, and held a conference call with analysts and investors to discuss the Company's results, plans and prospects.  Defendants revealed *inter alia* mortgage-banking related losses of $152 million (actually, $192 million offset by an unrelated $40 million in hedging gains on derivatives) and announced a further round of mortgage-banking job eliminations so as to reduce the Company's expenses by $125 million.

144

Although defendants' October 24, 2007 disclosures included some partial corrective disclosures (e.g., loss reserve increases, fair value writedowns, and an increase to targeted capitalization ratios), they were still materially false and misleading, as detailed below.

### i.     Loss Reserves

292.     First, the Company announced a $361 million increase to loan loss reserves. The largest single component of that increase was a $113 million increase to loan loss reserves for $4.4 billion of NHE New Production Loans – by way of instructive contrast, more than three times greater than the loss reserve increase of $37 million for the Company's *larger subprime* loan portfolio ($7 billion of First Franklin loans).  During their October 24, 2007 conference call, defendants admitted that these loss reserve increases were "meaningfully higher" (defendant Richlovsky) than the amounts stated by defendants on September 6, 2007.[38]

293.     However, defendants falsely represented that such increased loss reserves: (1) were the result of a thorough review and rigorous evaluation of the Company's portfolios, current performance trends (e.g., increased delinquencies), and the macroeconomic environment (e.g., decreased liquidity, rate resets, depreciating home prices); (2) used assumptions (e.g., loss severity, rate resets) purportedly significantly more negative than currently seen; and thus (3) adequately positioned the Company against expected losses:

> ROWE:    ... **the recently transferred held-for-sale book is exhibiting higher delinquency and potentially higher loss content than was assumed 45 days ago. Because of the worsening trends, we have placed additional loan loss reserve against the portfolio that was moved from held-for-sale. This reflects the current level of loss development and delinquency as well as significantly changed economic environment with much lower levels of liquidity**. This portfolio will bear watching going forward.
>
> ... In summary, **we conducted a thorough review of all the loan portfolios. Rigorously evaluated the trends and current environment and increased our reserves to a level that we believe is appropriate**...

---

[38]     Also defendant Rowe – "note that National City has significantly increased its loan loss reserve during the quarter. The extra provisioning is somewhat above the top end of reserves estimated during the investor presentation in September".

*****

ROWE: ...What **I would assure you in our calculations when you are simulating the current environment, we have assumed delinquencies that are generated from rate resets and we have also assumed loss severities that are higher than we have seen traditionally. So, it is my view that, at the current time**, although it's a great question and certainly the assumptions underlying it might be reached at some point, **we believe that we are appropriately reserved for the potential outcomes**.

*****

JILL HENNESSY: And **can you please discuss the issue of severity versus frequency of losses in home equity loans and lines?**

 ROB ROWE: Right now, **I would say that for us or for anybody in the industry, we would pretty much be modeling that severity would be 100% writeoff of a home equity loan. So, the decision point would really be what is the frequency or what is the default probability of the home equities, but at the current time, I believe we pretty much have only have a 5% recovery rate on the home equity loans that do default**.

*****

**JILL HENNESSY: In general, should we expect additional reserve build going forward?**

**ROB ROWE: Well, I would state right up front that the current level of reserves today is driven by our expectations of the performance of the portfolio going forward. It's not driven by net charge-offs at the time, but it's really a look to the future. So, we believe we are appropriately reserved.** As we said right up front, this is a difficult environment to simulate and we just have to keep it at that. **We believe we are appropriately reserved today**.

### ii.    Fair Value and Fair Value Writedowns

294.    Defendants stated on October 24, 2007 that they had written down to "fair value" the value of the Company's "held for sale" mortgages, including further billions of NHE New Production Loans, and that in so doing had incurred total charges of $74 million, the lion's share of which related to the NHE New Production Loans.[39]  The Company's October 24, 2007 press release stated that "[l]oans held for sale have been written down to estimated market prices, and in certain

---

[39]    As earlier stated, after the Company's August 2007 shutdown of NHE, defendants ceased to report NHE's operations separately and instead folded them into the National City Mortgage line item.  The Company reported $78 million of losses in connection with National City Mortgage loans and home equity lines of credit, the majority of which is believed to relate to the NHE New Production Loans.

cases, moved to portfolio".  Defendants further represented during their October 24, 2007 conference call that such writedowns had been extremely conscientious and aggressive, and had taken into account expected "scratch and dent" fallout and other difficulties in selling the loans held for sale:

> **We also incorporated an estimate of the likely scratch-and-dent loss content of the remaining loans not under contract to sell.** Because the majority of the loans held for sale, but not under contract are agency eligible, we expect the trade fallout and, thus, scratch-and-dent losses will be materially lower going forward.

### iii.    Capital and Dividend

295.    Although defendants acknowledged on October 24, 2007 that they needed to raise their Tier 1 capital target range capital, defendants falsely represented that (1) the Company would easily achieve such targeted Tier 1 Capital ranges, without any need to raise capital, "naturally over the next several quarters as... retained earnings accumulate"; and (2) that the Company's dividend was safe and would be maintained ("we see no need to and have no intention of -- of reducing the dividend"):

> KELLEY: ...  **it now seems appropriate to allow our capital ratios to migrate towards their respective target ranges and in the case of our tier one capital ratio, to move the entire target range upward. Our target ranges are 5 to 6% for the tangible common equity ratio, and 7 to 8% for the tier one risk-based capital ratio**. As I said, we did implement an increase in this target range of about 0.5%. **In the absence of issuing capital securities of some type, the increases I described in those ratios will occur naturally over the next several quarters as the balance sheet shrinks from here and retained earnings accumulate**.
>
> *****
>
> JILL HENNESSY: Jeff, can you please talk about capital strength in the context of what would cause the current dividend to be at risk? And what would make you reevaluate your dividend policy?
>
> JEFF KELLY: **Well, let me say that I think given both our current capital position and our intention to allow capital to rise over the next several quarters within the -- the target ranges that I described and in the context of those target ranges that -- that we see no need to and have no intention of -- of reducing the dividend**. We have always believed this is a very important

147

component of our total return to shareholders and have always sought not only to pay it every year but frankly to increase it every year.

And while I would certainly admit that our dividend payout ratio is clearly above our long-term target of 45%, I remind all that this is a long-term target and there have certainly been time periods in the past when we were -- our actual payout ratio has exceeded that level. So I think many of the factors, at least recently, that have contributed to that actual payout ratio being somewhat above our target, we consider to be short-term and, indeed, in many cases one time in nature. And, as Peter mentioned in his comments, we're focused on improving the financial performance of the company and we believe that's achievable and, therefore, we have -- see no need to or have no intention of cutting the dividend.

### b.    Falsity/Scienter

296.    Defendants' above-detailed October 24, 2007 representations concerning loss reserves for the NHE New Production Loans, fair value writedowns of those loans, and the Company's capital and dividend capacity in light of those loans were materially false and misleading.

297.    **Loss Reserves**.  The $113 million loss reserve for $4.4 billion in NHE New Production Loans was materially false and misleading and did not represent, as per the Company's stated policies and as per defendants' October 24, 2007 representations, a sum adequate to absorb probable losses from those loans given their risk characteristics and current economic events.  In fact, and contrary to defendants' representations, defendants' loss reserve was inadequate given *current* mortgage performance trends and the *current* economic environment and did not use assumptions more negative than currently seen.

(a)    First, the $113 million October 24, 2007 reserve increase was the first establishment of any loan loss reserve for the NHE New Production Loans.  Undisclosed to the class and contrary to stated reserve policy as well as defendants' express October 24, 2007 representations, defendants were failing to reserve for loans that had yet to reach charge-off levels, and were primarily basing reserve provisioning on current levels of charge offs.  This made those reserves fundamentally backward-looking, so that they failed to account for *current* portfolio risks

148

and *current* economic conditions (directly contrary to defendants' October 24 2007 representations) let alone prospective portfolio performance (again, contrary to defendants' October 24, 2007 representations).   Making matters worse still, defendants, undisclosed to the class and in contravention of stated policy, were waiting for loans to go 180 days without payment before declaring them to be "nonperforming" and subsequently charging them off.

> (b)    The NHE New Production Loans – nearly all second liens, nearly all high-CLTV, nearly all originated for purchases at market-peak prices for homes that had since significantly depreciated in value – were at high risk, in the case of default, of total or near-total loss. Therefore as defendant Rowe acknowledged on October 24, 2007, in modeling for expected losses on home equity loans, loss severity should be assumed to be 100%[40], making probability of default the driving factor of loss estimation. A $113 million loss reserve for $4.4 billion of NHE New Production Loans is the equivalent of providing for losses that would be generated if 2.57% of the NHE New Production Loans defaulted and upon default experienced a total loss.   Although defendants represented that the "current level of reserves today is driven by our expectations of the performance of the portfolio going forward", it was apparent long before October 2007 that such loans would default at a rate much higher than 2.5%.   Indeed, one and one half months later, defendants admitted that they would raise loss reserves by approximately $700 million, largely driven by the NHE New Production Loans.  Ultimately, in April 2008, after a capital and liquidity crisis brought on by the NHE New Production Loans required near-total elimination of the Company's dividend and a life-saving capital infusion on severely onerous terms, defendants revealed that loss expectations for $6.4 billion of the NHE New Production Loans were on the order of $2 billion. *That implies a default rate of at least 31.25% – more than ten times the rate provided for in October 2007.*

---

[40]      In fact, defendants had long been aware that subprime quality NHE New Production Loan loss severity would be total.  Defendants acknowledged even prior to the class period that subprime second lien loans were producing 100% loss severity upon default (¶ 146, *supra*), and large swathes of the NHE New Production Loans were subprime quality.

298.  **Fair Value**.  Defendants failed – contrary to their stated policy and to their October 24, 2007 representations – to write down the NHE New Production Loans held for sale to their "fair value", and did not adequately take into account trade fallout and scratch and dent fallout factors.  In fact, market valuations were materially lower than defendants "fair value" valuations (as defendants well knew, given that selling those loans was now possible only at severe discounts), and the costs of trade fallout therefore would be materially higher.  On December 17, 2007, defendants so acknowledged, warning in their Mid-Quarter Update of a further approximately $200 million of charges incurred from cleaning out the "held for sale" warehouse, including writedowns, trade fallout and scratch and dent factors.  On January 22, 2008, when defendants demonstrated that the Company's held for sale warehouse had been finally and completely emptied of NHE New Production Loans, they also reported $149 million in losses incurred from selling those loans (actually, $165 million in losses offset by $16 million in unrelated gains from other products), the lion's share believed to relate to the NHE New Production Loans.

299.  **Capital and Dividend**.  Defendants' claim that the Company's capital ratios would "naturally" migrate upwards as "retained earnings accumulate" was without basis:  due to the mismatch between current reserves for the NHE New Production Loans and the expected losses from such loans, the Company would have no such "retained earnings" to bolster its capital position. Defendants' claim that the dividend was safe was  without basis for the same reason:  due to the need to adequately reserve for the NHE New Production Loans *and* retain as much earnings as possible to bolster the Company's Tier 1 Capital, the Company simply didn't have enough available earnings to maintain its dividend at its current level.  Indeed, as defendants had earlier admitted (during their September 6, 2007 conference call, only after being directly challenged), merely paying the dividend during the third quarter of 2007 would itself require more earnings than the Company was actually generating (i.e., leaving no earnings to be retained):

> UNIDENTIFIED AUDIENCE MEMBER: So just to be clear then, in that regard -- I'm not going to try to make you forecast third

quarter earnings, but **it's reasonable to conclude from what you've told us that third quarter net profitability should be below the dividend level**.

TOM RICHLOVSKY: **That would not be unreasonable to conclude**.

### c.    Impact

300.    To continue the metaphor, the NHE New Production iceberg – rendered invisible to plaintiffs and the class at all times until September 6, 2007; represented as little more than an ice cube on September 6, 2007 – was represented by defendants on October 24, 2007 as something the Company ship could sail through without suffering any fundamental damage. According to defendants, capital levels would replenish, the dividend would be paid, but fair value writedowns were over with and loss reserves had been established on a forward-looking conscientious basis to absorb the shock of impact.

## G.    Denouement

### 1.    Precursors

301.    In November 2007, both Fitch and Moody's, citing the NHE New Production Loans, downgraded the Company's credit ratings and warned further downgrades were possible:

(a)    On or about November 6, 2007, Fitch downgraded the Company from AA- to A+, stating:

> The company's weakened core financial performance, exhibited in varying degrees over the past few quarters, highlights the challenges this company is likely to face in coming quarters… **the company's large remaining mortgage banking business is likely to remain pressured... meaningful exposures in residential construction lending, home equity and second mortgages remain and are likely to present the company with challenges**.  The economic prospects for some of the company's core markets are less than robust and while expansion to more vibrant markets such as Florida hold long-term promise, bear-term issues are emerging which may further restrain financial performance.  Proceeds form the timely sale of First Franklin were largely used to fund share repurchases, which quickly eroded the extra capital cushion

(b)    On or about November 19, 2007, Moody's downgraded the Company from A2

151

to A1 as a result of "Moody's expectations that National City will need to make elevated [loan loss] provisions well into 2008" driven by the Company's $6.6 billion subprime portfolio in run-off, $10.7 billion national home equity run-off portfolio, and $8.1 portfolio containing residential development, land development and residential construction loans.  Additionally, Moody's placed National City on "negative outlook" for further downgrade because of the Company's need for further loss provisions combined with its comparatively high dividend payout of $240 million a quarter -- "maintenance of such a high dividend limits the company's ability to build its capital".

302.    On or about November 19, 2007, the Company replaced its heretofore Chief Risk Officer Jim Bell, who had worked at the Company for 25 years, with relatively new hire Dale Roskom, who unlike Bell, had previous risk management experience at the executive officer level. On or about December 6, 2007, the Company replaced its heretofore CEO of National City Mortgage Paul "Buck" Bibb.

## 2.    December 17, 2007: The Tip of the NHE New Production Iceberg Revealed

303.    On December 17, 2007, defendants finally began to acknowledge publicly the magnitude of the financial impact of the NHE New Production Loans.  In a Mid-Quarter Update attached as an exhibit to a Form 8-K filed with the SEC, defendants warned that they would incur $200 million in charges resulting from emptying the "held for sale" warehouse of unsellable NHE New Production Loans, and a further $700 million in charges for loss reserve increases for "in particular" the NHE New Production Loans.  The December 17, 2007 Mid Quarter Update stated:

> **Mortgage Banking**
> During October and November, **substantially all non-agency eligible mortgages, second liens, and home equity lines were cleared from the mortgage warehouse, either by settlement of existing committed trades or by transfer to portfolio. As a result, charges of approximately $200 million were incurred in October and November, reflected in loan sale revenue, owing to trade fallout, "scratch and dent" losses, unfavorable mark-to-market adjustments**, and generally poor conditions in the mortgage markets. As of the end of November, the balance of loans in the warehouse consisted mainly of agency-eligible and other loans deemed readily salable, and no additional losses of significance are expected...

152

**Credit Quality**

Credit quality in the commercial and core consumer portfolios, including direct home equity lending, remains satisfactory.  **The areas of elevated risk continue to be in the run-off portfolios of First Franklin non-prime mortgages, especially seconds; broker-originated home equity loans and lines of credit associated with the former National Home Equity business; and certain sectors of investment real estate and residential construction. In particular, indirect home equity loans and lines that were transferred to portfolio in the third quarter have shown further deterioration** beyond that which was anticipated at the time the September 30 loan loss allowance was established. **As a result, additional loan loss provision will be required in the fourth quarter** to increase the allowance to a level commensurate with management's best estimate of the probable loss content of these portfolios. While the exact amounts will not be determinable until after the close of the year, it is expected that the total provision for loan losses for the fourth quarter will be **in the area of $700 million**.

304.    The nearly $1 billion dollar fallout revealed on December 17, 2007 was of an order of magnitude completely unexpected given defendants' prior representations concerning, inter alia, reserves, reserve adequacy, and NHE New Production loan quality, characteristics and risks.  And yet, it was only the tip of the iceberg.  Although defendants indicated that the $700 million reserve increase was driven "in particular" by the NHE New Production Loans, defendants never disclosed the specific amounts of that increase dedicated to Company's various troubled portfolios.  Even were half the increase devoted to the NHE New Production Loans (which, given all that is known, seems the upper possible bound), so that reserves for those loans were increased by $350 million, those loss reserves were still deeply inadequate.  In fact, defendants revealed on April 21, 2008 that a further $2 billion of losses were to come.

**3.      January 2, 2008: The Capital Crisis Begins, and the Dividend is Cut in Half**

305.    On January 2, 2008, National City issued a press release announcing that it would cut its dividend in half, retain Goldman Sachs as a "capital advisor" and seek to raise capital through debt/hybrid securities issuance, and embark on yet further rounds of cost-cutting and job

153

eliminations.

306.    As the foregoing allegations demonstrate, the January 2, 2008 dividend reduction – and the admission that the Company would need to take active steps to raise capital – were catalyzed by the repatriation of the $6.4 billion in subprime quality NHE New Production Loans and of the losses those loans were expected to generate.

307.    However, defendants' January 2, 2008 representations  still failed to reveal the full extent of the financial impact of the NHE New Production Loans.  The January 2, 2008 press release represented that National City had adequately reserved for loan losses (the "company has significantly built reserves for expected losses on these portfolios") and that the Company was operating with a strong foundation and future.  Neither was true.

(a)    Three weeks later, the Company would reveal that it expected to charge off more than $1 billion of loans during 2008.  Three months after that, on April 21, 2008, defendants revised expected in-year charge-offs to more than $2 billion, and also raised announced loss reserve increases totaling $1.39 billion (the largest single component of which was an increase of $379 million to the loss reserves for the NHE New Production Loans).  Defendants also and for the first time revealed remaining lifetime expected loss estimates for several of their portfolios, including – worst by far – approximately $2 billion for the NHE New Production Loans.  Expected losses from the NHE New Production Loans were three times greater than subprime First Franklin losses ($750 million), three times greater than Construction Loan losses ($550-625 million), and five times greater than NHE Run-Off Portfolio losses ($300-$400 million).

(b)    Under the weight of such losses ($3.3 billion - $3.7 billion just for the above-mentioned portfolios), neither National City's foundation nor future was "strong".  The losses sitting on National City's books were threatening to exhaust the Company's capital,  liquidity and ability to function as a going concern.  Even after the Company raised $1.65 billion in capital through January 2008 offerings of debt and hybrid securities, and a further $500 million from Visa shares it held and sold in Visa's initial public offering, the Company's capital and liquidity crisis continued

154

unabated and in fact intensified.  The Company began no later than mid-March 2008 to shop itself to deep-pocketed buyers who could provide sufficient funds to save the Company from collapsing. On April 1, 2008 defendants officially announced that the Company was considering "strategic alternatives".  And finally, on April 21, 2008, the Company announced that it had selected the best strategic alternative available to it: an outside investment group that would provide $7 billion in exchange for 1.4 billion in newly-issued National City shares (i.e., purchase price of $5 per share), thus instantly diluting the stake of the Company's prior shareholders by 66%.

## IV.   THE IMPACT OF THE ABOVE-MENTIONED LOANS TO THE COMPANY'S CAPITALIZATION, LIQUIDITY AND FUNDAMENTAL FINANCIAL CONDITION

### A.   Summary and Overview

308.   Throughout the class period, defendants claimed to be adequately reserved and adequately capitalized.  Even as the Company grudgingly acknowledged growing loan losses in late 2007, defendants continued to deny and understate the drastic impact of those losses on the Company's fundamental financial condition and very existence.  It was only in April 2008 that defendants revealed the truth – a situation so dire that defendants were forced to give away two-thirds of the Company in order to save it.

### B.   Background: Prior to the Class Period, the Company Rids Itself of "Excess Capital"

309.   On January 23, 2007, defendants announced National City's financial and operational results for the fourth quarter and year of 2006, and held a conference call with analysts and investors to further discuss the Company's results, plans and prospects.  Defendants stated that, with the First Franklin portfolio now in run-off, with the Company having already taken purportedly large reserves for that portfolio, and with the National Home Equity output being sold rather than retained, the Company's balance sheet and balance sheet risks were smaller.  The Company, defendants therefore concluded, had "several billion dollars in excess capital at this moment" which, defendants announced, they would use on a "large scale" share repurchase.

155

… Lastly, some comments about the balance sheet. We've said that we would identify the core businesses, shrink to the core, and then work to enhance and grow the core and focus on the productivity of capital. The divestiture of First Franklin is part of that strategy, as is the originate and sell model for National Home Equity, as well as the Florida acquisition. **The First Franklin and National Home Equity portfolios are now less than half of what they were a year ago and they will continue to shrink rapidly**, driving improvement in the ratio of core deposits to loans and reducing purchase funding requirement as well as credit and prepayment risk. We also issued some hybrid capital securities in the fourth quarter with more planned for 2007, providing a cost effective boost, addition to regulatory and rating agency capital. **All of these actions point to a lower absolute, as well as relative requirement for common equity on the balance sheet. With the tangible common equity ratio at 7.8%, we have arguably several billion dollars in excess capital at this moment**. … Due to the restrictions arising from acquisitions and other matters, we've been unable to execute any meaningful share repurchases for several months now. As those restrictions are now lapsing, **we believe that a large scale share repurchase beyond what is contemplated in our current authorization could make a lot of sense for both the Company and its shareholders**. We've been considering a number of options, including both regular, open market share repurchases, accelerated share repurchase programs, as well as a tender offer, either individually or in some combination. We would expect to reach a decision on this capital deployment reasonably soon and move forward in the near future.

310. In truth, the Company's subprime portfolio, subprime risks and need for capital were substantially greater than indicated on January 23, 2007.[41]

311. By January 2007, although the subprime markets were still functioning albeit at depressed levels, subprime problems were widely known. That was precisely why defendants had enacted a $127 million reserve increase for the Company's First Franklin portfolio. That reserve increase, defendants represented, had been taken on the basis of assumptions that the negative subprime loan performance trends already evident would in fact significantly worsen – i.e., that the

---

[41]     As already alleged in Section II.E, *supra*, defendants had long known that $1.6-$1.7 billion of subprime First Franklin loans that defendants classified as "held for sale" were in fact unsellable, and had been rejected by purchasers desirous of acquiring billions of dollars of subprime loans after the purchasers' due diligence had revealed those loans to be sub-subprime, and thus would have to be retained on the Company's portfolio where they would impose sharper credit risks than run-of-the-mill subprime. Because the First Franklin portfolio was in fact $1.6-$1.7 billion greater than stated, and additionally because the additional $1.6-$1.7 billion of First Franklin loans that defendants failed to count were sub-subprime loans that would produce disproportionate losses, the Company's balance sheet and balance sheet risks were greater than represented. In light of the larger-than-represented level of assets and risks, the Company's capitalization was less solid than represented and the Company's need for capital greater than represented.

156

Company had protected itself for the possibility that subprime loans would perform significantly worse than they were already performing.  As defendants stated during their January 23, 2007 conference call:

> Going forward, there is still some residual exposure in the First Franklin retained portfolio that was not sold, as Jim Bell will discuss, but we feel that we are well reserved for the risk based on everything we know at this point

Likewise, as defendant Raskind stated in a January 23, 2007 Bloomberg article:

> The stress in the subprime sector is fairly well advertised and we've not been immune from that stress... We're sanguine about credit quality looking ahead.  We see no sign for alarm.

312.    In response to this reassuring news concerning the Company's subprime portfolio, subprime risks, capitalization and fundamental financial condition, National City's share price rose 2.8% to close on January 23, 2007 at $36.47 per share (up from $35.49 per share on January 22, 2007).

313.    Two days later, on January 25, 2007, defendants announced the "large scale" share repurchase that they had mentioned on January 23, 2007.  Specifically, defendants announced that the Company would hold a "Dutch auction" tender offer in which the Company would purchase up to 75 million shares at $35-$38.75 per share until February 28, 2007.

314.    As noted in an article published in the American Banker the next day, on January 26, 2007, defendants' tender offer was of sufficient scale to exhaust the Company's available capital:

> National City  said that it plans to repurchase 75 million shares, or 12% of its stock outstanding, by February 28. In a regulatory filing, it said it could spend $2.7 billion to $2.9 billion on the share buybacks, which is nearly all of the $3 billion in excess capital the company had in its coffers at year end, after accounting for some recent deals...

315.    Defendant Daberko, quoted in the January 26, 2007 American Banker article, dismissed the concern that the Company's capitalization would be stretched too thin and its capital

levels overly depleted.  Daberko reassured that the Company would be able to bolster its capital
levels through the Company's future earnings:

> David A. Daberko [] said the company expects to "create a lot of
> excess capital going forward."

316.     In response to this news, National City's  share price immediately rose 4.3%
in intra-day trading on January 25, 2007 and ended the day 2.7% higher, closing at $37.74 per share
(up from $36.76 per share on January 24, 2007).

317.     On March 1, 2007, the Company issued a press release announcing the
conclusion of the tender offer and its preliminary results, reporting that 39.9 million shares had been
offered for tender to the Company and that the Company would purchase those shares at the tender
offer maximum price of $38.75 per share.  In response to this news, National City's share price rose
nearly 2% to close trading on March 1, 2007 at $38.49 per share (up from $37.85 per share on
February 28, 2007).  The March 1, 2007 closing price was the Company's peak price.

318.     In February 2007, the primary and secondary markets for subprime mortgages
suffered a spectacular meltdown.  Large losses were revealed, many subprime lenders ceased
subprime origination altogether or significantly tightened their origination standards, and many other
subprime lenders ceased operations altogether and/or declared bankruptcy.

319.     Defendants' March 14, 2007 Mid-Quarter Update acknowledged that the
secondary market for subprime loans had become so "adverse" that the Company had concluded it
could not sell its remaining $1.6-$1.7 billion of First Franklin loans still classified as "held for sale".
As a result, the Mid-Quarter update stated, those loans would be added to the Company's First
Franklin run-off portfolio.

320.     On April 2, 2007, in light of continuing subprime downturns and the
Company's recent admission that its subprime exposure was $1.6-$1.7 billion larger than previously
indicated, A.G. Edwards analyst David A. George downgraded his recommendation on the Company
from "hold" to "sell" based on his opinions that the "residual credit risk associated with the portfolio
being retained is greater than what is priced into the stock in our opinion".  The Company's share

price fell 3.3% on April 2, 2007, closing at $36.02 (down $1.23 from the previous closing price of $37.25 on March 30, 2007).

321.    On April 24, 2007, however, defendants represented seeming confidence in the Company's capitalization and capital levels by announcing, in a press release, that the Company was newly authorized to repurchase up to 40 million shares of its stock (subject to an aggregate purchase limit of $1.6 billion). This new authorization was in addition to the Company's extant authorization (a 40 million share repurchase authorized in December 2006, under which authorization was remaining for repurchase of 10 million shares).

C.    **Class Period Misrepresentations Concerning the Company's Fundamental Financial Condition**

1.    **April 2007 - November 2007: Defendants Maintain that Loan Losses Will Have No Impact on the Company's Fundamental Financial Condition**

322.    On April 30, 2007, defendants announced financial and operational results for the first quarter of 2007, and held a conference call with analysts and investors to further discuss the Company's results, plans and prospects.

(a)    As previously detailed: (1) with respect to the First Franklin loans, defendants represented that following a writedown incurred in transferring the $1.6-$1.7 billion of "held for sale" loans to the Company's portfolio, as well as a further reserve increase, which defendants attributed largely to one insurer's improper failures to pay claims, defendants were more than fully reserved (defendant Bell – "Within the nonconforming runoff portfolio, the underlying loans are performing somewhat better than we had expected at the start of the year, but because of the continued tightening of lending standards in the market, we are not yet improving or adjusting our loss development forecast"); (2) with respect to the NHE New Production Loans, defendants still classified them in their entirety as "held for sale"; and (3) with respect to the Construction Loans, mentioned their existence but entirely misrepresented the nature and scale of the problem (defendant Bell – "National City Mortgage -  raised reserves to reflect the probability of higher losses in the construction loan portfolio... just a recognition that these properties are generally not owner-

159

occupied primary residences and may have a higher loss given default going forward than they have had in the past").

(b)     Additionally, defendants, on April 30, 2007, represented that the Company was in fundamentally excellent condition and that matters would only improve in the future. For example, defendants' April 30, 2007 press release, quoting defendant Daberko,  represented that "Our mortgage business continues to operate in a difficult environment, **but we have less exposure to the mortgage sector than in prior years. Overall, we expect each successive quarter from here to show improved earnings**..."

Defendant Daberko reiterated such representations in his closing comments during the April 30, 2007 conference call:

> ... other than a small number of specific names and situations, we're very pleased with credit quality on the commercial side, and at this point it appears that loan-loss provisions for the year will be less than planned. **So, our outlook for the year is that we expect each successive quarter to show improvement. We have reason to feel a bit more optimistic about the First Franklin portfolio, both fundamentally and with respect to the insurance coverage, based on the developments as Jim described**... While the mortgage market remains difficult, we're in that business for the long haul, and in fact, we're using the down time to invest heavily in upgrades to our origination system. The conversion of our Florida banks is behind us, and the pieces are in place to execute against our game plan. The best-in-class programs, all of which are integrated into business unit plans, are coming on stream at exactly the right time. **The National City that is taking shape in 2007 is somewhat smaller, but lower risk, more focused and possesses better growth potential**.

Similarly, defendants' conference call statements indicated confidence in the Company's capitalization levels, despite significant capital depletion through continuing share repurchases on a large scale:

> KELLY: ...**Absent  further capital management, we project that ratio would grow something on the order of 6.6% by year end. As a result, you should expect to see more repurchase activity over the balance of the year**, and you probably saw that we obtained additional authorization from our board last week...

323.    Defendants' April 30, 2007 statements and disclosed financial results were

160

materially false and misleading, because:

(a)     Contrary to defendants' representations as to the performance of and reserves for the First Franklin loans, loan performance was materially worse than represented (*see* (f) *infra*) and reserves materially under-provisioned (see (g) *infra*).

(b)     Contrary to defendants' representations of the NHE New Production Loans as "held for sale" and as of "prime-quality", in fact (but undisclosed) the NHE New Production Loans were of subprime quality and hence unsellable (given the already-acknowledged shutdown of the secondary market for subprime loans).  Approximately 40% of the NHE New Production Loans were originated on a stated-income basis, and nearly all of the loans at extremely high loan-to-value ratios.  In fact, nearly half of those high-LTV loans were second-lien piggyback loans – the single worst variant of subprime lending (as was already apparent and as the Company's severe losses from First Franklin second-lien piggybacks would confirm).

(c)     Consequently, by April 2007, the NHE New Production Loans were (except for the small amount of truly prime-quality loans among them) unsellable, meaning that the Company's balance sheet and balance sheet risks were materially greater than stated and its capitalization and capital ratios materially less than stated.

(d)     Given that the NHE New Production Loans were in large part subprime second-lien piggybacks, and as such both unsellable and at high risk of severe loss, defendants (1) failed to take "fair value" writedowns of those loans classified as "held for sale", and (2) failed to establish any loss reserves for those loans, under the misleading fiction that they were being "held for sale".

(e)     Contrary to defendants' representations concerning the Construction Loans and their risks and their reserves, defendants had been aware since "late 2006" of the "bad product design" of those loans – namely, no down payment, effective 100% loan-to-value ratios, and stated income origination.  Defendants were likewise aware that the sharp  property price deflation in Florida and West Coast states had made that "bad product design" lethal, and primed those loans

161

for high rates of default and extreme loss upon default.  Defendants disclosed neither the nature of the loans nor their known risks, and failed to establish reserves adequate for those risks or adequate to alert the class as to those risks.

(f)    Defendants misrepresented performance throughout the Company's residential real estate portfolios to be better than it in fact was, by failing to designate as "nonperforming" hundreds of millions of dollars of actually nonperforming loans.

(g)    Defendants misrepresented and under-provisioned their loan loss reserves and represented those reserves to be more adequate than they in fact were, by:

(i)    Defendants' abovementioned and undisclosed delay in reporting loans to be nonperforming.

(ii)    Misrepresenting that loan loss reserves were maintained on a forward-looking basis and accounted for current loan risks and current economic conditions.  In fact, defendants' undisclosed practice was to tie reserve levels to currently-experienced levels of loan charge-offs.  Charge-offs are a lagging indicator of loan losses, primarily because there is a substantial length of time between when a loan first experiences trouble (i.e., the beginning of payment delinquency) and when it is ultimately charged off.  Here, the length of time between incipient signs of loan trouble and ultimate charge-off was further lengthened by defendants' undisclosed practice of waiting for half a year to pass without payment before declaring a loan nonperforming (and subsequently charging it off).

(iii)    Failing, as discussed above, to provide any loss reserves at all for billions of dollars of subprime-quality, unsellable NHE New Production Loans that the Company had no choice but to retain, yet still classified falsely as "held for sale".

(iv)    Failing, as discussed above, to reserve adequate amounts for Construction Loan losses, given defendants awareness since late 2006 that defaults would be high, loss severity extreme, and that these problems would be experienced imminently given the short life of the loans.

162

(h)     Given (a)-(g) above – i.e., that defendants were aware (1) that loan portfolio performance was significantly worse than publicly reported, (2) that they would be stuck with billions of dollars of subprime NHE New Production Loans that would experience high rates of default and complete loss upon default, and for which they had not reserved a penny, (3) that a wave of Construction Loan defaults with high loss severity would soon be upon them, and (4) that their loss reserves had been systematically under-provisioned by tying them to current charge-offs (and thus long-ago economic conditions, rather than current and much worse economic conditions).

324.    Despite defendants' misleading statements, there was enough negativity disclosed that the Company's share price fell 3.0% on April 30, 2007, closing at $36.55 (down $1.15 from the previous closing price of $37.70 on April 27, 2007).

325.    On July 26, 2007, defendants announced financial and operational results for the second quarter of 2007, and held a conference call with analysts and investors to further discuss the Company's results, plans and prospects.

(a)     As previously detailed: (1) with respect to the First Franklin loans, defendants still maintained they were more than fully reserved and that their primary loss risk stemmed from insurer behavior rather than loan performance ("Leaving aside the noise of the insurance, the performance of the underlying loans for the first two quarters has been somewhat better than our expectation"); (2) with respect to the NHE New Production Loans, defendants still classified them in their entirety as "held for sale", without having incurred any charges for "fair value" writedowns or to establish loss reserves; and (3) with respect to the Construction Loans, mentioned their existence but entirely misrepresented the nature and scale of the problem ("As I mentioned during last quarter's call, we added reserves for this portfolio during the first quarter to reflect that many of these properties were not destined to be the owner's primary residence").

(b)     Additionally, defendants, in their July 26, 2007 press release and conference call comments, represented that the Company was well aware of and well-positioned for mortgage market risks, and poised to perform better in the future.  For example, defendant Raskind concluded

his comments during the July 26, 2007 conference call by stating:

> RASKIND: ... To sum up, while the first half of this year has been more difficult than we expected, **we firmly believe that this Company is strategically in a much better place than it was one year ago. We've got a more attractive footprint, a lower risk profile, and a better business mix. We are acutely aware of where we have fallen short of expectations, and of the risks and the challenges we face. National City harbors much more performance potential than we have been displaying in the recent past and we are working hard to convert that potential to clear results. And along the way, we pledge to be very candid and forthright as we keep you apprised of our progress**.

(c)     Similarly, defendants' July 26, 2007 conference call statements indicated confidence in the Company's capitalization levels.  For example, defendant Kelly explained that the Company had lowered its targeted capital range because of the "smaller balance sheet and lower risk profile" that had resulted from the sale of First Franklin and the shift of National Home Equity to an originate-and-sell model.

(d)     Similarly, defendants' July 26, 2007 statements represented that the credit quality of its residential real estate holdings to be "stable" and "solid", as stated in the Company's press release ("Credit trends remain stable, both in the core and run-off portfolios") and during the Company's conference call by defendant Bell ("second quarter results are better described as straightforward, routine and solid. You may consider them to be stronger than that").

326.     Defendants' July 26, 2007 statements and disclosed financial results were materially false and misleading for the reasons stated in ¶ 323 (a)-(h), *supra*.

327.      Although misleading, defendants' statements were sufficiently negative in nature to cause the Company's share price to fall 2.4% on July 26, 2007, closing at $30.10 (down $0.74 from the previous closing price of $30.84 on July 25, 2007).

328.     On August 3, 2007, National City's share price fell $2 per share to $27.22 (from the previous closing price of $29.20 on August 2, 2007) after it was reported that the Company had stopped funding second-lien loans and mortgages originated on the basis of "stated income".  In an August 2, 2007 Bloomberg article titled "IndyMac, Rivals Make 'Major Changes'

164

in Home Lending", market participant David Stevens stated that "There's just no market... Nobody's taking them. They're radioactive". National City spokeswoman Kristen Baird Adams was quoted in the same article to state that the Company would no longer make nonconforming loans (i.e., loans that could not be resold to the GSEs) unless borrowers' incomes were fully documented. Unbeknownst to the class, nearly half of the NHE New Production Loans had been originated on the basis of borrower "income" that had merely been stated by the borrower rather than verified by the lender.

329. On August 29, 2007, defendants issued a press release announcing that the share-exchange ratio pursuant to which National City would acquire MAF Bancorp had been set, based on the Company's closing stock price during the previous 20 trading days ($28.09), so that each MAF Bancorp shareholder would receive 1.9939 shares of National City common stock for each share of MAF Bancorp common stock.

330. On September 4, 2007, defendants issued a press release announcing that the Company's acquisition of MAF Bancorp had been closed and completed.

331. On September 6, 2007 – just two days later – defendants held their annual Analyst Conference with analysts and institutional investors. The focus was on the Company's mortgage business and residential real estate loan portfolios. The essence was that the Company was downsizing the former (to cut expenses and to cut origination of more suspect-quality mortgages) and increasing reserves for the latter, with a combined financial impact of approximately $200 million (made up of severance charges, fair value writedowns, and loss reserve increases).

332. Defendants' September 6, 2007 conference call statements with respect to the First Franklin loans, the NHE New Production Loans, and the Construction Loans have already been detailed above. To reiterate:

(a) With respect to First Franklin, defendants advised that they would increase reserves by approximately $50 million ($40 million for the second liens, $10 million for the first liens), but again attributed the increase to be driven by insurer behavior ("This is not a significant

change. And once again, if insurer B was paying at the same claims rate that insurer A was, there would not be much here at all. That is really why it is going up. ") rather than fundamental credit quality or prior reserve under-provisioning;

        (b)     With respect to the NHE New Production Loans, defendants advised that they had transferred approximately $4 billion of such loans out of the "held for sale" warehouse after concluding those loans were unsellable (but still retained further billions as "held for sale"). Defendants did not take any "fair value" writedown when transferring the $4 billion of NHE New Production Loans to the portfolio, but estimated that they would establish a $20 million loss reserve for those loans, and that further transfers of remaining NHE New Production Loans still "held for sale" could result in at most  $5 million in "fair value" writedowns.  Defendants maintained that the NHE New Production Loans were of similar quality and performance to the Company's two other portfolios of home equity loans – the NHE Run-Off portfolio and the Direct Home Equity portfolio – except for the fact (disclosed for the first time) that the NHE New Production Loans had a "slightly" higher content of "stated income" loans;

        (c)     With respect to the Construction Loans, defendants disclosed for the first time the "bad product design" of the loans and how declining real estate prices had exposed that bad product design.  However, defendants simultaneously represented (1) that problems and losses were only related to one small sub-subset of the portfolio, namely a $250-$400 million segment of construction loans made in Florida for investment properties, and (2) that the problems were primarily a function of risk of default while (3) omitting to explain or disclose the sharp loss severity upon default that defendants knew the Construction Loans were guaranteed to produce.  Defendants insisted that, out of an excess of conservatism and as a result of "trying to get out in front" of the issue, they expected to increase reserves by approximately $60 million during the second half of 2007.

        333.     Additionally, on September 6, 2007 defendants stated that the Company was adequately capitalized, had sufficient capital and liquidity to absorb the NHE New Production loans

("we easily have the capacity to move it back both from a capital and a funding standpoint"), and had sufficient capital and liquidity to continue paying its dividend at current rates ("We see the dividend as a very important component of shareholder return and we have no intention of altering it. Put another way, a payout ratio above our target for a period of time is okay with us. "):

> KELLY: … **We expect a return to profitability in our mortgage line of business in the fourth quarter**…
>
> … **we have made the decision to allow our capital ratios to gravitate toward the top end of their range** and that would be 5% to 6% for tangible common equity and for our Tier 1 capital ratio 6.5 to 7.5. Our intention would be to allow our capital ratios to rise to the top of those ranges. And **I suspect they will do so probably by the middle of next year**… **I don't see any reason to raise the capital targets per se**…
>
> KELLY: **Our intention is essentially to move everything that we don't believe is saleable in the foreseeable future into the loan portfolio. And we think that our capital ratio is getting to the top of the range by the middle of next year is consistent with that movement of virtually all of those assets**… **I think we easily have the capacity to move it back both from a capital and a funding standpoint**… **Obviously, we feel comfortable moving the assets that are in the warehouse currently onto our balance sheet and in the loan portfolio**… **I think we have a capital position and a liquidity position to put it in portfolio from this point forward**…
>
> *****
> RASKIND: … **we will let our capital ratios float up toward the top of our articulated ranges**… **The related topic that has already come up would be our dividend policy and dividend payout ratio. As was pointed out this morning, our payout ratio today is well above our previously stated target of 40% to 45%. We see the dividend as a very important component of shareholder return and we have no intention of altering it. Put another way, a payout ratio above our target for a period of time is okay with us**.

334.    Defendants' September 6, 2007 disclosures contained enough bad news to cause the Company's share price to fall 2.4%, declining from the September 5, 2007 closing price of $27.33 to close on September 6, 2007 at $26.67.  The Company' shares continued to decline in the following days as analyst reports followed; two trading days later, the Company's shares closed on September 10, 2007 below $26 per share.

335.    However, defendants' September 6, 2007 statements concerning the

167

Company's capitalization and capital levels, liquidity, and ability to continue to pay its dividend were materially false and misleading, because defendants misrepresented and failed to disclose:

(a)  That performance throughout the residential real estate portfolio was materially worse than reported, given defendants' undisclosed practice of waiting for half a year without payment before reporting loans to be "nonperforming", resulting in under-reporting actually non-performing loans by as much as $688 million, and in making reported reserve-to-nonperforming-loan ratios roughly double what they in fact were;

(b)  That current loss reserves were materially misrepresented and under-provisioned, given defendants' undisclosed practice of tying reserve provisioning to current charge-offs.  By so doing, defendants were reserving for the past rather than the future, and were failing to take into account the current and worsening economic conditions actually being experienced and purportedly being reserved for.  When defendants expanded their reserves only in January 2008 to add amounts for loans that had not yet reached charge-off levels, the reserve increase was by far the largest in the Company's history ($691 million), until eclipsed in April 2008 by a further catch-up reserve increase more than twice as large ($1.39 billion);

(c)  That, with respect to the Construction Loans, the problems were not isolated in one sub-subset of the portfolio, but were affecting the portfolio much more widely, and would produce extreme loss severity upon default, throughout the portfolio, given the long-understood "bad product design" of the loans;

(d)  That, with respect to the First Franklin loans, reported loan performance was materially misleading and overstated as per (a) above and reserves materially misleading and under-provisioned as per (b) above.   Consequently, the need for reserve increases was not insurance-driven, but a function of the undisclosed fact that reserves had been under-provisioned and failed to take into account current, known loan risks, loan performance trends and economic conditions (which , as alleged in detail at ¶¶ 171-180, *supra*, had long been known to defendants);

(e)  That, with respect to the NHE New Production Loans, the quality and

168

performance of those loans were still misrepresented (i.e., as being fundamentally comparable to, rather than fundamentally worse than, the Company's other home equity portfolios), the quantity of those loans was still misrepresented (the Company still classified approximately $2 billion or more as "held for sale"), and the financial impact to the Company of retaining those loans was vastly understated (a $20 million loss reserve and $30 million in writedowns).  In fact, the NHE New Production loans were akin to the First Franklin second-lien piggybacks: they were nearly all second liens and nearly half piggyback loans, originated at extremely high combined-loan-to-value levels, with nearly half of the loans originated on a stated income basis.  These risks made them prone to high rates of default and total loss upon default – which, as defendants revealed in April 2008, would present the Company with losses in excess of $2 billion;

(f)      That, as a result of the misrepresentations and undisclosed facts stated in  (c)-(e) above, the Company's stated loss reserves were all the more misleading and inadequate; and

(g)      That, given the known risks and losses lying in wait in the above-mentioned portfolios for which the Company had failed to reserve, the need to raise loss reserves and otherwise absorb loan losses would overwhelm the Company's available capital and liquidity, make it impossible for the Company to fund its current dividend, and require the Company to raise its capital so as to avoid falling below regulatory minimums for "well-capitalized" financial institutions.

336.    On October 24, 2007, defendants announced financial and operational results for the third quarter of 2007, and held a conference call with analysts and investors to further discuss the Company's results, plans and prospects.  The Company's earnings for the quarter had shrunk to $106 million, under the weight of a $361 million loss reserve increase, net charge-offs of $141 million, and $192 million of charges related to mortgage-banking operations (including $74 million of losses from loan sales).

(a)      As previously detailed: (1) with respect to the First Franklin loans, defendants raised loss reserves by only $37 million and ceased to attribute the need for such increases on insurer behavior; (2) with respect to the NHE New Production Loans, defendants established a loss reserve

of $113 million (which the Company termed "meaningfully" more than the $20 million figure announced on September 6, 2007, but which remained "meaningfully" less than the $2 billion in loss content revealed in April 2008), but still classified approximately $2 billion of such loans as "held for sale"; and (3) with respect to the Construction Loans, defendants disclosed a loss reserve increase of $51 million but still represented (a) problems to be limited to one small sub-subset of the portfolio, namely investment-purposed properties in Florida, and (b) omitted to disclose the extreme loss severity upon default that defendants had long known the Construction Loans would produce given their "bad product design".

   (b) Conjoined with the foregoing loss reserve increases, defendants made repeated and emphatic representations concerning the quality and adequacy of the Company's reserves, and especially their purported forward-looking nature:

> ROWE:  In summary, **we conducted a thorough review of all the loan portfolios. Rigorously evaluated the trends and current environment and increased our reserves to a level that we believe is appropriate**... I would assure you in our calculations when you are simulating the current environment, we have assumed delinquencies that are generated from rate resets and we have also assumed loss severities that are higher than we have seen traditionally. **So, it is my view that, at the current time, [] we believe that we are appropriately reserved for the potential outcomes**... **I would state right up front that the current level of reserves today is driven by our expectations of the performance of the portfolio going forward. It's not driven by net charge-offs at the time, but it's really a look to the future. So, we believe we are appropriately reserved**.
> *****
> HENNESSY: Do you expect to have to overprovide by a similar amount in the fourth quarter?
> ROWE: No, no, I don't. **But what I'm getting to is if we knew that today and that would be basis for already taken that type of reserve action. So the reserve actions we have taken today are consistent with what we think of the future**. But that's -- that's what we are talking about today.

   (c) In light of evident deterioration in mortgage performance and relevant economic trends, and of their financial impact upon the Company, defendants admitted that they were raising their target range for the Company's Tier 1 capital ratio.  However, defendants

170

continued to represent that the Company's desired capital levels would "occur naturally" during the next several quarters as "retained earnings accumulate" and as the balance sheet would shrink:

> KELLY: ... In our view, and I have mentioned this at our analyst conference, **it now seems appropriate to allow our capital ratios to migrate towards their respective target ranges and in the case of our tier one capital ratio, to move the entire target range upward**. Our target ranges are 5 to 6% for the tangible common equity ratio, and 7 to 8% for the tier one risk-based capital ratio. As I said, **we did implement an increase in this target range of about 0.5%.  In the absence of issuing capital securities of some type, the increases I described in those ratios will occur naturally over the next several quarters as the balance sheet shrinks from here and retained earnings accumulate**.

(d)     Finally, defendants continued to represent that the dividend was safe.  Per defendants, given that capitalization improvements would "occur naturally" as "retained earnings accumulate" and that the Company's mortgage-related difficulties were "short term", defendants stated that they "see no need to and have no intention of -- of reducing the dividend":

> HENNESSY: Jeff, **can you please talk about capital strength in the context of what would cause the current dividend to be at risk?** And what would make you reevaluate your dividend policy?
>
> KELLY: **Well, let me say that I think given both our current capital position and our intention to allow capital to rise over the next several quarters within the -- the target ranges that I described and in the context of those target ranges that -- that we see no need to and have no intention of -- of reducing the dividend**.

337.     Defendants' October 24, 2007 disclosures contained enough bad news to cause the Company's share price to fall 3.7%, declining from the October 23, 2007 closing price of $23.91 to close on October 24, 2007 at $23.02.  In intra-day trading on October 24, 2007, however, the Company's shares fell as much as 6%.

338.     However, defendants' October 24, 2007 statements concerning the Company's reserves, capitalization and capital levels, liquidity, and ability to continue to pay its dividend were materially false and misleading, because defendants misrepresented and failed to

171

disclose:

(a)     That performance throughout the residential real estate portfolio was materially worse than reported, given defendants' undisclosed practice of waiting for half a year without payment before reporting loans to be "nonperforming".  This practice resulted in under-reporting actually non-performing loans by as much as $688 million, and in making reported reserve-to-nonperforming-loan ratios roughly double what they in fact were;

(b)     That current loss reserves were materially misrepresented and under-provisioned, given defendants' undisclosed practice – which ran directly contrary to defendants' repeated and emphatic October 24, 2007 declarations – of tying reserve provisioning to current charge-offs.  By so doing, defendants were reserving for the past rather than the future, and were failing to take into account the current and worsening economic conditions actually being experienced and purportedly being reserved for.  When defendants expanded their reserves only in January 2008 to add amounts for loans that had not yet reached charge-off levels, the reserve increase was twice as large as the October reserve increase and by far the largest in the Company's history ($691 million), until eclipsed in April 2008 by a further catch-up reserve increase more than twice as large ($1.39 billion);

(c)     That, with respect to the Construction Loans, the problems were not isolated in one sub-subset of the construction portfolio, but were affecting the portfolio much more widely, and would produce extreme loss severity upon default, throughout the portfolio, given the long-understood "bad product design" of the loans;

(d)     That, with respect to the First Franklin loans, reported loan performance was materially misleading and overstated as per (a) above, and reserves materially misleading and under-provisioned as per (b) above, especially given defendants' long-standing awareness of the dynamics driving First Franklin credit risks and loan losses;

(e)     That, with respect to the NHE New Production Loans, the quality and performance of those loans were still misrepresented (i.e., although their stated income component

172

had now been revealed, their over-concentration of extremely high loan-to-value ratios and low FICO scores had not), the quantity of those loans was still misrepresented (the Company still classified approximately $2 billion or more as "held for sale"), and the financial impact to the Company of retaining those loans was still vastly understated (a $113 million loss reserve and stated minimal further writedowns).  In fact, the NHE New Production Loans were akin to the First Franklin second-lien piggybacks: they were nearly all second-liens and nearly half piggyback loans, originated at extremely high combined-loan-to-value levels, with nearly half of the loans originated on a stated income basis.  Such risks made the NHE New Production Loans highly unsellable despite still being classified as "held for sale", and clearly worth less than the original value at which they were being carried on National City's books (as defendants admitted on December 17, 2007 with a further $200 million writedown).  These risks made the NHE New Production Loans susceptible to high rates of default and total loss upon default – which, as defendants revealed in April 2008, would present the Company with losses in excess of $2 billion;

(f)     That, as a result of the misrepresentations and undisclosed facts stated in (c)-(e) above, the Company's stated loss reserves were all the more misleading and inadequate; and

(g)     That, given the known but undisclosed risks and losses lying in wait in the above-mentioned portfolios for which the Company had failed to reserve, the imminent need to raise loss reserves and otherwise absorb loan losses would overwhelm the Company's available capital and liquidity, make it impossible for the Company to fund its current dividend, and require the Company to raise its capital so as to avoid falling below regulatory minimums for "well-capitalized" financial institutions.  Moreover, given the known but undisclosed loan risks and losses, and the known but undisclosed failure to reserve for them, the need to fund loan loss reserves would not leave any "retained earnings" to allow for improvements in the Company's capital levels and ratios to "occur naturally".

     **2.     December 2007 - January 2008: Defendants Admit that Loan Losses Have a Minor Impact on the Company's Fundamental Financial Condition**

339.    The first cracks in the facade appeared in December 2007 and January 2008, as defendants disclosed two directly connected facts: (1) $900 million of reserve increases and fair value writedowns (stemming, as already alleged, from the NHE New Production Loans, First Franklin loans, and Construction Loans, and defendants' prior under-reserving for those loans' known risks); and (2) a 50% reduction to the Company's dividend payment.

340.    Defendants' January 2008 admission that the Company was insufficiently capitalized to maintain its dividend payment was preceded, in November 2007, by credit rating agency downgrades.

(a)    On November 6, 2007, the Company had its credit ratings cut by Fitch.  Fitch downgraded National City from AA- to A+ , explaining that:

> **National City's weakened core financial performance, exhibited in varying degrees over the past few quarters, highlights the challenges this company is likely to face in coming quarters**… The company's large remaining mortgage banking business is likely to remain pressured... **meaningful exposures in residential construction lending, home equity and second mortgages remain and are likely to present National City with challenges**... Proceeds from the timely sale of First Franklin were largely used to fund **share repurchases, which quickly eroded the extra capital cushion**.

On November 7, 2007, National City's share price fell 6.8%, from November 6, 2007's closing price of $22.76 per share to a November 7, 2007 closing price of $21.21 per share. On the following day, November 8, 2007, National City shares fell further, closing at $20.52 per share, for a two-day aggregated decline of 9.8%.

(b)    On November 19, 2007, the Company had its credit ratings cut by Moody's, which downgraded National City's ratings from A2 to A1 while placing the Company on "negative outlook" for further ratings cuts.  The straightforward reason for Moody's ratings cut was "**Moody's expectations that National City will need to make elevated [loan loss] provisions well into 2008**" for its First Franklin loans, NHE New Production Loans, and Construction Loans.  Moody's added that it was keeping National City on "negative outlook" for further ratings cuts because of National City's comparatively high dividend payout of $240 million a quarter at a time when its

174

capitalization and capital levels were in doubt -- "**maintenance of such a high dividend limits NCC's ability to build its capital**".

In response, National City's shares fell 5.6% from their $20.37 closing price on November 19, 2007, closing at $19.22 on November 20, 2007 and falling again the next to close at $18.69 on November 21, 2007, for a two-day decline of 8.2%.

341.    The market knew that National City's Mid-Quarter Update was due to be released on or about December 17, 2007.  This was to be the Company's last-ever Mid-Quarter Update, as the Company had announced earlier on October 24, 2007, because the Company had concluded that such interim disclosures "encourage[d] short-term speculation in the stock":

> RICHLOVSKY:  Secondly, **as you know, for the last several years we have been publishing a mid quarter update during the third month of each quarter**... While nearly everyone found it useful, **a number of respondents noted that it seemed to encourage short-term speculation in the stock. Certainly not our intent or expectation when we started issuing the update. Taking all of the feedback and the various pros and cons into consideration, we have decided to finish out this year and then eliminate the mid quarter** update beginning in 2008. **So the one published in December, this coming December, will be our last one**.

342.    Indeed, in the week prior to the Company's release of Mid-Quarter Update, trading in the Company's stock rose notably, exceeding 10 million shares traded in 3 of the 5 trading days, and the Company's share price fell significantly, from a $20.20 close on December 10, 2007 to a $16.62 close on December 14, 2007.  The market was clearly betting, just as defendants had explained on October 24, 2007 and as defendants themselves would later conclude after the fact (*see* ¶ 345, *infra*), that the Mid-Quarter Update would disclose further bad news.

343.    Defendants' December 17, 2007 Mid-Quarter Update disclosed further bad news, of an order of magnitude completely unindicated by defendants' prior representations: (1) first, an expected reserve increase of $700 million – approximately twice the reserve increase defendants had taken less than two months earlier on October 24, 2007; and (2) second, further charges of $200 million incurred upon emptying the "held for sale" warehouse of billions of dollars

175

of NHE New Production Loans that had been classified as "held for sale".

344.    Because market speculation leading up to the December 17, 2007 Mid-Quarter Update had already erased nearly 20% of the Company's shares' remaining value in anticipation of just such bad news, driving down the share price from $20.20 on December 10, 2007 to $16.62 by December 14, 2007, further market reaction after December 17, 2007 was muted. National City's shares fell to $16.51 on December 17, 2007 and to $16.25 on December 18, 2007.

345.    As an December 18, 2007 American Banker article titled "Nat City Cleans House in Last Midquarter Update" concluded, and as National City's Treasurer Thomas Richlovsky confirmed in that article, speculation related to the contents of the December 17, 2007 Mid-Quarter Update disclosures was the cause of the Company's share price declines from $20.20 on December 10, 2007 to $16.62 by December 14, 2007:

> National City stated in October that it would discontinue the practice because of the "stock speculation" it stoked.... Despite forecasting $700 million of fourth quarter loan losses in the update, about twice what it reported for the preceding quarter and a year earlier, Nat City's stock slipped 0.7% Monday...**[I]nvestors had punished the $141 billion-asset company's shares last week in an anticipation of the update**, which covered October and November. **In an interview Monday, Thomas A. Richlovsky, the company's treasurer, reiterated that the stock speculation the company saw last week is exactly why it will no longer issuer midquarter updates.**

346.    The $900 million in charges revealed on December 17, 2007: (1) revealed that the Company's loan losses would be far greater than previously indicated by defendants' statements and by the loss reserves purportedly established for those losses; (2) admitted what defendants had long known – that the NHE New Production Loans classified as "held for sale" were unsellable and worth far less than the value at which they had been carried on the Company's books; and (3) strongly suggested, contra defendants' prior statements, that capital levels would neither (a) rise "naturally" as a result of retained earnings (because there would be no earnings to retain), nor (b) permit continued payment of the dividend at current levels.

347.    On January 2, 2008, defendants  issued a press release announcing that they

were cutting the Company's dividend in half, enacting further organizational downsizing and job eliminations in order to further cut expenses, retaining Goldman Sachs as a "capital advisor", and seeking actively to raise capital, capital levels and liquidity through debt and hybrid securities offerings.

348.   Essentially, defendants began to concede, on January 2, 2008, what they had long misrepresented and/or denied:  that the financial impact of the NHE New Production Loans, the First Franklin loans, and the Construction Loans was so large as to threaten the Company's fundamental financial condition, which could no longer support dividend payments at current levels and which required active shoring up.

349.   In fact, as the Cleveland Plain Dealer reported on January 3, 2008, quoting RBC Capital Markets analyst Gerard Cassidy, defendants' January 2, 2008 disclosures concerning capital were the most significant of all the Company's January 2, 2008 disclosures because it "tells you they are really building up a fortress to survive":

> National City Corp. said Wednesday that it will slash its dividend to shareholders nearly in half and cut 900 more jobs in its mortgage operations. **On that news, the Cleveland bank's stock plunged to its lowest value in 12 years, closing at $15.59. It was a one-day drop of 5.3 percent. "No matter how you slice it . . . it's been a disaster for National City from an investor standpoint," said banking analyst Jeff Davis of FTN Midwest Research** in Nashville, Tenn. This was National City's fourth wave of job cuts in five months. In all, it has eliminated 10.5 percent of its work force since early August. The 900 latest job cuts are all within National City Mortgage...
>
> In addition to cutting costs, National City said it plans to raise new capital in the first quarter with help from Goldman Sachs. **The announcement about capital was much more surprising than the dividend cut, said banking analyst Gerard Cassidy of RBC Capital Markets in Portland, Maine. "That tells you they are really building up a fortress to survive" the credit problems, he said**...

350.   In response to defendants' January 2, 2008 disclosures, the Company's shares fell 5.3% from their closing price of $16.46 on December 31, 2007 to close, on January 2, 2008, at $15.59 per share.  The Company's shares continued to decline further in the following days, closing

at $14.50 per share on January 4, 2008, for an aggregate decline of $1.96 per share, or 11.9%.

351.    Despite defendants' January 2, 2008 disclosures, which revealed that a capital crisis was at hand, the true size and severity of the crisis visited upon the Company by the size of the loan losses sitting on its books (and particularly in its portfolios of First Franklin loans, NHE New Production loans, and Construction Loans) was yet to be revealed.  After January 2, 2008, as detailed below, further disclosures and events revealed just how bad the Company's financial condition was, causing the Company's shares to lose most of their remaining value.

352.    On January 8, 2008, Moody's announced that it placed National City's credit ratings on review for possible downgrade, citing specifically the Company's exposure to loss from the NHE New Production loans and the Construction Loans (National City "has a large second-lien home-equity exposure and a sizeable exposure to residential development and land loans").  The Company's share price fell in response from $15.19 on January 7, 2008 to $14.22 on January 8, 2008.

353.    On January 22, 2008, defendants issued a press release announcing financial and operational results for the fourth quarter and year of 2007, and held a conference call with analysts and investors to discuss the Company's results, plans and prospects.  Defendants disclosed, rather than any "retained earnings", a sizeable fourth quarter loss of $333 million, driven by a loss reserve increase of $691 million, net charge-offs of $275 million, a further $149 million of markdowns and losses taken in cleaning out the "held for sale" warehouse of unsellable loans, a $181 million writedown of all "goodwill" asset valuation pertaining to the Company's mortgage operations, $66 million in severance costs, and $132 million in charges taken for Visa-related liabilities.

354.    The $691 million loss reserve increase announced on January 22, 2008 had been adverted to in defendants' December 17, 2007 Mid-Quarter Update.   However, in their January 22, 2008 press release, defendants revealed *sotto voce* that the primary reason for their unprecedented, large reserve increase was "to reflect estimated probable credit losses within the loan

portfolio that have not yet reached charge-off thresholds."   As already alleged, this admission revealed defendants' prior descriptions of the Company's loss reserves, and the prior loss reserves themselves, to have been materially false and misleading.  Defendants' material misrepresentation and understatement of reserves during prior periods, rather than any new risks or new economic conditions, necessitated the massive, corrective increases to reserves that the Company incurred in 2008.  Indeed, the January 2008 $691 million reserve increase, then the largest in the Company's history, was eclipsed in April 2008 by a further catch-up reserve increase more than twice as large ($1.39 billion).

355.    Defendants' January 22, 2008 $691 million reserve increase had been driven particularly by the NHE New Production Loans.  As already detailed (¶ 233, *supra*), defendants' January 22, 2008 provision of more detailed disclosures concerning the NHE New Production Loans revealed *why* those loans were requiring such disproportionate reserve increases.  As defendants had long known but disclosed only on January 22, 2008, "**the quality and other characteristics of these loans are visibly worse**" than the Company's other home equity loans (i.e., the Direct Home Equity portfolio and the NHE Run-Off portfolio).  Indeed, defendant Raskind compared the NHE New Production Loans' quality unfavorably to the Company's *subprime* loans (¶ 234, *supra*):

356.    Defendants' January 22, 2008 disclosures also included further corrective disclosures with respect to the Construction Loans, as already alleged.  Defendants revealed that "bad product design" was afflicting performance in the entire Construction Loan portfolio, and that loss severities were averaging  50% (i.e., upon default, the Company would only be able to recover half of the money it had lent).  Defendants had long been aware of such facts even prior to the class period.

357.    Despite the massive losses, absence of retained earnings, and massive reserve increases and loan writedowns and losses disclosed on January 22, 2008, defendants *still* falsely represented that the Company was fundamentally sound, would rebuild its capital and capital strength, and had been positioned to deliver better results going forwards.  During conference call

179

statements and discussions concerning the company's capital, capitalization and capital ratios, defendants maintained that the Company's capital metrics would improve naturally as a result of dividend and cost cuts and balance sheet shrinking, and would further benefit from further one-time boosts provided through securities offerings:

358.    Indeed, the very first question asked during the Company' January 22, 2008 conference call went to the heart of the matter – the Company's basic financial condition.  Was the balance sheet "in good shape" and had loan assets been fairly valued (i.e., by having had reserves established for those loans)?

> JILL HENNESSY, IR MANAGER, NATIONAL CITY: Yes, and we'll start with you, Peter. **The dividend was cut in early January and the stock continues to be under pressure. Is the balance sheet now in good shape and are the assets fairly valued?** What is the future plan for National City and what will it mean for shareholders?

359.    After the Company made the above disclosures on the morning of January 22, 2008, National City's shares declined further in intra-day trading to year-low prices.  However, later the same morning the Federal Reserve announced an unexpected and unexpectedly large interest rate cut, causing all financial stocks – including National City – to rise.

360.    Subsequently, the Company raised further funding and capital, as it announced in a January 24, 2008 press release, through an offering of $1.4 billion of convertible senior notes and a hybrid security offering of $600 million (accounted for as Tier 1 capital).

361.    As a result of the Federal Reserve's interest rate cuts and the Company's seeming alleviation of its capital and liquidity concerns, National City shares rose in the following days and weeks to trade between $15-$18 per share.

**3.    March 2008: As Defendants Remain Silent, the Market Suspects that Loan Losses Are Overwhelming the Company's Fundamental Financial Condition and the Threatening the Company's Ability to Continue as an Ongoing Concern**

362.    In the middle of the day on March 13, 2008, Dow Jones newswires reported market rumors that the Company was searching for a buyer and had put itself up for sale.  As

corporate acquisitions are generally accomplished at a premium to current share prices, this helped National City's shares rise slightly to close on March 13, 2008 at $15.01 per share (up from $14.71 on March 12, 2008).

363.    However, after the close of the market on March 13, 2008, Moody's announced that, even despite the Company's having raised approximately $2 billion in funds while slashing the dividend and cutting costs, it was further *downgrading* the Company's credit ratings as a direct function of the NHE New Production Loans, and was keeping those ratings on review for further downgrade. Specifically, the rating cut reflected Moody's expectation that:

> **National City's very sizable second-lien home equity portfolio will result in significant losses that will further weaken the Company's capital position**. In addition, Moody's expects material losses from National City's commercial real estate exposure, in particular its residential development and land loan portfolios... **these troubled portfolios could experience comparatively high loss severity, which would negatively impact National City's capital metrics**...

Moody's added that the Company's credit ratings remained on review because, given Moody's loss expectations, Moody's expected the Company to face more pronounced weakness in its capital position in the near term.

364.    Next, on the morning of March 14, 2008, the investment bank Bear Stearns & Co., Inc. imploded. As detailed below, the market drew a direct analogy from Bear Stearns to National City. Defendants' April 21, 2008 disclosures later confirmed this market reasoning to have been correct.

365.    Like National City, Bear Stearns was (1) carrying billions of dollars of more-or-less toxic assets expected to generate significant losses, (2) had experienced significant share price erosion as a result, but (3) still appeared to be sufficiently capitalized and liquid, which (4) was reflected in the fact that its shares seemed to possess substantial value (Bear Stearns shares were then trading in the $60 per share range).

366.    On March 14, 2008, Bear Stearns began to experience a "run on the bank",

181

as many of its counterparties and the market concluded that the losses sitting on Bear Stearns books might overwhelm the company's available capital and liquidity and drive the company out of business and/or into bankruptcy.  Bear Stearns' customers withdrew their funds from Bear Stearns and Bear Stearns' counterparties and creditors demanded their money back, all trying to limit their exposure to a company whose creditworthiness and continued operational viability was in doubt. With its capital and liquidity and continued existence thrown into existential doubt, Bear Stearns' shares lost half of their remaining value on March 14, 2008, falling from $57 per share to $30 per share.  During the intervening weekend of March 15-16, 2008, Bear Stearns sought to avoid declaring bankruptcy by searching for a deep-pocketed suitor who could provide the necessary capital and liquidity to allow Bear Stearns to continue to operate despite the immense losses sitting on its books.  On or about March 17, 2008, JP Morgan agreed to buy Bear Stearns, but, given the size of Bear Stearns' liabilities, at a price of only $2 per share.  Bear Stearns' shares thus fell steeply again, closing on March 17, 2008 at less than $5 per share.

367.    The market drew a direct – and, as defendants' later April 21, 2008 disclosures effectively admitted, correct – analogy from Bear Stearns to National City.  Like Bear Stearns, National City was struggling under the undisclosed-but-suspected weight of billions of dollars of expected losses, which were threatening to drive the Company's capital below crucial regulatory minimums and exhaust the Company's available liquidity.  As defendants later admitted on April 21, 2008, as with Bear Stearns, exactly when the Company was in greatest need of funds, counterparties were cutting off their exposure to the Company for fear the Company would collapse, and demanding their money back, making the Company's dire position even worse.  The fact that National City had put itself up for sale suggested, as with Bear Stearns, that the Company had concluded it did not possess sufficient capital or liquidity to continue as an independent viable concern, but rather required saving by a deep-pocketed suitor.  It also suggested that the Company's liabilities were significantly worse than previously represented.  And, as the Bear Stearns debacle demonstrated, those liabilities could be so large that the Company's true value was substantially

182

below that indicated in its current share price, and thus that any acquisition of the Company would be at a discount rather than a premium.

368.   RBC Capital Markets analyst Gerard Cassidy, quoted in a March 14, 2008 Cleveland Plain Dealer article reporting on the disclosure that National City had put itself up for sale, observed that with the Company's share price at near-record lows, this was the single worst time to try to sell the Company.  That defendants were nevertheless trying to do so, Cassidy concluded, could mean only that the Company's problems were greater than previously-revealed:

> I find it hard to believe they put themselves up for sale. [] You're not going to receive top value. []  If they do sell out, **it tells you the severity of the situation they're facing**. []  **I don't believe anyone on the board or the management team would sell in this credit cycle . . . unless there are greater problems.**

369.   A similar conclusion was reached by Oppenheimer & Co. analyst Terry McEvoy, who also followed the Company as an analyst, after the Company officially confirmed the rumors on April 1, 2008.  As reported in the Cleveland Plain Dealer on April 2, 2008:

> **... the announcement shows National City is desperate, said banking analyst Terry McEvoy of Oppenheimer & Co., because it indicates the bank might sell itself for perhaps half of what it was worth a year ago... "It's telling me that National City thinks there's no light at the end of the tunnel,"** he said...

370.   Thus, on March 14, 2007, as a result of the credit rating downgrade and the meaning of the fact that the Company had put itself up for sale at such an inauspicious time, National City's shares fell 12.4%, or $1.86 per share, from $15.01 on March 13, 2007 to $13.15 on March 14, 2007.

371.    On March 17, 2007, the next trading day, National City's shares lost 43% of their remaining value, falling from $13.15 to close at $7.52, on the concern that, as was demonstrated by Bear Stearns, the Company's liabilities were so sizeable that the Company's true value – and the price at which any acquisition could take place – was substantially below the current share price.  The one-day decline was by far the worst of all the declines suffered by members of the KBW bank index – nearly four times greater than second-place Washington Mutual, which fell

13% – and was the Company's worst single-day drop during the previous quarter century.  Although most financial stocks fell on March 17, 2008, the declines were modest compared with National City's.

372.    RBC Capital Markets analyst Gerard Cassidy, quoted in a March 17, 2008 Bloomberg article, attributed the Company's 43% share price plunge to the "fear that there are more severe problems in its loan and securities portfolios".

373.    National City spokeswoman Kristen Baird Adams, quoted in the same article, used different words to convey *exactly the same conclusion*: "Our stock's volatility today is related to the market's reaction to the Bear Stearns acquisition".  She reiterated those words and that conclusion in a Cleveland Plain Dealer article published the next day on March 18, 2008: "We would certainly surmise that the volatility we've experienced in our share price today was related to the market reaction to the Bear Stearns announcement. . . There was also a lot of speculation last week that may have come into play as well".

374.    That there was "speculation" was merely a fact of the absence of definitive disclosures from National City concerning the size of the losses expected from the loans sitting on its books.  As the Cleveland Plain Dealer reported on March 18, 2008:

> National City's mortgage exposure has already taken its toll. After becoming intoxicated on $1 billion a year in profits just from home loans a few years ago, National City's mortgage business last year lost more than a half-billion dollars. Late last year, the company eliminated 10 percent of its 32,000-person national work force. **Reports surfaced last week that the 163-year-old bank, the largest in Ohio, was shopping for a buyer. Because investors have little confidence in home loans that were originated under the backdrop of past loose lending standards, National City is sitting on $17 billion of loans that could be worth nickels on the dollar. Further, National City is bracing for a potential rise in defaults among borrowers as the economy continues to struggle**. The bank's mounting woes led the credit-rating agency Moody's Investors Service late last week to downgrade National City's investment-grade rating to "A3" from "A2." Moody's also cut the bank's financial strength rating deeper into junk status, from B- to C+. Its rating on bank deposits was cut from A1 to A2. All the ratings remain under review for a possible further downgrade.

184

375.     On April 1, 2008, the Company issued a terse press release informing that the Company's board of directors was "reviewing a range of strategic alternatives for the company".

376.     However, this effective admission that the Company had put itself up for sale failed to result in the customary sharp rise in share price.  In fact, after closing at $9.99 per share on April 1, 2008 after its announcement, the Company's shares had fallen to $8.99 per share by April 4, 2008.  As the New York Times reported on April 4, 2008:

> Often, when a company announces it is looking at "strategic alternatives," it can sit back and watch its stock take flight. That phrase is universal code for "we're on the auction block," and shareholders usually expect a premium from a buyer.  Not so for National City Corporation, which played the strategic-alternatives card late Tuesday but saw its shares fall in Wednesday trading. (It closed at $9.79 on Thursday.)  Part of the reason for the decline was that Wall Street had all but assumed that the struggling Midwestern bank was willing to sell. Another factor was a general feeling that lenders were in no position to bargain. "Transactions can get done at steep discounts," Jason Goldberg, an analyst at Lehman Brothers, wrote in a report, citing Bear Stearns's fire sale to JPMorgan Chase as a "prime example."

### 4.     April 21, 2008: Endgame – the Truth Is Revealed

377.     On April 21, 2008, the Company disclosed, simultaneously, the resolution to and the depth of its capital crisis.

378.     First, in a press release issued on April 21, 2008, the Company announced that it had secured an equity infusion of $7 billion, which would serve to see the Company through its immense loan losses (also disclosed, as detailed below) while preserving the Company's capital ratios above requisite regulatory minimums, thus ensuring the Company's viability as an ongoing concern:

379.     Second, the Company, in order to preserve capital, effectively eliminated the remaining half of its dividend payment (i.e., after it had already cut its dividend in half on January 2, 2008) to $0.01 per share from $0.21 per share.

380.     Third, the $7 billion equity infusion came at a steep and massively dilutive price.  Effectively, the Company agreed to issue and sell 1.4 billion new shares of its stock at a price

185

of $5 per share (total sale: $7 billion) to a group of investors led by Corsair Capital.  On April 20, 2008, the Company had outstanding approximately 650 million outstanding shares, representing complete ownership of the Company.  However, as a result of the rescue announced on April 21, 2008 and the addition of 1.4 billion new shares to the rescuers, the holders of the Company's 650 million shares as of April 20, 2008 no longer had full ownership of  the Company, but rather ownership of slightly less than 33% of the Company.  In short, although $7 billion had been added to the Company, existing shareholders saw their ownership diluted by two-thirds.

381.    Despite the massive dilution of existing shareholders that the Company's rescue entailed, defendants emphasized in their April 21, 2008 conference call with investors and analysts that the rescue had been the "best" of the "strategic alternatives" with which they had been presented:

> JILL HENNESSEY:  Peter, how was it you chose to raise capital as opposed to merging with another organization?
>
> PETER RASKIND:  Well, as I'm sure you can understand I can't go into too much detail about the processes that we've undertaken. But as I said in my prepared remarks, **what I can assure you of is we and the board together did in fact explore quite deeply a wide range of alternatives and ultimately the board unanimously concluded that this alternative was the best in terms of serving the interests of our shareholders**.
>
> *****
>
> MIKE MAYO - DEUTSCHE BANK:  As far as deals, there's a lot of reports in the press and we never knew what was true and what wasn't. Was it a matter of you getting offers and saying no or did you not get the offers? Can give any more color on that?
>
> PETER RASKIND:  Unfortunately I can't provide a lot more color on that. **All I can tell you is again is we did thoroughly explore a wide range of alternatives and ultimately it was clear to us that this alternative was the best for the shareholders**.

382.    That such an option was the Company's best available one itself is one concrete measure of the (previously-unrevealed) depth of the Company's crisis.  Another: that even though the Company's gain of $7 billion had provided it with a definitive hold on life, the

186

Company's (massively diluted) shares lost more than a quarter of their remaining value, falling from $8.33 on April 18, 2007 to $6.03 on April 21, 2007.

> 383.    During the April 21, 2008 conference call, disclosures made by defendants Raskind and Kelley revealed that earlier market speculation in mid-March 2008, in the absence of Company disclosures, had been correct.   In fact, the Company had entered into a "death spiral" akin to that experienced by Bear Stearns.   As defendants disclosed on April 21, 2008, the Company's "real estate exposures" were feared to be so severe that the Company was finding itself literally unable to continue to do business – counterparties were not willing to lend money or grant credit; customers were not willing to entrust their funds or business.   The losses from the Company's troubled portfolios were threatening the Company's very ability to exist.   As defendant Raskind put it, the "pivot point" for everything was the "ultimate loss expectations" for the Company's troubled loan portfolios:

> > HENNESSEY: ... Peter, a few questions for you.   First, **please address the very dramatic dilution imposed upon existing shareholders by the just-announced capital action. Selling material interest in the company at more than a 50% discount from tangible book value suggests a desperate need for capital. Given the company's liquidity and earnings power of the retail bank, wasn't a more palatable alternative available to management?**
> >
> > RASKIND:  Thanks, Jill. First of all stating the obvious, there is no question that this transaction is substantially dilutive to the current shareholders. That is factual and irrefutable. But I have to say our objectives for this transaction were severalfold.
> >
> > **First, it was very important for us to provide ourselves with sufficient flexibility to deal with our problem assets** we felt in a more expeditious fashion than simply over the passage of what would probably have been a relatively long period of time. While we've made no particular decisions as to exactly what actions we'll undertake to do that, what we now know is that we have the flexibility to move through these problems more quickly than we otherwise would have.
> >
> > **Secondly, it was also very important and Jeff referenced this in his prepared remarks for us to stabilize our debt ratings beyond a shadow of a doubt, in order to head off some of the rumors that were circulating. And as Jeff mentioned, anecdotally some cases**

187

**where we knew that we had counterparties who were uncomfortable interacting with us. That had to stop**.

So on both counts, it was clear to us that the answer to that was incremental capital and definitionally and unfortunately because it's not something we're pleased about or proud of but definitionally that was going to mean dilution to the current shareholders.

*****

HENNESSEY:  Peter, final question for you then from the email. **Every additional dollar raised further hurts National City's shareholder base**. What would be the necessary return on equity to justify raising these funds, and **why would you not limit the offering to what was necessary and prudent?**

RASKIND:  **Well it's a great question and I think the answer to it really revolves around the estimate of what is necessary and prudent**. I think it is fair to say that as we went through this process and talked with a large number of significant potential investors -- and very sophisticated investors -- there was a very wide range of views as to what the right sizing was for this capital raise.

**Of course the pivot point there, as you might expect, was very widely varying views around ultimate loss expectations.** So the answer as to what was exactly the right size and what was prudent frankly was not at all obvious. But as I said earlier, **certainly one of the key objectives for us was to make sure that we had the proper flexibility to deal with loss content in the liquidating portfolios comfortably and in an expeditious way; as well as I said earlier to make sure that we stabilized debt ratings as well**.

So again, recognizing fully that at any significant magnitude whether it be $7 billion or less than that, the dilution to current shareholders would be substantial we did conclude that conservatism in this regard would serve us well, and that another trip back to the capital markets in the near future would be inadvisable.

*****

GERARD CASSIDY - RBC CAPITAL:  If you can give us more color, I think **in your prepared remarks you guys mentioned that some lenders backed away from lending to you during the recent crisis? Can you give us more color of what went on there?**

KELLY:  We did see, I mean, we normally in any environment go through and test lines, money market lines... **we have anecdotally heard through brokers that some lines to us had been cut by other counterparties and some direct dealings had encountered that**.

188

**So I don't think that was terribly surprising given the downgrade and review from downgrade from Moody's at the beginning of March. That seems to have stabilized here of late, but it was a fact. We anticipated that but we did hear some money market lines and counterparty lines having been reduced or eliminated**.

384.    Fourth, the Company disclosed for the first time the "ultimate loss expectations" that were responsible for the Company's crisis, near-death, and expensive rebirth – but only after having secured the Company' lifesaving rescue by Corsair.

385.    As already alleged, the crucial issue for investors and potential investors in the Company was the size of the Company's loan liabilities that such investors would inherit upon purchase – which thus affected the purchase price.  In connection with putting the Company up for sale in March 2008, defendants shared "nonpublic" information concerning those liabilities with potential acquirers. On April 21, 2008, as defendants announced their rescue by Corsair, defendants filed a Form 8-K with the SEC that attached as an exhibit an "Supplemental Data" presentation. Defendants' April 21, 2008 Form 8-K stated: "Furnished pursuant to this Current Report on Form 8-K as Exhibit 99.1 is an investor presentation that was provided by National City Corporation to certain investors who had previously executed confidentiality agreements" (i.e., Corsair and other potential investors).   That April 21, 2008 Supplemental Data presentation included a slide (reproduced below) revealing that defendants expected $3.3-$3.8 billion in losses from the NHE New Production Loans, the First Franklin Loans, and the construction loans[42]:

---

[42]        The company refused to provide any guidance for ultimate loss expectations for its "non-liquidating" or "core" residential real estate loan portfolios, which had an aggregate loan balance of a further $30 billion.

| Liquidating Portfolio - Loss Expectations | | |
|---|---|---|
| As of March 31, 2008<br>($ in millions) | 3/31 Current Pool Balance | Net Remaining Expected Loss |
| National Home Equity | | |
|  Originated for Portfolio | $4,546 | $300-$400 |
|  Originated for Sale | $6,239 | $1,700-$2,000 |
| | | |
| **Total National Home Equity** | **$10,785** | **$2,000-$2,400** |
| | | |
| Non-Prime Mortgage [(1)] | | |
|  First Liens | $3,978 | $300 |
|  Second Liens | $1,283 | $450 |
| | | |
| **Total Non-Prime Mortgage** | **$5,345** | **$750** |
| | | |
| **Construction - Permanent Portfolio** | **$2,673** | **$650-$725** |
| | | |
| [(1)]  Includes expected mortgage insurance recoveries | | |

386.    The $3.3-$3.8 billion in losses expected from just three of the Company's portfolios – accounting for only $19 billion of the Company's approximately $115 billion in loans – were of an order of magnitude altogether different than anything revealed by defendants during the class period, and revealed the Company's class period loan loss reserves to have been materially false and misleading.  At all times until late October 2007, the Company's loss reserves for all $25-$30 billion plus of its residential real estate loans were no more than $286 million.  In late October 2007, by which time the Company's loan risks and real estate downturns were long, well and fully known by defendants, total reserves for all residential real estate were raised to only $342 million. Thus, throughout 2007, total residential real estate reserves were less than 10% of the losses expected from just three portfolios (which themselves accounted for only roughly half of the

190

Company's residential real estate loans).  In short, the loan reserves established by defendants gave

no indication of the Company's real loan losses.

387.    Fifth and finally, defendants announced financial results for the first quarter

of 2008.  Again, rather than any retained earnings, defendants revealed another sizeable loss of $171

million (this despite more than $500 million of proceeds from the Visa IPO), driven by a $1.39

billion loss reserve increase and $538 million in net charge-offs.  Additionally, defendants doubled

their estimate for 2008 net loan charge-offs (from the $1.0-$1.3 billion announced to January 22,

2008 to $2.0-$2.4 billion).  These massive reserve and charge-off increases were, as defendants

explained, driven by the NHE New Production Loans, the First Franklin Loans and the Construction

Loans.  The Company's April 21, 2008 press release stated:

> Separately, National City released its first quarter results, reporting
> **a net loss for the first quarter of 2008 of $171 million, or $.27 per
> diluted share... The first quarter 2008 loss principally reflects a
> provision for loan losses of approximately $1.4 billion**, partially
> offset by a gain on the redemption of Visa shares of $532 million and
> a release of Visa indemnification liabilities of $240 million.
> *****
> **The provision for loan losses was $1.4 billion in the first quarter
> of 2008,** $691 million in the fourth quarter of 2007, and $122 million
> in the first quarter of 2007. **The higher provision in 2008
> principally reflects further deterioration in the credit quality of
> residential real estate loans, specifically within the liquidating
> nonprime and broker-sourced mortgage and home equity
> portfolios**, as well as the residential construction portfolio.

388.    Defendants' April 21, 2008 disclosures finally revealed the true financial

impact of the Company's loan losses and the true financial condition of the Company.  Both were

substantially worse than previously indicated.  The breathtaking size of the Company's expected

losses, and the sizeable dilution imposed upon the Company's shareholders in the form of a rescue

whose need, size and pain were a direct function of those expected losses, resulted in substantial

market re-evaluation of the value of the Company.  National City's shares lost 27.6% of their

remaining value on April 21, 2008, falling from $8.33 on April 18, 2008 to close at $6.03 on April

21, 2008.

## LOSS CAUSATION / ECONOMIC LOSS

389.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by plaintiffs and the class.

390.     During the class period, plaintiffs and the class acquired National City's stock at artificially inflated prices and were damaged thereby. As detailed in ¶¶ 323-388 above, the price of National City's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed towards the end of and at the end of the class period, causing investors' losses.   As the truth concerning National City's financial condition and concerning the First Franklin, NHE and Construction loan portfolios was disclosed, National City's stock price declined from $27.33 per share on September 5, 2007 to $6.03 per share on April 21, 2008.

391.     National City's share price declines during this time were company-specific, and *cannot* be explained as mere epiphenomena of broader stock price trends in the market as a whole or among National City's industry peers.   As defendants themselves demonstrated in the Company's Form 10-K for 2007, filed with the SEC on February 13, 2008 (i.e., even prior to the Company's share price collapse in March/April 2008), during 2007 National City shares sharply underperformed the most relevant indices of like companies and the broader market as a whole:

192

**Stockholder Return Performance**

Set forth below is a line graph comparing the five-year cumulative total return of National City common stock, based on an initial investment of $100 on December 31, 2002 and assuming reinvestment of dividends, with that of the Standard & Poor's 500 Index (the "S&P 500") and the KBW50 Index (the "KBW50"). The KBW50 is a market capitalization weighted bank stock index developed and published by Keefe, Bruyette & Woods, Inc., a nationally recognized brokerage and investment banking firm specializing in bank stocks. The index is composed of 50 of the nation's largest banking companies.

Five-Year Cumulative Total Return
12/2002-12/2007
National City vs. S&P 500 and KBW50 Index



392.     The above graphic (provided by defendants) understates matters because it is limited to 2007.  National City's shares lost most of their remaining value after 2007 as the depth of the Company's crisis was revealed, falling from $16.46 on December 31, 2007 to $6.03 on April 21, 2008 and below $5.00 per share on June 6, 2007.

393.     During the class period, National City shares lost 83.5% of their value – a fall more than ten times steeper than the one experienced by the market as a whole, and more than three times steeper than the regional banking company index used by defendants as benchmark.  During the same period, the broader stock market as a whole declined only 6.4% (the S&P 500), regional banking companies declined 25.8% (the "KBW50" index that defendants used a Company benchmark), and national banking companies declined 31.6% (the KBW Bank Index).

### ADDITIONAL SCIENTER ALLEGATIONS

394.     As already alleged, defendants' scienter is evidenced by *inter alia*:

(a)     With respect to defendants' misrepresentation of NHE New Production Loan quality and characteristics as "prime quality", and of NCM's output (which included the Construction Loans) as prime, conforming loans, defendants themselves originated those loans and knew *ab initio* that they featured the worst hallmarks of subprime (including, *inter alia*, stated income origination, extremely high LTV/CLTV and often no money down, and piggyback second-lien lending);

(b)     With respect to defendants' reporting of the NHE New Production Loans as "held for sale", defendants (1) were aware from the get go of the loans' subprime qualities, and (2) recognized that, by mid-March 2007, it had become impossible to sell subprime quality loans, as they themselves admitted with respect to the First Franklin loans;

(c)     With respect to defendants' under-reporting of nonperforming loans throughout the class period by more than two-thirds of a billion dollars (including $294 million of First Franklin loans and $260 million of Construction Loans), such under-reporting was

194

accomplished by consistent application of an undisclosed standard (waiting for a loan to go 180 days without payment before declaring the loan to be "nonperforming") that was contrary to defendants' stated standard for declaring and reporting loans to be "nonperforming;

(d)     With respect to defendants' under-provisioning of loss reserves, such under-provisioning was accomplished by consistent application of an undisclosed standard (tying loss reserve provisioning to current charge-off levels) that was contrary to defendants' stated standard for provisioning and maintaining loss reserves (that loss reserves took into account current loan risks and current economic events/conditions) and to defendants' representations that the Company's loss reserves were established on a prospective basis;

(e)     With respect to the Construction Loan misrepresentations and reserve under-provisioning, defendants were aware no later than "late 2006 " of the "bad product design" of those loans, namely: (1) that sharply-declining real estate prices in the geographic locales where the Construction Loans were most concentrated had made it economically absurd for borrowers to continue/complete construction; (2) that, because the borrowers had not needed to provide any down payment, borrowers were absolutely free to and highly likely to default; (3) that, given the way the Construction Loans worked, loss severity upon default would be extreme, not simply because land prices had declined since the Company had advanced the funds for purchase at peak market prices and 100% LTV, but because amounts advanced for partial construction would be almost completely unrecoverable through foreclosure and sale; and (4) that defaults and sharp losses upon default would hit the Company quickly, because the Construction Loans were short-term loans of approximately 12-18 months rather than 30-year mortgages;

(f)     With respect to First Franklin loan loss reserve under-provisioning, defendants were aware prior to the class period of every single loan risk factor and economic condition driving loan losses, including: (1) declining real estate prices, (2) the subprime market collapse in February/March 2007, (3) the consequent impossibility for subprime borrowers to escape looming rate resets, payment shock and default by refinancing, (4) that second-lien loss severity was

195

total, (5) that therefore the driving factor in second-lien losses was their risk of default, (6) that the risk of default for second-lien loans was driven primarily by the larger associated first-lien mortgages and their rate resets, and (7) the specific timing and size of the rate resets of the first-lien mortgages associated with the First Franklin second lien loans, which the Company had been tracking prior to the class period;

(g)     With respect to NHE New Production loan loss reserve under-provisioning, defendants were aware prior to the class period of every single loan risk factor and economic condition driving loan losses, including: (1) that large swathes of the NHE New Production Loans were subprime quality; (2) that subprime loans were unsellable no later than mid-March 2007; (3) that the Company had no choice but to retain the loans and suffer their risks; and (4) that the risks presented by the NHE New Production Loans – nearly all second-liens, nearly half piggybacks – were effectively those of the First Franklin second liens.

### A.    A Strong Inference of Scienter is Raised by the Fact that Defendants Themselves Originated All the Residential Real Estate Loans at Issue, And Were Thus Aware *Ab Initio* of The Loans' Objective Quality

395.    Headlines for the past year have been dominated by the sizeable losses numerous financial institutions suffered as a result of holding complex and opaque "structured finance" securities such as collateralized debt obligations (CDOs) that were ultimately backed by unfamiliar assets (aggregations of thousands of subprime residential real estate loans originated by other institutions) hidden by untrustworthy credit ratings.

396.    Matters here, however, are quite different.  The Company's (and class members') losses did not result from purchasing any such opaque mortgage-backed securities. Rather, the Company's losses were caused by thousands of subprime-quality mortgages *originated by the Company itself*, mortgages whose objective quality and characteristics were directly and always available to defendants.

397.    Each time National City considered whether or not to fund a particular mortgage applied for by a particular borrower for a particular property (such as one NHE New

Production Loan), National City demanded and received relevant data on the mortgage, the borrower and the property, which data served as the basis for National City's decision as to whether or not to lend money. Such data included, *inter alia*: the general creditworthiness of the borrower (e.g., FICO scores); the borrower's income (to be used to determine whether income was sufficient to allow the borrower to have a reasonable chance of paying monthly mortgage payments); the *basis* of that income (i.e., merely "stated" by the borrower or objectively verified and documented); the size of the down payment provided by the borrower, if any; the ratio of the loan's size to the property's value ("loan to value" or "LTV"); the location of the property; and numerous specific features that defined the mortgage (e.g., adjustable rate or fixed, timing and size of rate resets, prepayment penalties, etc.). Furthermore, if the loan was a second-lien, National City demanded and received details on the associated first-lien loan (e.g., loan size, LTV, adjustable rate or fixed, timing and size of rate resets, etc.) so that National City could determine combined debt-to-income ratios and determine combined LTV ("CLTV") ratios to assess the credit risks for the second-lien loan posed by *both* first- and second-lien loan burdens.

398.     In short, the objective characteristics of the residential real estate mortgages held on the Company's loan portfolio were not obscured in any way to defendants and did not present any "late-breaking" surprises to defendants. Rather, those characteristics were known to defendants at mortgage inception – they served as the very basis of the loans National City originated and funded. Each mortgage the Company made existed in the Company's data files as a data record that contained all the relevant details the Company had gathered in the process of originating that mortgage. If a residential real estate loan originated or funded by the Company was originated on a "stated income" basis, that fact was known and recorded. If a residential real estate loan originated or funded by the Company featured a high LTV or CLTV level, that fact was known and recorded. If a residential real estate loan originated or funded by the Company was made to a borrower with FICO scores below prime levels, that fact was known and recorded. If a residential real estate loan originated or funded by the Company was made as piggyback in conjunction with

197

a first-lien mortgage, that fact was known and recorded, together with relevant details of the associated first-lien mortgage.

399.    It was such recorded facts, for example, that allowed defendants to report in their financial statements the average FICO scores and LTV/CLTV ratios for their run-off portfolios of First Franklin and NHE loans (i.e., the NHE Run-Off portfolio).  It was such recorded facts, for example, that allowed defendants – as they explained on their conference calls – to analyze the timing and size of credit risks of the Company's second-lien loans by examining the rate reset schedules of the associated first lien loans (which, when resetting to higher rates, could cause a spike in defaults as combined loan burdens overwhelmed borrower income).  It was such recorded facts, for example, that allowed defendants to understand and demonstrate that the NHE New Production loans, the NHE Run-Off portfolio loans, and the Direct Home Equity portfolio loans *objectively* differed in quality and characteristics despite their all being home equity loans.

400.    Because of these known and recorded facts – not merely available to defendants, but used by defendants as the very grounds to originate and fund the mortgages they did – defendants' misrepresentations and omissions concerning the quality of the Company's mortgages are actionable ones under the securities laws.

401.    For example: defendants represented prior to and during the first half of the class period that NHE's output (the NHE New Production loans) was "prime quality".  Defendants later admitted that, in fact, NHE's output was subprime quality:  in late October 2007, defendants disclosed that nearly half of the NHE New Production loans were in fact "stated income" loans; in January 2008, that the NHE New Production loans had been made at higher CLTV levels to borrowers with lower FICO scores (and thus, as defendants admitted in January 2008, that the "quality and other characteristics of these loans are *visibly* worse than those underwritten for our portfolio" (emphasis added)).  These facts were not born in October 2007 or January 2008 but rather, simultaneously with NHE loan originations during 2006 and 2007, and had been "visible" to defendants long before defendants made such facts publicly visible.  These facts made these loans,

198

objectively and from the very get-go, subprime quality.

**B.     A Strong Inference of Scienter is Raised by the Fact that Defendants Were Required to, and in Fact Did, Monitor the Performance of All the Residential Real Estate Loans at Issue, And Were Thus Aware At All Times of The Loans' Objective Performance**

402.    A strong inference of *scienter* is also raised by the fact that at all times, National City actively monitored the performance of its residential real estate loans, and, specifically, the degree to which those loans were delinquent and/or nonperforming (i.e., the amount of time during which monthly payment had not been received).  At all times, defendants had access to comprehensive computer data about the performance of the Company's loans, allowing defendants to determine, for each residential real estate loan, whether payments were current or not, and, if not, the exact amount of time in which payment had not been received (i.e., the degree of delinquency).

403.    This performance monitoring allowed National City to report, as it was required to, the amount of residential real estate loans that: (1) were "delinquent" (which, as reported by National City, meant a loan that had gone without payment for 90 days or more), and (2) were "nonperforming".

404.    Moreover, as defendants' conference call statements indicated, defendants' knowledge was even more fine-grained.  Defendants monitored 30-60 day delinquencies and 60-90 day delinquencies, and even loans that were not delinquent at all but could foreseeably soon become so:

(a)     For example, defendants, in addition to publicly reporting loans that were delinquent by 90 days or more, also were aware of and actively monitored the amounts of residential real estate loans that had gone without payment for (1) between 30 and 60 days, and (2) between 60 days and 90 days.  Such internal monitoring allowed defendants to see, for example, to what extent and in what amount residential real estate loans were building up to 90-day delinquent levels (at which point they were publicly reported as delinquent) – i.e., to see the extent to which reported delinquency levels would rise.

199

(b)     Likewise, in conference call statements, defendants described how they could "get out in front" of foreseeable problem loans – like second-lien piggybacks associated with first lien loans whose rates would soon reset to higher levels – by contacting second-lien borrowers 90 days before the first-lien mortgage reset to higher rates, and ascertaining whether those borrowers could continue to make payments on the second-lien loan in light of the increased first-lien payment burden.  The First Franklin portfolio contained approximately $2 billion of such second-lien loans, and the NHE New Production loan portfolio contained further billions of such loans.

(c)     Likewise, defendants also described a massive effort to "get out in front" of foreseeable Construction Loan problems, even when such loans were not officially delinquent, by contacting every single Construction Loan borrower and ascertaining whether they intended to keep making payments and/or to continue with or abandon construction plans.

405.    Such monitoring of loans delinquent by 30, 60 or 90 or more days, and such efforts to "get out in front" of First Franklin, NHE New Production and Construction Loans which were not delinquent at all but for which delinquency was foreseeable, gave defendants a wealth of advance knowledge concerning loans that would become "officially" delinquent and proceed to default, charge-off, and loss.

406.    Such knowledge rendered defendants' provisioning of loan loss reserves, and defendants' misrepresentations and omissions concerning the Company's loan loss reserves, actionably false and misleading under the securities laws.  As defendants admitted on January 22, 2008, defendants – during throughout 2007 – had been failing to reserve for loans that had yet to reach charge-off levels.  And, as defendants admitted later still in May 2008, defendants had been, contrary to stated policy, artificially depressing charge-off levels by waiting for 180 days to pass without payment before declaring residential real estate loans to be "nonperforming" (and subsequently or simultaneously charged off).  Thus, by secretly tying actually-established reserves to current charge-off levels (which levels were further artificially depressed by the defendants' undisclosed and extreme delays in charging off loans), defendants were turning a blind eye to the

facts that their monitoring provided to them –namely, a rising wave of early-stage and soon-to-be delinquencies, leading to corresponding waves of default and loan losses.

407.    In short, the loan loss reserves established by defendants did not reflect the facts made available to defendants as a result of their monitoring of loan performance.

**C.    A Strong Inference of *Scienter* is Further Supported by National City's Pending Acquisition of MAF**

408.    As defendants disclosed in National City's July 13, 2007 Effective Registration Statement, defendants Raskind and Daberko communicated to MAF in October 2006 concerning their desire to acquire MAF, a confidentiality agreement allowing negotiations to proceed was signed in November 2006, and negotiations subsequently proceeded through April 2007.  On May 1, 2007, defendants publicly disclosed that an agreement had been reached for National City to acquire MAF.

409.    The MAF acquisition agreement called for National City to pay for MAF by issuing shares of National City stock to MAF shareholders for their MAF shares.  Specifically, each MAF share would be exchanged for a number of National City shares that amounted to $56.00, based essentially on National City's average share price during the 20 days prior to deal closing.  The total value of the MAF acquisition, based on the $56 per share consideration to be paid, was $1.9 billion.  The only unknown, given the acquisition agreement, was how many shares the Company would have to issue to provide $1.9 billion worth of National City shares to MAF shareholders.

410.    This acquisition, and this acquisition structure, provided defendants with strong  motive to maintain the Company's share price at levels as high as possible.  The higher the Company's share price, the fewer the number of new shares the Company would have to issue, and the less dilutive to ownership and earnings the acquisition would be.  To illustrate:

(a)    **Ownership Dilution**.  MAF was a constant, but the shares to be exchanged for MAF would vary.  If the Company paid for MAF with 50 million shares (assuming for

201

illustration's sake that the Company already had 500 million shares outstanding), then the combined company would have 550 million shares, and former MAF shareholders would own 9% while National City shareholders would own 91%. However, if the Company's share price sank so that the Company needed 100 million shares to pay for MAF (rather than the original 50 million), then the combined company would have 600 million shares, and former MAF shareholders would own 17% while National City shareholders would own 83%. In both scenarios, the combined company was in fact the same, but in the first National City shareholders would own 91% of it and in the second only 83%.

(b)     **Earnings Dilution**. Earnings are often measured as earnings per share, and companies are often valued as a multiple of earnings per share. If National City could pay for MAF with 50 million shares (at a high share price) rather than 100 million shares (at a low share price), this would have a less dilutive effect on earnings per share. In both scenarios, combined company earnings stay the same – they are what they are, independent of share issuance. But in the first scenario (50 million shares issued), earnings per share will be greater (implying a higher share price valuation), and in the second scenario (100 million shares issued), earnings per share will be lesser (because of the additional shares issued), implying a lower share price valuation.

411.     The issue of dilution was a very important one, both to the Company's shareholders and to the management that had negotiated the acquisition, because it would provide a fundamental measure of the benefit (or lack thereof) of the acquisition. National City's original expectation was that it would have to issue 50 million shares to purchase MAF, but, as the Company's share price fell between May 2007 and July 2007, the number of shares increased significantly. As defendants revealed during their July 26, 2007, conference call, the acquisition had become significantly more dilutive, because at that point National City would have to issue approximately 64 million shares to purchase MAF, rather than the 50 million originally envisioned:

> JILL HENNESSEY: If National City's stock price stays at its current level, Jeff, how many shares will National City have to issue to complete the MAF acquisition? And how does that figure compare

202

to the original amount of shares you assumed you would issue when you announced the deal? And lastly, by how much does the extra shares reduce your original IRR calculation on the MAF deal?

JEFF KELLY: Okay. The original expectation in terms of shares to be issued for the MAF acquisition was 50 million shares, and at roughly $30 a share, we'd have to issue about 64 million shares. As it relates to IRR, share price or the number of shares we issued doesn't impact the IRR at all, although it obviously will impact going forward the dilution or -- accretion or dilution of the deal.

412.     Moreover, as communicated during the same July 26, 2007 conference call, many analysts concluded that MAF was worth far less than the price the Company had agreed to pay, which only exacerbated the dilution issue (because the National City would be receiving even less [an MAF that was diminished in value] while having to pay ever more shares):

JILL HENNESSEY: Thank you, Jim. And our last question for Peter, what is the breakup fee on the MAF transaction? **It appears that the MAF fundamentals are materially worse than when you signed the agreement. Have you or would you think about changing the terms in the agreement or backing away from the deal completely**?

PETER RASKIND: Well, thanks, Jill. The specifics of the breakup fee in the MAF transaction are publicly disclosed in the S-4 that we filed associated with the transaction. But I think more to the spirit of the question, are we still fully committed to the MAFB transaction? The answer is absolutely yes. MAFB is exactly the right franchise, exactly the right distribution network, to bring us to threshold scale in Chicago, hence our continuing interest in it over the last seven to ten years. And as I've said a couple of times already now this morning, that is a very long-term view on our part. And **while near-term changes in the balance sheet of MAFB or in the overall operating environment may make it easier or more difficult to move through integration, and to realize growth there in the very near term**, it doesn't change our long-term interest in the franchise. We have every intention of proceeding.

413.     Indeed, although the Company's July 13, 2007 Effective Registration Statement had registered approximately 68 million shares to be issued and used in the MAF acquisition, defendants were forced to file a last-minute supplement on August 31, 2007, the day before the MAF acquisition was completed on September 1, 2007, registering an additional 4 million shares needed to fund the acquisition.  Thus, although the Company had initially envisaged paying

for MAF with 50 million shares, it ended up having to issue more than 72 million shares (i.e., almost 50% more).

414.    The MAF acquisition closed on September 1, 2007, as defendants announced on September 4, 2007, with an exchange ratio based on National City's average closing price during essentially the last 20 trading days of August 2007.

415.    Less than one week later, on September 6, 2007, defendants made their first significant partial corrective disclosures, as already alleged.  To summarize, defendants disclosed: (1) that the NHE New Production Loans were unsellable and that approximately $6 billion of them would be repatriated onto the Company's loan portfolio (where they became the single largest source of loan losses, the single largest contributor to the Company's capital and liquidity crises, and the single largest necessitator of the company's $7 billion massively-dilutive bailout); (2) that the Construction Loans suffered from "bad product design" that would cause significant losses and require significant reserve increases; (3) that the First Franklin loans would require further significant reserve increases; and that (4) these and other mortgage-related factors would cause the Company to take approximately $200 million in charges during the third quarter of 2007.

416.    As already alleged, defendants' September 6, 2007 disclosures were only partial and were themselves materially false and misleading.  Nevertheless, those disclosures contained enough bad news to cause the Company's share price to decline from their September 5, 2007 closing price of $27.33 to close on September 6, 2007 at $26.67, and to continue to decline until, two trading days later, on September 10, 2007, the Company's shares closed below $26 per share.

### D.    A Strong Inference of *Scienter* is Further Supported by Defendants' Admissions

417.    Defendant Raskind was interviewed by reporters for the Cleveland Plain Dealer on numerous occasions, including at some point during February 5-12, 2008.  Based on an interview with Raskind during the week prior to February 12, 2008, the Cleveland Plain Dealer published an article on February 12, 2008 titled "How National City's Mortgage Division Lost Half

a Billion Dollars".  The article reported that, while defendant Daberko was the Company's CEO (i.e., prior to August 2007), defendant Raskind (then the Company's President) had wanted to "scale back" on the Company's risky mortgage lending, particularly through brokers (i.e., the NHE New Production Loans):

> National City's new chairman and chief executive, Peter Raskind, said he wanted to scale back a long time ago.  Raskind, who during the boom time oversaw the mortgage businesses, because a vice chairman in 2004.  He became CEO last July and chairman in December.
>
> In an interview last week, Raskind said he particularly wanted to reduce lending through brokers and other risky deals.  It wasn't his decision though.
>
> "As a [management] team, sometimes we agreed and sometimes we didn't," Raskind said.  "At the end of the day, we had one CEO, and David Daberko was that person."

418.    This admission supports the inference that defendant Raskind was aware well prior to August 2007 of the risks being generated by the risky loans the Company was making (particularly the NHE New Production Loans) and had already concluded those risks were excessive.

419.    An inference of scienter is further supported by "resignation" of the Company's Chief Risk Officer for most of the class period, Jim Bell, announced by National City on November 16, 2007, and Bell's replacement by Dale Roskom.  As reported in a January 31, 2008 article published in the American Banker and titled "Risk Chiefs: As the Bar Rises, So Does Demand", defendant Raskind labeled this management change a "key move" in "trying to right the ship", in part because of Roskom's previous risk-management experience and Bell's absence of such experience:

> Mr. Raskind, who took over as Nat City's CEO in mid-2007 with mortgage losses mounting at the Cleveland banking company, has spent the past six months trying to right the ship.  He said key moves included promoting Dale Roskom to chief risk officer.
>
> Mr. Roskom, who joined Nat City in 2006 as executive vice president, had been the chief risk officer of Barclaycard UK, the consumer lending arm of Barclays PLC in the United Kingdom.  He

205

also held senior roles in credit risk and finance at Chase Card Services and at the Australia & New Zealand Banking Group in Melbourne.

To be sure, Mr. Roskom's resume is long on international experience for a company such as Nat City, whose banking operations are mostly in the United States. But Mr. Raskind said what's essential is Mr. Roskom's experience in risk - at a senior management level.

Mr. Raskind, who acknowledged that Nat City overextended itself on risky mortgages, joined the company in 2000 as the head of consumer finance. As the executive overseeing consumer lending and mortgage business, he was at the heart of Nat City's risk-taking. But it was former risk officer Jim Bell who fell on the sword. He abruptly retired in November after a 25-year banking career spent entirely at Nat City.

Mr. Bell, who in 2004 became Nat City's first chief risk officer, previously held senior positions in retail banking and credit administration. But the 2004 appointment was his first run at a position devoted to risk. Mr. Raskind did not single out Mr. Bell, but he did emphasize that deep experience in risk assessment was a paramount and new requirement for the risk officer position now.

"I have to say that our difficulties have been somewhat exacerbated by decisions we made in the past," Mr. Raskind told analysts last week. "We can't change those decisions now, but we can learn from them and run a better company in the future."

E.    **A Strong Inference of *Scienter* is Further Supported by Accounts Provided by Former Employees of National City**

420.    Defendants' scienter is further confirmed by several former National City employees (the "Confidential Witnesses" or "CW's") who spoke to representatives of lead plaintiff.

421.    CW 1 served in an executive capacity at National City prior to the class period and into the first months of the class period.  CW1 reported directly to defendant Rob Rowe, National City's Chief Credit Officer.  CW1 was responsible for the underwriting guidelines and the contents of National City's consumer credit portfolio including, *inter alia*, the NHE loans, as well as the First Franklin subprime portfolio.

422.    CW1 recounted how National City materially slackened up on the credit criteria for the NHE loans when the decision was made to switch to the originate-to-sell model. Prior to the strategy shift, home equity loans were based on an average FICO score of 730, and

reserves were based on the performance of the portfolio, which held up well, according to CW 1, because it was "high-quality paper."

423.    According to CW1, National City began to loosen its home-equity loan underwriting standards in October or November 2006. As a result, according to CW1, each month beginning in late 2006 and continuing into the beginning of the class period, the proportion of stated income loans grew.  National City failed to off-load the risk posed by these poor-quality loans because of poor pipeline management and because investors refused to buy the loans, something that was apparent to CW1 early in the class period.

424.    According to CW1, part of the reason for the deterioration of credit quality of the NHE loans in 2006 is because National City's Secondary Products Group, headed by Timothy Yanoti and Peter McCarthy were brought on board to try to securitize the NHE loans.  Yanoti and McCarthy were first hired to sell the First Franklin subprime loans, but shortly after their hiring, National City decided instead to sell off First Franklin.  Thus, the Secondary Products Group, shortly after being brought aboard, was left with nothing to do.  The solution was to have the Secondary Products Group securitize the NHE loans.  Because the Secondary Products Group were considered to be the experts in this area, National City brass, including  Chief Risk Officer Jim Bell, decided to allow the Secondary Products Group to control the standards and guidelines for the NHE underwriting process.

425.    CW1 confirms that in addition to lax underwriting standards, National City did not have a good pipeline system for keeping track of the home equity loans for sale.  The system in question was made by First Data Resources, and it was, according to CW1, not designed for pipeline management.  The result of using this system, according to CW1, was that individual loans were not tracked very well.  Loans "fell out of trades, and went back into the held-for-sale pool or back into the portfolio."  At the time, NHE was producing about $1 billion per month in home equity loans, but loans fell out of trades that should have been sold.  An employee named Stuart Watterson had to complete complicated manual searches of the system to find lost trades.  The number of trades

207

that fell out of the portfolio balances became significant over time, growing from $20 or $30 million before the class period to as high as $600 million several months into the class period.

426.    CW1 was so concerned about the home equity pipeline problems in the originate-to-sell process at NHE that CW1 wrote a memo just prior or just after the start of the class period, which was sent to, *inter alia*, Jim Bell and Robert Rowe.  The point of the memo was to alert the senior personnel to the risks that the company was running.  While CW1 never got a response, CW1 learned that Bell had sent the memo to John Gorney, who was the head of information technology.  The issue was also discussed at a monthly meeting that CW1 attended of an *ad hoc* team that addressed technology issues at the bank.  The team was led by Bob Manning, who had been the head of loan operations.  The issue was also discussed at a risk management meeting for the home equity business line, and the memos produced for these meetings were received by defendants Bell and Rowe.   However, the company did not, at least during CW1's tenure, resolve the pipeline problem.

427.    On the issue of reserves, CW1 frequently prepared reserve analyses that included a forward-looking forecast.  The recommended reserve rates were sent to defendants Rowe and Bell, who would then uniformly modify those reserves.

428.    CW2 was a trader in National City's Secondary Mortgage Division from before the class period through the end of 2007.  CW2 traded Alt-A second-lien fixed-rate loans and scratch-and-dent loans.  CW2 reported to Steve Simpers, the Vice President of Non-Agency Execution, who in turn, reported to Paul Thomas, Executive Vice President to the Secondary Mortgage Division.  Thomas reported to Buck Bibb, Chief Executive Officer of National City Mortgage.

429.    CW2 confirms that by the spring of 2006, National City traders, including CW2, began to experience difficulty selling loans with riskier attributes, such as second liens.  Around this time, Wall Street stopped buying home equity loans, according to CW2.  The "stated income" portion of the portfolio was growing, and investors, according to CW2, did not like that.

208

Volume began to slow down, and by early 2007, first lien Alt-A loans became difficult to sell, as well.  CW2 had discussions with supervisor Steve Simpers in early 2007, in which Simpers confirmed being aware of the market changes, and had actually remarked that the situation would get a lot worse.

430.    The situation got so bad by May 2007 that CW2 "basically sat around and didn't sell any loans". The others in the CW2's department (there were approximately 12 employees, including the traders in the Secondary Market Division) could not sell any loans either because investors, such as UBS and Bear Stearns, had stopped buying the loans.  By the summer of 2007, CW2's boss, Simpers, had  notified Loan Production that Wall Street was not buying the loans, and suggested to superiors that the company make borrowers' fees higher or stop originating these loans.

431.    CW3 worked at National City starting before the class period through the end of 2007.  CW3 was a Senior Funder in the Wholesale Correspondent Division at National City Mortgage.  CW3 was one of 12 employees who wired funds to correspondents after the loans were closed.  CW3 reported to the Head Funding and Audit Manager, Linda Patton, who reported to Maureen O'Brien, the Assistant Vice President and Operations Manager.  O'Brien reported to Dave Hardwick, the Senior Vice President.

432.    According to CW3, despite news that the mortgage market was slowing down, the Wholesale Correspondent Division did not begin to tighten up on loan standards until October 2007.  According to CW3, the loans that National City Mortgage were funding were low quality, "C and D customers," who had high default rates.

433.    CW3's division was involved in loans that were often not audited, and very often the loan programs included products that allowed borrowers to borrow up to 120% of the value of their homes.  Also, in many instances, the borrowers' debt to income ratio was over 45%, and there was a growing number of stated income loans.  Approximately 35% of the loans that CW3 processed in 2007 were non-conforming loans. Furthermore, in 2007, National City introduced new

209

products, such as a 40-year Second Lien Loan, and other non-conforming products in what was known as the "E Program."  Second mortgages made up 30% of the volume, and National City basically did not audit the home-equity loans they had received from correspondents, despite the fact that at the end of 2006 or early 2007, fraud in the home-equity loans was discovered with several of the correspondents.

434.    Particularly problematic, according to CW3 was that lending standards, which were "always kind of loose," would get much worse at the end of the month.  "In order to make the numbers, it was basically anything goes."  CW3's supervisors Hardwick and O'Brien "let everything go to make the numbers" and several of the correspondents took advantage of this.

435.    When National City's computer system would reject loans because they did not meet the applicable criteria, the correspondents would ask for "exceptions" – i.e., National City accepting a loan despite the fact that it did not meet the criteria.  The exceptions were also known as "overrides," and were approved by the underwriting manager or a higher ranking executive.  According to CW3, underwriters who rejected these loans were told by superiors to push them through.  For example, if the underwriting manager refused to approve a loan, the correspondent went to a vice president who approved the loan.  As CW3 said, "we [National City] were real easy on the exceptions."

436.    While National City had said that it would tighten its standards in May 2007, according to CW3, they did not do that.  CW3 knows that because CW3 "saw it in the files."  CW3, in fact, did not notice any change in the standards until October 2007, when National City finally decided to stop funding certain risky loans and began to refuse the repeated requests for exceptions.

437.    CW4 was the Executive Vice President who headed National City's home equity business unit from before the class period through September 2007.  CW4 confirmed that National City had a problem in operations that impacted their ability to move some of their loans.  National City Operations Group had a back office based in Drexel, Ohio, which handled the filing and storage of paperwork.  It was headed by the Executive Vice President of Operations and

210

Information Services, Jane Grebenc, who reported to Executive Vice President, Jim Sapitro, who in turn, reported to Executive Vice President, Bob Manning.  Grebenc's office was responsible for all documents when those loans closed, according to CW4.  When a sale occurred, Grebenc received the loan files and package for investors' due diligence, and delivered them to the company buying the assets.  This process had to be completed properly in order for National City to succeed with its originate-to-sell strategy.

438.    According to CW4, because Grebenc's group did not have experience handling the paperwork process, there were "a lot of hiccups along the way."  The anticipated turnaround for document delivery to investors should have been 30-60 days from closing, but according to CW4, it usually took far longer than that, and these delays were "making a fairly big impact on profitability."  As a result, many buyers were re-evaluating the pools before National City could get the paperwork delivered, and they were bidding lower or not buying.

439.    CW4 recalls that Countrywide had a bid on two fairly significant pools of home equity loans that should have been delivered in the summer of 2007.  CW4 believes that the pools held more than $2 billion in assets, but when CW4 left National City at the end of September 2007, the loan pools had still not been delivered to Countrywide.

440.    CW4 said that because of the document delay issues, the originate-to-sell model was "very frustrating" because "we were not ready to perform as fast as we needed to."

441.    The problem in moving the loan documents and its effect of sales was communicated to the top executives in National City.  CW4 had a quarterly meeting with, *inter alia*, defendants Daberko, Raskind and Kelly.  Also at the meeting was Rob Crowl, the controller.  These meetings usually lasted about 20 minutes, and the document delay in sales issue was something that CW4 mentioned often, and CW4 also expressed these concerns in writing.

442.    CW4 confirms that the office of the chairman okayed the decision to have Tim Yanoti's Secure Products Group handle the intent to sell the loans once National City adopted the model of selling the home equity loans to the secondary market.  The result was to start pushing to

211

market new products that were "more aggressive on stated income and were higher on loan-to-value ratio."

443.     According to CW4, the decision to sell riskier home equity loans was approved by defendant Raskind.  Furthermore, CW4 recalls that defendant Kelly was telling the business units they could originate anything they wanted to, as long as they could sell.

444.     CW4 confirms that prior to the implementation of originate-to-sell model, National City had "conservative underwriting guidelines," but CW4 confirms that "you could see a difference in performance once we started matching the desires of the secondary market."  At that point, the investors were "dictating to us what the underwriting guidelines should look like."

445.     CW4 recalls that at the very start of 2007, in January or February, there was a "big roll-out" of home equity loans by National City, but "literally within weeks we took them off the market because the secondary market decided they would not buy."  By April 2007, i.e., the start of the class period, "there was a lot of retraction in the secondary market."  CW4 was getting daily feedback from the Secure Products Group on how the home equity product was selling.

## FALSE FINANCIAL STATEMENTS

446.     During the class period, defendants issued financial statements reporting the Company's financial results for the first, second and third quarters of 2007, in the following documents:

(a)     For the first quarter of 2007, defendants: (i) issued a press release on April 30, 2007 containing financial statements for the first quarter of 2007; (ii) filed a Form 8-K with the SEC on the same day, attaching a copy of the press release as well as a more detailed "Financial Supplement" containing financial statements for the first quarter of 2007; and (iii) filed a Form 10-Q with the SEC on May 9, 2007 containing financial statements for the first quarter of 2007.

(b)     For the second quarter of 2007, defendants: (i) issued a press release on July 26, 2007 containing financial statements for the second quarter of 2007; (ii) filed a Form 8-K with the SEC on the same day, attaching a copy of the press release as well as a more detailed "Financial

212

Supplement" containing financial statements for the second quarter of 2007; and (iii) filed a Form 10-Q with the SEC on August 8, 2007 containing financial statements for the second quarter of 2007.

(c)     For the third quarter of 2007, defendants: (i) issued a press release on October 24, 2007 containing financial statements for the third quarter of 2007; (ii) filed a Form 8-K with the SEC on the same day, attaching a copy of the press release as well as a more detailed "Financial Supplement" containing financial statements for the third quarter of 2007; and (iii) filed a Form 10-Q with the SEC on November 13, 2007 containing financial statements for the third quarter of 2007.

447.    For the reasons already alleged in detail above, and summarized below, the documents listed in ¶ 446(a)-(c) were materially false and misleading.  Specifically, the documents and financial statements contained materially false and misleading reported figures for (1) nonperforming loans, (2) loan charge-offs, (3) reserve-to-nonperforming-loan ratios, (4) loan loss reserves, and (5) net income.

448.    **Defendants' reporting of nonperforming loans was materially false and misleading**. Each quarter, defendants reported the amount of loans on the Company's portfolio that were nonperforming.  These nonperforming loan figures were materially false and misleading. Defendants – undisclosed to the class, and in direct contravention of their own stated policy concerning designation of loans as "nonperforming" – secretly delayed designating a loan as "nonperforming" until the loan had gone for half a year without payment.  The result: hundreds of millions of *de facto* nonperforming loans were not reported as "nonperforming", thus making the Company's loan portfolio to *appear* to be performing much better than it in fact was.  On May 12, 2008, defendants belatedly disclosed that their *practice* during the class period had been to wait for 180 days without payment before reporting a loan to be "nonperforming", disclosed that they were now abandoning that practice (and returning effectively to their stated policy), and disclosed that, as a result, an *additional* $688 million of residential real estate loans had been designated nonperforming.  Almost all the loans reclassified as nonperforming in May 2008 were First Franklin

213

loans ($294 million) and Construction loans ($260 million).    The misrepresentation and understatement of these nonperforming loans was material.  Given that the entire Construction loan portfolio was then approximately $2.6 billion, the reclassification revealed an *additional* 10% of the Construction loan portfolio to be nonperforming.  Post-May 2008 reclassification, the number of First Franklin loans reported as nonperforming *quadrupled*.  The nonperforming loans previously hidden by defendants effectively resulted in obscuring approximately half a billion dollars of imminent loan losses, given that nonperforming loans have a high dollar-for-dollar translation into losses (i.e., most default, and, with the Construction loans and First Franklin second-lien loans, loss upon default was near-total).

   449. **Defendants' reporting of charge-offs was materially false and misleading**. Each quarter, defendants reported the amount of loan losses that had been "charged off" against extant loan loss reserves.  These charge-off figures were materially false and misleading.  Loans are only "charged off" (i.e., an actual loss is recognized and charged to the current loan reserve) after they have been declared to be nonperforming (or simultaneously with such declaration).  By secretly waiting for loans to go 180 days without payment before declaring them nonperforming, defendants effected like delays in charge-offs.  This had the effect of materially under-reporting charge-offs during the class period, as loans that *should* have been declared nonperforming and *should* have been charged off were *not* declared nonperforming and were *not* charged off.  Essentially, defendants under-reported actual loan losses during the class period by deferring recognition of the those losses into the future.

   450. **Defendants' reporting of reserve-to-nonperforming loan ratios was materially false and misleading**. Each quarter, defendants reported a ratio comparing the funds held in loan loss reserves to the amount of nonperforming loans.  These ratios were materially false and misleading.  The reserve-to-nonperforming loan ratio is a primary indicator of reserve adequacy: if a company's reserves are a multiple of their nonperforming loans, the company appears well-reserved to absorb portfolio losses in store.  Here, however, defendants materially understated the

amount of nonperforming loans, by as much as two thirds of a billion dollars.  Because nonperforming loans were so understated, the ratio of reserves to nonperforming loans was correspondingly overstated, making it seem as if the Company were more adequately reserved than it in fact was.  The reserve-to-nonperforming-loan ratios reported by defendants through most of the 2007 were above 200% (¶ 137, *supra*).  In fact, given hundreds of millions of dollars of nonperforming loans that defendants failed to report as such, the true ratios were less than half the reported ratios, and below 100% (i.e., reserves were *less* than the amount of nonperforming loans) (¶ 140, *supra*).

      451.  **Defendants' reporting of portfolio loans and "held for sale" loans was materially false and misleading**.  Each quarter, defendants reported the amount of loans held in the Company's portfolio, and, separately, the amount of loans "held for sale".  The reported figures were materially false and misleading.  Defendants – undisclosed to the class, and in direct contravention of their own stated policy concerning designation of loans as "held for sale" – continued to classify as "held for sale" approximately $6 billion of unsellable NHE New Production Loans.  Defendants knew, although the class did not, that the NHE New Production Loans were subprime quality.  Defendants acknowledged in March 2007 that it had become impossible to sell subprime quality loans.  In short, at all times after mid-March 2007, defendants recognized that the subprime quality NHE New Production Loans were *de facto* portfolio loans, but *failed* to report them as such, and thereby materially understated the amount of loans in the Company's loan portfolio by billions of dollars.[43]  This was highly material.  The majority of the NHE New Production Loans were subprime quality second-lien loans, at high risk of default and, upon default, generating 100% loss severity. The Company was required to establish loan loss reserves for loans held in its portfolio.  By holding

---

[43]    Until September 2007, defendants kept the entirety of the NHE New Production loans as "held for sale".  In September and October 2007, defendants admitted the loans were unsellable, and repatriated approximately $4.4 billion of those loans onto the Company's portfolio. However, the Company's financial statements for third quarter of 2007, issued by defendants in October 2007 and November 2007, continued to under-report the amount of loans in the Company's portfolio by still classifying approximately $2 billion of the NHE New Production loans as held for sale.  Those loans were repatriated onto the Company's portfolio only in late December 2007 and January 2008.  As defendants revealed in January 2008, the total amount of repatriated NHE New Production loans was at least $6.4 billion.

the NHE New Production loans off of the loan portfolio, in the "held for sale" warehouse, defendants represented that the Company would not be liable for the losses generated by those loans and made it seem as if the Company did not have to establish loan loss reserves for those loans.  But, in fact, defendants knew the Company had no choice but to be liable for those loans' losses, and needed to establish massive reserves for such losses.

452. **Defendants' valuation of "held for sale" loans was materially false and misleading as a result of defendants' failure to take "fair value" writedowns**.  Each quarter, defendants reported the value of the loans kept in the "held for sale" warehouse.  These figures were materially false and misleading.  Per stated Company policy, valuation of "held for sale" loans was supposed to be at the lower of (1) cost basis or (2) "fair value", defined essentially as market price. As market prices for subprime quality second-lien loans plummeted in early 2007 and even disappeared (i.e., as the true extent of their credit risks became known, the loans were so undesirable that no one wanted to buy them at all), defendants failed to take *any* "fair value" writedowns for the billions of dollars of NHE New Production Loans being "held for sale", despite it being evident (to defendants) that the "fair value" was far lower than the cost basis at which the loans were being carried.  Indeed, it was only *after* defendants admitted in September 2007 that the loans were unsellable and would be transferred to the Company's loan portfolio that defendants *began* to take fair value writedowns (i.e., they took the writedowns when the loans were being moved out of the held for sale warehouse, rather than when the loans were still in the "held for sale" warehouse).[44] The failure to take fair value writedowns was material.  Because there is no requirement to establish loan loss reserves for "held for sale" loans, fair value writedowns are the only mechanism to account for the risk those loans pose.  By failing to take any writedowns, defendants represented that the loans posed zero risk and that the loans were worth at least 100% of the principal lent.  Defendants knew, however, given the risks of those loans and the consequent evaporation of the market for such

---

[44]    Although defendants' subsequent disclosures were vague on the issue, it appears that they took fair value writedowns in the tens of millions of dollars in October 2007/November 2007 (reporting third quarter results) and further writedowns of up to $200 million in December 2007/January 2008 (reporting fourth quarter results).

loans, that the loans posed substantial risk and were no longer worth 100% of principal.  As defendants later admitted, $6.4 billion of NHE New Production loans will generate approximately $2 billion in losses, implying that their fair value is on the order of 70% of their cost basis.

453.    **Defendants' reporting of loan loss reserves was materially false and misleading**.  Each quarter, defendants reported the new "provision" they had made for loan loss reserves during the quarter (i.e., the amount added to extant reserves) and the total loan loss reserves as they stood at the end of the quarter (i.e., including the new provision).  The reported figures were materially false and misleading, for multiple reasons.

(a)    **First, and most simply, defendants failed to reserve a single penny for the Company's NHE New Production Loans until September 2007**, despite (1) being well aware of the risks of those subprime quality second-lien loans and (2) being well aware that, because of those risks, those loans were unsellable and the Company had no choice but to retain them.  In September 2007, defendants admitted they would have to retain the loans, but stated that loss reserves would need be only minor ($20 million).  In October and November 2007, in reporting third quarter results, defendants established a reserve of approximately $113 million for those loans.  This reserve provision was still materially false and misleading, as the risks of those loans were much greater than indicated by that reserve.  In December 2007/January 2008, however, defendants announced a total reserve increase of approximately $700 million, and, in April 2008, a total reserve increase of $1.39 billion – both of which increases were driven in single largest part by the NHE New Production Loans.  In April 2008, defendants also revealed that they expected the NHE New Production Loans to lose approximately $2 billion.

(b)    **Second, and likewise, defendants failed to reserve adequately for the Construction Loans**, despite having long been that those loans, suffering from serious "bad product design", had become a time-bomb.  Defendants had long known that this bomb had been set off by declining real estate prices and the Construction Loans' "bad product design", that the fuse was short (given the short life of the loans), and that the resulting explosion would be imminent and costly

217

(given the bad product design, loss severity would be extreme).  There were more than $3 billion of such loans in the Company's portfolio.  Nevertheless, through September 2007, defendants had set aside only approximately $25 million in reserves.  That is the equivalent of assuming that 2% of the loans will default (i.e., $60 million) and upon default, suffer a 50% loss (i.e., $30 million).  In September 2007, defendants disclosed the bad product design of these loans and stated that they would substantially increase reserves (by approximately $60 million during the remainder of 2007).  In October and November 2007, in reporting third quarter results, defendant disclosed a reserve increase of $51 million for those loans.  But in January 2008 and April 2008, defendants took two further reserve increases of $700 million and $1.39 billion respectively, driven particularly by the Construction Loans and the NHE New Production loans.  In April 2008, defendants admitted that Construction Loan loss severities were between 50% and 95%, and revealed that the remaining $2.6 billion of Construction loans would generate approximately $600 million in losses that would hit the Company quite quickly, mostly in the coming year.  This latter loss figure is equivalent to almost 50% of the Construction Loans defaulting and, upon default, suffering a 50% loss.

(c)     **Third, defendants failed to reserve adequately for residential real estate loans by secretly and improperly tying reserves to current charge-off levels which (i) were a *lagging* indicator of the *current* loans risks and *current* economic conditions that defendants were purportedly reserving for, and which (ii) lagged current conditions yet further as a result of defendants' undisclosed delays in designating loans to be nonperforming and charging them off.**  Defendants represented that the Company's loss reserves were "maintained at a level believed adequate by management to absorb probable incurred losses within the loan portfolio [] based on the size and current risk characteristics of the loan portfolio, an assessment of individual problem loans and actual loss experience, probable recoveries under lender paid mortgage insurance, current economic events in specific industries and geographical areas [] and general economic conditions".  In truth, however, the Company's reserves were not maintained in this manner, and, unbeknownst to the class, turned a blind eye to "current economic events... and general economic conditions".

218

As defendants admitted late in the class period on January 22, 2008, prior class period loan loss reserves had been tied to current charge-off levels (put differently, the Company was not establishing reserves for loans that had yet to reach charge-off status). Charge-offs are a lagging indicator of loan losses, primarily because there is a substantial length of time between when a loan first experiences trouble (i.e., the beginning of payment delinquency) and when it is ultimately charged off. Here, the length of time between incipient signs of loan trouble and ultimate charge-off was further lengthened by defendants' undisclosed practice of waiting for half a year to pass without payment before declaring a loan nonperforming (and subsequently charging it off). Thus, the economic conditions represented by current charge-offs were *not* current economic conditions, but rather the economic conditions that had prevailed six months or more in the past. By tying loss reserves to charge-offs, defendants were reserving for the past rather than the future, and were failing to take into account the current and worsening economic conditions actually being experienced and purportedly being reserved for.

In January 2008, defendants revealed their largest reserve increase to date, $691 million (which would be eclipsed three months later by defendants' next reserve increase of $1.39 billion). Defendants stated that the primary reason for their unprecedented, large reserve increase was "to reflect estimated probable credit losses within the loan portfolio *that have not yet reached charge-off thresholds*." This admission revealed defendants' prior descriptions of the Company's loss reserves, and the prior loss reserves themselves, to have been materially false and misleading. Unbeknownst to the class and directly contrary to defendants' representations, defendants' prior loss reserves failed to reflect probable loan losses from loans that had yet to reach charge-off thresholds.

(d)      **Fourth, the reserves actually taken appeared to be more adequate than they in fact were**, given defendants' above-described under-reporting of nonperforming loans and the consequent over-reporting of reserve-to-nonperforming-loan ratios.

454.    **Defendants' reporting of net income (earnings) was materially false and misleading**. Each quarter, defendants reported the Company's net income. The reported net income

figures were materially false and misleading.  Net income is the amount left over after subtracting, from revenues, (1) expenses, (2) taxes, and (3) loan loss reserve provisions and loan charge offs. As stated above, defendants under-reported loan loss reserves and charge offs. Each dollar that defendants failed to take in provisioning loan loss reserves and in charging off loans was a dollar that flowed into and inflated reported net income.  Net income was therefore overstated by defendants' above-described failure to charge-off nonperforming loans and by defendants' above-described failure to establish reserves adequate to the Construction Loans, the NHE New Production loans, the First Franklin loans and current economic conditions.  Had defendants been charging off loans in the manner publicly represented and objectively warranted, class period charge-offs would have been tens or hundreds of millions of dollars higher, and net income correspondingly lower. Had defendants been reserving for loan losses in the manner publicly represented and objectively warranted, class period loan loss reserve provisioning would have been hundreds of millions of dollars higher, and net income correspondingly lower.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

455.    At all relevant times, the market for National City's common stock was an efficient market for the following reasons, among others:

(a)    National City's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market. The average daily volume of National City shares during the Class Period was 6.27 million shares;

(b)    As a regulated issuer, National City filed periodic public reports with the SEC and the NYSE;

(c)    National City regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)      National City was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

(e)      National City's stock price reacted promptly to all material information, as alleged specifically herein (¶¶ 389-391, *supra*).

456.     As a result of the foregoing, the market for National City's common stock promptly digested current information regarding National City from all publicly-available sources and reflected such information in the price of National City's common stock.  The stock price reacted promptly to all material information, as detailed in ¶¶ 324-391.  Under these circumstances, all persons who purchased or otherwise acquired National City's common stock during the Class Period suffered similar injury through their purchase of National City's common stock at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

457.     Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of: (1) a class (the "class") consisting of plaintiffs and all other persons or entities who purchased or otherwise acquired the common stock of defendant National City between April 30, 2007 and April 21, 2008, inclusive (the "class period") and (2) a subclass of all persons who acquired National City common stock issued pursuant to a National City registration statement filed with the SEC in connection with National City's acquisition of MAF Bancorp, Inc. on or about September 1, 2007 (the "MAF Subclass").  Excluded from the class and the MAF Subclass are the defendants, members of their immediate families, National City and any officer or director of National City.

458.     The class and the MAF Subclass are so numerous that joinder of all members is impracticable.  As of December 31, 2007, approximately 633.9 million shares of National City common stock were outstanding, registered, and listed on the New York Stock Exchange ("NYSE"),

traded under the symbol "NCC."  Approximately 72 million of such shares were issued to members of the MAF Subclass.  Average daily trading volume during the class period was approximately 6.27 million shares.  There are believed to be thousands of persons who purchased National City common stock on the open market during the class period, and thousands of persons who acquired National City common stock as a result of National City's purchase of MAF Bancorp, Inc.

459.    Plaintiffs' claims are typical of the claims of the other members of the class and the MAF Subclass, as plaintiffs and all members of the class and MAF Subclass sustained damages arising out of defendants' conduct in violation of federal law as complained of herein.

460.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and the MAF Subclass and have retained counsel competent and experienced in class action and securities litigation.

461.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the class and MAF Subclass may be relatively small, the expense and burden of individual litigation make it impossible for the members of the class and MAF Subclass individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

462.    Common questions of law and fact exist as to all members of the class, and as to all members of the MAF Subclass, and predominate over any questions affecting solely individual members of the class or MAF Subclass.  Among the questions of law and fact common to the class:

(a)    whether the federal securities laws or the common law were violated by defendants' acts as alleged herein;

(b)    whether statements disseminated by defendants to the investing public and to the shareholders of National City during the class period omitted and/or misrepresented material facts about the business operations and prospects of the Company;

222

(c)     whether defendants acted willfully or recklessly in omitting and/or misrepresenting material facts;

(d)     whether defendants' non-disclosures and/or misrepresentations constituted a fraud on the market by artificially inflating the market prices of National City common stock during the class period; and

(e)     whether the members of the class and MAF Subclass have sustained damages and, if so, what is the proper measure of such damages.

463.     Questions (a), (b) and (e) are also common to the MAF Subclass members.

## NO SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS

464.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of National City who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against National City and the Officer Defendants

465.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

223

466.     During the class period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the class period, did: (i) deceive the investing public, including plaintiffs and other class members, as alleged herein; and (ii) cause plaintiffs and other members of the class to purchase or otherwise acquire National City's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

467.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon acquirers of the Company's common stock in an effort to maintain artificially high market prices for National City's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

468.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about National City's loans, loan performance, loan reserves, loan losses, loan risks, fundamental financial condition and prospects, as specified herein.

469.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of National City's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about National City and its financial condition and its Construction Loans, NHE New Production Loans and First Franklin loans, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course

224

of business which operated as a fraud and deceit upon the acquirers of National City's common stock during the class period.

470.    Each of the Officer Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Officer Defendants were high-level executives and/or directors at the Company during the class period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports, as well as of the characteristics of the loan portfolios described above; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's loans, finances, and operations at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew was, or recklessly disregarded whether it was, materially false and misleading.

471.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing National City's loans, loan performance, loan reserves, loan losses, loan risks, fundamental financial condition and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's loan quality, loan performance, loan reserves, loan losses, loan risks, fundamental financial condition and prospects throughout the class period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to

225

discover whether those statements were false or misleading.

472.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of National City's common stock was artificially inflated during the class period. In ignorance of the fact that market prices of National City's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the class acquired National City's common stock during the class period at artificially high prices and were damaged thereby.

473.     At the time of said misrepresentations and omissions, plaintiffs and other members of the class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the class and the marketplace known the truth regarding the problems that National City was experiencing, which were not disclosed by defendants, plaintiffs and other members of the class would not have purchased or otherwise acquired their National City common stock, or, if they had acquired such securities during the class period, they would not have done so at the artificially inflated prices which they paid.

474.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

475.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the class period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Officer Defendants**

476.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

226

477.    The Officer Defendants acted as controlling persons of National City within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

478.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

479.    As set forth above, National City and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the class suffered damages in connection with their acquisitions of the Company's common stock during the class period.

**THIRD CLAIM**
**For Violation of Section 11 of the Securities Act of 1933**
**By the MAF Subclass**
**Against National City, the Director Defendants, and**
**Defendants Raskind, Daberko, Kelly, and Richlovsky**

480.    This cause of action is brought by plaintiffs, on behalf of the MAF Subclass,

pursuant to section 11 of the Securities Act of 1933, 15 U.S.C. §77k, against National City, the Director Defendants, and defendants Raskind, Daberko, Kelly, and Richlovsky.

481.  On May 1, 2007, defendants announced that it had reached an agreement with MAF Bancorp, Inc. ("MAF") to acquire MAF.  Under the terms of the MAF acquisition agreement, MAF shareholders were to receive, as payment for each MAF share, $56 worth of National City common stock – based essentially on the average closing price of National City shares during the 20 trading days prior to the acquisition's completion.  That average was $28.09 per share. The MAF acquisition was completed on September 1, 2007.

482.  In connection with the Company's acquisition of MAF, defendants filed a registration statement with the SEC for the National City shares that defendants issued to use as the currency with which to acquire MAF.  The effective registration statement for the National City shares to be issued for the MAF acquisition was filed with the SEC by defendants on July 13, 2007, and was declared effective by the SEC on July 13, 2007  (the "Effective Registration Statement"):

(a)  On or about June 27, 2007, defendants filed with the SEC a preliminary registration statement on Form S-4, containing a preliminary proxy statement/prospectus, in connection with the MAF acquisition and the National City shares to be issued for that acquisition (the "Preliminary Registration Statement").

(b)  On or about July 13, 2007, defendants filed with the SEC an amended registration statement on Form S-4/A, containing the final proxy/prospectus, in connection with the MAF acquisition and the National City shares to be issued in that acquisition (the "Effective Registration Statement").  The SEC declared the Effective Registration Statement to be effective on July 13, 2007.

(c)  Additionally, on or about August 31, 2007, defendants filed with the SEC a further amended registration statement on Form S-4/A (the "Additional Registration Statement"). The Additional Registration Statement was a brief document that (1) incorporated by reference the Effective Registration Statement and (2) registered an additional 4 million National City shares now

228

required, given declines in National City's share price since mid-July 2007, for the MAF acquisition.

483.     As the Effective Registration Statement explained, the SEC allows companies to make requisite disclosures through "incorporation by reference" of other, previously-filed documents containing such requisite information.  The information contained in documents "incorporated by reference" becomes, through incorporation by reference, part of the registration statement itself, as the Effective Registration Statement stated ("information incorporated by reference is deemed to be part of this proxy statement-prospectus"):

ADDITIONAL INFORMATION

**This proxy statement-prospectus incorporates important business and financial information about [] National City from other documents filed with the Securities and Exchange Commission** ("SEC")...

*****

**Important business and financial information about [] National City is not included in this proxy statement-prospectus.  This information is incorporated by reference** to documents that [] National City [has] filed, or will file, separately, with the Securities and Exchange Commission...

*****

INCORPORATION BY REFERENCE

The SEC allows National City and MAF to "incorporate by reference" information into this proxy statement-prospectus, which means that **the companies can disclose important information about National City and MAF to you by referring you to another document filed separately with the SEC** rather than providing the information in this proxy statement-prospectus. **The information incorporated by reference is deemed to be part of this proxy statement-prospectus**, except for any information superseded by information contained directly in the proxy statement-prospectus.

484.     Specifically, the Effective Registration Statement and Additional Registration Statement (which incorporated the Effective Registration Statement by reference) incorporated by reference, *inter alia*, the following documents: National City's Form 10-K filed on February 8, 2007; National City's Forms 10-Q filed with the SEC on May 9, 2007 and August 8, 2007; and National

City's Forms 8-K filed with the SEC on April 30, 2007 and July 26, 2007.[45]

485.    The Effective Registration Statement (and the Additional Registration Statement, which incorporated the Effective Registration Statement) contained untrue statements of material facts, was inaccurate and misleading, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described below.

486.    First, the Effective Registration Statement materially misrepresented the nature, quality and credit characteristics of the loans being generated by the Company's National Home Equity unit (the "NHE New Production Loans").

(a)    The Effective Registration Statement stated that the NHE New Production Loans were "prime quality".[46]

(b)    This was false.  In truth, as defendants later admitted, the NHE New Production Loans were of subprime quality, and bore the worst hallmarks of subprime.  Defendants admitted on October 24, 2007 that nearly half of the NHE New Production Loans had been originated on a "stated income" basis.  Defendants admitted on January 22, 2008 that the NHE New Production loans were objectively distinguishable from, and of worse credit quality than, the Company's prime home equity loans, in that the NHE New Production Loans were (1) offered to less creditworthy borrowers, at (2) higher LTV/CLTV levels.  On January 22, 2008, defendant Raskind compared the NHE New Production Loans' origination standards unfavorably to the Company's *subprime* origination standards.

(c)    This was material.  As a direct result of the NHE New Production Loans' subprime quality, misrepresented in and omitted from the Effective Registration Statement,

---

[45]    The Effective Registration Statement represented that each of National City's SEC filings filed "*after* the date of this proxy statement-prospectus and until the offering of the securities terminates will be incorporated by reference into this proxy statement-prospectus and will be a part of this proxy statement-prospectus from the date of filing of that document" (emphasis added).

[46]    Via incorporation of the February 8, 2007 Form 10-K and the May 9 and August 8, 2007 Forms 10-Q.

230

defendants revealed on April 21, 2008 that the Company's $6.4 billion of NHE New Production Loans would generate further losses on the order of $2 billion.

487.    Second, the Effective Registration Statement materially misrepresented the marketability and status of the NHE New Production Loans, and thus their credit risk to the Company

(a)    The Effective Registration Statement: (a) represented that loans reported as "held for sale" were loans that the Company had the "intent and the *ability* to sell" (emphasis added),(b) reported the NHE New Production Loans in their entirety as "held for sale", and (c) did not report any NHE New Production Loans to be part of the Company's loan portfolio.[47]

(b)    These representations were materially false.  In truth, the Company did *not* have the ability to sell the Company's subprime quality NHE New Production Loans: the secondary market for subprime loans had collapsed, and it had been effectively impossible to sell subprime loans since mid-March 2007.  In truth, therefore, the Company had no choice but to retain those loans, so those loans were a *de facto* part of the Company's loan portfolio.  Defendants admitted on September 6, 2007 – less than one week after the MAF acquisition was completed on September 1, 2007 – that the NHE New Production Loans were unsellable, and removed $4.4 billion of the NHE New Production Loans from "held for sale" and onto the Company's loan portfolio.  On January 22, 2008, defendants disclosed that they had transferred a further $2 billion of NHE New Production loans from "held for sale" to the Company's loan portfolio, and had cleaned out the "held for sale" warehouse of all NHE New Production Loans.

(c)    These representations were highly material and misleading, because they rendered invisible the enormous credit risk to the Company of the NHE New Production Loans. Because loans "held for sale" are purportedly loans for which there exists the intent and ability to sell, such loans are understood not to pose a credit risk (because they will be sold, and the purchaser

---

[47]    Via incorporation of the February 8, 2007 Form 10-K and the May 9 and August 8, 2007 Forms 10-Q; additionally, for (b) and (c), via incorporation of the April 30, 2007 and July 26, 2007 Forms 8-K.

231

will bear the credit risk).  Consequently, no loss reserves need be established for potential credit losses from loans being held for sale.  However, defendants did *not* have the ability to sell the NHE New Production Loans they were misrepresenting as "held for sale" – as they admitted less than a week after the MAF acquisition was completed.  Because the loans were unsellable, the Company had no choice but to bear their credit risks.  Those credit risks were enormous: as defendants revealed on April 21, 2008, the $6.4 billion of NHE New Production Loans transferred to the Company's portfolio from the Company's "held for sale" warehouse will yield losses on the order of $2 billion.  The misleading classification of those loans as "held for sale" in the Effective registration statement functioned to represent that the credit risk to the Company of those loans was $0.

488.   Third, the Effective Registration Statement materially misrepresented the value of the NHE New Production Loans being "held for sale".

(a)   The Effective Registration Statement: (a) represented that loans classified as held for sale were valued at the lower of their cost basis or their "fair value", which "fair value" was the current market valuation of the loans; and (b) carried the NHE New Production Loans held for sale at their cost basis.[48]

(b)   In truth, current market valuations of the NHE New Production Loans were substantially *below* the cost basis of those loans, but defendants failed to write down the carrying value of the NHE New Production Loans, and instead reported them at their cost basis.  Defendants so admitted on September 6, 2007, less than one week after completing the MAF acquisition on September 1, 2007.  During a September 6, 2007 conference call, defendant Kelly stated that "frankly, we think the market prices that would exist if we were to attempt to push them off the balance sheet would not represent an economic execution".  Removed of jargon – the NHE New Production Loans could only be sold at a loss (i.e., below their cost basis).

---

[48]   Via incorporation of the February 8, 2007 Form 10-K and the May 9 and August 8, 2007 Forms 10-Q; additionally, for (b), via incorporation of the April 30, 2007 and July 26, 2007 Forms 8-K.

232

(c)     These representations were material.  The Effective Registration Statement overvalued the NHE New Production Loans being held for sale.  Essentially, the Effective Registration Statement represented that the NHE New Production Loans were untroubled assets with unimpaired value, when in fact those loans were deeply troubled assets whose value was fundamentally impaired.

489.    Fourth, the Effective Registration Statement misrepresented the nature, quality and risks of the mortgages being generated by the Company's National City Mortgage unit, and omitted to disclose the nature, quality and risks of the billions of dollars of residential construction loans being generated by National City Mortgage (the "Construction Loans").

(a)     The Effective Registration Statement represented the loans being generated by National City Mortgage to be prime, conforming loans – underwritten pursuant to the safest lending standards and thus eligible for purchase by the GSEs: "National City Mortgage's residential real estate production is primarily originated in accordance with underwriting standards set forth by the government-sponsored entities (GSEs)... National City Mortgage production is sold in the secondary mortgage market primarily to the GSEs... These loans ... have loan-to-collateral value ratios of 80% or less, and are made to borrowers in good credit standing"[49].

(b)     In truth, National City Mortgage was issuing, and the Company was holding, more than $3 billion of Construction Loans, all of which were nonconforming, all of which were originated at LTV levels far higher than 80%, many of which were originated on the basis of stated income, and few or none of which required the borrower to provide any down payment.

(c)     These misrepresentations were highly material.  The credit risks of the highly nonconforming, high-LTV, no-money-down Construction Loans were far greater than the credit risks of prime, conforming loans that the Effective Registration Statement represented to be National

---

[49]     Via incorporation of the February 8, 2007 Form 10-K.  Incorporation of the May 9 and August 8, 2007 Forms 10-Q yielded essentially similar representation: "National City Mortgage (NCM) primarily originates conventional residential mortgages ... These loans are typically sold to primary mortgage market aggregators (Fannie Mae, Freddie Mac, Ginnie Mae, or the Federal Home Loan Banks) and jumbo loan investors".

City Mortgage's output.  The combination of the above-mentioned Construction Loan features, as defendants admitted on September 6, 2007 – less than one week after the MAF acquisition was completed on September 1, 2007 – constituted "bad product design" that left the Construction Loans at extreme risk of default.  This combination of factors constituting the "bad product design" also yielded extreme loss severity upon default – between 50% and 95%, as defendants admitted on April 21, 2008.  On April 21, 2008, defendants revealed that the $2.6 billion of Construction Loans on the Company's loan portfolio would generate losses of approximately $600 million.

490.    Fifth, the Effective Registration Statement materially misrepresented the performance of the Company's residential real estate loans, and in particular the Company's Construction Loans and the Company's subprime loans originated by the Company's former First Franklin unit (the "First Franklin" loans).

(a)    The Effective Registration Statement represented: (a) that the Company declared residential real estate loans to be nonperforming after loans went 90 days without payment; and (b) represented that  there were $536 million of such nonperforming loans as of the first quarter of 2007 and $562 million of such nonperforming loans as of the second quarter of 2007.[50]

(b)    In fact, the Company's actual practice had been to wait for loans to go without payment for 180 days before declaring them to be nonperforming.  As defendants revealed on May 13, 2008, as a result of this undisclosed practice, they had thus understated the amount of nonperforming loans by as much as $688 million (including $260 million of Construction Loans and $294 million of First Franklin loans).

(c)    These misrepresentations were material.  They made the Company's residential real estate loans appear to be performing better than they in fact were, and rendered invisible hundreds of millions of dollars of nonperforming loans.  Nonperforming Construction Loans and nonperforming First Franklin loans were highly likely to default, and upon default to

---

[50]    Via incorporation of the May 9 and August 8, 2007 Forms 10-Q; additionally, for (b), via incorporation of the April 30, 2007 and July 26, 2007 Forms 8-K.

234

result in, respectively, loss severity of 50%-95% (Construction Loans) and 100% (First Franklin second lien loans).  In short, the amount of nonperforming loans (and particularly Construction Loans and First Franklin loans) had a very high rate of translation into actual loan losses and was a direct indicator of imminent loan losses.  The Effective Registration Statement's material understatement of nonperforming loans made the Company's loan loss liabilities appear to be materially less dire than they in fact were.

491.  Sixth, as a direct result of defendants' undisclosed delays in declaring residential real estate loans to be nonperforming, the Effective Registration statement materially misrepresented the adequacy of the Company's loan loss reserves.

(a)  A primary metric of reserve adequacy is the ratio of loan loss reserves to nonperforming loans.  The Effective Registration Statement represented that the reserve-to-nonperforming loan ratio as of the first quarter of 2007 was 226.1%, and as of the second quarter of 2007, 206.1%.[51]

(b)  These ratios were materially false.  Defendants' failure to report nonperforming loans as "nonperforming" resulted directly in inflating the reserve-to-nonperforming loan ratio.

(c)  These misrepresentation were material.  They presented the Company's loan loss reserves as more adequate than they in fact were.  Defendants admitted on May 13, 2008 that $688 million of loans were in fact nonperforming but had not previously been reported as such, as a result of defendants' undisclosed practice of waiting for a loan to go 180 days without payment before declaring it nonperforming.  Adding those $688 million of unreported nonperforming loans to the nonperforming loan amounts reported in the Effective Registration Statement ($536 million as of the first quarter of 2007, $562 million as of the second quarter of 2007) would have the effect of more than halving the reserve-to-nonperforming-loan ratios reported in the Effective Registration

---

[51]  Via incorporation of the May 9 and August 8, 2007 Forms 10-Q as well as the April 30, 2007 and July 26, 2007 Forms 8-K.

Statement, and revealing reserve levels to be less than – rather than double than – the amount of nonperforming loans.

492.    Seventh, as a direct result of defendants' undisclosed delays in declaring residential real estate loans to be nonperforming, the Effective Registration Statement materially misrepresented and understated the Company's current loan losses.

(a)    Residential real estate loans are "charged off" (i.e., a loss is actually recognized and booked) only after a loan is declared nonperforming (or, at best, simultaneously with such declaration).  The Effective Registration Statement represented that net residential real estate charge-offs for first quarter of 2007 were $67 million, and for the second quarter of 2007, $36 million.[52]

(b)    These representations were materially false and misleading.  By failing to declare loans to be nonperforming until 180 days (as opposed to 90 days) had elapsed, defendants instituted like delays in taking charge-offs, with like effects – reported charge-offs were materially understated. Had defendants been following stated policy (as represented in the Effective Registration Statement) with respect to nonperforming loan designation, nonperforming loans and thus charge-offs would have been materially higher.

493.    Eighth, the Effective Registration Statement materially misrepresented the Company's residential real estate loan loss reserves, the principles driving computation and establishment of those reserves, and the risks which those reserves purportedly took into account.

(a)    The Effective Registration Statement stated that the Company's loss reserves were maintained and provisioned at amounts adequate to absorb probable incurred losses given, inter alia, "*current* risk characteristics of the loan portfolio", "*current economic events* in specific industries and geographical areas" and "general economic conditions" (emphasis added):[53]

---

[52]    Via incorporation of the May 9 and August 8, 2007 Forms 10-Q as well as the April 30, 2007 and July 26, 2007 Forms 8-K.

[53]    Via incorporation of the February 8, 2007 Form 10-K and the May 9 and August 8, 2007 Forms 10-Q.

236

**To provide for the risk of loss inherent in extending credit, National City maintains an allowance for loan losses**...
*****
**The allowance for loan losses is maintained at a level believed adequate by management to absorb probable losses inherent in the loan portfolio and is based on the size and current risk characteristics of the loan portfolio, an assessment of individual problem loans and actual loss experience, probable recoveries under lender paid mortgage insurance, current economic events in specific industries and geographical areas, including unemployment levels, and other pertinent factors, including regulatory guidance and general economic conditions**.

(b)      The Effective Registration Statement stated that, on the basis of the above-mentioned principles, the Company's residential real estate loss reserves as of the first quarter of 2007 were $283 million, and as of the second quarter of 2007, $286 million.

(c)      In fact, the Company's method of calculating loss reserves did not adequately account for "current risk characteristics" and "current economic events [and] conditions".  That rendered the reserves established by the Company inadequate to absorb probable incurred losses generated by the current risk characteristics of the Company's residential real estate loans and by then-current economic events and conditions.  As detailed below and admitted by defendants on January 22, 2008, defendants had been failing to reserve for loans whose risks were apparent but which had not yet reached the threshold at which they were charged off.  It takes a long time for a loan to reach such levels: first, a loan becomes delinquent, later it is declared to be nonperforming, and later still it is charged off.  It took a longer time here, as a result of defendants' undisclosed practice of waiting for loans to go 180 days without payment before declaring them nonperforming and subsequently charging them off.  Charge-offs are, essentially, a slowly-moving shockwave conveying information about events set in motion *in the past* – and, here, given defendants' undisclosed 180-day delays, half a year or more in the past (e.g., the economic conditions and events that caused the borrower to stop paying the loan half a year ago).  By basing loan loss reserve provisioning on current charge-off levels – which levels were themselves understated, as already alleged – *defendants' loss reserves were literally behind the times*: they reflected past, rather than

237

current, economic conditions; and they reflected loan risks evident long ago while turning a blind eye to current, evident loan risks (i.e., loans that were delinquent or would foreseeably become so but had not yet reached charge-off levels).  In short, defendants were underfunding the Company's loan loss reserves, creating a situation where they would later have to play "catch up" to the current risks and conditions those reserves were not taking into account.

(i)      The loss reserves and loss reserve increases disclosed in the Effective Registration Statement had been provisioned on the basis of currently-experienced charge-offs.  For example, during the first quarter of 2007, the Company reported $67 million in net residential real estate charge-offs, and added $70 million in residential real estate loss reserve provisioning, leaving the Company with a loss reserve of $283 million.  Similarly, during the second quarter of 2007, the Company reported $36 million in net residential real estate charge-offs, and added $39 million in residential real estate loss reserve provisioning, thus increasing the Company's loss reserve by a net $3 million from the first quarter ($283 million) to the second ($286 million).

(ii)      On January 22, 2008, defendants disclosed a massive reserve increase totaling $691 million, $356 million of which was for residential real estate.  Unlike previous quarters, the reserve increase more than tripled the amount of charge-offs: the Company reported $101 million in residential real estate charge-offs, but increased residential real estate reserves by $356 million, so that residential real estate reserves then totaled $597 million (i.e., double class period levels).  Defendants stated on January 22, 2008 that the large reserve increase had been driven by  "estimated probable credit losses within the loan portfolio that have not yet reached charge-off thresholds".  Defendants had previously failed to reserve for such loans.

(d)      The above-mentioned representations were highly material.  The Company's stated loss reserves did not in fact reserve for the risks which, according to the Effective Registration Statement, they were reserving for; and defendants' actual method of computing loss reserves resulted in systemic underfunding of such reserves given those risks.  The consequent need to play "catch up" to risks and losses long-known overwhelmed the Company's capitalization and liquidity

238

in late 2007 and early 2008 and nearly capsized the Company.  On January 2, 2008, defendants disclosed that the Company was facing a capital shortfall, cut the Company's dividend in half, and announced that it had retained Goldman Sachs as a "capital advisor".  On January 22, 2008, loss reserves were increased by $691 million ($356 million for residential real estate), and on April 21, 2008, by a further $1.39 billion ($860 million for residential real estate).  On April 21, 2008, the remaining half of the Company's dividend was eliminated.  The Company's ability to continue as an ongoing concern was only made certain when, on April 21, 2008, the Company disclosed that it had secured a massive, and massively-diluting, equity infusion of $7 billion, whose breathtaking size and punishing dilution were both a direct function of the Company's expected loan losses – which, as the Company also revealed on April 21, 2008, were approximately $3.5 billion from the NHE New Production Loans, the Construction Loans, and the First Franklin loans.

494.    Ninth and finally, the Effective Registration Statement contained materially false and misleading financial results and financial statements for the first and second quarters of 2007[54], as a result of the above-mentioned factors.

(a)    Reported amounts of portfolio loans were materially understated, and of "held for sale" loans materially overstated, by defendants' misleading misclassification of the NHE New Production Loans in their entirety as "held for sale".

(b)    The value of the NHE New Production Loans held for sale was materially overstated by defendants' misleading valuation of those loans at their cost basis, rather than at their materially lesser "fair value".

(c)    The amounts of nonperforming loans and loan charge-offs were materially understated, and the ratio of reserves-to-nonperforming loans materially overstated, by defendants' practice of waiting for loans to go without payment for 180 days before declaring them to be nonperforming.

---

[54]    Via incorporation of the May 9 and August 8, 2007 Forms 10-Q as well as the April 30, 2007 and July 26, 2007 Forms 8-K.

(d)     The allowance for loan loss reserves was materially understated, as a result of (1) defendants' tying of loan loss reserve provisioning to current charge-off levels, (2) which charge-off levels were themselves materially understated, and of (3) defendants' consequent failure to reserve for current portfolio risks and current economic events and conditions.

(e)     The Company's net income was materially overstated, as a result of (1) defendants' failure to take fair value writedowns for the NHE New Production Loans, (2) defendants' failure to charge off loans on a timely basis, and (3) defendants' failure to reserve adequately for current, known loan risks and economic conditions and events.  Each of the above – writedowns, charge-offs and reserve provisioning – decrease reported net income.  By failing to taking the appropriate writedowns, charge-offs and reserve provisions, defendants inflated the Company's reported net income.

495.    National City was the registrant for the shares issued to plaintiffs and other members of the MAF Subclass pursuant to the Effective Registration Statement.

496.    National City, as the registrant for the shares issued to plaintiffs and other members of MAF Subclass pursuant to the Effective Registration Statement, issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Effective Registration Statement.  As an issuer of the shares, National City is strictly liable to plaintiffs and the MAF Subclass for the material misstatements or omissions.

497.    Defendants Daberko, Raskind, Kelly, Richlovsky, Barfield, Broadhurst, Connor, Healy, McCallister, Ormond, Shaheen, Thornton and Weiss signed the Preliminary Registration Statement, Effective Registration Statement and Additional Registration Statement, either personally or through an attorney-in-fact.  Each of the Officer Defendants was a director and/or senior executive of National City at the time the Effective Registration Statement became effective.

498.    The defendants named herein were responsible for the contents and

240

dissemination of Effective Registration Statement.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for believing that the statements contained in the Effective Registration Statement were true and did not omit any material facts and were not materially misleading.

499.    Plaintiffs and members of the MAF Subclass acquired shares of National City pursuant to, or traceable to, the Effective Registration Statement, and did not know of untrue statements or of omissions of material facts therein.

500.    The valuation of the National City shares issued pursuant to the Effective Registration Statement was $28.09 per share: the average closing price of National City shares during the 20 trading days prior to August 29, 2007. At the time the Effective Registration Statement was filed with the SEC and became effective on July 13, 2007, National City's share price was $33.35.  At the time the Additional Registration Statement was filed with the SEC on August 31, 2007, National City's share price was $26.91.   At the time the MAF acquisition was completed on September 1, 2007, National City's share price was $26.91.

501.    The last closing price of National City's shares prior to the first filing of a complaint asserting claims under the Securities Act of 1933 (i.e., the instant complaint) was $5.23 per per share, on June 12, 2008.

502.    Plaintiffs and the MAF Subclass have suffered damages.

503.    Less than one year elapsed from the times of the violations and facts upon which this complaint is based to the time of filing this action.  Less than three years elapsed from (a) the time that National City stock was *bona fide* issued to plaintiffs and the MAF Subclass pursuant to the Effective Registration Statement, to (b) the time of the filing this action.

### FOURTH CLAIM
### For Violation of Section 15 of the Securities Act of 1933
### Against the Officer and the Director Defendants

504.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 480-503 above as though fully set forth herein.

241

505.    This cause of action is being brought by plaintiffs, on behalf of the MAF Subclass, pursuant to section 15 of the Securities Act of 1933, 15 U.S.C. §77o, against the Officer Defendants and the Director Defendants.

506.    Each of the  Officer Defendants and the Director Defendants was a control person of National City with respect to the Effective Registration Statement by virtue of his/her position as a senior executive officer and/or director of National City.

507.    As a result, the  Officer Defendants and the Director Defendants are liable under Section 15 of the Securities Act for National City's primary violations of Section 11 of the Securities Act.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of plaintiffs and the other class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding plaintiffs and the class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

242

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated:          June 13, 2008                    **KIRBY McINERNEY LLP**


                                    By:         s/ Ira M. Press
                                                Ira M. Press
                                                Alice McInerney
                                                825 Third Avenue, 16th  Floor
                                                New York, NY  10022
                                                Telephone: (212) 371-6600
                                                Facsimile: (212) 751-2540
                                                Email:  ipress@kmllp.com

                                                *Lead Counsel*


                                    **VAN DEUSEN & WAGNER, LLC**
                                    Roger W. Van Deusen
                                    Attorneys at Law
                                    1610 The Hanna Building
                                    1422 Euclid Avenue
                                    Cleveland, Ohio 44115
                                    Telephone: (216) 781-4000
                                    Facsimile: (216) 781-5666
                                    Email: vandeusenr@vwlawyers.com

                                    *Liaison Counsel*


243